112 F.4th 357, *357; 2024 U.S. App. LEXIS 19950, **1; 2024 FED App. 0168P (6th Cir.), ***Cir.)

Limitations > Tolling

**HN2[⬇]** **Statute of Limitations, Equitable Estoppel**

Despite their value, the time limits imposed by statutes of limitations may on occasion be too mechanical and unforgiving. For that reason, the doctrine of equitable tolling permits a court to pause the statute of limitations when some significant impediment beyond the plaintiff's control prevented the plaintiff from filing a timely action. In other words, much of the focus of equitable tolling is the impediment to filing. Thus, the equitable tolling inquiry turns not on the uniqueness of a party's circumstances or the outrageousness of what they endured, but instead on the severity of the obstacle impeding compliance with a limitations period.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Governments > Legislation > Statute of Limitations > Pleadings & Proof

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Governments > Legislation > Statute of Limitations > Time Limitations

**HN3[⬇]** **Standards of Review, De Novo Review**

Although the statute of limitations is an affirmative defense that a plaintiff ordinarily need not plead to state a claim, dismissal of the plaintiff's claim is appropriate when the allegations in the complaint affirmatively show that the claim is time-barred. An appellate court reviews the issue of whether a limitations period has expired de novo.

Governments > Legislation > Statute of Limitations > Time Limitations

**HN4[⬇]** **Statute of Limitations, Time Limitations**

The FTCA requires plaintiffs to file administrative claims with the government within two years after the claims accrued and to commence any legal action within six months after the government denies these administrative claims. *28 U.S.C.S. § 2401(b).*

Civil Procedure > ... > Affirmative Defenses > Statute of Limitations > Borrowing Statutes

Torts > Procedural Matters > Statute of Limitations > Borrowing Statutes

Civil Rights Law > Protection of Rights > Procedural Matters > Statute of Limitations

Governments > Legislation > Statute of Limitations > Time Limitations

**HN5[⬇]** **Statute of Limitations, Borrowing Statutes**

*42 U.S.C.S. § 1983* and claims lack express statutes of limitations, and instead borrow the personal-injury statute of limitations from the state in which the claim arose.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Governments > Legislation > Statute of Limitations > Tolling

Civil Procedure > Appeals > Standards of Review > De Novo Review

**HN6[⬇]** **Standards of Review, Abuse of Discretion**

An appellate court reviews a denial of equitable tolling de novo when the underlying facts are undisputed and for abuse of discretion when there is a factual dispute.

Governments > Legislation > Statute of Limitations > Time Limitations

Governments > Legislation > Statute of Limitations > Tolling

**HN7[⬇]** **Statute of Limitations, Time Limitations**

An equitable tolling analysis generally proceeds in two steps. A court must first determine whether it has authority to equitably toll a particular statute of limitations. When interpreting federal limitations periods, the authority to equitably toll typically exists if the limitations period is not jurisdictional.

Case 5:24-cv-12647-JEL-KGA ECF No. 64-1, PageID.1426 Filed 12/19/24 Page 2 of 100

Page 3 of 14
112 F.4th 357, *357; 2024 U.S. App. LEXIS 19950, **1; 2024 FED App. 0168P (6th Cir.), ***Cir.)

Governments > Legislation > Statute of Limitations > Tolling

HN8[⬇] Statute of Limitations, Tolling

The Sixth Circuit has traditionally considered five factors to determine whether equitable tolling of an FTCA claim is warranted: whether the plaintiff (1) lacked notice of the filing requirement, (2) lacked constructive knowledge of the filing requirement, (3) diligently pursued his rights, (4) would prejudice the defendant in pursuing the claim, and (5) reasonably ignored the filing requirement. Although these factors are not exhaustive, and not all the factors may be applicable in every case, they serve as useful guideposts for our analysis.

Governments > Legislation > Statute of Limitations > Tolling

HN9[⬇] Statute of Limitations, Tolling

The first and second equitable tolling factors look to whether plaintiff had (1) actual notice or (2) constructive knowledge of the filing deadlines. The existence of a publicly available statute setting forth a filing deadline at the very least establishes constructive knowledge. Likewise, a plaintiff has constructive knowledge when his attorney should have known of the filing deadlines.

Governments > Legislation > Statute of Limitations > Time Limitations

HN10[⬇] Statute of Limitations, Time Limitations

The FTCA contains an express statute of limitations provision, which plainly provides notice of the Act's limitations period. 28 U.S.C.S. § 2401(b).

Governments > Legislation > Statute of Limitations > Tolling

Torts > Malpractice & Professional Liability > Attorneys

HN11[⬇] Statute of Limitations, Tolling

An attorney's mistake is typically not grounds for equitable tolling. That is because the lawyer acts as the agent of his client, and the client therefore must bear the risk of attorney error. And the proper remedy for attorney error is generally a legal malpractice suit or an ineffective assistance of counsel claim, not equitable tolling.

Governments > Legislation > Statute of Limitations > Tolling

HN12[⬇] Statute of Limitations, Tolling

Courts have recognized an exception to the general rule that an attorney error does not warrant equitable tolling. When attorney misconduct is extraordinary, as opposed to merely a form of garden variety negligence, equitable tolling may be warranted. For example, a plaintiff might qualify for equitable tolling when his attorney repeatedly ignores his communications, refuses the plaintiff's instructions to submit filings, or never speaks or meets with the plaintiff. Instead, an attorney's being unaware of the date on which the limitations period expired suggests simple negligence.

Governments > Legislation > Statute of Limitations > Tolling

HN13[⬇] Statute of Limitations, Tolling

A plaintiff must have diligently pursued the instant claims during the entire period over which he seeks equitable tolling. That means the plaintiff must have pursued his claims with some regularity during that period, as permitted by his circumstances.

Civil Procedure > ... > Jury Trials > Right to Jury Trial > Actions in Equity

Governments > Legislation > Statute of Limitations > Tolling

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

HN14[⬇] Right to Jury Trial, Actions in Equity

The decision to invoke equitable tolling is a question of law for a court to answer, rather than for a jury.

Case 5:24-cv-12647-JEL-KGA  ECF No. 64-1, PageID.1427  Filed 12/19/24  Page 3 of 100

Page 4 of 14

112 F.4th 357, *357; 2024 U.S. App. LEXIS 19950, **1; 2024 FED App. 0168P (6th Cir.), ***Cir.)

Civil Procedure > ... > Affirmative Defenses > Statute of Limitations > Borrowing Statutes

Torts > Procedural Matters > Statute of Limitations > Borrowing Statutes

Civil Rights Law > Protection of Rights > Procedural Matters > Statute of Limitations

Governments > Legislation > Statute of Limitations > Time Limitations

Governments > Legislation > Statute of Limitations > Tolling

*HN15*[⤓]  **Statute of Limitations, Borrowing Statutes**

*42 U.S.C.S. § 1983* and claims borrow their statutes of limitations from state law. And ordinarily, when the statute of limitations is borrowed from state law, so too are the state's tolling provisions, except when they are inconsistent with the federal policy underlying the cause of action under consideration.

Civil Procedure > ... > Affirmative Defenses > Statute of Limitations > Federal Preemption

Torts > Procedural Matters > Statute of Limitations > Borrowing Statutes

Civil Rights Law > Protection of Rights > Procedural Matters > Statute of Limitations

Governments > Legislation > Statute of Limitations > Time Limitations

Governments > Legislation > Statute of Limitations > Tolling

*HN16*[⤓]  **Statute of Limitations, Federal Preemption**

Because claims, like *42 U.S.C.S. § 1983* claims, borrow state statutes of limitations, the rationale for applying state equitable tolling principles to *§ 1983* claims applies to claims as well.

Governments > Legislation > Statute of

Limitations > Time Limitations

Governments > Legislation > Statute of Limitations > Tolling

*HN17*[⤓]  **Statute of Limitations, Time Limitations**

Under Michigan law, an express statute of limitations ordinarily cannot be equitably tolled.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Voluntary Dismissals > Court Order > Dismissal With Prejudice

Civil Procedure > Dismissal > Voluntary Dismissals > Appellate Review

*HN18*[⤓]  **Standards of Review, Abuse of Discretion**

Dismissal with prejudice is appropriate when the complaint could not be saved by an amendment. An appellate court reviews the dismissal of a complaint with prejudice for an abuse of discretion but apply de novo review to the determination that an amendment would be futile.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN19*[⤓]  **Standards of Review, Abuse of Discretion**

If a district court considers materials outside the pleadings at the motion to dismiss stage, it must ordinarily convert the motion to dismiss into a motion for summary judgment. However, the district court may consider exhibits attached to the complaint, exhibits attached to the motion to dismiss briefing, items in the record, or public records without converting the motion to dismiss when these items are referred to in the complaint and are central to the claims contained therein. The appellate court reviews the district court's treatment of materials outside the pleadings for an

Case 5:24-cv-12647-JEL-KGA   ECF No. 64-1, PageID.1428   Filed 12/19/24   Page 4 of 100

Page 5 of 14

112 F.4th 357, *357; 2024 U.S. App. LEXIS 19950, **1; 2024 FED App. 0168P (6th Cir.), ***Cir.)

abuse of discretion, which occurs when the district court relies on clearly erroneous findings of fact, applies the law improperly, or uses an erroneous legal standard.

**Counsel:** ARGUED: Nabih H. Ayad, AYAD LAW, PLLC, Detroit, Michigan, for Appellant.

John G. Adam, LAW OFFICE OF JOHN G. ADAM, PLLC, Berkley, Michigan, for Appellees Dixon, Groman, Helland, and King.

Cheryl L. Ronk, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellees Jasper, Green, and City of Detroit.

ON BRIEF: Nabih H. Ayad, AYAD LAW, PLLC, Detroit, Michigan, for Appellant.

John G. Adam, LAW OFFICE OF JOHN G. ADAM, PLLC, Berkley, Michigan, Stuart M. Israel, STUART M. ISRAEL, PLLC, Farmington Hills, Michigan, for Appellees Dixon, Groman, Helland, and King.

Cheryl L. Ronk, Gregory B. Paddison, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellees Jasper, Green, and City of Detroit.

ARGUED: Nabih H. Ayad, AYAD LAW, PLLC, Detroit, Michigan, for Appellant.

Jennifer L. Newby, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

ON BRIEF: Nabih H. Ayad, AYAD LAW, PLLC, Detroit, Michigan, for Appellant.

Jennifer L. Newby, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

**Judges:** Before: CLAY, McKEAGUE, [**2] and READLER, Circuit Judges.

**Opinion by:** CLAY

# Opinion

[*361]   [***2] CLAY, Circuit Judge. Plaintiff Richard Wershe, Jr., appeals the district court's dismissal of his complaints in two lawsuits pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. On July 20, 2021, Wershe sued the City of Detroit and federal and state law enforcement officials for violations of his constitutional rights under *42 U.S.C. § 1983* and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)*. Based on the same underlying facts, on October 28, 2022, Wershe also sued the United States for violations of the *Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.* In a consolidated order, the district court dismissed Wershe's complaints with prejudice because Wershe's claims were time-barred. For the reasons set forth below, we **AFFIRM** the district court's order.

[*362]   [***3] **I. BACKGROUND**

**A. Factual Background**

We draw the following facts from Wershe's complaints and take them to be true at the motion to dismiss stage. See *Marvaso v. Sanchez, 971 F.3d 599, 605 (6th Cir. 2020)*.

In 1984, when Wershe was fourteen years old, his father contacted the Federal Bureau of Investigation ("FBI") about a known drug dealer who had begun dating Wershe's sister. FBI Agent James Dixon met with Wershe's father about the dealer, and Wershe's father brought Wershe along. At the meeting, Dixon showed Wershe and his father photographs of neighborhood individuals who were of interest to [**3] the FBI, and Wershe was able to identify most of them.

Based on Wershe's ability to identify neighborhood individuals of interest to the FBI, Dixon began using fourteen-year-old Wershe as a drug informant for a joint task force between the FBI and the Detroit Police Department. To solicit information from Wershe, FBI agents would show up unannounced while Wershe walked to school, to his home, and to other locations, sometimes several times a week or daily. Because Wershe was a juvenile and afraid of law enforcement, he felt he could not refuse. Over the following year, Wershe's involvement with the task force deepened. Federal and state officers, including Defendants Groman, Jasper, and Greene, instructed Wershe to buy and sell drugs, at one point sending him to another state with thousands of dollars to do so.

Wershe's work as a juvenile drug informant placed him in very dangerous situations. As a fourteen- and fifteen-year-old, Wershe was put in proximity to drug trafficking gangs and, by the age of seventeen, experienced multiple attempted shootings. In November 1984, someone shot and nearly killed Wershe, requiring him to be hospitalized and causing injuries to his large intestine. [**4] After using Wershe as an informant for a couple of years, Defendants Groman, Jasper, and

Greene then cut off contact with him. By 1987, Wershe no longer worked as an informant.

On May 22, 1987, Wershe was arrested after officers received a tip connecting Wershe to a large box of cocaine. Subsequently, Wershe was convicted by a jury of possession with intent [***4] to distribute 650 grams or more of cocaine, in violation of *Michigan Compiled Laws § 333.7401(2)(a)(i)* (amended 2002). *See People v. Wershe*, No. 107785, at 1 (Mich. Ct. App. Apr. 30, 1990). For this conviction, Wershe—then seventeen years old—received the statutorily mandated sentence of life imprisonment without parole, *see Mich. Comp. Laws § 333.7401* (1978), although he later became parole eligible based on changes to state law, *see Act to Amend 1953 PA 232, Pub. L. No. 314, Mich. Comp. Laws § 791.234* (1998) (amending Michigan's drug laws to establish parole eligibility for individuals who had been sentenced to life imprisonment without parole).

While Wershe was incarcerated, law enforcement approached him multiple times about cooperating with ongoing investigations. In 1991, Defendants Groman and Helland approached Wershe to participate in "Operation Backbone," an investigation into corruption within the Detroit Police Department and among Detroit politicians. Because Defendant Helland stated that he and Defendant Groman would [**5] do everything in their power to get Wershe released if he cooperated, Wershe agreed to participate. After Operation Backbone resulted in the arrest of multiple Detroit police officers and public officials, Defendant Helland arranged for Wershe to be placed in a witness protection program [*363] while incarcerated. Through this program, Wershe was relocated within the state prison system and received a fake identity.

In 1992, Wershe was again approached by law enforcement officials, including Defendant King, this time to testify before a grand jury against the "Best Friends" gang. Wershe ultimately agreed to participate based on King's promises that Wershe's grand jury testimony would remain sealed and on the condition that King would do everything in his power to get Wershe's sentence commuted.

Wershe became eligible for parole in 2002, and his parole hearing was scheduled for March 2003. Ahead of Wershe's parole hearing, Defendant Helland informed Wershe that neither he nor Defendant King could advocate for Wershe's release because their office did not support Wershe's release. Wershe was denied parole at the 2003 hearing. At the hearing, Wershe observed law enforcement officers reading from [**6] his grand jury testimony regarding the Best Friends gang, contrary to his belief that his testimony would remain sealed.

 [***5] In 2017, Wershe was ultimately granted parole by the Michigan Parole Board. Thereafter, Wershe was immediately transferred to a Florida prison to serve a sentence for an unrelated racketeering charge. Wershe was released from prison on July 20, 2020.

**B. Procedural History**

Based on the above facts, Wershe brought two lawsuits. On July 20, 2021, Wershe brought his first lawsuit, in which he sued: (1) the City of Detroit, (2) two former Detroit police officers (William Jasper and Kevin Greene), (3) two former FBI agents (Herman Groman and the Estate of James Dixon, via its representative Carol Dixon), and (4) several former assistant U.S. attorneys (Lynn Helland, Edward James King, and Unknown Former Assistant U.S. Attorney). Wershe sued the City of Detroit and the former municipal officials (the "City Defendants") under *42 U.S.C. § 1983*, and he sued the former federal officials (the "Individual federal Defendants") under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, which recognizes a cause of action for damages against federal officials. *See 403 U.S. at 389*.

Wershe alleged that [**7] while he was a juvenile informant in the 1980s, the former police officers and FBI agents violated his *Fifth Amendment* substantive due process rights, his *Fourth Amendment* right to be free from government seizures, and his *First Amendment* right to family integrity.[1] He also asserted that the former assistant U.S. attorneys had violated and conspired to violate his *Fifth Amendment* due process rights by allegedly circulating his sealed grand jury testimony ahead of his 2003 parole hearing. Wershe additionally claimed that several Defendants breached a promise to advocate for him at his 2003 parole hearing, in violation of his *Fifth Amendment* due process rights. Finally, Wershe alleged that the City of Detroit was liable for its police department's conduct based on

---

[1] Although Wershe's complaint alleges violations of his due process rights under the *Fifth Amendment*, his claims against the City Defendants fall under the *Fourteenth Amendment's Due Process Clause*. *See Scott v. Clay County, 205 F.3d 867, 873 n.8 (6th Cir. 2000)*.

_Monell_ liability. _See_ _Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)._

[***6] On October 28, 2022, Wershe brought a second lawsuit, in which he sued the United States under the _Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq._ Wershe alleged that the United States was liable for the conduct of the individual [*364] federal Defendants named in the first lawsuit, which he claimed had resulted in the torts of negligence or wanton misconduct, intentional infliction of emotional distress, fraud or negligent misrepresentation, and civil conspiracy.

Defendants in both lawsuits moved to dismiss. Thereafter, the district [**8] court issued a consolidated order in which it granted Defendants' motions to dismiss in both lawsuits and dismissed Wershe's claims with prejudice. The district court reasoned that dismissal was appropriate pursuant to _Federal Rule of Civil Procedure 12(b)(6)_ because Wershe's claims plainly fell outside of the applicable statutes of limitations and Wershe was not entitled to equitable tolling. Wershe then timely appealed the district court's order.

## II. DISCUSSION

_HN1_[⬆] Our legal system recognizes time limits on a party's ability to bring claims. These time limits, reflected in statutes of limitations, serve a number of purposes. They prevent parties from bringing claims long after the "evidence has been lost, memories have faded, and witnesses have disappeared." _CTS Corp. v. Waldburger, 573 U.S. 1, 8, 134 S. Ct. 2175, 189 L. Ed. 2d 62 (2014)_ (quoting _Ord. of R.R. Telegraphers v. Ry. Express Agency, Inc., 321 U.S. 342, 349, 64 S. Ct. 582, 88 L. Ed. 788 (1944)_). They bring "security and stability to human affairs" by disallowing the revival of claims in perpetuity. _Gabelli v. SEC, 568 U.S. 442, 448-49, 133 S. Ct. 1216, 185 L. Ed. 2d 297 (2013)_ (quoting _Wood v. Carpenter, 101 U.S. 135, 139, 25 L. Ed. 807 (1879)_). Whether a plaintiff has a just claim or not, in light of the above considerations, "the right to be free of stale claims in time comes to prevail over the right to prosecute them." _Ord. of R.R. Telegraphers, 321 U.S. at 349._

_HN2_[⬆] Despite their value, the time limits imposed by statutes of limitations may on occasion be too mechanical and unforgiving. _See_ _Holland v. Florida, 560 U.S. 631, 650, 130 S. Ct. 2549, 177 L. Ed. 2d 130 (2010)_. For that reason, the doctrine of [**9] equitable

tolling permits a court to pause the statute of limitations when some significant impediment beyond the plaintiff's control prevented the plaintiff from filing a timely action. _See_ _Waldburger, 573 U.S. at 9_. In other words, much of the focus of equitable [***7] tolling is the impediment to filing. Thus, the equitable tolling inquiry turns "not on the uniqueness of a party's circumstances or the outrageousness of what they endured," but instead on "the severity of the obstacle impeding compliance with a limitations period." _Doe v. United States, 76 F.4th 64, 72 (2d Cir. 2023)_ (internal quotation marks and citation omitted).

These principles are implicated in the case before us today. The district court dismissed Wershe's claims as time-barred. In response, Wershe argues that limitations periods should have been equitably tolled. He also takes issue with the district court's dismissal of his claims with prejudice, rather than without prejudice, and with the district court's treatment of materials outside the pleadings. Without reaching the merits of Wershe's case, we conclude that the district court correctly disposed of Wershe's claims.

## A. Statute of Limitations

Defendants argue that Wershe's claims are barred by the statutes of limitations. _HN3_[⬆] Although the [**10] statute of limitations is an affirmative defense that a plaintiff ordinarily need not plead to state a claim, dismissal of the plaintiff's claim is appropriate when "the allegations in the complaint affirmatively show that the claim is time-barred." _Baltrusaitis v. Int'l Union,_ [*365] _United Auto., Aerospace & Agric. Implement Workers, 86 F.4th 1168, 1178 (6th Cir. 2023)_ (citation omitted). We review the issue of whether a limitations period has expired _de novo._ _Durand v. Hanover Ins. Grp., Inc., 806 F.3d 367, 374 (6th Cir. 2015)._

Wershe's complaints make clear that both his lawsuit under the FTCA and his lawsuit under _§ 1983_ and _Bivens_ were untimely. _HN4_[⬆] The FTCA requires plaintiffs to file administrative claims with the government "within two years" after the claims accrued and to commence any legal action "within six months" after the government denies these administrative claims. _See_ _28 U.S.C. § 2401(b)_. Wershe's most recent FTCA claims accrued when he was denied parole shortly after his March 2003 parole hearing, at which Defendants allegedly committed torts. _See_ _Hertz v. United States, 560 F.3d 616, 618 (6th Cir. 2009)_ (stating that tort claims under the FTCA generally accrue when

the plaintiff is injured). With respect to his most recent FTCA claims, Wershe was therefore required to bring administrative claims shortly after March 2005. See *28 U.S.C. § 2401(b)*. However, Wershe did not file his administrative claims until July [***8] 2021, long after the expiration of the FTCA's [**11] two-year limitations period. And many of Wershe's FTCA claims date even further back because they relate to torts allegedly committed while Wershe was a juvenile informant from 1984 to 1986.

Likewise, the limitations period for Wershe's *§ 1983* and *Bivens* claims expired before Wershe sued the City Defendants and individual federal Defendants. *HN5*[⬆] *Section 1983* and *Bivens* claims lack express statutes of limitations, and instead "borrow the personal-injury statute of limitations from the state in which the claim arose." *Zappone v. United States, 870 F.3d 551, 559 (6th Cir. 2017)*. Because Wershe's *§ 1983* and *Bivens* claims arose in Michigan, they are subject to Michigan's three-year statute of limitations for personal-injury claims. See *Garza v. Lansing Sch. Dist., 972 F.3d 853, 867 n.8 (6th Cir. 2020)* (citing *Mich. Comp. Laws § 600.5805(2)*). Wershe's most recent *§ 1983* and *Bivens* claims are due process claims related to his March 2003 parole hearing. These claims accrued at the time of the parole hearing or at the latest when Wershe was denied parole. See *Bannister v. Knox Cnty. Bd. of Educ., 49 F.4th 1000, 1010-11 (6th Cir. 2022)* (observing that the accrual date for due process claims turns on several considerations and that some due process claims accrue before any adverse consequences flow from the due process violation); see also *Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015)* (noting that *§ 1983* claims accrue when a plaintiff knew or should have known of an injury); *Friedman v. Est. of Presser, 929 F.2d 1151, 1159 (6th Cir. 1991)* (same for *Bivens*). Wershe was therefore required to bring [**12] his most recent *§ 1983* and *Bivens* claims in March 2006 or shortly thereafter, three years from the date of the March 2003 parole hearing or the denial of his parole, but he filed his lawsuit under *§ 1983* and *Bivens* on July 20, 2021. His earlier claims date back to the 1980s, and those claims are therefore even more untimely.

**B. Equitable Tolling**

Wershe does not dispute that his claims fall outside of the applicable statutes of limitations. However, he argues that the district court erred by not equitably tolling his limitations periods. *HN6*[⬆] We review a denial of equitable tolling *de novo* when the underlying facts are undisputed and for abuse of discretion when there is a factual dispute. *Robertson v. Simpson, [***9] 624 F.3d 781, 784 (6th Cir. 2010)*. Because we [*366] assume Wershe's facts to be true at the motion to dismiss stage, "there are no factual disputes" and *de novo* review applies to the issue of equitable tolling in this case. *Amini v. Oberlin Coll., 259 F.3d 493, 498 (6th Cir. 2001)*.

*HN7*[⬆] An equitable tolling analysis generally proceeds in two steps. A court must first determine whether it has authority to equitably toll a particular statute of limitations. When interpreting federal limitations periods, the authority to equitably toll typically exists if the limitations period is not jurisdictional. See *Boechler, P.C. v. Comm'r, 596 U.S. 199, 203, 209, 142 S. Ct. 1493, 212 L. Ed. 2d 524 (2022)*; see also *Irwin v. Dep't of Veterans Affs., 498 U.S. 89, 95-96, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990)*. Wershe's limitations [**13] period with respect to his FTCA claims does not implicate this Court's jurisdiction and is therefore subject to equitable tolling. See *United States v. Wong, 575 U.S. 402, 420, 135 S. Ct. 1625, 191 L. Ed. 2d 533 (2015)*. State law presumptively governs the tolling of Wershe's *§ 1983* claims against the City Defendants and his *Bivens* claims against the individual federal Defendants, so the availability of tolling for those claims will ordinarily depend on the contours of state law. See *Bishop v. Child.'s Ctr. for Developmental Enrichment, 618 F.3d 533, 537 (6th Cir. 2010)*. If equitable tolling is available, the court must next decide whether equitable tolling is warranted based on the governing tolling rules for each claim, as discussed in greater detail for Wershe's claims below.

**1. FTCA Claims**

*HN8*[⬆] This Circuit has traditionally considered five factors to determine whether equitable tolling of an FTCA claim is warranted: whether the plaintiff (1) lacked notice of the filing requirement, (2) lacked constructive knowledge of the filing requirement, (3) diligently pursued his rights, (4) would prejudice the defendant in pursuing the claim, and (5) reasonably ignored the filing requirement.[2] *Zappone, 870 F.3d at 556*. Although

---

[2] As the district court observed, the Supreme Court has applied a different, two-element equitable tolling test to habeas cases. See *Holland, 560 U.S. at 649*. That test equitably tolls a habeas petitioner's claims when the petitioner shows "'(1) that

these factors are not exhaustive, [***10] and not all the factors may be applicable in every case, they serve as useful guideposts for our analysis. See *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 561 (6th Cir. 2000)*. We therefore consider each [**14] factor in turn.

### a. Actual Notice and Constructive Knowledge

*HN9*[⬆] The first and second equitable tolling factors look to whether Wershe had (1) actual notice or (2) constructive knowledge of the filing deadlines. *Zappone, 870 F.3d at 556*. The existence of a publicly available statute setting forth a filing deadline at the very least establishes constructive knowledge. See *Athens Cellular, Inc. v. Oconee County, 886 F.3d 1094, 1101 (11th Cir. 2018)*; [*367] see also *Atkins v. Parker, 472 U.S. 115, 130, 105 S. Ct. 2520, 86 L. Ed. 2d 81 (1985)*. Likewise, a plaintiff has constructive knowledge when his attorney should have known of the filing deadlines. See *Rose v. Dole, 945 F.2d 1331, 1335 (6th Cir. 1991)*.

*HN10*[⬆] These factors weigh against Wershe. The FTCA contains an express statute of limitations provision, which plainly provides notice of the Act's limitations period. See *28 U.S.C. § 2401(b)*. Because the limitations period for an FTCA claim is publicly available, and Wershe's attorneys should have known of it, Wershe was at the very least on constructive notice of his FTCA filing deadlines.

Wershe argues that two attorneys he retained—William Bufalino and Ralph Musilli—mistakenly believed that he would have one year after his release from prison to file claims. According to Wershe, that advice was based on a former Michigan law that tolled a plaintiff's limitations period while the plaintiff was incarcerated. See *Mich. Comp. Laws § 600.5851(1)* (1961) [**15] (amended

---

he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* (quoting *Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005)*). However, our Circuit continues to apply the above five-factor equitable tolling test to FTCA claims and other civil claims "[b]ecause the Supreme Court has never expressly adopted the *Holland* test outside of the habeas context." *Zappone, 870 F.3d at 557*; see also *Menominee Indian Tribe v. United States, 577 U.S. 250, 257 n.2, 136 S. Ct. 750, 193 L. Ed. 2d 652 (2016)* ("[W]e have never held that [*Holland*'s] equitable-tolling test necessarily applies outside the habeas context."). Regardless, applying the *Holland* test to Wershe's claims would not change the outcome of his case.

1993). Even assuming that Michigan law is relevant to the tolling of Wershe's FTCA claims, *but see Zappone, 870 F.3d at 556-57* (applying federal law to the tolling of FTCA claims), Michigan law abolished incarceration as a ground for tolling in 1993, effective April 1, 1994, and impacted individuals were directed to bring suit by April 1, 1995. See *Mich. Comp. Laws § 600.5851(9)* (1993). At best, the legal advice Wershe received would have been mistaken after April 1, 1995.

[***11] *HN11*[⬆] However, an attorney's mistake is typically not grounds for equitable tolling. See *Jurado v. Burt, 337 F.3d 638, 644-45 (6th Cir. 2003)*; see also *Lawrence v. Florida, 549 U.S. 327, 336, 127 S. Ct. 1079, 166 L. Ed. 2d 924 (2007)*. That is because the lawyer acts as "the agent of his client," and the client therefore "must bear the risk of attorney error." *United States v. Wright, 945 F.3d 677, 684 (2d Cir. 2019)* (citation omitted); *accord Damren v. Florida, 776 F.3d 816, 821 (11th Cir. 2015)* (per curiam). And the proper remedy for attorney error "is generally a legal malpractice suit or an ineffective assistance of counsel claim," not equitable tolling. *Jurado, 337 F.3d at 644-45* (citations omitted).

*HN12*[⬆] Courts have recognized an exception to the general rule that an attorney error does not warrant equitable tolling, but that exception does not apply here. When attorney misconduct is extraordinary, as opposed to merely a form of "garden variety" negligence, equitable tolling may be warranted. *Holland, 560 U.S. at 651-52*. For example, a plaintiff might qualify [**16] for equitable tolling when his attorney repeatedly ignores his communications, *id. at 652*, refuses the plaintiff's instructions to submit filings, or never speaks or meets with the plaintiff, *Baldayaque v. United States, 338 F.3d 145, 152 (2d Cir. 2003)*. However, Wershe does not plausibly allege any such extraordinary attorney conduct here. Instead, an attorney's "be[ing] unaware of the date on which the limitations period expired . . . suggest[s] simple negligence." *Holland, 560 U.S. at 652*. While it is possible that Wershe's attorneys were negligent, any such attorney negligence is not grounds for equitable tolling. See *id*. Because Wershe's attorneys should have known of his limitations periods, he had at least constructive knowledge of his filing deadlines. See *Rose, 945 F.2d at 1335*.

### b. Diligence

The next factor looks to whether Wershe diligently pursued the claims he now brings. *Zappone, 870 F.3d*

at 556. _HN13_[⊤] A plaintiff must have diligently pursued the instant claims during the entire **[*368]** period over which he seeks equitable tolling. _See, e.g., Medina v. Whitaker, 913 F.3d 263, 267 (1st Cir. 2019)_; _Rashid v. Mukasey, 533 F.3d 127, 132 (2d Cir. 2008)_; _Alzaarir v. Att'y Gen. of U.S., 639 F.3d 86, 90 (3d Cir. 2011)_ (per curiam). That means the plaintiff must have pursued **[***12]** his claims with "some regularity" during that period, "as permitted by his circumstances." _Smith v. Davis, 953 F.3d 582, 601 (9th Cir. 2020)_ (en banc).

Consulting with legal professionals about bringing claims can certainly contribute to a plaintiff's diligence. _See Gordillo v. Holder, 640 F.3d 700, 705 (6th Cir. 2011)_ (concluding **[**17]** that litigants diligently pursued their claims when three lawyers, a fourth legal professional, and an immigration judge told the litigants that they lacked available relief). However, the mere fact that Wershe consulted with two attorneys about his claims does not establish his diligence over the multiple decades during which he failed to bring suit.

First, Wershe admits that in 2004 he asked his then-attorney about pursuing legal action against Defendants. However, he chose not to bring suit because "there was a real possibility of him being released on parole." No. 4:22-cv-12596, Compl., R. 1, Page ID #22. Wershe therefore discussed his potential claims with an attorney and made a decision to await his parole determination. His decision to delay his lawsuits based on the possibility of parole is not the type of extraordinary circumstance that ordinarily warrants equitable tolling. _See Waldburger, 573 U.S. at 9_.

Wershe also argues that while he was in prison, he feared Defendants would retaliate against him for bringing claims, and that this excuses his delay. Some courts have recognized that a defendant's "specific and credible" threats of retaliation against a prisoner can support equitable tolling. _See, [**18]_ e.g., Doe, 76 F.4th at 72_. As applied to our Circuit's equitable tolling test, a defendant's threats of retaliation sensibly bear on whether a plaintiff was diligent "as permitted by his circumstances," because a plaintiff's circumstances may be affected by such threats. _See Smith, 953 F.3d at 601_. And our Circuit has already acknowledged that retaliation and intimidation can excuse the failure to satisfy other requirements, such as the exhaustion requirement under the _Prison Litigation Reform Act, 42 U.S.C. § 1997e et seq. See Himmelreich v. Fed. Bureau of Prisons, 766 F.3d 576, 577 (6th Cir. 2014)_ (per curiam).

However, while Wershe alleges he feared retaliation by other parties for other conduct, he does not allege facts that plausibly suggest that Defendants ever threatened to retaliate as a result of him bringing suit. _See Doe, 76 F.4th at 72_. For example, Wershe asserts that while **[***13]** incarcerated, he participated in the "Operation Backbone" investigation into political corruption and police corruption in Detroit. As a result of his participation, Wershe was placed in a witness protection program, through which he was given a fake identity and was relocated. While Wershe may have feared retaliation from individuals targeted by Operation Backbone, these allegations do not establish any threats of retaliation by Defendants at all, let alone threats targeted at Wershe **[**19]** bringing suit. In fact, it was Defendant Helland, a former assistant U.S. attorney, who arranged for Wershe's placement in the witness protection program, ostensibly to protect Wershe from any retaliation. Wershe also claims that after he testified before a grand jury against the Best Friends gang, unknown officers circulated his grand jury testimony ahead of his parole hearing. But Wershe fails to demonstrate how this example points to Defendants or is connected to Wershe bringing claims.

**[*369]** Many of Wershe's other allegations amount to a sweeping fear that someone in the justice system would retaliate against him for bringing any legal action. However, such a generalized fear of retaliation is insufficient to warrant equitable tolling. _See id.; Huff v. Neal, 555 F. App'x 289, 296 (5th Cir. 2014)_ (per curiam); _Davis v. Jackson, No. 15-CV-5359, 2016 U.S. Dist. LEXIS 136034, 2016 WL 5720811, at *11 (S.D.N.Y. Sept. 30, 2016)_. Otherwise, any untimely plaintiff who asserted that he was generally fearful of bringing claims would be entitled to equitable tolling. For example, Wershe states that he "was terrified of his captors," No. 4:22-cv-12596, Compl., R. 1, Page ID #15, but such a conclusory allegation "will not suffice" at the motion to dismiss stage, _see Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005)_. He adds that two of his attorneys advised him to forego all legal action for fear of retaliation. **[**20]** However, this does little to establish specific threats of retaliation by Defendants and to turn Wershe's generalized fear of retaliation into a more concrete one.

Furthermore, Wershe's fear of retaliation is made less plausible by the fact that he pursued other legal actions while he was incarcerated, including a suit against members of his parole board. _See Wershe v. Combs, No. 1:12-CV-1375, 2016 U.S. Dist. LEXIS 43150, 2016 WL 1253036, at *1 (W.D. Mich. Mar. 31, 2016)_. He also

112 F.4th 357, *369; 2024 U.S. App. LEXIS 19950, **20; 2024 FED App. 0168P (6th Cir.), ***13

appealed his conviction and sentence and thereafter sought post-conviction relief multiple times. *People v. Wershe*, No. 107785 (Mich. Ct. App. Apr. 30, 1990) (direct appeal); *People v. Wershe*, No. 87-04902 (Mich. Cir. Ct. Apr. 1, 2003) (motion for relief [***14] from judgment); *People v. Wershe*, No. 329110 (Mich. Ct. App. Sept. 29, 2015) (motion for relief from judgment). Insofar as Wershe feared retaliation by anyone in the justice system, it did not prevent him from pursuing these actions, and such actions demonstrate that Wershe had some access to the legal system.

Lastly, Wershe claims that he was diligent because he filed his claims the day before his probation ended. Yet, by this point, Wershe had been released from prison for a year. More importantly, Wershe was required to diligently pursue the instant claims during the full period that he seeks to equitably toll. *See, e.g., Medina, 913 F.3d at 267.* The fact that Wershe brought his claims a year after his release cannot establish his diligence during the multiple decades [**21] for which he seeks equitable tolling. *Cf. Capiz-Fabian v. Barr, 933 F.3d 1015, 1018 (8th Cir. 2019)* ("Large time lapses are a significant obstacle to establishing one has diligently pursued his rights.").

**c. Prejudice to Defendants**

The fourth equitable tolling factor considers whether Defendants would be prejudiced by equitable tolling. *Zappone, 870 F.3d at 556.* This factor weighs strongly against Wershe. Wershe asks this Court to equitably toll his claims not for some small period of time but for decades. Defendants would be prejudiced by such a result. Defendants note that many of the relevant documents would be nearly impossible to locate, that events would be difficult to recall, and that a significant number of would-be witnesses are now dead. *See Cleveland Newspaper Guild, Loc. 1 v. Plain Dealer Publ'g Co., 839 F.2d 1147, 1154 (6th Cir. 1988)* (en banc) (observing that a delay in filing a claim may prejudice a defendant if the delay results in the loss of potential witnesses and evidence). For example, they observe that all of the following have passed away: (1) FBI Agent James Dixon, whom Wershe sues through a representative of Dixon's estate, (2) the two attorneys who allegedly advised Wershe of his statute of limitations, [*370] (3) a Detroit police commander who allegedly ordered someone to kill Wershe, and (4) former Detroit mayor Coleman Young, who Wershe's [**22] appellate briefing claims endangered Wershe.

In fact, Wershe concedes that virtually all relevant documents would be unavailable. He observes that "no direct documentary evidence" exists in this case, that any trial "would be [***15] almost purely testimonial," and that the witnesses would be "Plaintiff and Defendants." *See* No. 23-1903, Appellant's Br. at 47. Nonetheless, because he has the burden of proof, he argues that this would prejudice him more than it would prejudice Defendants. Even assuming that is true, the fact that all the parties would face nearly insurmountable litigation obstacles is of little help to Wershe. The potential prejudice to Defendants is that they might be forced to litigate on Wershe's terms without the help of any documentary evidence that could call his testimony into question. And the extremely limited ability to litigate this case only illustrates that, after so many years, his lawsuits may not be a suitable vehicle for the legal system's function of discerning the truth.

**d. Reasonableness**

The final factor asks whether Wershe's ignorance of his filing deadlines was reasonable. *Zappone, 870 F.3d at 556.* This factor, which overlaps with some of the prior factors, weighs against Wershe. [**23] Insofar as Wershe ignored the filing deadlines because of attorney error, attorney error typically is not grounds for equitable tolling. *Jurado, 337 F.3d at 644-45.* And insofar as Wershe ignored the filing deadlines because of threats of retaliation, as discussed above, his allegations do not plausibly demonstrate that Defendants threatened to retaliate or would have retaliated against him. While Wershe's circumstances are undoubtedly unique, and he alleges a number of concerning facts, his ignorance of the filing deadlines for nearly twenty years for some claims and thirty to forty years for others was not reasonable.

Wershe argues that a jury, not the district court, should have decided whether his ignorance of the filing deadlines was reasonable. At the least, Wershe adds, he was entitled to an evidentiary hearing. *HN14*[↑] However, "[t]he decision to invoke equitable tolling is a question of law for a court to answer," rather than for a jury. *Zappone, 870 F.3d at 562.* And Wershe never sought an evidentiary hearing below. The district court properly addressed the fifth factor of this Circuit's equitable tolling analysis. As the above five factors show, equitable tolling is not warranted for Wershe's FTCA claims.

[***16] **2. _Section 1983_ and _Bivens_ Claims**

Michigan [**24] law presumptively governs the tolling of Wershe's _§ 1983_ and _Bivens_ claims. _See Bishop, 618 F.3d at 537_. Just as with our Circuit's five-factor test, however, Wershe is not entitled to equitable tolling under Michigan law.

_HN15_[↑] _Section 1983_ and _Bivens_ claims borrow their statutes of limitations from state law. _Zappone, 870 F.3d at 559_. And ordinarily, "[w]hen the statute of limitations is borrowed from state law, so too are the state's tolling provisions, except when they are 'inconsistent with the federal policy underlying the cause of action under consideration.'" _Bishop, 618 F.3d at 537_ (quoting _Bd. of Regents v. Tomanio, 446 U.S. 478, 485, 100 S. Ct. 1790, 64 L. Ed. 2d 440 (1980)_). Although past cases have typically applied this principle to other state grounds for tolling, _see id. at 537-38_ (involving a state statute's tolling of a limitations period while the plaintiff was a minor); _Tomanio, 446 U.S. at 485-87_ (looking to state tolling provisions [*371] to determine whether a limitations period could be tolled while the plaintiff pursued a related cause of action), our Circuit has held in multiple unpublished cases that a state's equitable tolling principles likewise govern _§ 1983_ claims. _See, e.g., Roberson v. Macnicol, 698 F. App'x 248, 250 (6th Cir. 2017)_ (considering the possibility of applying Michigan equitable tolling rules); _Helm v. Ratterman, 778 F. App'x 359, 369 (6th Cir. 2019)_ (applying Kentucky's equitable tolling statute). _But cf. Martin v. Somerset County, 86 F.4th 938, 944-45 (1st Cir. 2023)_ (identifying as an open question in the First Circuit whether state or federal law governs [**25] the equitable tolling of _§ 1983_ claims). _HN16_[↑] Because _Bivens_ claims, like _§ 1983_ claims, borrow state statutes of limitations, the rationale for applying state equitable tolling principles to _§ 1983_ claims applies to _Bivens_ claims as well.

Turning to Michigan's tolling rules, Wershe has not satisfied his burden of pointing to any Michigan law that persuades us to toll his _§ 1983_ and _Bivens_ claims; nor is such law apparent. _See Robertson, 624 F.3d at 784_. Wershe does not argue, nor does he appear to qualify, for any of Michigan's statutory grounds for tolling.[3] _See,_

_e.g., Mich. Comp. Laws § 600.5855_ [***17] (tolling the limitations period where the defendant fraudulently conceals a claim); _id. § 600.5854_ (tolling the limitations period where the plaintiff is unable to bring suit due to war); _id. § 600.5856(a)_ (tolling the limitations period where the complaint is filed but not yet served). _HN17_[↑] And under Michigan law, an express statute of limitations ordinarily cannot be equitably tolled. _See Secura Ins. Co. v. Auto-Owners Ins. Co., 461 Mich. 382, 605 N.W.2d 308, 311 (Mich. 2000)_ (per curiam). Because Wershe's _§ 1983_ and _Bivens_ claims are governed by Michigan's express three-year statute of limitations for personal-injury claims, _Mich. Comp. Laws § 600.5805(2)_, equitable tolling appears to be unavailable under Michigan law.

We need not decide if Michigan's tolling rules are "inconsistent with the federal policy underlying [_§ 1983_ and [**26] _Bivens_]" and thus require the application of federal equitable tolling rules. _See Bishop, 618 F.3d at 537_ (quoting _Tomanio, 446 U.S. at 485_); _see, e.g., Battle v. Ledford, 912 F.3d 708, 715 (4th Cir. 2019)_. Wershe has not made that argument on appeal. And even if federal equitable tolling principles governed Wershe's _§ 1983_ and _Bivens_ claims, we have already concluded that Wershe is not entitled to equitable tolling under federal law. _See supra_ Section II.B.1.

Under both this Circuit's five-factor test and under Michigan law, Wershe cannot avail himself of equitable tolling, and his claims are therefore time-barred. We thus need not consider several additional arguments made by Defendants, such as that Wershe's "unclean hands" preclude equitable tolling. Without reaching the merits of Wershe's claims, we conclude that it was proper for the district court to dismiss Wershe's complaints.

[*372] **C. Dismissal with Prejudice**

Wershe argues that even if his claims are time-barred, the district court erred by dismissing his complaints with prejudice and, therefore, without leave to amend. Rather, he claims the district court should have permitted him to amend his complaints to add

---

[3] Wershe previously would have qualified for two of Michigan's statutory grounds for tolling, but neither applies now. First, Michigan law formerly would have tolled Wershe's claims while he was incarcerated, but that ground was repealed in 1993, effective April 1, 1994. _See Mich. Comp. Laws § 600.5851(1)_

(1961) (amended 1993). Second, when a limitations period expires while the plaintiff is a minor, Michigan law affords the minor a one-year grace period to file claims after the minor turns eighteen years old. _See id. § 600.5851(1)_. However, to the extent that any of Wershe's limitations periods expired while he was a minor, his one-year grace period has long passed because he turned eighteen years old in 1988. _See id._

allegations that Defendants directly threatened him with retaliation. _HN18_[⚓] Dismissal with prejudice is appropriate [***18] when "the complaint could [**27] not be saved by an amendment." _Stewart v. IHT Ins. Agency Grp., LLC, 990 F.3d 455, 457 n.1 (6th Cir. 2021)_. We review the dismissal of a complaint with prejudice for an abuse of discretion but apply _de novo_ review to the determination that an amendment would be futile. _See id._

The district court did not err by dismissing Wershe's complaints with prejudice. Wershe never moved to amend his complaints for the purpose of curing his statute of limitations deficiencies before the district court. _Cf. Printup v. Dir., Ohio Dep't of Job & Fam. Servs., 654 F. App'x 781, 791 (6th Cir. 2016)_ (affirming the dismissal with prejudice of a plaintiff's timebarred complaint where the plaintiff never moved to amend the complaint and an amendment would have been futile). Furthermore, Wershe does not point to any specific allegations he could add that would change the statute of limitations or equitable tolling inquiries. _See Indep. Tr. Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 943 (7th Cir. 2012)_ (affirming dismissal with prejudice where a plaintiff "did not offer any meaningful indication of how it would plead differently"). In fact, Wershe does not contest that the applicable statutes of limitations have expired. His claims clearly fall far outside of the applicable statutes of limitations, and any amendments to cure the statute of limitations deficiencies would plainly be futile.

Similarly, Wershe does not identify any particular [**28] allegations that could save his equitable tolling arguments. Of course, it is always possible that a plaintiff may allege some new fact, unknown to this Court now, that makes equitable tolling more compelling. But no such facts are apparent in Wershe's case, given his decades-old claims and the lack of available evidence to litigate his suits.

Wershe argues that he was caught off guard by the district court's focus on whether Defendants issued any specific threats of retaliation. Accordingly, he claims that he should be permitted to add such allegations to his complaint. However, it was Wershe's complaints that introduced the idea that equitable tolling could be based on threats of retaliation. Even on appeal, Wershe does not make any new allegations that plausibly identify specific threats of retaliation by Defendants. He only generally remarks that he "could have obtained more affidavits and/or facts." No. 23-1902, Appellant's Br. at 59; No. 23-1903, Appellant's Br. at 58. [***19] Because

no amendments appear able to save Wershe's time-barred claims, dismissal with prejudice of Wershe's complaints was proper.

**D. Materials Outside the Pleadings**

Lastly, Wershe challenges the district court's [**29] handling of materials outside the pleadings. _HN19_[⚓] If a district court considers materials outside the pleadings at the motion to dismiss stage, it must ordinarily convert the motion to dismiss into a motion for summary judgment. _Mediacom Se. LLC v. BellSouth Telecomms., Inc., 672 F.3d 396, 399 (6th Cir. 2012)_. However, the district court may consider exhibits attached to the complaint, exhibits attached to the motion to dismiss briefing, items in the record, or public records without converting the motion to dismiss when these items "are referred to in the [c]omplaint [*373] and are central to the claims contained therein." _Bassett v. NCAA, 528 F.3d 426, 430 (6th Cir. 2008)_. We review the district court's treatment of materials outside the pleadings for an abuse of discretion, _see Wysocki v. Int'l Bus. Mach. Corp., 607 F.3d 1102, 1104 (6th Cir. 2010)_, which occurs when the district court "relies on clearly erroneous findings of fact, applies the law improperly, or uses an erroneous legal standard," _United States v. Pembrook, 609 F.3d 381, 383 (6th Cir. 2010)_.

Wershe first takes issue with the district court's failure to consider three affidavits attached to his complaints that allegedly established his fear of retaliation, as well as other evidence attached to his motion to dismiss briefing. However, while this Circuit's case law permits the district court to consider such evidence at the motion to dismiss stage if it is central to the plaintiff's claims, [**30] nothing requires the district court to do so. _See Bassett, 528 F.3d at 430_. In this case, the district court reasonably concluded that "many of the submitted exhibits"—both those submitted by Defendants and by Wershe—fell "well outside of the complaint's central claims." No. 4:21-cv-11686, Consol. Order, R. 73, Page ID #1418; No. 4:22-cv-12596, Consol. Order, R. 20, Page ID #213. It was not an abuse of discretion for the district court to do so. In any case, these affidavits do not allege any specific threats of retaliation, and seemingly do not change the equitable tolling analysis given the strength of the factors weighing against equitable tolling.

[***20] Wershe next argues that the district court improperly considered Defendants' evidence but refused to consider Wershe's evidence. Specifically, the district

court took notice that Wershe had sued his parole board and the prison warden, and had also challenged his conviction. However, unlike the affidavits and other evidentiary materials that Wershe and Defendants incorporated by reference into the pleadings, here the district court simply took notice of other judicial proceedings. And it took notice of these lawsuits "not for the truth of the facts recited therein, [**31] but for the existence of the [suits]." *Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565, 576 (6th Cir. 2008)* (citation omitted). It is "well-settled" that courts may do just that, *see Lyons v. Stovall, 188 F.3d 327, 332 n.3 (6th Cir. 1999)*, including at the motion to dismiss stage, *see Winget, 537 F.3d at 576*; *see also Fed. R. Evid. 201(d)*. The district court did not err in doing so.

## III. CONCLUSION

A number of Wershe's allegations, if true, are deeply troubling. That said, we cannot move forward with adjudicating Wershe's claims because his statutes of limitations have long expired. For the reasons set forth above, we **AFFIRM** the district court's dismissal of Wershe's complaints.

---

**End of Document**

No *Shepard's* Signal™
As of: November 20, 2024 4:49 PM Z

## *Wershe v. City of Detroit*

United States District Court for the Eastern District of Michigan, Southern Division

August 1, 2024, Decided; August 1, 2024, Filed

Case No. 21-11686

**Reporter**
2024 U.S. Dist. LEXIS 136543 *; 2024 WL 3625312

RICHARD WERSHE, JR., Plaintiff, v. THE CITY OF DETROIT, et al., Defendants.

**Prior History:** *Wershe v. City of Detroit, 2022 U.S. Dist. LEXIS 39200, 2022 WL 612390 ( E.D. Mich., Mar. 2, 2022)*

## Core Terms

sanctions, Defendants', motion for sanctions, equitable tolling, proceedings, attorney's fees, vexatiously, assertions, safe harbor provision, multiplied, frivolous, expenses, opposing party, existing law, circumstances, limitations, retaliation, untimely, argues, cases, advisory committee note, unwarranted, grounded, lawsuit, Courts, counts, parole, prison, rights, costs

**Counsel:** [*1] For Richard Wershe, Jr, Plaintiff: Nabih H. Ayad, Ayad Law, P.L.L.C., Detroit, MI.

For City of Detroit, William Jasper, Kevin Greene, Defendants: Gregory B. Paddison, City of Detroit, Law Department, Coleman A. Young Municipal Center, Detroit, MI.

For Herman Groman, Carol Dixon, as Represenative of the Estate of James Dixon, Edward James King, Lynn A. Helland, Defendants: John G. Adam, Law Office of John G. Adam, PLLC, Royal Oak, MI; Stuart M. Israel, Stuart M. Israel PLLC, Farmington Hills, MI.

**Judges:** F. Kay Behm, United States District Judge.

**Opinion by:** F. Kay Behm

## Opinion

### ORDER DENYING *BIVENS* DEFENDANTS' MOTION FOR SANCTIONS (ECF No. 77) AND DENYING PLAINTIFF'S COUNTER-REQUEST FOR SANCTIONS

(ECF No. 80)

### I. INTRODUCTION

This case is before the court on Defendants Carol Dixon, Herman Groman, Lynn Helland, and E. James King's (the "*Bivens* Defendants") motion for sanctions. (ECF No. 77). This motion follows a lengthy civil rights litigation involving two related cases: *Wershe v. City of Detroit*, Case No. 21-11686 ("*Wershe I*"), the present matter, and *Wershe v. United States*, Case No. 22-12596 ("*Wershe II*"). Both cases, *Wershe I* and *Wershe II* were dismissed by this court on September 18, 2023 in a consolidated Opinion [*2] and Order finding that Plaintiff's claims were barred by the relevant statutes of limitations. (ECF No. 73, PageID.1412). Following the dismissal of Plaintiff's claims, the *Bivens* Defendants moved for sanctions against Plaintiff Wershe and his attorneys pursuant to *Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, Federal Rule of Civil Procedure 54(d)(2)*, and *Eastern District of Michigan Local Rule 54.1.2.* (ECF No. 77, PageID.1444). Specifically, they ask for sanctions "in the form of a fee award for legal work done by the *Bivens* defendants' attorneys in defending against Wershe's untimely and unwarranted claims." *Id.*, PageID.1444; 1446 ("we ask for an award of fees at market rates, jointly and severally payable to the *Bivens* defendants' attorneys by Wershe and his attorneys"). Wershe filed a response on October 27, 2023, arguing not only that the motion should be denied, but also that the *Bivens* Defendants and/or their counsel should be sanctioned under *Fed. R. Civ. P. 11* for the filing of this motion for sanctions. (ECF No. 80, PageID.1597). The *Bivens* Defendants filed a reply on October 30, 2023. (ECF No. 81). Pursuant to *E.D. Mich. LR 7.1(f)(1)*, the court finds that oral argument would not aid in the resolution of this motion, and now decides it on the parties' briefs alone. For the reasons stated below, the court denies both the *Bivens* Defendants' [*3] motion and Plaintiff's request for sanctions.

2024 U.S. Dist. LEXIS 136543, *3

## II. BACKGROUND

The court will not recount the extensive factual history of this case in full, but incorporates by reference the factual background section from the court's consolidated Order issued on September 18, 2023. (ECF No. 73). In short, Plaintiff's claims stem from allegations that he was "indoctrinated into criminal society" as a child by officers from the Federal Bureau of Investigation (FBI) and the Detroit Police Department (DPD), who allegedly recruited him to serve as a confidential drug informant for a joint FBI/DPD "taskforce." (See ECF No. 4, PageID.88, 125). Plaintiff was eventually arrested, convicted of possessing 7,933.8 grams of cocaine, and sentenced to life in prison without the possibility of parole under Michigan's "650-lifer law." *Id.*, PageID.95. Following reforms to the "650-lifer law," Plaintiff became eligible for parole in 2002, and was granted parole in 2017. *Id.*, PageID.98, 105. Upon his release from prison in Michigan, he was immediately transferred to a Florida prison, where he served five years on a separate racketeering conviction. *Id.*, PageID.104. In total, Plaintiff served 32 years and seven months in [*4] prison before he was released on July 20, 2020. *Id.*, PageID.105.

On July 20, 2021, Plaintiff filed the present matter, *Wershe I*, against the City of Detroit, William Jasper, Kevin Greene, the four *Bivens* Defendants (Carol Dixon, Herman Groman, Lynn Helland, and E. James King), and an unknown Assistant United States Attorney.[1] *Id.*, PageID.82; see also ECF No. 1. Plaintiff's first amended complaint, filed on September 14, 2021, brought a number of claims under *42 U.S.C. § 1983* and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)*, for alleged violations of his constitutional rights. (ECF No. 4). Plaintiff filed his second case, *Wershe II*, on October 28, 2022, against the United States of America.[2] (*Wershe II*, ECF No. 1). *Wershe II* brought seven tort claims under Michigan law pursuant to the *Federal Tort Claims Act (FTCA), 28 U.S.C. §*

*1346(b)*. *Id.* Defendants in both cases filed motions to dismiss the relevant counts. (See *Wershe I*, ECF Nos. 8, 34; *Wershe II*, ECF No. 6).

On July 19, 2023, the court held a hearing in both cases, *Wershe I* and *Wershe II*, which was "limited in scope to the statutes of limitations applicable to Plaintiff's claims." (See ECF No. 58). The court issued a consolidated Opinion and Order on September 18, 2023, finding "Plaintiff's claims [*5] in both *Wershe I* and *Wershe II* were untimely under the relevant statutes of limitations" and Plaintiff's "generalized fear of retaliation" did not entitle him to equitable tolling. (ECF No. 73, PageID.1433). As such, the court dismissed all of Plaintiff's claims in both cases. *Id.*, PageID.1438. Approximately one month later, on October 11, 2023, the *Bivens* Defendants filed the present motion for sanctions against "Ayad Law PLLC, Nabih H. Ayad, and William D. Savage — who signed and advocated Wershe's 'verified' complaints and later papers," and "'verifier' Wershe." (ECF No. 77, PageID.1444).

## III. RELEVANT LEGAL STANDARDS

The *Bivens* Defendants' motion argues that sanctions are warranted under *Fed. R. Civ. P. 11*, *28 U.S.C. § 1927*, *Fed. R. Civ. P. 54(d)(2)*, and *E.D. Mich. LR 54.1.2*. *Id.*

*Fed. R. Civ. P. 11* requires an attorney filing a pleading in federal court to certify, to the best of their "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing [*6] law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a belief or a lack of information.

*Fed. R. Civ. P. 11(b)*. The Advisory Committee Notes to

---

[1] *Wershe I* was originally before District Judge Laurie J. Michelson, but was reassigned to District Judge Shalina D. Kumar on February 15, 2022, and subsequently to the undersigned on February 6, 2023.

[2] *Wershe II* was originally before District Judge Denise Page Hood, but was reassigned to District Judge Shalina D. Kumar on November 8, 2022, and subsequently to the undersigned on February 6, 2023.

2024 U.S. Dist. LEXIS 136543, *6

*Rule 11* set forth the following factors a court may consider in deciding a motion for sanctions:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether that person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants.

*Fed. R. Civ. P. 11*, Advisory Committee Notes (1993 amend.). The Sixth [*7] Circuit's test for *Rule 11* sanctions asks "whether the individual's conduct was reasonable under the circumstances." *Union Planters Bank v. L & J Dev. Co., 115 F.3d 378, 384 (6th Cir. 1997)* (citing *Lemaster v. United States, 891 F.2d 115, 118 (6th Cir. 1989)*). Courts must use an objective standard and must determine what was reasonable under the circumstances at the time the pleading was filed. *Salkil v. Mount Sterling Twp. Police Dep't, 458 F.3d 520, 530 (6th Cir. 2006)* (citing *INVST Fin. Group, Inc. v. Chem-Nuclear Sys., Inc., 815 F.2d 391, 401 (6th Cir. 1987)*) ("Although a district court is given wide discretion in deciding whether counsel have acted reasonably under the circumstances, '[t]he court is expected to avoid using the wisdom of hindsight and should test [counsel]'s conduct by inquiring what was reasonable to believe at the time [counsel acted.]'").

*28 U.S.C. § 1927* similarly provides a basis for sanctions. Specifically, it states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

*28 U.S.C. § 1927*. Under this section, "sanctions are warranted when an attorney objectively 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater, 465 F.3d 642, 646 (6th Cir. 2006)* (citing [*8] *Ruben v. Warren City Sch., 825 F.2d 977, 984 (6th Cir. 1987)*). "The purpose is to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy." *Id.* (citing *Jones v. Continental Corp., 789 F.2d 1225, 1230-31 (6th Cir. 1986)*).

*Fed. R. Civ. P. 54(d)(2)* governs the filing of motions for attorney's fees and related nontaxable expenses, stating: "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." *Fed. R. Civ. P. 54(d)(2)(A)*. Under this rule, "[u]nless a statute or a court order provides otherwise, the motion must: (i) be filed no later than 14 days after the entry of judgment; (ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award; (iii) state the amount sought or provide a fair estimate of it; and (iv) disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made." *Id.* In this district, pursuant to *E.D. Mich. LR 54.1.2*, "[a] motion for attorneys' fees and related non-taxable expenses pursuant to *Fed. R. Civ. P. 54(d)(2)* must be filed no later than 28 days after entry of judgment." *E.D. Mich. LR 54.1.2(a)*. This motion must also be supported by "a memorandum brief as to the authority of the Court to make such an award" and "an affidavit of counsel setting out in detail the number of hours spent [*9] on each aspect of the case, the rate customarily charged by counsel for such work, the prevailing rate charged in the community for similar services, and any other factors which the Court should consider in making the award." *E.D. Mich. LR 54.1.2(b)*.

## IV. ANALYSIS

### A. *Bivens* Defendants' Motion for *Rule 11* Sanctions

To bring a motion for sanctions under *Fed. R. Civ. P. 11*, a party must first comply with the Rule's "safe harbor provision." *See Penn, LLC v. Prosper Bus. Dev. Corp., 773 F.3d 764, 766-67 (6th Cir. 2014)*. This provision, intended to "allow the nonmovant a reasonable period to reconsider the legal and factual basis for his contentions and, if necessary, to withdraw the offending document," requires a party to serve their proposed motion for sanctions on the opposing party at least 21 days before filing the motion with the court. *Fed. R. Civ. P. 11(c)(2)* ("The motion must be served under *Rule 5*, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."). "Failure to comply with the safe-harbor provision

2024 U.S. Dist. LEXIS 136543, *9

precludes imposing sanctions on the party's motion." *Penn, LLC, 773 F.3d at 767.*

Plaintiff argues in opposition to the *Bivens* Defendants' motion that he was not served properly under *Rule 11*'s safe harbor [*10] provision, which requires "the moving party to have provided the nonmovant with **the exact motion** requesting sanctions, prior to their filing of the motion." (ECF No. 80, PageID.1623) (emphasis in original). The Sixth Circuit has not directly commented on whether a motion filed under *Rule 11* must be the same motion sent to the opposing party under the safe harbor provision. However, the Sixth Circuit has been clear that only service of a *motion* for sanctions, not a "warning letter," satisfies this rule, stating: "[w]e have no doubt that the word 'motion' definitionally excludes warning letters."[3] *Penn, LLC, 773 F.3d at 764.* Further, courts across the country who have addressed this question have held that, to comply with *Rule 11*'s safe harbor provision, the motion filed with the court must be the *exact same* motion sent to the opposing party. *See*

---

[3] The *Bivens* Defendants point to a recent Sixth Circuit decision, *King v. Whitmer,* which found that defendant complied with *Rule 11*'s safe harbor provision when they "sent plaintiffs a *detailed letter* specifying the allegedly sanctionable material" more than 21 days prior to the filing of their motion for sanctions. *King v. Whitmer, 71 F.4th 511, 529 (6th Cir. 2023)* (emphasis added). The Sixth Circuit, however, does not fully explain what was in this "detailed letter" and does not fully analyze its sufficiency under the rule. *Id.* Looking to the lower court filings, the defendant's relevant "motion for sanctions, for disciplinary action, for disbarment referral and for referral to state bar disciplinary bodies," filed on January 5, 2021, states:

The City also served Plaintiffs with a Motion for Sanctions under *Fed. R. Civ. P. 11* on December 15, 2020. Plaintiffs did not withdraw or correct any of the false factual allegations and frivolous legal theories in their pleadings during the 21 days "safe harbor" period. Thus, this motion is timely.

(*King v. Whitmer,* Eastern District of Michigan Case No. 20-13134, ECF No. 78, PageID.3617). Additionally, Eastern District of Michigan Judge Linda V. Parker's earlier Order in *King v. Whitmer* discussed the "Safe Harbor Motion the City served on Plaintiffs' counsel on December 15, 2020." *King v. Whitmer, 556 F. Supp. 3d 680, 704 (E.D. Mich. 2021).* These two points suggest that the defendant did serve the plaintiffs with an actual motion, not just a letter. As such, the court does not interpret the Sixth Circuit's decision in *King v. Whitmer* as overruling their prior precedent. *See Penn, LLC, 773 F.3d at 767* ("[f]irst and most important, the rule specifically requires formal service of a motion.").

*SortiumUSA, LLC v. Hunger, No. 3:11-CV-1656-M, 2014 U.S. Dist. LEXIS 35920, 2014 WL 1080765, at *3 (N.D. Tex. Mar. 18, 2014)* ("Big Time's failure to serve the Plaintiff during the safe-harbor period with the same motion for sanctions that it later filed with the Court indicates that it has not strictly complied with *Fed. R. Civ. P. Rule 11(c)(2).*") (citing *Roth v. Green, 466 F.3d 1179, 1192 (10th Cir. 2006)* ("[t]he plain language...requires a copy of the actual motion for sanctions to be served on the person(s) accused of sanctionable behavior at least twenty-one days prior to the [*11] filing of that motion."); *Robinson v. Alutiiq-Mele, LLC, 643 F. Supp. 2d 1342, 1350-51 (S.D. Fla. 2009)* ("By its plain language, *Rule 11* requires a movant to file and serve the same sanctions motion."); *O'Connell v. Smith, No. CV 07-0198-PHX-SMM, 2008 U.S. Dist. LEXIS 121812, 2008 WL 477875, at *2 (D. Ariz. Feb. 19, 2008)* (rejecting the contention that service of a "draft" motion for sanctions satisfies the safe harbor provision of *Rule 11*); *Wells Fargo Home Mortg., Inc. v. Taylor, Nos. 04-825 & 04-841, 2004 U.S. Dist. LEXIS 15502, 2004 WL 1771607, at *1 (E.D. La. Aug. 5, 2004)* (a draft of a different motion for sanctions "is not sufficient to fulfill the *Rule 11* requirements")).

The *Bivens* Defendants sent Plaintiff's counsel, Mr. Ayad and Mr. Savage, a copy of their "prospective sanctions motion" on May 6, 2022[4] via email at 5:53 pm, which they argue is sufficient to meet *Rule 11*'s requirements. (ECF No. 77-10). This prospective motion, labeled "*Bivens* Defendants' [Prospective] Sanctions Motion" makes the following key arguments, among others:

Wershe's *Bivens* claims are unwarranted by fact and law, have no proper purpose, in material respects lack evidentiary support and are grounded on allegations inconsistent [*12] with Wershe's previous sworn testimony, admissions, and representations in state and federal court proceedings, and are based on false assertions and misrepresentations.

[]

Wershe's *Bivens* action is devoid of legal merit and factual basis. It is premised on misrepresentations — direct and by omission, half-truths, and untruths — presented in this Court and in the media for no proper purposes. Wershe uses this action to

---

[4] Notably, this prospective motion was served on Plaintiff and his counsel 17 months before the motion was actually filed with this court on October 11, 2023.

promote his "brand," foster his "victim" persona, and enhance his commercial interests.

*Id.*, PageID.1563, 1570. There are a number of key differences between the motion served on Plaintiff's counsel and the motion eventually filed with the court. Notably, the *Bivens* Defendants' current motion argues "he and his attorneys failed to plead facts that, even if true, would prove that Wershe's convictions and prison sentences were 'reversed on direct appeal' or 'invalidated,' an essential element of his *Bivens* claims." (ECF No. 77, PageID.1445). The current motion also focuses on the court's dismissal of Plaintiff's claims for being untimely, arguing that "Wershe and his attorneys asserted 'equitable tolling' to avoid the time-bar but, as the Court held [], relied [sic] on Wershe's supposed subjective [*13] 'fears' factually-unconnected to the *Bivens* defendants and failed to plead facts that, even if true, could satisfy *any* of the equitable tolling doctrine's 'required elements.'" *Id.* Neither of these arguments are mentioned in the "prospective" motion, outside of a general note that the motion "incorporates the *Bivens* defendants' dismissal motion, brief, and exhibits," which makes similar arguments about the validity of the *Bivens* claims and the case's timeliness. (*See* ECF No. 34). Because the current motion was not the same motion sent to Plaintiff and his counsel, and adds several new arguments following the court's dismissal of Plaintiff's claims, it fails to comply with *Rule 11*'s safe harbor provision, and the *Bivens* Defendants are not entitled to *Rule 11* sanctions.

## B. *Bivens* Defendants' Motion for Sanctions under *28 U.S.C. § 1927*

Even though the *Bivens* Defendants are not entitled to sanctions under *Rule 11*, they may still seek excess costs and attorney fees under *28 U.S.C. § 1927*. "Unlike *Rule 11* sanctions, a motion for excess costs and attorney fees under *§ 1927* is not predicated upon a 'safe harbor' period, nor is the motion untimely if made after the final judgment in a case." *Ridder v. City of Springfield, 109 F.3d 288, 297 (6th Cir. 1997)* (citing *In re Ruben, 825 F.2d 977, 981-82) (6th Cir. 1987)*). As stated above, *28 U.S.C. § 1927* provides that any attorney "who so multiples the proceedings in any [*14] case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *28 U.S.C. § 1927*; *see also Ridder, 109 F.3d at 298*. Sanctions under *§ 1927* cannot be based on "simple inadvertence or negligence that frustrates the trial judge," rather "[t]here must be some

conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party." *Ridder, 109 F.3d at 298* (citations omitted). "[T]he mere finding that an attorney failed to undertake a reasonable inquiry into the basis for a claim does not automatically imply that the proceedings were intentionally or unreasonably multiplied." *Id.*

The *Bivens* Defendants now seek a fee award from Plaintiff's attorneys, "Ayad Law PLLC, Nabih H. Ayad, and William D. Savage," arguing they "ignored defense dismissal requests and complicated, multiplied, and prolonged their unwarranted claims unreasonably and vexatiously." (ECF No. 77, PageID.1460). Specifically, the *Bivens* Defendants argue fees are warranted for three [*15] key reasons: (1) because Plaintiff's *Bivens* claims were inexcusably untimely; (2) because Plaintiff's *Bivens* claims were legally and factually meritless; and (3) because Plaintiff's pleadings "made false assertions of fact, disregarded the law, and filed this lawsuit with an ulterior purpose." *Id.*, PageID.1448. The court will address each of these arguments in turn.

## i. Timeliness of *Bivens* claims

The *Bivens* Defendants first argue they are entitled to fees because Plaintiff knowingly brought untimely claims and the equitable tolling doctrine "*never* applied to Wershe's self-claimed circumstances." *Id.*, PageID.1461 (emphasis in original). Plaintiff's first amended complaint admits his claims were filed outside of the relevant statutes of limitations, but he argues they fall under an "emerging doctrine" which finds that, "when a prisoner has a legitimate fear of retaliation for exercising their rights, equitable tolling must be considered." (ECF No. 4, PageID.83); *see also Davis v. Jackson, No. 15-CV-5359 (KMK), 2016 U.S. Dist. LEXIS 136034, 2016 WL 5720811, at *11 (S.D.N.Y. September 30, 2016)* ("Thus, the Court concludes that in the prison context, reasonable fear of retaliation may be sufficient to constitute extraordinary circumstances warranting equitable tolling, particularly if the person threatening retaliation is a defendant [*16] or another official who could be or was influenced by a defendant."). The court analyzed Plaintiff's arguments about the applicability of equitable tolling to his unique situation and found that he failed to allege "specific facts showing that a reasonable fear of retaliation prevented [him] from filing a timely complaint." (ECF No. 73, PageID.1437) (citing *Davis,*

2024 U.S. Dist. LEXIS 136543, *16

_2016 U.S. Dist. LEXIS 136034, 2016 WL 572018, at_
_*11; Stone #1 v. Annucci, No. 20-CV-1326 (RA), 2021_
_U.S. Dist. LEXIS 186195, 2021 WL 4463033, at *12_
_(S.D.N.Y. Sept. 28, 2021)_).

The _Bivens_ Defendants now argue that "from the start,
Wershe did not satisfy the _Davis_ principles or _Iqbal_
standards and he failed to state a cognizable or timely
claim." (ECF No. 77, PageID.1465). Plaintiff's
arguments for equitable tolling relied heavily on _Davis v._
_Jackson_, "an unpublished case from the Southern
District of New York [which] is not binding on this court."
(ECF No. 73, PageID.1431). The court noted that
"neither the Sixth Circuit nor the Michigan courts have
directly addressed the issue of equitable tolling due to a
fear of retaliation" and, therefore, whether _Davis_ was
applicable to the unique facts of this case presented a
relatively novel question of law. _Id._, PageID.1432.
Courts are generally hesitant to award sanctions to a
prevailing party based on the court's dismissal of a
novel, albeit unsuccessful, argument. [*17] _See In re_
_John Richards Homes Bldg. Co., L.L.C., No. 02-54689,_
_2009 U.S. Dist. LEXIS 117913, 2009 WL 5166199, at *2_
_(E.D. Mich. Dec. 17, 2009)_ ("Simply because JRH's
interpretation of the Michigan statute was novel did not
make it frivolous. JRH simply lost on the interpretation
issue; the conduct of JRH and its attorneys in arguing
that position does not now warrant sanctions simply
because they lost and their argument was not
persuasive."); _see also B & H Med., L.L.C., v. ABP_
_Admin., Inc., 526 F.3d 257, 271 (6th Cir. 2008)_
("Sanctions are not appropriate simply because an
appellant's case 'may indeed be quite weak.'"); _Gaiardo_
_v. Ethyl Corp., 835 F.2d 479, 483 (3d Cir. 1987)_
("Nothing in the language of the Rule or the Advisory
Committee Notes supports the view that 'the Rule
empowers the district court to impose sanctions on
lawyers simply because a particular argument or ground
for relief contained in a non-frivolous motion is found by
the district court to be unjustified.'"). This is based on a
fear of restricting or "inhibit[ing] imaginative legal or
factual approaches to the applicable law." _Gaiardo, 835_
_F.2d at 483_.

As stated above, fees may be awarded pursuant to _28_
_U.S.C. § 1927_ only if "the attorney 'multiples the
proceedings' in the case 'unreasonably and
vexatiously.'" _28 U.S.C. § 1927_. While the court did not
adopt Plaintiff's theory and rule in his favor on the
equitable tolling issue, this decision was made only after
the court independently analyzed the unique facts of this
case under [*18] both the _Holland v. Florida_ two-factor
test and the Sixth Circuit's five-factor test. (_See_ ECF No.

73, PageID.1437). Given the novelty of Plaintiff's
argument and the unique facts of this case, the court
does not find that Plaintiff's counsel acted recklessly or
made frivolous claims by arguing that equitable tolling
applied. _See Red Carpet Studios Div. of Source_
_Advantage, Ltd., 465 F.3d at 646_ (holding that _§ 1927_
sanctions require "something more than negligence or
incompetence"); _Riddle v. Egensperger, 266 F.3d 542,_
_553 (6th Cir. 2001)_ (holding that _§ 1927_ sanctions are
appropriate if an attorney "knows or reasonably should
know that a claim pursued is frivolous."). As such, the
_Bivens_ Defendants are not entitled to recover fees
under this argument.

_ii._ Merit of _Bivens_ claims

The _Bivens_ Defendants next argue they are entitled to
recover fees from Plaintiff's counsel because "Wershe
and his attorneys presented and advocated _Bivens_
claims that were legally and factually unwarranted _and_
that depended on deliberate falsehoods and willful
misrepresentation by omission." (ECF No. 77,
PageID.1460). Specifically, they argue "Wershe's
_Bivens_ claims were barred by causation principles and
were 'not cognizable' under _Heck v. Humphrey_ []," and
"'Damages' claims like Wershe's — asserting
'unconstitutional conviction or imprisonment' - 'must be
dismissed' [*19] if, as here, the 'conviction or sentence'
was not 'reversed on direct appeal' or otherwise legally
'invalidated.'" _Id._, PageID.1466. The court's September
18, 2023 Order specifically clarified that it was limited to
dismissing Plaintiff's claims based on the statutes of
limitations and "should not be taken as a ruling on the
merits of any of the other substantive claims included in
these motions." (ECF No. 73, PageID.1438 n. 8). The
relief the _Bivens_ Defendants now ask for would require
the court to undertake an analysis and make a ruling on
whether Plaintiff's substantive claims failed on the merits
to a degree that would make them frivolous. The court
declines to do so. The _Bivens_ Defendants are not
entitled to recover fees under this argument.

_iii._ Alleged false assertions of fact, disregard for the law,
and ulterior purpose

Finally, the _Bivens_ Defendants argue Plaintiff and his
attorneys violated _Rule 11_'s "duty of candor" to the court
and other parties by "presenting falsehoods in 'verified'
papers and affidavits offered 'under penalty of perjury,'"
as well as "omitt[ing] pertinent facts, disregard[ing]
pertinent law, and irresponsibly complicat[ing] and

prolong[ing] the unwarranted *Bivens* claims." (ECF No. 77, [*20] PageID.1468). As discussed above, the *Bivens* Defendants are not entitled to *Rule 11* sanctions because they failed to comply with the safe harbor provision. Therefore, the court may only impose sanctions for their "false assertions of fact, disregard[] [for] the law" and "ulterior purpose" if this conduct is found to have "unreasonably and vexatiously" multiplied the proceedings, pursuant to *28 U.S.C. § 1927*. "Since the plain language of the statute only penalizes attorneys who vexatiously and unreasonably 'multiply' proceedings, Courts generally do not impose sanctions under *28 U.S.C § 1927* based on the filing of an initial complaint that turns out to be meritless..." *El-Khalil v. Tedeschi, No. 18-12759, 2023 U.S. Dist. LEXIS 159610, 2023 WL 5827666, at *8 (E.D. Mich. Sept. 8, 2023)*.

The *Bivens* Defendants' motion bases their argument about "false fact assertions and willful misrepresentation" on two categories of claims: (1) Plaintiff's assertions in Counts 7 and 9 about the "unwritten promises" made by Groman, Helland, and King to support his state parole, which were allegedly "'breached'" in 2003 when — supposedly — they 'refused' support, opposed parole, and 'advocated for' Wershe's 'permanent incarceration;'" and (2) Plaintiff's assertions in Counts 6, 10, and 11 about the cause of his criminality and incarceration, which were allegedly contradicted [*21] by his own testimony at various hearings in 1999-2002 and 2017. (ECF No. 77, PageID.1469-72). The *Bivens* Defendants' motion also argues generally that Plaintiff and his attorneys' "complaint and advocacy omitted facts which debunked their 'equitable tolling' plea *and* the causation and 'breached promises' assertions on which their *Bivens* claims depended." *Id.,* PageID.1472. They also note that, although "Wershe's 'equitable tolling' plea depended on *Davis...*his attorneys cited only *Davis 1* [], not *Davis 2*," in further violation of their duty of candor. *Id.,* PageID.1474. These arguments are limited to the facts alleged in Plaintiff's original complaint and, therefore, they cannot form the basis of an award of sanctions under *§ 1927*. *El-Khalil, 2023 U.S. Dist. LEXIS 159610, 2023 WL 5827666, at *9* ("this Court finds that Gonek's act of filing a complaint asserting FCA claims that turned out to be unmeritorious does not amount to a vexatious or unreasonable multiplication of proceedings worthy of sanctions under *§ 1927*.").

Finally, the *Bivens* Defendants argue Plaintiff's "true goal" was to sue the United States, and they "offered in June 2022 to dismiss their placeholder claims against Dixon, Groman, Helland, and King and 'substitute' the United States" but, even after Defendants [*22] agreed, "Wershe's attorneys multiplied proceedings by vexatiously: (1) moving to *add* the United States *and keep* the *Bivens* defendants, and (2) filing untenable "companion" claims against the United States (in E.D. Mich. no. 22-cv-12596) based on assertions virtually-identical to their false and legally-deficient assertions in this case." (ECF No. 77, PageID.1475-76). They also argue Wershe intended to use this lawsuit to "expand and profit from his 'notoriety,'" pointing to media statements made on the steps of the federal courthouse "about this lawsuit and his new 'cannabis brand' - called 'the 8th by White Boy Rick.'" *Id.,* PageID.1476. The court does not find that these actions "unreasonably or vexatiously" multiplied the proceedings in this case to the degree required by *§ 1927*. While the filing of a separate lawsuit against the United States of America (*Wershe II*) added a layer of complication to the proceedings, Plaintiff has repeatedly asserted that this was done "to help preserve Plaintiff's rights owing to statute of limitations concerns," after the court failed to act. (ECF No. 80, PageID.1606). This alone does not merit sanctions. *See El-Khalil, 2023 U.S. Dist. LEXIS 159610, 2023 WL 5827666, at *9* ("Gronek's act of filing an amended complaint did [*23] not unreasonably or vexatiously multiply the proceedings of the case" where his amended complaint was "word-for-word identical to Khalil's argument already presented in his first motion."). Additionally, whatever Plaintiff's "motive" was for filing this lawsuit, it did not alone unreasonably lengthen or delay the proceedings. As such, the *Bivens* Defendants are also not entitled to recover fees under this argument.

C. *Bivens Defendants' Motion for Attorney's Fees under Fed. R. Civ. P. 54(d)(2) and E.D. Mich. LR 54.1.2(a)*

In addition to their claims under *Fed. R. Civ. P. 11* and *28 U.S.C. § 1927*, the *Bivens* Defendants cite *Fed. R. Civ. P. 54(d)(2)* and E.D. Mich. LR 54.1.2 as a basis for their requested relief. (ECF No. 77, PageID.1444). As stated above, *Fed. R. Civ. P. 54(d)(2)* creates a provision for the recovery of "attorney's fees and related nontaxable expenses." *Fed. R. Civ. P. 54(d)(2)(A)*. Such a motion must: "(i) be filed no later than 14 days after the entry of judgment;" "(ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award;" "(iii) state the amount sought or provide a fair estimate of it;" and "(iv) disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made." *Fed. R. Civ. P. 54(d)(2)(B)*. This rule is supplemented by E.D. Mich. LR 54.1.2, which gives a party seeking costs 28 days from the

2024 U.S. Dist. LEXIS 136543, *23

entry of judgment, [*24] rather than 14 days, to file their motion. *E.D. Mich. LR. 54.1.2.*

The *Bivens* Defendants' motion does not specifically detail their entitlement to relief under *Fed. R. Civ. P. 54(d)(2)* outside of their general request for sanctions under *Fed. R. Civ. P. 11* and *28 U.S.C. § 1927.* (ECF No. 77, PageID.1444) ("The *Bivens* defendants ask for a fee award (1) against Wershe's attorneys...under *Rule 11(b)(1)*, *(2)*, and *(3)* and *28 U.S.C. 1927*, and (2) against "verifier" Wershe, under *Rule 11(b)(1)* and *(3)*.") (emphasis added). *Fed. R. Civ. P. 54(d)(2)* explicitly "do[es] not apply to claims for fees and expenses as sanctions for violating these rules or as sanctions under *28 U.S.C. § 1927.* *Fed. R. Civ. P. 54(d)(2)(E).* The *Bivens* Defendants have cited no other authority to support their entitlement to attorney's fees under this subsection and, therefore, the court denies their request.

D. Plaintiff's Response and Request for Sanctions

Plaintiff's response not only requests the *Bivens* Defendants' motion be denied, but also requests "Defendants and/or their counsel, John G. Adam and Stuart M. Israel, be sanctioned for filing the pending motion, as is allowed pursuant to *Rule 11.*" (ECF No. 80, PageID.1597). As discussed above, before moving for sanctions under *Rule 11*, a party typically must serve their proposed motion on the opposing party at least 21 days before filing it with the court. *Fed. R. Civ. P. 11(c)(2)* ("The motion must be served under *Rule 5*, but it [*25] must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."). "Failure to comply with the safe-harbor provision precludes imposing sanctions on the party's motion." *Penn, LLC, 773 F.3d at 767.* The advisory committee notes to *Rule 11* state, however, that "service of a *cross motion* under *Rule 11* should rarely be needed since under the revision the court may award to the person who prevails on a motion under *Rule 11* - whether the movant or the target of the motion — reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion." *Fed. R. Civ. P. 11*, advisory committee notes to 1993 amend (emphasis added). However, to the extent a party's cross-motion seeks additional sanctions "*in addition to* fees and expenses incurred in opposing" the sanctions motion, the safe harbor provision does apply. *Universal Surveillance Corp. v. Checkpoint Sys., Inc., No. 5:11-CV-1755, 2013 U.S. Dist. LEXIS 187040, 2013 WL 8350812, at *6 n. 23 (N.D. Ohio Oct. 16, 2013),* report and recommendation adopted, *No. 5:11CV1755, 2014 U.S. Dist. LEXIS 51936, 2014 149315 (N.D. Ohio Apr. 15, 2014)* (emphasis in original); *see also Rich v. TASER Int'l, Inc., No. 2:09-CV-02450-ECR, 2012 U.S. Dist. LEXIS 107927, 2012 WL 3155137, at *4 (D. Nev. Aug. 2, 2012)* ("To the extent that Plaintiffs seek additional sanctions, Plaintiffs' request must be denied as procedurally improper.").

Here, Plaintiff seeks sanctions "as [] allowed pursuant to *Rule 11.*" (ECF No. 80, PageID.1597). [*26] Specifically, he argues the *Bivens* Defendants' conduct is sanctionable for ten independent reasons:
- (1) For "having the gall to accuse him of bringing suit solely for 'commercial purposes.'"
- (2) For speculating that "'Plaintiff's 'true goal' was to sue the United States" when, had the litigation continued, the United States would have been substituted regardless.

- (3) For arguing that his failure to cite only *Davis 1*, not *Davis 2*, was sanctionable, as "*Davis 2* did not abrogate the holding in *Davis 1* in any way, shape, or form."
- (4) For making the "nonsense" argument that Plaintiff violated his duty of candor.
- (5) Because their "accusations of 'false causation assertion' for counts 6, 10, [and] 11 are frivolous."
- (6) Because their "accusations of 'false breached promises assertions' behind counts 7 and 9 are frivolous."
- (7) Because no claims were filed against Carol Dixon.

- (8) Because they "impermissibly relitigate, post-judgment that Plaintiff's claims were barred by immunity law, *Bivens, Heck v. Humphreys* principles, and *Iqbal* pleading standards."
- (9) For "Defendants' attempted retrospective re-litigation of their 'reasonable diligence' and 'reasonable fear' arguments."

- (10) "[A]s [*27] their motion is not 'warranted by existing law' where they filed a completely different motion than the one which they originally sent Plaintiff, pre-judgment."

*Id.*, PageID.1604-1622. Many of Plaintiff's arguments appear to be responding to what he views as personal attacks made by the *Bivens* Defendants in their motion. *See id.*, PageID.1610 (Defendants' attempt to hold Plaintiff to statements made by him or his agents while Plaintiff was clearly under duress is wrong of

Defendants technically and morally; And it is indecent and unbecoming of members of the bar."); PageID.1627 ("The undersigned has been awarded by almost every major civil rights organization, including receiving special recognition from the Department of Justice, co-chairing civil and law enforcement organizations, being appointed Civil Rights Commissioner by two Governors of this state (and so vetted by the Michigan Senate)...He would never consider bringing a case that was anywhere near frivolous."). The remainder of Plaintiff's arguments counter the points made in the *Bivens* Defendants' motion including, in part, that "there simply was no requirement of any kind on Plaintiff to cite [*Davis 2*]," it was facially false to argue [*28] that Plaintiff sued Carol Dixon, "where Plaintiff has only ever sued the estate of James Dixon," Defendants' arguments as to Plaintiff's *Bivens* claims "have already been considered by this Court had were not found meritorious," and Defendants failed to comply with *Rule 11*, where they filed "a substantially different motion (one that incorporates, references, and heavily relies on this Court's final order) than the 'motion' which they sent to Plaintiff's counsel." *Id.*, PageID.1607, 1615, 1617, 1625.

Again, under *Rule 11* sanctions may be imposed if "a reasonable inquiry discloses the pleading, motion or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers, 613 F.3d 609, 626 (6th Cir. 2010)* (citing *Herron v. Jupiter Transp. Co., 858 F.2d 332, 335 (6th Cir. 1988)*). The purpose of *Rule 11* sanctions is to deter the abuse of the legal process. *Gibson v. Solideal USA, Inc., 489 F. App'x 24, 29 (6th Cir. 2012)*. Here, Plaintiff has not sufficiently shown that the *Bivens* Defendants' motion was not well grounded, not warranted by existing law, or filed to harass or create an improper delay. *Id.* Although the court did not find Plaintiff's conduct to be sanctionable, the *Bivens* Defendants' motion for sanctions itself [*29] was not inherently frivolous. As such, the court also denies Plaintiff's request for sanctions.

## V. CONCLUSION

For the reasons stated above, the court declines to award sanctions against Plaintiff or his attorneys and the *Bivens* Defendants' motion for sanctions is **DENIED**. Additionally, the court **DENIES** Plaintiff's counter-request for sanctions included in their response to the

*Bivens* Defendants' motion.

**SO ORDERED.**

Date: August 1, 2024

/s/ F. Kay Behm

F. Kay Behm

United States District Judge

---

**End of Document**

Q Questioned
As of: November 20, 2024 4:56 PM Z

# _Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics_

Supreme Court of the United States

January 12, 1971, Argued ; June 21, 1971, Decided

No. 301

**Reporter**
403 U.S. 388 *; 91 S. Ct. 1999 **; 29 L. Ed. 2d 619 ***; 1971 U.S. LEXIS 23 ****

BIVENS v. SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS

**Subsequent History:** On remand at _Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 456 F.2d 1339, 1972 U.S. App. LEXIS 10860 (2d Cir. N.Y., 1972)_

**Prior History:** [****1] CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.

_Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 409 F.2d 718, 1969 U.S. App. LEXIS 12867 (2d Cir. N.Y., 1969)_

**Disposition:** _409 F.2d 718_, reversed and remanded.

## Core Terms

damages, federal court, exclusionary rule, cases, state law, rights, suppression doctrine, federal official, arrest, authorization, courts, search and seizure, suppress, cause of action, violations, invasion, remedies, equitable, seizure, seized, deter, damages remedy, district court, federal agent, federal law, vindication, effective, resources, federal cause of action, law enforcement officer

## Case Summary

### Procedural Posture

Petitioner appealed a judgment of the United States Court of Appeals for the Second Circuit, which affirmed the dismissal of petitioner's suit for damages against respondents, agents of the Federal Bureau of Narcotics, who were alleged to have conducted an unlawful search and arrest in violation of _U.S. Const. amend. IV_.

### Overview

The federal agents argued that petitioner's right to damages for an invasion of the state-created right to privacy was available only in a state court applying state law. Thus, respondents asserted, they would stand before state law as private citizens if a constitutional violation was found. The court disagreed, saying that the relationship between federal agents, acting unconstitutionally, and a private citizen differed from that between private citizens. Because agents had a far greater capacity for harm, the Court reasoned, the _Fourth Amendment_ limited the exercise of federal power. The Court explained that the Amendment did not proscribe only those acts engaged in by private citizens that were condemned by state law, that the interests of state laws regulating invasion of privacy and the Amendment's guarantee against unreasonable searches could be inconsistent, and that the awarding of damages to petitioner following a violation of the Amendment by federal agents was a remedy normally available in the federal courts.

### Outcome

The judgment affirming the dismissal of petitioner's suit for damages against the federal agents in federal court was reversed and remanded, because a federal remedy for an unlawful search and arrest allegedly in violation of the _Fourth Amendment_ was not limited to conduct condemned by state law.

## LexisNexis® Headnotes

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

403 U.S. 388, *388; 91 S. Ct. 1999, **1999; 29 L. Ed. 2d 619, ***619; 1971 U.S. LEXIS 23, ****1

**HN1[⬇]  Search & Seizure, Scope of Protection**

See *U.S. Const. amend. IV*.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Governments > Federal Government > Claims By & Against

Constitutional Law > ... > Fundamental Rights > Search & Seizure > General Overview

Governments > Federal Government > Employees & Officials

**HN2[⬇]  Search & Seizure, Scope of Protection**

A violation of the *Fourth Amendment* protection against unreasonable searches and seizures by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct.

Criminal Law & Procedure > Search & Seizure > Governmental Action Requirement

Torts > ... > Duty On Premises > Trespassers > General Overview

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search & Seizure > General Overview

Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Private Searches

**HN3[⬇]  Search & Seizure, Governmental Action Requirement**

*U.S. Const. amend. IV* operates as a limitation upon the exercise of federal power regardless of whether the state in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen. It guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority. And where federally protected rights have been invaded, it has been the rule from the beginning

that courts will be alert to adjust their remedies so as to grant the necessary relief.

Governments > Legislation > Statutory Remedies & Rights

**HN4[⬇]  Legislation, Statutory Remedies & Rights**

Where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.

## Lawyers' Edition Display

**Summary**

An action for damages was instituted in the United States District Court for the Eastern District of New York against federal narcotics agents, the plaintiff seeking recovery for humiliation and mental suffering resulting from the agents' conduct, under claim of federal authority, in connection with an arrest and search relating to alleged narcotics violations by the plaintiff. The plaintiff alleged that the agents, acting without a warrant and without probable cause, had entered the plaintiff's apartment, had used unreasonable force in effecting the arrest, had searched the apartment, and had later interrogated the plaintiff and subjected him to a visual strip search. The District Court dismissed the complaint on the ground, inter alia, that it failed to state a cause of action (*276 F Supp 12*), and the Court of Appeals for the Second Circuit affirmed on that basis. (*409 F2d 718*.)

On certiorari, the United States Supreme Court reversed and remanded. In an opinion by Brennan, J., expressing the view of five members of the court, it was held that a violation of the *Fourth Amendment's* command against unreasonable searches and seizures, by a federal agent acting under color of federal authority, gave rise to a federal cause of action for damages consequent upon the agent's unconstitutional conduct.

Harlan, J., concurred in the judgment, stating that federal courts had the power to award damages for violation of constitutionally protected interests, and that the traditional judicial remedy of damages was appropriate to vindicate the personal interests protected by the *Fourth Amendment*.

403 U.S. 388, *388; 91 S. Ct. 1999, **1999; 29 L. Ed. 2d 619, ***619; 1971 U.S. LEXIS 23, ****1

Burger, Ch. J., dissented, expressing the views that the doctrine of separation of powers would be better preserved by recommending a solution to the problem of damages caused by a federal agent's failure to obey the strictures of the *Fourth Amendment* to the Congress as the branch of government in which the Constitution has vested the legislative power; that with regard to deterring law enforcement officials from attempting to obtain evidence through illegal searches and seizures, the suppression doctrine, calling for the exclusion of illegally obtained evidence which would otherwise be admissible, was unsatisfactory; and that the problem could be solved by Congress' enacting legislation which would (1) waive sovereign immunity as to illegal acts of law enforcement officials committed in the performance of assigned duties, (2) create a cause of action for damages resulting from such illegal acts, (3) create a quasi-judicial tribunal to adjudicate the claims for such damages, (4) provide that this statutory remedy would be in lieu of the exclusion of evidence secured for use in criminal cases in violation of the *Fourth Amendment*, and (5) provide that no evidence otherwise admissible would be excluded from any criminal proceeding because of violation of the *Fourth Amendment*.

Black, J., dissented on the ground that while Congress could create a federal cause of action for damages for an unreasonable search by federal officers in violation of the *Fourth Amendment*, it had not done so, and the creation of such a cause of action by the court was an exercise of power not given to it by the Constitution.

Blackmun, J., dissenting, stated that the judicial legislation creating the cause of action opened the door for another avalanche of new federal cases, tending to stultify proper law enforcement, and that if a truly aggrieved person had no adequate remedy, then it was for Congress and not the court to act.

## Headnotes

SEARCH AND SEIZURE §32 > federal agent's unconstitutional conduct -- action for damages -- > Headnote:
*LEdHN[1A][⬇]* [1A]*LEdHN[1B][⬇]* [1B]

Violation of the *Fourth Amendment's* command against unreasonable searches and seizures, by a federal agent acting under color of federal authority, gives rise to a federal cause of action against the agent for money damages consequent upon the agent's unconstitutional conduct.

PLEADING §179 > unlawful search and seizure -- allegation of lack of probable cause -- > Headnote:
*LEdHN[2][⬇]* [2]

Fairly read, a complaint in an action to recover damages for federal officers' alleged violation of the plaintiff's *Fourth Amendment* right against unreasonable search and seizure, sufficiently alleges that the arrest of the plaintiff was made without probable cause where it alleges that the arrest was "done unlawfully, unreasonably and contrary to law," notwithstanding that the complaint does not explicitly state that the agents had no probable cause for the plaintiff's arrest.

SEARCH AND SEIZURE §4 > operation of Fourth Amendment -- > Headnote:
*LEdHN[3][⬇]* [3]

The *Fourth Amendment* operates as a limitation upon the exercise of federal power regardless of whether a state in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen.

SEARCH AND SEIZURE §4 > Fourth Amendment guaranty -- > Headnote:
*LEdHN[4][⬇]* [4]

The *Fourth Amendment* guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority.

COURTS §255 > violation of federal right -- remedy -- > Headnote:
*LEdHN[5][⬇]* [5]

Where federally protected rights have been invaded, the courts will be alert to adjust their remedies so as to

403 U.S. 388, *388; 91 S. Ct. 1999, **1999; 29 L. Ed. 2d 619, ***619; 1971 U.S. LEXIS 23, ****1

grant the necessary relief.

The *Fourth Amendment* confines an officer executing a search warrant strictly within the bounds set by the warrant.

SEARCH AND SEIZURE §4 > Fourth Amendment -- conduct proscribed -- > Headnote:
*LEdHN[6][📥] [6]*

The *Fourth Amendment* does not proscribe only such conduct as would, if engaged in by private persons, be condemned by state law.

TRESPASS §5 > liability -- invitation to home -- > Headnote:
*LEdHN[11][📥] [11]*

A private individual lawfully in the home of another will not normally be liable for trespass beyond the bounds of his invitation absent clear notice to that effect.

SEARCH AND SEIZURE §4 > Fourth Amendment -- local trespass laws -- > Headnote:
*LEdHN[7][📥] [7]*

The *Fourth Amendment* is not tied to the niceties of local trespass laws.

SEARCH AND SEIZURE §4 > Fourth Amendment -- state law -- > Headnote:
*LEdHN[12][📥] [12]*

State law may neither authorize federal agents to violate the *Fourth Amendment* nor undertake to limit the extent to which federal authority can be exercised.

SEARCH AND SEIZURE §4 > SEARCH AND SEIZURE §32 > Fourth Amendment -- state-law tort claim -- > Headnote:
*LEdHN[8][📥] [8]*

The *Fourth Amendment* does not serve only as a limitation on federal defenses to a state-law tort claim against federal agents, but is an independent limitation upon the exercise of federal power.

COURTS §255 > federal right -- remedy for violation -- > Headnote:
*LEdHN[13][📥] [13]*

Where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.

TRESPASS §5 > admission to house -- > Headnote:
*LEdHN[9][📥] [9]*

A private citizen, asserting no authority other than his own, will not normally be liable in trespass if he demands, and is granted, admission to another's house.

ACTION OR SUIT §2 > civil liberty -- protection of laws -- > Headnote:
*LEdHN[14][📥] [14]*

The essence of civil liberty consists in the right of every individual to claim the protection of the laws whenever he receives an injury.

SEARCH AND SEIZURE §29 > warrant -- execution -- > Headnote:
*LEdHN[10][📥] [10]*

ERROR §1681 > reversal -- question not decided below -- > Headnote:

403 U.S. 388, *388; 91 S. Ct. 1999, **1999; 29 L. Ed. 2d 619, ***619; 1971 U.S. LEXIS 23, ****1

LEdHN[15][⬇️] [15]

Upon reversing a Federal Court of Appeals' judgment which had affirmed a District Court's dismissal--for failure to state a cause of action--of a complaint to recover damages for federal agents' alleged violation of the _Fourth Amendment_, the United States Supreme Court will not consider the question whether the agents are immune from liability by virtue of their official position, where such question was not passed upon by the Court of Appeals.

## Syllabus

Petitioner's complaint alleged that respondent agents of the Federal Bureau of Narcotics, acting under color of federal authority, made a warrantless entry of his apartment, searched the apartment, and arrested him on narcotics charges. All of the acts were alleged to have been done without probable cause. Petitioner's suit to recover damages from the agents was dismissed by the District Court on the alternative grounds (1) that it failed to state a federal cause of action and (2) that respondents were immune from suit by virtue of their official position. The Court of Appeals affirmed on the first ground alone. _Held_:

1. Petitioner's complaint states a federal cause of action under the _Fourth Amendment_ for which damages are recoverable upon proof of injuries resulting from the federal agents' violation of that Amendment. Pp. 390-397.

2. The Court does not reach the immunity question, which was not passed on by the Court of Appeals. [****2] Pp. 397-398.

**Counsel:** Stephen A. Grant argued the cause and filed a brief for petitioner.

Jerome Feit argued the cause for respondents. On the brief were Solicitor General Griswold, Assistant Attorney General Ruckelshaus, and Robert V. Zener.

Melvin L. Wulf filed a brief for the American Civil Liberties Union as amicus curiae urging reversal.

**Judges:** Brennan, J., delivered the opinion of the Court, in which Douglas, Stewart, White, and Marshall, JJ., joined. Harlan, J., filed an opinion concurring in the judgment, post, p. 398. Burger, C. J., post, p. 411, Black, J., post, p. 427, and Blackmun, J., post, p. 430, filed dissenting opinions.

Opinion by: BRENNAN

## Opinion

[*389] [***622] [**2001]   MR. JUSTICE **BRENNAN** delivered the opinion of the Court.

_LEdHN[1A][⬆️]_ [1A]The _Fourth Amendment_ provides that:

_HN1_[⬆️] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

In _Bell v. Hood, 327 U.S. 678 (1946),_ [****3] we reserved the question _HN2_[⬆️] whether violation of that command by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct. Today we hold that it does.

This case has its origin in an arrest and search carried out on the morning of November 26, 1965. Petitioner's complaint alleged that on that day respondents, agents of the Federal Bureau of Narcotics acting under claim of federal authority, entered his apartment and arrested him for alleged narcotics violations. The agents manacled petitioner in front of his wife and children, and threatened to arrest the entire family. They searched the apartment from stem to stern. Thereafter, petitioner was taken to the federal courthouse in Brooklyn, where he was interrogated, booked, and subjected to a visual strip search.

_LEdHN[2][⬆️]_ [2]On July 7, 1967, petitioner brought suit in Federal District Court. In addition to the allegations above, his complaint asserted that the arrest and search were effected without a warrant, and that unreasonable force was employed in making the arrest; fairly [****4] read, it alleges as well that the arrest was made without probable cause. [1] Petitioner [***623] claimed to have suffered great humiliation, [*390] embarrassment, and mental suffering as a result of the

---

[1] Petitioner's complaint does not explicitly state that the agents had no probable cause for his arrest, but it does allege that the arrest was "done unlawfully, unreasonably and contrary to law." App. 2. Petitioner's affidavit in support of his motion for summary judgment swears that the search was "without cause, consent or warrant," and that the arrest was "without cause, reason or warrant." App. 28.

403 U.S. 388, *390; 91 S. Ct. 1999, **2001; 29 L. Ed. 2d 619, ***623; 1971 U.S. LEXIS 23, ****4

agents' unlawful conduct, and sought $ 15,000 damages from each of them.  The District Court, on respondents' motion, dismissed the complaint on the ground, *inter alia*, that it failed to state a cause of action. [2] [****5] *276 F.Supp. 12 (EDNY 1967)*. The Court of Appeals, one judge concurring specially, [3] affirmed on that basis. *409 F.2d 718 (CA2 1969)*. We granted certiorari.  *399 U.S. 905 (1970)*. We reverse.

I

Respondents do not argue that petitioner should be entirely without remedy for an unconstitutional invasion of his rights by federal agents.  In respondents' view, however, the rights that petitioner asserts -- primarily [**2002] rights of privacy -- are creations of state and not of federal law.  Accordingly, they argue, petitioner may obtain money damages to redress invasion of these rights only by an action in tort, under state law, in the state courts.  In this scheme the *Fourth Amendment* would serve merely to limit the extent to which the agents [****6] could defend [*391] the state law tort suit by asserting that their actions were a valid exercise of federal power: if the agents were shown to have violated the *Fourth Amendment*, such a defense would be lost to them and they would stand before the state law merely as private individuals.  Candidly admitting that it is the policy of the Department of Justice to remove all such suits from the state to the federal courts for decision, [4] respondents nevertheless urge that we

uphold dismissal of petitioner's complaint in federal court, and remit him to filing an action in the state courts in order that the case may properly be removed to the federal court for decision on the basis of state law.

[****7]  *LEdHN[3]*[⚓] [3] *LEdHN[4]*[⚓] [4] *LEdHN[5]*[⚓] [5]We think that respondents' thesis rests upon an unduly restrictive [***624] view of the *Fourth Amendment's* protection against unreasonable searches and seizures by federal agents, a view that has consistently been rejected by this Court.  Respondents seek to treat the relationship between a citizen and a federal agent unconstitutionally exercising his authority as no different from the relationship [*392] between two private citizens.  In so doing, they ignore the fact that power, once granted, does not disappear like a magic gift when it is wrongfully used.  An agent acting -- albeit unconstitutionally -- in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own. Cf. *Amos v. United States, 255 U.S. 313, 317 (1921)*; *United States v. Classic, 313 U.S. 299, 326 (1941)*.  Accordingly, as our cases make clear, [****8] *HN3*[⚓] the *Fourth Amendment* operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen.  It guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority.  And "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell v. Hood, 327 U.S., at 684* (footnote omitted); see *Bemis Bros. Bag Co. v. United States, 289 U.S. 28, 36 (1933)* (Cardozo, J.); *The Western Maid, 257 U.S. 419, 433 (1922)* (Holmes, J.).

---

[2] The agents were not named in petitioner's complaint, and the District Court ordered that the complaint be served upon "those federal agents who it is indicated by the records of the United States Attorney participated in the November 25, 1965, arrest of the [petitioner]." App. 3.  Five agents were ultimately served.

[3] Judge Waterman, concurring, expressed the thought that "the federal courts can . . . entertain this cause of action irrespective of whether a statute exists specifically authorizing a federal suit against federal officers for damages" for acts such as those alleged.  In his view, however, the critical point was recognition that some cause of action existed, albeit a state-created one, and in consequence he was willing "*as of now*" to concur in the holding of the Court of Appeals. 409 F.2d, at 726 (emphasis in original).

[4] "Since it is the present policy of the Department of Justice to remove to the federal courts all suits in state courts against federal officers for trespass or false imprisonment, a claim for relief, whether based on state common law or directly on the *Fourth Amendment*, will ultimately be heard in a federal court." Brief for Respondents 13 (citations omitted); see *28 U. S. C. §*

---

1442 (a); *Willingham v. Morgan, 395 U.S. 402 (1969)*. In light of this, it is difficult to understand our Brother BLACKMUN's complaint that our holding today "opens the door for another avalanche of new federal cases." *Post*, at 430.  In estimating the magnitude of any such "avalanche," it is worth noting that a survey of comparable actions against state officers in 17 years (1951-1967) found only 53 reported cases in 17 years (1951-1967) that survived a motion to dismiss. Ginger & Bell, Police Misconduct Litigation -- Plaintiff's Remedies, 15 Am. Jur. Trials 555, 580-590 (1968).  Increasing this figure by 900% to allow for increases in rate and unreported cases, every federal district judge could expect to try one such case every 13 years.

403 U.S. 388, *392; 91 S. Ct. 1999, **2002; 29 L. Ed. 2d 619, ***624; 1971 U.S. LEXIS 23, ****8

*LEdHN[6]*[⬆] [6] *LEdHN[7]*[⬆] [7] *LEdHN[8]*[⬆] [8]First. Our cases have long since rejected the notion that the *Fourth Amendment* [****9] proscribes only such conduct as would, if engaged in by private persons, be condemned by state law. Thus in *Gambino v. United States, 275 U.S. 310 (1927)*, petitioners [**2003] were convicted of conspiracy to violate the National Prohibition Act on the basis of evidence seized by state police officers incident to petitioners' arrest by those officers solely for the purpose of enforcing federal law. *Id., at 314.* Notwithstanding the lack of probable cause for the arrest, *id., at 313*, it would have been permissible under state law if effected [*393] by private individuals. [5][****11] It appears, moreover, that the officers were under direction from the Governor to aid in the enforcement of federal law. *Id., at 315-317.* Accordingly, if the *Fourth Amendment* reached only to conduct impermissible under the law of the State, the Amendment would have had no application to the case. Yet this Court held the *Fourth Amendment* applicable and reversed petitioners' convictions as having been based upon evidence obtained through an unconstitutional search and seizure. Similarly, in *Byars v. United States, 273 U.S. 28 [***625] (1927)*, [****10] the petitioner was convicted on the basis of evidence seized under a warrant issued, without probable cause under the *Fourth Amendment*, by a state court judge for a state law offense. At the invitation of state law enforcement officers, a federal prohibition agent participated in the search. This Court explicitly refused to inquire whether the warrant was "good under the state law . . . since in no event could it constitute the basis for a *federal* search and seizure." *Id., at 29* (emphasis added). [6] And our recent decisions regarding electronic surveillance have made it clear beyond

peradventure that the *Fourth Amendment* is not tied to the [*394] niceties of local trespass laws. *Katz v. United States, 389 U.S. 347 (1967)*; *Berger v. New York, 388 U.S. 41 (1967)*; *Silverman v. United States, 365 U.S. 505, 511 (1961)*. In light of these cases, respondents' argument that the *Fourth Amendment* serves only as a limitation on federal defenses to a state law claim, and not as an independent limitation upon the exercise of federal power, must be rejected.

*LEdHN[9]*[⬆] [9] *LEdHN[10]*[⬆] [10] *LEdHN[11]*[⬆] [11] *LEdHN[12]*[⬆] [12]Second. The interests protected by state laws regulating trespass and the invasion of privacy, and those protected by the *Fourth Amendment's* guarantee against unreasonable searches and seizures, may be inconsistent or even hostile. Thus, we may bar the door against an unwelcome private intruder, or call the police if he persists in seeking [****12] entrance. The availability of such alternative means for the protection of privacy may lead the State to restrict imposition of liability for any consequent trespass. A private citizen, asserting no authority other than his own, will not normally be liable in trespass if he demands, and is granted, admission to another's house. See W. Prosser, The Law of Torts § 18, pp. 109-110 (3d ed. 1964); 1 F. Harper & F. James, The Law of Torts § 1.11 (1956). But one who demands admission under a claim of federal authority stands in a far different [**2004] position. Cf. *Amos v. United States, 255 U.S. 313, 317 (1921)*. The mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry or arrest by resort to the local police; and a claim of authority to enter is likely to unlock the door as well. See *Weeks v. United States, 232 U.S. 383, 386 (1914)*; *Amos v. United States, supra.* [7][****14] "In such cases there [***626] is no safety for the citizen, [*395] except in the protection of the judicial tribunals, for rights which have been invaded by [****13] the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime." *United States v. Lee, 106*

---

[5]New York at that time followed the common-law rule that a private person may arrest another if the latter has in fact committed a felony, and that if such is the case the presence or absence of probable cause is irrelevant to the legality of the arrest. See *McLoughlin v. New York Edison Co., 252 N. Y. 202, 169 N. E. 277 (1929)*; cf. N. Y. Code Crim. Proc. § 183 (1958) for codification of the rule. Conspiracy to commit a federal crime was at the time a felony. Act of March 4, 1909, § 37, 35 Stat. 1096.

[6]Conversely, we have in some instances rejected *Fourth Amendment* claims despite facts demonstrating that federal agents were acting in violation of local law. *McGuire v. United States, 273 U.S. 95 (1927)* (trespass *ab initio*); *Hester v. United States, 265 U.S. 57 (1924)* ("open fields" doctrine); cf. *Burdeau v. McDowell, 256 U.S. 465 (1921)* (possession of stolen property).

---

[7] Similarly, although the *Fourth Amendment* confines an officer executing a search warrant strictly within the bounds set by the warrant, *Marron v. United States, 275 U.S. 192, 196 (1927)*; see *Stanley v. Georgia, 394 U.S. 557, 570-572 (1969)* (STEWART, J., concurring in result), a private individual lawfully in the home of another will not normally be liable for trespass beyond the bounds of his invitation absent clear notice to that effect. See 1 F. Harper & F. James, The Law of Torts § 1.11 (1956).

403 U.S. 388, *395; 91 S. Ct. 1999, **2004; 29 L. Ed. 2d 619, ***626; 1971 U.S. LEXIS 23, ****13

_U.S. 196, 219 (1882)_. [8] Nor is it adequate to answer that state law may take into account the different status of one clothed with the authority of the Federal Government. For just as state law may not authorize federal agents to violate the _Fourth Amendment, Byars v. United States, supra; Weeks v. United States, supra; In re Ayers, 123 U.S. 443, 507 (1887)_, neither may state law undertake to limit the extent to which federal authority can be exercised. _In re Neagle, 135 U.S. 1 (1890)_. The inevitable consequence of this dual limitation on state power is that the federal question becomes not merely a possible defense to the state law action, but an independent claim both necessary and sufficient to make out the plaintiff's cause of action. Cf. _Boilermakers v. Hardeman, 401 U.S. 233, 241 (1971)_.

_LEdHN[1B][↑]_  [1B]  _LEdHN[13][↑]_  [13] _LEdHN[14][↑]_  [14]Third.  That damages may be obtained for injuries consequent upon a violation of the _Fourth Amendment_ by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. See _Nixon v. Condon, 286 U.S. 73 (1932)_; [*396] _Nixon v. Herndon, 273 U.S. 536, 540 (1927)_; _Swafford v. Templeton, 185 U.S. 487 (1902)_; [****15] _Wiley v. Sinkler , 179 U.S. 58 (1900)_; J. Landynski, Search and Seizure and the Supreme Court 28 _et seq._ (1966); N. Lasson, History and Development of the _Fourth Amendment to the United States Constitution_ 43 _et seq._ (1937); Katz, the Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in _Bell_ v. _Hood_, 117 U. Pa. L. Rev. 1, 8-33 (1968); cf.  _West v. Cabell, 153 U.S. 78 (1894)_; _Lammon v. Feusier, 111 U.S. 17 (1884)_. Of course, the _Fourth Amendment_ does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation. But "it is . . . well settled that _HN4[↑]_ where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." _Bell v. Hood, 327 U.S., at 684_ (footnote omitted). The present [**2005] case involves no special factors counselling hesitation in the absence of affirmative

action by [****16] Congress. We are not dealing with a question of "federal fiscal policy," as in _United States v. Standard Oil Co., 332 U.S. 301, 311 (1947)_. In that case we refused to infer from the Government-soldier relationship that [***627] the United States could recover damages from one who negligently injured a soldier and thereby caused the Government to pay his medical expenses and lose his services during the course of his hospitalization. Noting that Congress was normally quite solicitous where the federal purse was involved, we pointed out that "the United States [was] the party plaintiff to the suit. And the United States has power at any time to create the liability." _Id., at 316_; see _United States v. Gilman, 347 U.S. 507 (1954)_. Nor are we asked in this case to impose liability upon a congressional employee for actions contrary to no constitutional [*397] prohibition, but merely said to be in excess of the authority delegated to him by the Congress. _Wheeldin v. Wheeler, 373 U.S. 647 (1963)_. Finally, we cannot accept respondents' formulation of the question as whether the availability of [****17] money damages is necessary to enforce the _Fourth Amendment_. For we have here no explicit congressional declaration that persons injured by a federal officer's violation of the _Fourth Amendment_ may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress. The question is merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his _Fourth Amendment_ rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts. Cf. _J. I. Case Co. v. Borak, 377 U.S. 426, 433 (1964)_; _Jacobs v. United States, 290 U.S. 13, 16 (1933)_. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." _Marbury v. Madison, 1 Cranch 137, 163 (1803)_. Having concluded that petitioner's complaint states a cause of action under the _Fourth Amendment, supra, at 390-395_, we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result [****18] of the agents' violation of the Amendment.

II

_LEdHN[15][↑]_  [15]In addition to holding that petitioner's complaint had failed to state facts making out a cause of action, the District Court ruled that in any event respondents were immune from liability by virtue of their official position.  _276 F.Supp., at 15_. This question was not passed upon by the Court of Appeals,

---

[8] Although no State has undertaken to limit the common-law doctrine that one may use reasonable force to resist an unlawful arrest by a private person, at least two States have outlawed resistance to an unlawful arrest by a person known to be an officer of the law. _R. I. Gen. Laws § 12-7-10_ (1969); _State_ v. _Koonce_, 89 N. J. Super. 169, 180-184, 214 A. 2d 428, 433-436 (1965).

403 U.S. 388, *397; 91 S. Ct. 1999, **2005; 29 L. Ed. 2d 619, ***627; 1971 U.S. LEXIS 23, ****18

and accordingly we do not consider [*398] it here. The judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

**Concur by:** HARLAN

# Concur

MR. JUSTICE HARLAN, concurring in the judgment.

My initial view of this case was that the Court of Appeals was correct in dismissing the complaint, but for reasons stated in this opinion I am now persuaded to the contrary. Accordingly, I join in the judgment of reversal.

Petitioner alleged, in his suit in the District Court for the Eastern District of New York, that the defendants, [***628] federal agents acting under color of federal law, subjected him to a search and seizure contravening the requirements of the [****19] *Fourth Amendment*. He sought damages in the amount of $ 15,000 from each of the agents. Federal jurisdiction [**2006] was claimed, *inter alia*, [1] under *28 U. S. C. § 1331 (a)* which provides:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $ 10,000 exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

The District Court dismissed the complaint for lack of federal jurisdiction under *28 U. S. C. § 1331 (a)* and failure to state a claim for which relief may be granted. *276 F.Supp 12 (EDNY 1967)*. On appeal, the Court of Appeals concluded, on the basis of this Court's decision in *Bell v. Hood, 327 U.S. 678 (1946)*, that petitioner's claim for damages did "[arise] under the Constitution" [*399] within the meaning of *28 U. S. C. § 1331 (a)*; but the District Court's judgment was affirmed on the ground that the complaint failed to state a claim for which relief can be granted. *409 F.2d 718 (CA2 1969)*.

[****20] In so concluding, Chief Judge Lumbard's

opinion reasoned, in essence, that: (1) the framers of the *Fourth Amendment* did not appear to contemplate a "wholly new federal cause of action founded directly on the *Fourth Amendment*," *id.*, at 721, and (2) while the federal courts had power under a general grant of jurisdiction to imply a federal remedy for the enforcement of a constitutional right, they should do so only when the absence of alternative remedies renders the constitutional command a "mere 'form of words.'" *Id.*, at 723. The Government takes essentially the same position here. Brief for Respondents 4-5.  And two members of the Court add the contention that we lack the constitutional power to accord Bivens a remedy for damages in the absence of congressional action creating "a federal cause of action for damages for an unreasonable search in violation of the *Fourth Amendment*." Opinion of MR. JUSTICE BLACK, *post*, at 427; see also opinion of THE CHIEF JUSTICE, *post*, at 418, 422.

For the reasons set forth below, I am of the opinion that federal courts do have the power to award damages for violation of "constitutionally protected interests" [****21] and I agree with the Court that a traditional judicial remedy such as damages is appropriate to the vindication of the personal interests protected by the *Fourth Amendment*.

I

I turn first to the contention that the constitutional power of federal courts to accord Bivens damages for his claim depends on the passage of a statute creating a "federal cause of action." Although the point is not [*400] entirely free of ambiguity, [2] I do not understand either the Government or my dissenting Brothers to maintain that Bivens' contention that he is entitled to be free from the type of official conduct prohibited [***629] by the *Fourth Amendment* depends on a decision by the State in which he resides to accord him a remedy.  Such a position would be incompatible with the presumed availability of federal equitable relief, if a proper showing can be made in terms of the ordinary principles governing equitable remedies.  See *Bell v. Hood, 327 U.S. 678, 684 (1946)*. However broad a federal court's discretion concerning equitable remedies, it is absolutely clear -- at least after *Erie R. Co. v. Tompkins, 304 U.S. 64 (1938)* -- that in a nondiversity [****22] suit a federal court's power to grant even equitable relief depends on the presence of a substantive right derived

---

[1] Petitioner also asserted federal jurisdiction under *42 U. S. C. § 1983* and *28 U. S. C. § 1343 (3)*, and *28 U. S. C. § 1343 (4)*. Neither will support federal jurisdiction over the claim.  See *Bivens v. Six Unknown Named Agents, 409 F.2d 718, 720 n. 1 (CA2 1969)*.

[2] See n. 3, *infra*.

403 U.S. 388, *400; 91 S. Ct. 1999, **2006; 29 L. Ed. 2d 619, ***629; 1971 U.S. LEXIS 23, ****22

from federal law. Compare _Guaranty Trust Co. v. York, 326 U.S. 99, 105-107 (1945),_ [**2007] with _Holmberg v. Armbrecht, 327 U.S. 392, 395 (1946)._ See also H. Hart & H. Wechsler, The Federal Courts and the Federal System 818-819 (1953).

Thus the interest which Bivens claims -- to be free from official conduct in contravention of the _Fourth Amendment_ -- is a federally protected interest. See generally Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in Bell v. Hood, 117 U. Pa. L. Rev. 1, 33-34 (1968). [3] Therefore,

---

[3] The Government appears not quite ready to concede this point. Certain points in the Government's argument seem to suggest that the "state-created right -- federal defense" model reaches not only the question of the power to accord a federal damages remedy, but also the claim to any judicial remedy in any court. Thus, we are pointed to Lasson's observation concerning Madison's version of the _Fourth Amendment_ as introduced into the House:

"The observation may be made that the language of the proposal did not purport to _create_ the right to be secure from unreasonable search and seizures but merely stated it as a right which already existed."

N. Lasson, History and Development of the _Fourth Amendment to the United States Constitution_ 100 n. 77 (1937), quoted in Brief for Respondents 11 n. 7. And, on the problem of federal equitable vindication of constitutional rights without regard to the presence of a "state-created right," see Hart, The Relations Between State and Federal Law, 54 Col. L. Rev. 489, 523-524 (1954), quoted in Brief for Respondents 17.

On this point, the choice of phraseology in the _Fourth Amendment_ itself is singularly unpersuasive. The leading argument against a "_Bill of Rights_" was the fear that individual liberties not specified expressly would be taken as excluded. See generally, Lasson, _supra,_ at 79-105. This circumstance alone might well explain why the authors of the _Bill of Rights_ would opt for language which presumes the existence of a fundamental interest in liberty, albeit originally derived from the common law. See Entick v. Carrington, 19 How. St. Tr. 1029, 95 Eng. Rep. 807 (1765).

In truth, the legislative record as a whole behind the _Bill of Rights_ is silent on the rather refined doctrinal question whether the framers considered the rights therein enumerated as dependent in the first instance on the decision of a State to accord legal status to the personal interests at stake. That is understandable since the Government itself points out that general federal-question jurisdiction was not extended to the federal district courts until 1875. Act of March 3, 1875, § 1, 18

[***630] the question [*401] of judicial _power_ to grant Bivens damages is not a problem of the "source" of the "right"; instead, the question is whether the power to authorize damages as a judicial [*402] remedy for the vindication of a federal [****23] constitutional right is placed by the Constitution itself exclusively in Congress' hands.

[****24] II

[**2008] The contention that the federal courts are powerless to accord a litigant damages for a claimed invasion of his federal constitutional rights until Congress explicitly authorizes the remedy cannot rest on the notion that the decision to grant compensatory relief involves a resolution of policy considerations not susceptible of judicial discernment. Thus, in suits for damages based on violations of federal statutes lacking any express authorization of a damage remedy, this Court has authorized such relief where, in its view, damages are necessary to effectuate the congressional policy underpinning the substantive provisions of the statute. _J. I. Case Co. v. Borak, 377 U.S. 426 (1964);_

---

Stat. 470. The most that can be drawn from this historical fact is that the authors of the _Bill of Rights_ assumed the adequacy of common-law remedies to vindicate the federally protected interest. One must first combine this assumption with contemporary modes of jurisprudential thought which appeared to link "rights" and "remedies" in a 1:1 correlation, cf. _Marbury v. Madison, 1 Cranch 137, 163 (1803),_ before reaching the conclusion that the framers are to be understood today as having created no federally protected interests. And, of course, that would simply require the conclusion that federal equitable relief would not lie to protect those interests guarded by the _Fourth Amendment._

Professor Hart's observations concerning the "imperceptible steps" between _In re Ayers, 123 U.S. 443 (1887),_ and _Ex parte Young, 209 U.S. 123 (1908),_ see Hart, _supra,_ fail to persuade me that the source of the legal interest asserted here is other than the Federal Constitution itself. _In re Ayers_ concerned the precise question whether the _Eleventh Amendment_ barred suit in a federal court for an injunction compelling a state officer to perform a contract to which the State was a party. Having concluded that the suit was inescapably a suit against the State under the _Eleventh Amendment,_ the Court spoke of the presence of state-created rights as a distinguishing factor supporting the exercise of federal jurisdiction in other contract clause cases. The absence of a state-created right in _In re Ayers_ served to distinguish that case from the perspective of the State's immunity to suit; _Ayers_ simply does not speak to the analytically distinct question whether the Constitution is in the relevant sense a source of legal protection for the "rights" enumerated therein.

403 U.S. 388, *402; 91 S. Ct. 1999, **2008; 29 L. Ed. 2d 619, ***630; 1971 U.S. LEXIS 23, ****24

*Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 213 (1944).* Cf. *Wyandotte Transportation Co. v. United States, 389 U.S. 191, 201-204 (1967).* [4]

[****25] [*403] If it is not the nature of the remedy which is thought to render a judgment as to the appropriateness of damages inherently "legislative," then it must be the nature of the [***631] legal interest offered as an occasion for invoking otherwise appropriate judicial relief. But I do not think that the fact that the interest is protected by the Constitution rather than statute or common law justifies the assertion that federal courts are powerless to grant damages in the absence of explicit congressional action authorizing the remedy. Initially, I note that it would be at least anomalous to conclude that the federal judiciary -- while competent to choose among the range of traditional judicial remedies to implement statutory and commonlaw policies, and even to generate substantive rules governing primary behavior in furtherance of broadly formulated policies articulated by statute or Constitution, see *Textile Workers v. Lincoln Mills, 353 U.S. 448 (1957); United States v. Standard Oil Co., 332 U.S. 301, 304-311 (1947); Clearfield Trust Co. v. United States, 318 U.S. 363 (1943)* -- is powerless to accord [****26] a damages [*404] remedy to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the

---

[4] The *Borak* case is an especially clear example of the exercise of federal judicial power to accord damages as an appropriate remedy in the absence of any express statutory authorization of a federal cause of action. There we "implied" -- from what can only be characterized as an "exclusively procedural provision" affording access to a federal forum, cf. *Textile Workers v. Lincoln Mills, 353 U.S. 448, 462-463 (1957)* (Frankfurter, J., dissenting) -- a private cause of action for damages for violation of § 14 (a) of the Securities Exchange Act of 1934, 48 Stat. 895, *15 U. S. C. § 78n (a).* See § 27, 48 Stat. 902, *15 U. S. C. § 78aa.* We did so in an area where federal regulation has been singularly comprehensive and elaborate administrative enforcement machinery had been provided. The exercise of judicial power involved in *Borak* simply cannot be justified in terms of statutory construction, see Hill, Constitutional Remedies, 69 Col. L. Rev. 1109, 1120-1121 (1969); nor did the *Borak* Court purport to do so. See *Borak, supra, at 432-434.* The notion of "implying" a remedy, therefore, as applied to cases like *Borak,* can only refer to the process whereby the federal judiciary exercises a choice among *traditionally available* judicial remedies according to reasons related to the substantive social policy embodied in an act of positive law. See *ibid.,* and *Bell v. Hood, supra, at 684.*

Government as an instrument of the popular will.

More importantly, the presumed availability of federal equitable relief against threatened invasions of constitutional interests appears entirely to negate the contention that the status of an interest as constitutionally protected divests federal courts of power to grant damages absent express congressional authorization. Congress provided specially for the exercise of equitable remedial powers by federal courts, see Act of May [**2009] 8, 1792, § 2, 1 Stat. 276; C. Wright, Law of Federal Courts 257 (2d ed., 1970), in part because of the limited availability of equitable remedies in state courts in the early days of the Republic. See *Guaranty Trust Co. v. York, 326 U.S. 99, 104-105 (1945).* And this Court's decisions make clear that, at least absent congressional restrictions, the scope of equitable remedial discretion is to be determined according to the distinctive historical traditions of equity as an institution, *Holmberg v. Armbrecht, 327 U.S. 392, 395-396 (1946);* [****27] *Sprague v. Ticonic National Bank, 307 U.S. 161, 165-166 (1939).* The reach of a federal district court's "inherent equitable powers," *Textile Workers v. Lincoln Mills, 353 U.S. 448, 460* (Burton, J., concurring in result), is broad indeed, e. g., *Swann v. Charlotte-Mecklenburg Board of Education, 401 U.S. 1 (1971);* nonetheless, the federal judiciary is not empowered to grant equitable relief in the absence of congressional action extending jurisdiction over the subject matter of the suit. See *Textile Workers v. Lincoln Mills, supra, at 460* (Burton, J., concurring in result); Katz, 117 U. Pa. L. Rev., at 43. [5]

[****28] [*405] If [***632] explicit congressional authorization is an absolute prerequisite to the power of a federal court to accord compensatory relief regardless of the necessity or appropriateness of damages as a remedy simply because of the status of a legal interest as constitutionally protected, then it seems to me that explicit congressional authorization is similarly

---

[5] With regard to a court's authority to grant an equitable remedy, the line between "subject matter" jurisdiction and remedial powers has undoubtedly been obscured by the fact that historically the "system of equity 'derived its doctrines, as well as its powers, from its mode of giving relief.'" See *Guaranty Trust Co. v. York, supra, at 105,* quoting C. Langdell, Summary of Equity Pleading xxvii (1877). Perhaps this fact alone accounts for the suggestion sometimes made that a court's power to enjoin invasion of constitutionally protected interests derives directly from the Constitution. See *Bell v. Hood, 71 F.Supp. 813, 819 (SD Cal. 1947).*

403 U.S. 388, *405; 91 S. Ct. 1999, **2009; 29 L. Ed. 2d 619, ***632; 1971 U.S. LEXIS 23, ****28

prerequisite to the exercise of equitable remedial discretion in favor of constitutionally protected interests. Conversely, if a general grant of jurisdiction to the federal courts by Congress is thought adequate to empower a federal court to grant equitable relief for all areas of subject-matter jurisdiction enumerated therein, see 28 U. S. C. § 1331 (a), then it seems to me that the same statute is sufficient to empower a federal court to grant a traditional remedy at law. [6] Of course, the special historical traditions governing the federal equity system, see Sprague v. Ticonic National Bank, 307 U.S. 161 [*406] (1939), might still bear on the comparative appropriateness of granting equitable relief as opposed to money damages. That possibility, however, [****29] relates, not to whether the federal courts have the power to afford one type of remedy as opposed to the other, but rather to the criteria which should govern the exercise of our power. To that question, I now pass.

[****30] III

[**2010] The major thrust of the Government's position is that, where Congress has not expressly authorized a particular remedy, a federal court should exercise its power to accord a traditional form of judicial relief at the behest of a litigant, who claims a constitutionally protected interest has been invaded, only where the remedy is "essential," or "indispensable for vindicating constitutional rights." Brief for Respondents 19, 24. While this "essentiality" test is most clearly articulated with respect to damages remedies, apparently the Government believes the same test explains the exercise of equitable remedial powers. Id., at 17-18. It is argued that historically the Court has rarely exercised the power to accord such relief in the absence of an

express congressional authorization and that "if Congress had thought that federal officers should be subject to a law different than state law, it would have had no difficulty in saying so, as it did with respect to state officers . . . ." Id., at 20-21; see 42 U. S. C. § 1983. Although conceding that the standard of determining whether a damage remedy should be utilized to effectuate [****31] statutory policies is one of "necessity" or "appropriateness," see J. I. Case Co. v. Borak, 377 U.S. 426, 432 (1964); United [****633] States v. Standard Oil Co., 332 U.S. 301, 307 (1947), the Government contends that questions concerning congressional discretion to modify judicial remedies relating to constitutionally protected interests warrant a more stringent constraint on [*407] the exercise of judicial power with respect to this class of legally protected interests. Brief for Respondents 21-22.

These arguments for a more stringent test to govern the grant of damages in constitutional cases [7] seem to be adequately answered by the point that the judiciary has a particular responsibility to assure the vindication of constitutional interests such as those embraced by the Fourth Amendment. To be sure, "it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." Missouri, Kansas & Texas R. Co. v. May, 194 U.S. 267, 270 (1904). But it must also be recognized that the Bill of Rights is particularly intended to vindicate [****32] the interests of the individual in the face of the popular will as expressed in legislative majorities; at the very least, it strikes me as no more appropriate to await express congressional authorization of traditional judicial relief with regard to these legal interests than with respect to interests protected by federal statutes.

The question then, is, as I see it, whether compensatory relief is "necessary" or "appropriate" to the vindication of the interest asserted. Cf. J. I. Case Co. v. Borak, supra, at 432; United States v. Standard Oil Co., supra, at 307; Hill, Constitutional Remedies, 69 Col. L. Rev. 1109, 1155 (1969); Katz, 117 U. Pa. L. Rev., at 72. In resolving that question, it [****33] seems to me that the range of policy considerations we may take into account is at least as broad as the range of those a legislature would consider with respect to an express statutory

---

[6] Chief Judge Lumbard's opinion for the Court of Appeals in the instant case is, as I have noted, in accord with this conclusion:

"Thus, even if the Constitution itself does not give rise to an inherent injunctive power to prevent its violation by governmental officials there are strong reasons for inferring the existence of this power under any general grant of jurisdiction to the federal courts by Congress." 409 F.2d, at 723.

The description of the remedy as "inferred" cannot, of course, be intended to assimilate the judicial decision to accord such a remedy to any process of statutory construction. Rather, as with the cases concerning remedies, implied from statutory schemes, see n. 4, supra, the description of the remedy as "inferred" can only bear on the reasons offered to explain a judicial decision to accord or not to accord a particular remedy.

[7] I express no view on the Government's suggestion that congressional authority to simply discard the remedy the Court today authorizes might be in doubt; nor do I understand the Court's opinion today to express any view on that particular question.

403 U.S. 388, *407; 91 S. Ct. 1999, **2010; 29 L. Ed. 2d 619, ***633; 1971 U.S. LEXIS 23, ****33

authorization of a traditional remedy. In this regard I agree with the Court that the appropriateness of according Bivens [*408] compensatory relief does not turn simply on the deterrent effect liability will have on federal official conduct. [8] Damages as a traditional form [**2011] of compensation for invasion [***634] of a legally protected interest may be entirely appropriate even if no substantial deterrent effects on future official lawlessness might be thought to result. Bivens, after all, has invoked judicial processes claiming entitlement to compensation for injuries resulting from allegedly lawless official behavior, if those injuries are properly compensable in money damages. I do not think a court of law -- vested with the power to accord a remedy -- should deny him his relief simply because he cannot show that future lawless conduct will thereby be deterred.

[****34] And I think it is clear that Bivens advances a claim of the sort that, if proved, would be properly compensable in damages. The personal interests protected by the Fourth Amendment are those we attempt to capture by the notion of "privacy"; while the Court today properly points out that the type of harm which officials can inflict when they invade protected zones of an individual's life [*409] are different from the types of harm private citizens inflict on one another, the experience of judges in dealing with private trespass and false imprisonment claims supports the conclusion that courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for

invasion of Fourth Amendment rights. [9]

[****35] On the other hand, the limitations on state remedies for violation of common-law rights by private citizens argue in favor of a federal damages remedy. The injuries inflicted by officials acting under color of law, while no less compensable in damages than those inflicted by private parties, are substantially different in kind, as the Court's opinion today discusses in detail. See Monroe v. Pape, 365 U.S. 167, 195 (1961) (HARLAN, J., concurring). It seems to me entirely proper that these injuries be compensable according to uniform rules of federal law, especially in light of the very large element of federal law which must in any event control the scope of official defenses to liability. See Wheeldin v. Wheeler, 373 U.S. 647, 652 (1963); Monroe v. Pape, supra, at 194-195 (HARLAN, J., concurring); Howard v. Lyons, 360 U.S. 593 (1959). Certainly, there is very little to be gained from the standpoint of federalism by preserving different rules of liability for federal officers dependent on the State where the injury occurs. Cf. United States v. Standard Oil Co., 332 U.S. 301, 305-311 (1947). [****36]

Putting aside the desirability of leaving the problem of federal official liability to the vagaries of common-law actions, it is apparent that some form of damages is the only possible remedy for someone in Bivens' alleged [*410] position. It will be a rare case indeed in which an individual in Bivens' position will be able to obviate the harm by securing injunctive [**2012] relief from any court. However desirable a direct remedy against the Government might be as a substitute for individual official liability, the sovereign still remains immune to suit. Finally, assuming [***635] Bivens' innocence of the crime charged, the "exclusionary rule" is simply irrelevant. For people in Bivens' shoes, it is damages or nothing.

The only substantial policy consideration advanced against recognition of a federal cause of action for violation of Fourth Amendment rights by federal officials is the incremental expenditure of judicial resources that will be necessitated by this class of litigation. There is, however, something ultimately self-defeating about this argument. For if, as the Government contends, damages will rarely be realized by plaintiffs in these

---

[8] And I think it follows from this point that today's decision has little, if indeed any, bearing on the question whether a federal court may properly devise remedies -- other than traditionally available forms of judicial relief -- for the purpose of enforcing substantive social policies embodied in constitutional or statutory policies. Compare today's decision with Mapp v. Ohio, 367 U.S. 643 (1961), and Weeks v. United States, 232 U.S. 383 (1914). The Court today simply recognizes what has long been implicit in our decisions concerning equitable relief and remedies implied from statutory schemes; i. e., that a court of law vested with jurisdiction over the subject matter of a suit has the power -- and therefore the duty -- to make principled choices among traditional judicial remedies. Whether special prophylactic measures -- which at least arguably the exclusionary rule exemplifies, see Hill, The Bill of Rights and the Supervisory Power, 69 Col. L. Rev. 181, 182-185 (1969) -- are supportable on grounds other than a court's competence to select among traditional judicial remedies to make good the wrong done, cf. Bell v. Hood, supra, at 684, is a separate question.

[9] The same, of course, may not be true with respect to other types of constitutionally protected interests, and therefore the appropriateness of money damages may well vary with the nature of the personal interest asserted. See Monroe v. Pape, 365 U.S. 167, 196 n. 5 (HARLAN, J., concurring).

403 U.S. 388, *410; 91 S. Ct. 1999, **2012; 29 L. Ed. 2d 619, ***635; 1971 U.S. LEXIS 23, ****36

cases because [****37] of jury hostility, the limited resources of the official concerned, etc., then I am not ready to assume that there will be a significant increase in the expenditure of judicial resources on these claims. Few responsible lawyers and plaintiffs are likely to choose the course of litigation if the statistical chances of success are truly *de minimis*. And I simply cannot agree with my Brother BLACK that the possibility of "frivolous" claims -- if defined simply as claims with no legal merit -- warrants closing the courthouse doors to people in Bivens' situation. There are other ways, short of that, of coping with frivolous lawsuits.

On the other hand, if -- as I believe is the case with respect, at least, to the most flagrant abuses of official power -- damages to some degree will be available when the option of litigation is chosen, then the question appears to be how *Fourth Amendment* interests rank on a scale of social values compared with, for example, the interests of stockholders defrauded by misleading proxies. [*411] See *J. I. Case Co. v. Borak, supra.* Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we [****38] automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests. And current limitations upon the effective functioning of the courts arising from budgetary inadequacies should not be permitted to stand in the way of the recognition of otherwise sound constitutional principles.

Of course, for a variety of reasons, the remedy may not often be sought. See generally Foote, Tort Remedies for Police Violations of Individual Rights, 39 Minn. L. Rev. 493 (1955). And the countervailing interests in efficient law enforcement of course argue for a protective zone with respect to many types of *Fourth Amendment* violations. Cf. *Barr v. Matteo, 360 U.S. 564 (1959)* (opinion of HARLAN, J.). But, while I express no view on the immunity defense offered in the instant case, I deem it proper to venture the thought that at the very least such a remedy would be available for the most flagrant and patently unjustified sorts of police conduct. Although litigants may not often choose to seek relief, it is important, in a civilized society, that the judicial [****39] branch of the Nation's government stand ready to afford a remedy in these circumstances. It goes without saying that I intimate no view on the merits of petitioner's underlying claim.

For these reasons, I concur in the judgment of the Court.

**Dissent by:** BURGER; BLACK; BLACKMUN

# Dissent

MR. CHIEF JUSTICE BURGER, dissenting.

I dissent from today's holding which judicially creates a damage [***636] remedy not provided for by the Constitution and not enacted by Congress. We would more surely preserve the important values of the doctrine of separation [*412] of powers -- and perhaps get a better result -- by recommending a solution to the Congress as the branch of government in which the Constitution has vested the legislative power. Legislation is the business of the Congress, and it has the facilities and competence for that task -- as we do [**2013] not. Professor Thayer, speaking of the limits on judicial power, albeit in another context, had this to say: [1]

"And if it be true that the holders of legislative power are careless or evil, yet the constitutional duty of the court remains untouched; it cannot rightly attempt to protect the people, by undertaking a function [****40] not its own. On the other hand, by adhering rigidly to its own duty, the court will help, as nothing else can, to fix the spot where responsibility lies, and to bring down on that precise locality the thunderbolt of popular condemnation. . . . For that course -- the true course of judicial duty always -- will powerfully help to bring the people and their representatives to a sense of their own responsibility."

This case has significance far beyond its facts and its holding. For more than 55 years this Court has enforced a rule under which evidence of undoubted reliability and probative value has been suppressed and excluded from criminal cases whenever it was obtained in violation of the *Fourth Amendment. Weeks v. United States, 232 U.S. 383 (1914); Boyd v. United States, 116 U.S. 616, 633 (1886)* (dictum). This rule was extended to the States in *Mapp v. Ohio, 367 U.S. 643 (1961).* [****41] [2] [*413] The rule has rested on a theory that suppression of evidence in these circumstances was imperative to deter law enforcement authorities from using improper methods to obtain evidence.

---

[1] J. Thayer, O. Holmes, & F. Frankfurter, John Marshall 88 (Phoenix ed. 1967).

[2] The Court reached the issue of applying the *Weeks* doctrine to the States *sua sponte.*

403 U.S. 388, *413; 91 S. Ct. 1999, **2013; 29 L. Ed. 2d 619, ***636; 1971 U.S. LEXIS 23, ****41

The deterrence theory underlying the suppression doctrine, or exclusionary rule, has a certain appeal in spite of the high price society pays for such a drastic remedy. Notwithstanding its plausibility, many judges and lawyers and some of our most distinguished legal scholars have never quite been able to escape the force of Cardozo's statement of the doctrine's anomalous result:

"The criminal is to go free because the constable has blundered. . . . A room is searched against the law, and the body of a murdered man is found. . . . The privacy of the home has been infringed, and the murderer goes free." *People v. Defore, 242 N. Y. 13, 21, 23-24, 150 N. E. 585, 587, 588 (1926).* [3]

The [****42] plurality opinion in *Irvine v. California, 347 U.S. 128, 136 (1954),* catalogued the doctrine's defects:

"Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its remedy [***637] against one lawbreaker because he has been pursued by another. It protects one against whom incriminating evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches."

From time to time members of the Court, recognizing the validity of these protests, have articulated varying [*414] alternative justifications for the suppression of important evidence in a criminal trial. Under one of these alternative [****43] theories the rule's foundation is shifted to the "sporting contest" thesis that the government must "play the game fairly" and cannot be allowed to profit from its own illegal acts. *Olmstead v. United States, 277 U.S. 438, 469, 471 (1928)* (dissenting opinions); see *Terry v. Ohio, 392 U.S. 1, 13 (1968).* But the exclusionary rule does not ineluctably flow from a desire to ensure that government plays the "game" [**2014] according to the rules. If an effective alternative remedy is available, concern for official observance of the law does not require adherence to the exclusionary rule. Nor is it easy to understand how a court can be thought to endorse a violation of the *Fourth*

*Amendment* by allowing illegally seized evidence to be introduced against a defendant if an effective remedy is provided against the government.

The exclusionary rule has also been justified on the theory that the relationship between the *Self-Incrimination Clause of the Fifth Amendment* and the *Fourth Amendment* requires the suppression of evidence seized in violation of the latter. *Boyd v. United States, supra, at 633* (dictum); *Wolf v. Colorado, 338 U.S. 25, 47, 48 (1949)* [****44] (Rutledge, J., dissenting); *Mapp v. Ohio, supra, at 661-666* (BLACK, J., concurring).

Even ignoring, however, the decisions of this Court that have held that the *Fifth Amendment* applies only to "testimonial" disclosures, *United States v. Wade, 388 U.S. 218, 221-223 (1967); Schmerber v. California, 384 U.S. 757, 764 and n. 8 (1966),* it seems clear that the *Self-Incrimination Clause* does not protect a person from the seizure of evidence that is incriminating. It protects a person only from being the conduit by which the police acquire evidence. Mr. Justice Holmes once put it succinctly, "A party is privileged from producing the [*415] evidence but not from its production." *Johnson v. United States, 228 U.S. 457, 458 (1913).*

It is clear, however, that neither of these theories undergirds the decided cases in this Court. Rather the exclusionary rule has rested on the deterrent rationale -- the hope that law enforcement officials would be deterred from unlawful searches and seizures if the illegally seized, albeit trustworthy, evidence was suppressed often enough and the courts persistently [****45] enough deprived them of any benefits they might have gained from their illegal conduct.

This evidentiary rule is unique to American jurisprudence. Although the English and Canadian legal systems are highly regarded, neither has adopted our rule. See Martin, The Exclusionary Rule Under Foreign Law -- Canada, 52 J. Crim. L. C. & [***638] P. S. 271, 272 (1961); Williams, The Exclusionary Rule Under Foreign Law -- England, 52 J. Crim. L. C. & P. S. 272 (1961).

I do not question the need for some remedy to give meaning and teeth to the constitutional guarantees against unlawful conduct by government officials. Without some effective sanction, these protections would constitute little more than rhetoric. Beyond doubt the conduct of some officials requires sanctions as

---

[3] What Cardozo suggested as an example of the potentially far-reaching consequences of the suppression doctrine was almost realized in *Killough v. United States, 114 U. S. App. D. C. 305, 315 F.2d 241 (1962).*

403 U.S. 388, *415; 91 S. Ct. 1999, **2014; 29 L. Ed. 2d 619, ***638; 1971 U.S. LEXIS 23, ****45

cases like *Irvine* indicate. But the hope that this objective could be accomplished by the exclusion of reliable evidence from criminal trials was hardly more than a wistful dream. Although I would hesitate to abandon it until some meaningful substitute is developed, the history of the suppression doctrine demonstrates that it is both conceptually sterile and practically ineffective [****46] in accomplishing its stated objective. This is illustrated by the paradox that an unlawful act against a totally innocent person -- such as petitioner claims to be -- has been left without an effective remedy, and hence the Court finds [*416] it necessary now -- 55 years later -- to construct a remedy of its own.

Some clear demonstration of the benefits and effectiveness of the exclusionary rule is required to justify it in view of the high price it extracts from society -- the release of countless guilty criminals. See Allen, *Federalism and the Fourth Amendment*: A Requiem for Wolf, 1961 Sup. Ct. Rev. 1, 33 n. 172. But there is no empirical evidence to support the claim that the rule actually deters illegal conduct of law enforcement officials. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 667 (1970).

[**2015] There are several reasons for this failure. The rule does not apply any direct sanction to the individual official whose illegal conduct results in the exclusion of evidence in a criminal trial. With rare exceptions law enforcement agencies do not impose direct sanctions on the individual officer [****47] responsible for a particular judicial application of the suppression doctrine. *Id.*, at 710. Thus there is virtually nothing done to bring about a change in his practices. The immediate sanction triggered by the application of the rule is visited upon the prosecutor whose case against a criminal is either weakened or destroyed. The doctrine deprives the police in no real sense; except that apprehending wrongdoers is their business, police have no more stake in successful prosecutions than prosecutors or the public.

The suppression doctrine vaguely assumes that law enforcement is a monolithic governmental enterprise. For example, the dissenters in *Wolf v. Colorado, supra, at 44,* argued that:

"Only by exclusion can we impress upon the zealous *prosecutor* that violation of the Constitution will do him no good. And only when that point is driven home can the *prosecutor* be expected to emphasize [*417] the importance of observing the constitutional demands in

his instructions to the police." (Emphasis added.)

But the prosecutor who loses his case because of police misconduct is not an official in the police department; [****48] he can rarely set in motion any corrective action or administrative penalties. Moreover, he does not have control or direction over police procedures or police actions that lead to the exclusion of evidence. It is the rare exception when [***639] a prosecutor takes part in arrests, searches, or seizures so that he can guide police action.

Whatever educational effect the rule conceivably might have in theory is greatly diminished in fact by the realities of law enforcement work. Policemen do not have the time, inclination, or training to read and grasp the nuances of the appellate opinions that ultimately define the standards of conduct they are to follow. The issues that these decisions resolve often admit of neither easy nor obvious answers, as sharply divided courts on what is or is not "reasonable" amply demonstrate. [4] Nor can judges, in all candor, forget that opinions sometimes lack helpful clarity.

[****49] The presumed educational effect of judicial opinions is also reduced by the long time lapse -- often several years -- between the original police action and its final judicial evaluation. Given a policeman's pressing responsibilities, it would be surprising if he ever becomes aware of the final result after such a delay. Finally, the exclusionary [*418] rule's deterrent impact is diluted by the fact that there are large areas of police activity that do not result in criminal prosecutions -- hence the rule has virtually no applicability and no effect in such situations. Oaks, *supra*, at 720-724.

Today's holding seeks to fill one of the gaps of the suppression doctrine -- at the price of impinging on the legislative and policy functions that the Constitution vests in Congress. Nevertheless, the holding serves the useful purpose of exposing the fundamental weaknesses of the suppression doctrine. Suppressing unchallenged truth has set guilty criminals free but demonstrably has neither deterred deliberate violations

---

[4] For example, in a case arising under *Mapp, supra,* state judges at every level of the state judiciary may find the police conduct proper. On federal habeas corpus a district judge and a court of appeals might agree. Yet, in these circumstances, this Court, reviewing the case as much as 10 years later, might reverse by a narrow margin. In these circumstances it is difficult to conclude that the policeman has violated some rule that he should have known was a restriction on his authority.

of the *Fourth Amendment* nor decreased those errors in judgment that will inevitably occur **[**2016]** given the pressures inherent in police work having to **[****50]** do with serious crimes.

Although unfortunately ineffective, the exclusionary rule has increasingly been characterized by a single, monolithic, and drastic judicial response to all official violations of legal norms. Inadvertent errors of judgment that do not work any grave injustice will inevitably occur under the pressure of police work. These honest mistakes have been treated in the same way as deliberate and flagrant Irvine-type violations of the *Fourth Amendment*. For example, in *Miller v. United States, 357 U.S. 301, 309-310 (1958)*, reliable evidence was suppressed because of a police officer's failure to say a "few more words" during the arrest and search of a known narcotics peddler.

This Court's decision announced today in *Coolidge* v. *New Hampshire, post*, p. 443, dramatically illustrates the extent to which the doctrine represents a mechanically inflexible response to widely varying degrees of police error and the resulting high price that society pays. I dissented in *Coolidge* primarily because I do not **[***640]** believe the *Fourth Amendment* had been violated. Even on the Court's contrary premise, however, whatever violation **[*419]** **[****51]** occurred was surely insufficient in nature and extent to justify the drastic result dictated by the suppression doctrine. A fair trial by jury has resolved doubts as to Coolidge's guilt. But now his conviction on retrial is placed in serious question by the remand for a new trial -- years after the crime -- in which evidence that the New Hampshire courts found relevant and reliable will be withheld from the jury's consideration. It is hardly surprising that such results are viewed with incomprehension by nonlawyers in this country and lawyers, judges, and legal scholars the world over.

Freeing either a tiger or a mouse in a schoolroom is an illegal act, but no rational person would suggest that these two acts should be punished in the same way. From time to time judges have occasion to pass on regulations governing police procedures. I wonder what would be the judicial response to a police order authorizing "shoot to kill" with respect to every fugitive. It is easy to predict our collective wrath and outrage. We, in common with all rational minds, would say that the police response must relate to the gravity and need; that a "shoot" order might conceivably be tolerable to prevent **[****52]** the escape of a convicted killer but surely not for a car thief, a pickpocket or a shoplifter.

I submit that society has at least as much right to expect rationally graded responses from judges in place of the universal "capital punishment" we inflict on all evidence when police error is shown in its acquisition. See ALI, Model Code of Pre-Arraignment Procedure § SS 8.02 (2), p. 23 (Tent. Draft No. 4, 1971), reprinted in the Appendix to this opinion. Yet for over 55 years, and with increasing scope and intensity as today's *Coolidge* holding shows, our legal system has treated vastly dissimilar cases as if they were the same. Our adherence to the exclusionary rule, our resistance to change, and our refusal even to acknowledge the need **[*420]** for effective enforcement mechanisms bring to mind Holmes' well-known statement:

"It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897). **[****53]**

In characterizing the suppression doctrine as an anomalous and ineffective mechanism with which to regulate law enforcement, I intend no reflection on the motivation of those members of this Court who hoped it would be a means of enforcing the *Fourth Amendment*. Judges cannot be faulted for being offended by arrests, searches, and seizures **[**2017]** that violate the *Bill of Rights* or statutes intended to regulate public officials. But we can and should be faulted for clinging to an unworkable and irrational concept of law. My criticism is that we have taken so long to find better ways to accomplish these desired objectives. And there are better ways.

Instead of continuing to enforce the suppression doctrine inflexibly, rigidly, and mechanically, we should view it as one of the experimental steps in the great tradition of the **[***641]** common law and acknowledge its shortcomings. But in the same spirit we should be prepared to discontinue what the experience of over half a century has shown neither deters errant officers nor affords a remedy to the totally innocent victims of official misconduct.

I do not propose, however, that we abandon the suppression doctrine until some **[****54]** meaningful alternative can be developed. In a sense our legal system has become the captive of its own creation. To overrule *Weeks* and *Mapp*, even assuming the Court

403 U.S. 388, *420; 91 S. Ct. 1999, **2017; 29 L. Ed. 2d 619, ***641; 1971 U.S. LEXIS 23, ****54

was now prepared to **[\*421]** take that step, could raise yet new problems. Obviously the public interest would be poorly served if law enforcement officials were suddenly to gain the impression, however erroneous, that all constitutional restraints on police had somehow been removed -- that an open season on "criminals" had been declared. I am concerned lest some such mistaken impression might be fostered by a flat overruling of the suppression doctrine cases. For years we have relied upon it as the exclusive remedy for unlawful official conduct; in a sense we are in a situation akin to the narcotics addict whose dependence on drugs precludes any drastic or immediate withdrawal of the supposed prop, regardless of how futile its continued use may be.

Reasonable and effective substitutes can be formulated if Congress would take the lead, as it did for example in 1946 in the Federal Tort Claims Act. I see no insuperable obstacle to the elimination of the suppression doctrine if Congress would provide some **[\*\*\*\*55]** meaningful and effective remedy against unlawful conduct by government officials.

The problems of both error and deliberate misconduct by law enforcement officials call for a workable remedy. Private damage actions against individual police officers concededly have not adequately met this requirement, and it would be fallacious to assume today's work of the Court in creating a remedy will really accomplish its stated objective. There is some validity to the claims that juries will not return verdicts against individual officers except in those unusual cases where the violation has been flagrant or where the error has been complete, as in the arrest of the wrong person or the search of the wrong house. There is surely serious doubt, for example, that a drug peddler caught packaging his wares will be able to arouse much sympathy in a jury on the ground that the police officer did not announce his identity and **[\*422]** purpose fully or because he failed to utter a "few more words." See _Miller v. United States, supra._ Jurors may well refuse to penalize a police officer at the behest of a person they believe to be a "criminal" and probably will not punish an **[\*\*\*\*56]** officer for honest errors of judgment. In any event an actual recovery depends on finding nonexempt assets of the police officer from which a judgment can be satisfied.

I conclude, therefore, that an entirely different remedy is necessary but it is one that in my view is as much beyond judicial power as the step the Court takes today. Congress should develop an administrative or quasi-

judicial remedy against the government itself to afford compensation and restitution for persons whose _Fourth Amendment_ rights have been violated. The venerable doctrine of _respondeat superior_ in our tort law provides an entirely **[\*\*\*642]** appropriate conceptual basis for this remedy. If, for example, a security guard privately employed by a department store commits an assault or other tort on a customer such as an improper search, the victim **[\*\*2018]** has a simple and obvious remedy -- an action for money damages against the guard's employer, the department store. W. Prosser, The Law of Torts § 68, pp. 470-480 (3d ed. 1964). [5] Such a statutory scheme would have the added advantage of providing some remedy to the completely innocent persons who are sometimes the victims of illegal police **[\*\*\*\*57]** conduct -- something that the suppression doctrine, of course, can never accomplish.

A simple structure would suffice. [6] For example, Congress could enact a statute along the following lines:

(a) a waiver of sovereign immunity as to the illegal **[\*423]** acts of law enforcement officials committed in the performance of assigned duties;

(b) the creation of a cause of action for damages sustained by any person aggrieved by conduct of governmental agents in violation of the _Fourth Amendment_ or statutes regulating official conduct;

(c) the creation of a tribunal, quasi-judicial **[\*\*\*\*58]** in nature or perhaps patterned after the United States Court of Claims, to adjudicate all claims under the statute;

(d) a provision that this statutory remedy is in lieu of the exclusion of evidence secured for use in criminal cases in violation of the _Fourth Amendment_; and

(e) a provision directing that no evidence, otherwise admissible, shall be excluded from any criminal proceeding because of violation of the _Fourth Amendment_.

I doubt that lawyers serving on such a tribunal would be swayed either by undue sympathy for officers or by the prejudice against "criminals" that has sometimes moved

---

[5] Damage verdicts for such acts are often sufficient in size to provide an effective deterrent and stimulate employers to corrective action.

[6] Electronic eavesdropping presents special problems. See _18 U. S. C. §§ 2510-2520 (1964 ed., Supp. V)._

lay jurors to deny claims. In addition to awarding damages, the record of the police conduct that is condemned would undoubtedly become a relevant part of an officer's personnel file so that the need for additional training or disciplinary action could be identified or his future usefulness as a public official evaluated. Finally, appellate judicial review could be made available on much the same basis that it is now provided as to district courts and regulatory agencies. This would leave to the courts the ultimate responsibility for determining and articulating standards.

Once the constitutional [****59] validity of such a statute is established, [7] it can reasonably be assumed that the States [*424] would develop their own remedial systems on the federal model. Indeed there is nothing to prevent a State from enacting a comparable statutory scheme without waiting for the Congress. Steps along these lines would move our system toward more responsible law enforcement [***643] on the one hand and away from the irrational and drastic results of the suppression doctrine on the other. Independent of the alternative embraced in this dissenting opinion, I believe the time has come to re-examine the scope of the exclusionary rule and consider at least some narrowing of its thrust so as to eliminate the anomalies it has produced.

[****60] In a country that prides itself on innovation, inventive genius, and willingness to experiment, it is a paradox that we should cling for more than a half century to a legal mechanism that was poorly designed and never really worked. I can only hope now that the Congress will manifest a willingness to view realistically the hard evidence of the half-century history of the suppression doctrine revealing [**2019] thousands of cases in which the criminal was set free because the constable blundered and virtually no evidence that innocent victims of police error -- such as petitioner claims to be -- have been afforded meaningful redress.

APPENDIX TO OPINION OF BURGER, C. J., DISSENTING

It is interesting to note that studies over a period of years led the American Law Institute to propose the following in its tentative draft of a model pre-arraignment

code:

"(2) *Determination*. Unless otherwise required by the Constitution of the United States or of this State, a motion to suppress evidence based upon a [*425] violation of any of the provisions of this code shall be granted *only if the court finds that such violation was substantial*. In determining whether a violation [****61] is substantial the court shall consider all the circumstances, including:

"(a) the importance of the particular interest violated;

"(b) the extent of deviation from lawful conduct;

"(c) the extent to which the violation was willful;

"(d) the extent to which privacy was invaded;

"(e) the extent to which exclusion will tend to prevent violations of this Code;

"(f) whether, but for the violation, the things seized would have been discovered; and

"(g) the extent to which the violation prejudiced the moving party's ability to support his motion, or to defend himself in the proceeding in which the things seized are sought to be offered in evidence against him.

"(3) *Fruits of Prior Unlawful Search*. If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to a motion to suppress under subsection (1), and if as a result of such search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes that such evidence would probably have been discovered by law enforcement authorities irrespective of such search [****62] or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of this Code."

ALI, Model Code of Pre-Arraignment Procedure §§ SS 8.02 (2), (3), pp. 23-24 (Tent. Draft No. 4, 1971) (emphasis supplied).

[*426] The Reporters' views on the exclusionary rule are also reflected in their comment on the proposed section:

[***644] "The Reporters wish to emphasize that they are not, as a matter of policy, wedded to the exclusionary rule as the sole or best means of enforcing

---

[7] Any such legislation should emphasize the interdependence between the waiver of sovereign immunity and the elimination of the judicially created exclusionary rule so that if the legislative determination to repudiate the exclusionary rule falls, the entire statutory scheme would fall.

the _Fourth Amendment_. See Oaks, _Studying the Exclusionary Rule in Search and Seizure_, 37 U. of Chi. L. Rev. 665 (1970). Paragraph (2) embodies what the Reporters hope is a more flexible approach to the problem, subject of course to constitutional requirements." _Id_., comment, at 26-27.

This is but one of many expressions of disenchantment with the exclusionary rule; see also:

1. Barrett, Exclusion of Evidence Obtained by Illegal Searches -- A Comment on People vs. Cahan, 43 Calif. L. Rev. 565 (1955).

2. Burns, _Mapp_ v. _Ohio_: An All-American Mistake, 19 DePaul L. Rev. 80 (1969).

3. Friendly, The _Bill of Rights_ as a Code of [****63] Criminal Procedure, 53 Calif. L. Rev. 929, 951-954 (1965).

4. F. Inbau, J. Thompson, & C. Sowle, Cases and Comments on Criminal Justice: Criminal Law Administration 1-84 (3d ed. 1968).

5. LaFave, Improving Police Performance Through the Exclusionary Rule [**2020] (pts. 1 & 2), 30 Mo. L. Rev. 391, 566 (1965).

6. LaFave & Remington, Controlling the Police: The Judge's Role in Making and Reviewing Law Enforcement Decisions, 63 Mich. L. Rev. 987 (1965).

7. N. Morris & G. Hawkins, The Honest Politician's Guide to Crime Control 101 (1970).

8. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665 (1970).

[*427] 9. Plumb, Illegal Enforcement of the Law, 24 Cornell L. Q. 337 (1939).

10. Schaefer, The _Fourteenth Amendment_ and Sanctity of the Person, 64 Nw. U. L. Rev. 1 (1969).

11. Waite, Judges and the Crime Burden, 54 Mich. L. Rev. 169 (1955).

12. Waite, Evidence -- Police Regulation by Rules of Evidence, 42 Mich. L. Rev. 679 (1944).

13. Wigmore, Using Evidence Obtained by Illegal Search and Seizure, 8 A. B. A. J. 479 (1922). [****64]

14. 8 J. Wigmore, Evidence § 2184a (McNaughton rev. 1961).

MR. JUSTICE BLACK, dissenting.

In my opinion for the Court in _Bell_ v. _Hood, 327 U.S. 678 (1946)_, we did as the Court states, reserve the question whether an unreasonable search made by a federal officer in violation of the _Fourth Amendment_ gives the subject of the search a federal cause of action for damages against the officers making the search. There can be no doubt that Congress could create a federal cause of action for damages for an unreasonable search in violation of the _Fourth Amendment_. Although Congress has created such a federal cause of action against _state_ officials acting under color of state law, [*] it [***645] has never created such a cause of action against federal officials. If it wanted to do so, Congress could, of course, create a remedy against [*428] federal officials who violate the _Fourth Amendment_ in the performance of their duties. But the point of this case and the fatal weakness in the Court's judgment is that neither Congress nor the State of New York has enacted legislation creating such a right of action. For us to do so is, in my judgment, an exercise [****65] of power that the Constitution does not give us.

Even if we had the legislative power to create a remedy, there are many reasons why we should decline to create a cause of action where none has existed since the formation of our Government. The courts of the United States as well as those of the States are choked with lawsuits. The number of cases on the docket of this Court have reached an unprecedented volume in recent years. A majority of these cases are brought by citizens with substantial complaints [****66] -- persons who are physically or economically injured by torts or frauds or governmental infringement of their rights; persons who have been unjustly deprived of their liberty or their property; and persons who have not yet received the equal opportunity in education, employment, and pursuit of happiness that was the dream of our forefathers. Unfortunately, there have also been a growing number of frivolous lawsuits, particularly actions for damages against law enforcement officers whose conduct has been judicially sanctioned by state trial and appellate courts and in many instances even by

---

[*]"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Rev. Stat. § 1979, _42 U. S. C. § 1983_.

this Court. My fellow Justices on this Court and our brethren throughout the federal judiciary know only too well the time-consuming task of conscientiously poring over hundreds of thousands of pages of factual allegations [**2021] of misconduct by police, judicial, and corrections officials. Of course, there are instances of legitimate grievances, but legislators might well desire to devote judicial resources to other problems of a more serious nature.

[*429] We sit at the top of a judicial system accused by some of nearing the point of collapse. Many criminal defendants do not receive [****67] speedy trials and neither society nor the accused are assured of justice when inordinate delays occur. Citizens must wait years to litigate their private civil suits. Substantial changes in correctional and parole systems demand the attention of the lawmakers and the judiciary. If I were a legislator I might well find these and other needs so pressing as to make me believe that the resources of lawyers and judges should be devoted to them rather than to civil damage actions against officers who generally strive to perform within constitutional bounds. There is also a real danger that such suits might deter officials from the *proper* and honest performance of their duties.

All of these considerations make imperative careful study and weighing of the arguments both for and against the creation of such a remedy under the *Fourth Amendment*. I would have great difficulty for myself in resolving the competing policies, goals, and priorities in the use of resources, if I thought it were my job to resolve those questions. But that is not my task. The task of evaluating the pros and cons of creating judicial remedies for particular wrongs is a matter for Congress and the legislatures [****68] of the States. Congress has not provided that any federal court can entertain [***646] a suit against a federal officer for violations of *Fourth Amendment* rights occurring in the performance of his duties. A strong inference can be drawn from creation of such actions against state officials that Congress does not desire to permit such suits against federal officials. Should the time come when Congress desires such lawsuits, it has before it a model of valid legislation, *42 U. S. C. § 1983*, to create a damage remedy against federal officers. Cases could be cited to support the legal proposition which [*430] I assert, but it seems to me to be a matter of common understanding that the business of the judiciary is to interpret the laws and not to make them.

I dissent.

MR. JUSTICE BLACKMUN, dissenting.

I, too, dissent. I do so largely for the reasons expressed in Chief Judge Lumbard's thoughtful and scholarly opinion for the Court of Appeals. But I also feel that the judicial legislation, which the Court by its opinion today concededly is effectuating, opens the door for another avalanche of new federal cases. Whenever a suspect imagines, or chooses [****69] to assert, that a *Fourth Amendment* right has been violated, he will now immediately sue the federal officer in federal court. This will tend to stultify proper law enforcement and to make the day's labor for the honest and conscientious officer even more onerous and more critical. Why the Court moves in this direction at this time of our history, I do not know. The *Fourth Amendment* was adopted in 1791, and in all the intervening years neither the Congress nor the Court has seen fit to take this step. I had thought that for the truly aggrieved person other quite adequate remedies have always been available. If not, it is the Congress and not this Court that should act.

## References

Am Jur, Searches and Seizures (1st ed 63-73)

US L Ed Digest, Search and Seizure 32

ALR Digests, Search and Seizure 24

L Ed Index to Anno, Damages; Officers; Search and Seizure

ALR Quick Index, Damages; Public Officers and Employees; Search and Seizure

Federal Quick Index, Damages; Public Officers and Employees; Search and Seizure

Annotation References:

Unconstitutional conduct by state [****70] or federal officer as affecting governmental immunity from suit in federal court. *12 L Ed 2d 1110*.

Police action in connection with arrest as violation of Civil Rights Act, *42 USC 1983*. 1 ALR Fed 519.

Signed in as State Of Michigan Michigan DOC - Staff.



## MCLS § 750.316

**Copy Citation**

This document is current through Act 149 of the 2024 Regular Legislative Session and E.R.O. 2024-2

**Michigan Compiled Laws Service**  **Chapter 750 Michigan Penal Code (§§ 750.1 — 750.568)**  **Act 328 of 1931 (§§ 750.1 — 750.568)**  **Chapter XLV Homicide (§§ 750.316 — 750.329a)**

## § **750.316**. First degree murder; incarceration order upon conviction; penalty; definitions.

Sec. 316.

**(1)** Except as provided in sections 25 and 25a of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.25 and 769.25a, a person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life without eligibility for parole:

**(a)** Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.

**(b)** Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, kidnapping, vulnerable adult abuse in the first or second degree under section 145n, torture under section 85, aggravated stalking under section 411i, or unlawful imprisonment under section 349b.

**(c)** A murder of a peace officer or a corrections officer committed while the peace officer or corrections officer is lawfully engaged in the performance of any of his or her duties as a peace officer or corrections officer, knowing that the peace officer or corrections officer is a peace officer or corrections officer engaged in the performance of his or her duty as a peace officer or corrections officer.

**(2)** Immediately following a conviction under this section, a court shall enter an order committing the convicted person to the jurisdiction of the department of corrections for incarceration in a state correctional facility pending sentencing using a form created by the state court administrative office for this purpose. This order becomes effective if both of the following apply:

**(a)** The sheriff agrees to transport for final sentencing the person from the state correctional facility to the county and from the county back to the state correctional facility.

**(b)** The convicted person was not less than 18 years of age at the time he or she committed the offense for which he or she was convicted under this section.

**(3)** A court shall hold the sentencing hearing not more than 45 days after a person is committed to the department of corrections under subsection (2).

**(4)** As used in this section:

**(a)** "Arson" means a felony violation under chapter X.

**(b)** "Corrections officer" means any of the following:

**(i)** A prison or jail guard or other prison or jail personnel.

**(ii)** Any of the personnel of a boot camp, special alternative incarceration unit, or other minimum security correctional facility.

**(iii)** A parole or probation officer.

**(c)** "Major controlled substance offense" means any of the following:

**(i)** A violation of section 7401(2)(a)(i) to (iii) of the public health code, 1978 PA 368, MCL 333.7401.

**(ii)** A violation of section 7403(2)(a)(i) to (iii) of the public health code, 1978 PA 368, MCL 333.7403.

**(iii)** A conspiracy to commit an offense listed in subparagraph (i) or (ii).

**(d)** "Peace officer" means any of the following:

**(i)** A police or conservation officer of this state or a political subdivision of this state.

**(ii)** A police or conservation officer of the United States.

**(iii)** A police or conservation officer of another state or a political subdivision of another state.

## History

Pub Acts 1931, No. 328, Ch. XLV, § 316, eff September 18, 1931; amended by Pub Acts 1969, No. 331, eff March 20, 1970; 1980, No. 28, imd eff March 7, 1980; 1994, No. 267, imd eff July 6, 1994, by § 2 eff October 1, 1994; 1996, No. 20, imd eff February 15, 1996, by § 2 eff April 1, 1996; 1996, No. 21, imd eff February 15, 1996, by § 2 eff April 1, 1996; 1999, No. 189, by enacting § 1 eff April 1, 2000; 2004, No. 58, imd eff April 12, 2004, by enacting § 1 eff June 11, 2004; 2006, No. 415, imd eff September 29, 2006, by enacting § 1 eff December 1, 2006; Pub Acts 2013, No. 39, effective June 4, 2013; Pub Acts 2014, No. 23, effective March 4, 2014; Pub Acts 2014, No. 158, effective July 1, 2014; Pub Acts 2022, No. 149, effective July 19, 2022.

▼  Annotations

## Notes

**Prior codification:**

RS 1846, Ch. 153,§ 1; CL 1857, § 5711; CL 1871, § 7510; How § 9075; CL 1897, § 11470; CL 1915, § 15192; CL 1929, § 16708.

MSA § 28.548

**Amendment Notes**

**The 1994 amendment** rewrote this section.

**The first 1996 amendment (Pub Act 20)** in subsection (1), paragraph (b), inserted ", second" and "home invasion in the first or second degree,"; added a new subsection (2), paragraph (a); and redesignated former subsection (2), paragraphs (a)–(c) as paragraphs (b)–(d).

**The second 1996 amendment (Pub Act 21)** in subsection (1), paragraph (b), inserted ", second" and "home invasion in the first or second degree,"; added a new subsection (2), paragraph (a); and redesignated and revised former subsection (2), paragraphs (a)–(c) as paragraphs (b)–(d); substituted "chapter X" for "section 72, 73, 74, or 75" in (2)(a); and substituted "A" for "Any" throughout (2).

**The 1999 amendment** in subsection (2), paragraph (b), subparagraph (ii), substituted "Any of the" for "A", added ", special alternative incarceration unit," after "camp"; and updated statutory references and made grammatical changes.

**The 2004 amendment** in subsection (1), paragraph (b), deleted "or" preceding "kidnapping" and inserted ", or vulnerable adult abuse in the first and second degree under section 145n" following "kidnapping".

**The 2006 amendment** revised subsection (1), paragraph (b) from one which read: "Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, kidnapping, or vulnerable adult abuse in the first and second degree under section 145n.".

**The 2013 amendment by PA 39** substituted "or" for "and" preceding "second degree" in (1)(b).

**The 2014 amendment by PA 23** in the introductory language of (1), added "Except as provided in sections 25 and 25a of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.25 and 769.25a" at the beginning and "without eligibility for parole" at the end.

**The 2014 amendment by PA 158** added "unlawful imprisonment under section 349b" at the end of (1)(b) and made related changes.

**The 2022 amendment by PA 149** added (2) and (3); redesignated former (2) as (4); and substituted "under chapter" for "of chapter" in (4)(a).

## NOTES TO DECISIONS

⬇ **1. Constitutionality.**

⬇ 2. Construction, operation and effect.
⬇ 2.5. Double jeopardy.
⬇ 3. Degrees of murder.
⬇ 4. First-degree murder.
⬇ 5. —Essential requisites.
⬇ 6. —Poisoning or furnishing poison.
⬇ 7. —Killing committed in perpetration of robbery.
⬇ 8. —Killing committed in perpetration of rape.
⬇ 9. —Killing committed in perpetration of other crimes.
⬇ 10. First and second-degree murder distinctions.
⬇ 11. Manslaughter.
⬇ 12. Lesser included offenses.
⬇ 13. Assault with intent to kill or do great bodily harm.
⬇ 14. Conspiracy.
⬇ 15. Aiding and abetting.
⬇ 16. Felony-murder.
⬇ 17. Essentials of murder; malice.
⬇ 18. —Intent.
⬇ 19. —Motive.
⬇ 20. —Deliberation and premeditation.
⬇ 21. — —Second look; necessary time span.
⬇ 22. — —Weapons used.
⬇ 23. —Malice aforethought.
⬇ 24. Venue.
⬇ 25. Defenses; justification or excuse.
⬇ 26. —Self-defense from felonious assault.
⬇ 27. —Self-defense in belief of imminent danger.
⬇ 28. —Defense of others.
⬇ 29. —Defense of home or property.
⬇ 30. —Obligation to retreat.
⬇ 31. —Resisting unwarranted arrest.
⬇ 32. —Threats, uncontrollable passion or mistake of law.
⬇ 33. —Death at later time.
⬇ 34. —Insanity.
⬇ 35. —Intoxication.
⬇ 36. —Intervening medical error.
⬇ 37. –Battered spouse syndrome.
⬇ 38. Presumptions and inferences.
⬇ 39. —Malice.
⬇ 40. —Intent.
⬇ 41. —Deliberation and premeditation.
⬇ 42. — —Weapons used in or connected with crime.
⬇ 43. — —Character of wounds inflicted.
⬇ 44. Corpus delicti.
⬇ 45. Burden of proof; identity of accused.
⬇ 46. —Self-defense.
⬇ 47. —Intent, premeditation and deliberation.
⬇ 48. —Degree of crime.
⬇ 49. —Felony-murder.
⬇ 50. —Specific cases.
⬇ 51. Admissibility of evidence.
⬇ 52. —Cause of death and corpus delicti.
⬇ 53. —Surrounding circumstances.
⬇ 54. —Real or demonstrative evidence.
⬇ 55. —Admissions, confessions and declarations; hearsay.
⬇ 56. —Acts and conduct of or threats by accused.
⬇ 57. —Acts or conduct of or threats by victim.
⬇ 58. —Experiments and tests.
⬇ 59. —Weapons used in or connected with crime.
⬇ 60. —Source of weapon.
⬇ 61. —Personal feelings and relationship of parties.
⬇ 62. —Mental condition of accused.
⬇ 63. —Evidence of similar crimes.

⬇ 64. —Expert testimony.
⬇ 65. —Dying declarations.
⬇ 66. —Motive.
⬇ 67. —Res gestae statements.
⬇ 68. —Photographs.
⬇ 69. — —Depicting corpus delicti or cause of death.
⬇ 70. — —Depicting self-defense.
⬇ 71. — —Demonstrating deliberation and premeditation.
⬇ 72. —Quarrelsome character and violence.
⬇ 73. —Self-defense.
⬇ 74. Weight and sufficiency of evidence.
⬇ 75. —Guilt of accused.
⬇ 76. —Degree of crime.
⬇ 77. —Felony-murder.
⬇ 78. —Circumstantial evidence.
⬇ 79. —Conspiracy.
⬇ 80. —Identity of accused.
⬇ 81. —Corpus delicti.
⬇ 82. —Poisoning.
⬇ 83. —Malice.
⬇ 84. —Mental condition of accused.
⬇ 85. —Deliberation and premeditation.
⬇ 86. — —Inferences from evidence.
⬇ 87. —Self-defense.
⬇ 88. —Aiding or abetting.
⬇ 89. —Specific cases.
⬇ 90. Witnesses.
⬇ 91. Instructions to jury; nature and scope.
⬇ 92. —Grade or degree of crime.
⬇ 93. —Lesser included offenses.
⬇ 94. —Felony-murder.
⬇ 95. —Second-degree murder.
⬇ 96. —Manslaughter.
⬇ 97. —Instructions read as whole.
⬇ 98. —Emphasizing, restricting or singling out facts and theories.
⬇ 99. —Premeditation and deliberation.
⬇ 100. —Malice.
⬇ 101. — —Use of deadly weapon.
⬇ 102. —Motive and intent.
⬇ 103. —Cause of death.
⬇ 104. —Aiding and abetting.
⬇ 105. —Relating to self-defense.
⬇ 106. — —In general.
⬇ 107. — —Duty to retreat or avoid encounter.
⬇ 108. — —Belief in or apprehension of danger or great bodily harm.
⬇ 109. —Insanity.
⬇ 110. —Intoxication.
⬇ 111. —Standard of proof.
⬇ 112. —Burden of proof.
⬇ 113. —Failure or refusal to instruct.
⬇ 114. —Necessity for request.
⬇ 115. —Failure to object.
⬇ 116. —Nonreversible error.
⬇ 117. —Erroneous instructions.
⬇ 118. Reading of information or statute to jury.
⬇ 119. Questions for jury; degree of crime and guilt of accused.
⬇ 120. —Identification of defendant.
⬇ 121. —Premeditation and deliberation.
⬇ 122. —Malice.
⬇ 123. —Dying declaration.
⬇ 124. —Weight and credibility of testimony.
⬇ 125. —Dangerous weapon.
⬇ 126. —Justification, mitigation and excuse of taking decedent's life.

⬇ **127. —Specific cases.**
⬇ **128. Verdict, findings and judgment.**
⬇ **129. Sentence.**
⬇ **130. Eligibility for parole.**
⬇ **131. Appeal and error.**
☇ **1. Constitutionality.**

MCL 750.316, Michigan's first-degree murder statute, is constitutional, even though the term "murder" is not defined by statute, because no such definition is required as there is nothing vague about what conduct is prohibited by the statute. People v. Mesik, 285 Mich. App. 535, 775 N.W.2d 857, 2009 Mich. App. LEXIS 1844 (Mich. Ct. App. 2009).

The homicide statute making it first-degree murder to kill a peace officer or corrections officer while lawfully engaged in the performance of official duties does not unconstitutionally create a strict liability crime, because a conviction under the statute requires proof beyond a reasonable doubt of all the elements of one of the three forms of murder (intent to kill, intent to do great bodily harm, or knowingly creating a very high risk of death or great bodily harm knowing that death or such harm was the likely result of the actions), and does not depend solely upon the status of the victim. People v. Herndon, 246 Mich. App. 371, 633 N.W.2d 376, 2001 Mich. App. LEXIS 124 (Mich. Ct. App. 2001), app. denied, 465 Mich. 970, 642 N.W.2d 678, 2002 Mich. LEXIS 471 (Mich. 2002).

The statute classifying the murder of a peace officer as first-degree murder does not violate constitutional equal protection guarantees because the statute is rationally related to the legitimate governmental interest of protecting peace officers in the performance of their duties. People v. Clark, 243 Mich. App. 424, 622 N.W.2d 344, 2000 Mich. App. LEXIS 261 (Mich. Ct. App. 2000), app. denied, 465 Mich. 864, 634 N.W.2d 353, 2001 Mich. LEXIS 1695 (Mich. 2001).

First-degree murder statute authorizing conviction for felony murder as separate offense from premeditated murder upon proof of intent to kill or wanton act and that death resulted from commission of one of specified felonies, as well as proof of malice beyond reasonable doubt inferable from nature of underlying felony and circumstances surrounding its commission, would be held not to be violative of due process either as reducing prosecution's burden of proof or as shifting such burden impermissibly to defendant, but merely providing for proof of different elements in order to elevate second-degree murder to first-degree murder. People v. Martin, 75 Mich. App. 6, 254 N.W.2d 628, 1977 Mich. App. LEXIS 1071 (Mich. Ct. App. 1977).

Challenge to constitutionality of felony-murder provision of this section would not be considered on review where it was not raised at trial in felony-murder prosecution. People v. Oliver, 63 Mich. App. 509, 234 N.W.2d 679, 1975 Mich. App. LEXIS 1196 (Mich. Ct. App. 1975).

☇ **2. Construction, operation and effect.**

A murder that occurs during the uninterrupted chain of events surrounding the commission of the predicate felony is committed in the "perpetration of" that felony for felony-murder purposes under MCL § 750.316(1)(b). Accordingly, the term "perpetration" encompasses acts beyond the definitional elements of the predicate felony, to include those acts committed within the res gestae of that felony. People v. Gillis, 474 Mich. 105, 712 N.W.2d 419, 2006 Mich. LEXIS 624 (Mich. 2006).

Abrogation of the common-law year and a day rule that the death of a person which occurred more than a year and a day after an assault was not caused by the assault does not relieve the prosecution of the duty to prove all the elements of a homicide, including proximate cause, beyond a reasonable doubt. People v. Stevenson, 416 Mich. 383, 331 N.W.2d 143, 1982 Mich. LEXIS 635 (Mich. 1982).

At time first-degree murder statute was recodified in 1931, conduct historically known as rape was prohibited by carnal knowledge statute, and as it exists in first-degree murder statute, term "rape" was intended to encompass course of conduct originally proscribed at common law and altered by various statutes through years. People v. McDonald, 409 Mich. 110, 293 N.W.2d 588, 1980 Mich. LEXIS 232 (Mich. 1980).

This section enumerates felonies solely for purpose of elevating degree of murder committed in perpetration or attempted perpetration of those felonies and nowhere indicates intention to enumerate felonies for purpose of defining malice. People v. Aaron, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

Use of term "murder" in this section does not codify common-law felony murder rule, but requires that murder must first be established before section is applied to elevate degree. People v. Aaron, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

Purpose of this section is to graduate punishment. People v. Aaron, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

In Michigan, homicide is not a crime; it is murder and manslaughter that are crimes. People v. Allen, 390 Mich. 383, 212 N.W.2d 21, 1973 Mich. LEXIS 150 (Mich. 1973).

Neither murder nor manslaughter is defined in statutes concerning such offenses. People v. Carter, 387 Mich. 397, 197 N.W.2d 57, 1972 Mich. LEXIS 172 (Mich. 1972).

This section does not define murder but simply classifies murder perpetrated in a particular manner as murder in the first degree and has no application until a murder has been established. People v. Austin, 221 Mich. 635, 192 N.W. 590, 1923 Mich. LEXIS 512 (Mich. 1923).

The doctrine of ejusdem generis had no application to this provision so as to limit the words "or any other kind of wilful, deliberate and premeditated killing," to acts of the same general nature or class as those enumerated, i.e., killing by means of poison or lying in wait. People v. Vinunzo, 212 Mich. 472, 180 N.W. 502, 1920 Mich. LEXIS 541 (Mich. 1920).

A defendant's convictions of first-degree premeditated murder and first-degree felony murder arising from the death of a single victim violates double jeopardy; the defendant's conviction should be modified to one count of first-degree murder supported by two theories: premeditated murder and felony murder. People v. Bigelow, 229 Mich. App. 218, 581 N.W.2d 744, 1998 Mich. App. LEXIS 112 (Mich. Ct. App. 1998), app. denied, 1998 Mich. LEXIS 2895 (Mich. Nov. 6, 1998), app. denied, 459 Mich. 898, 589 N.W.2d 278, 1998 Mich. LEXIS 2903 (Mich. 1998).

A defendant's convictions of and sentences for both felony murder and the predicate offense violated the defendant's right against double jeopardy and, accordingly, the conviction of and sentence for breaking and entering was vacated. People v. Bigelow, 229 Mich. App. 218, 581 N.W.2d 744, 1998 Mich. App. LEXIS 112 (Mich. Ct. App. 1998), app. denied, 1998 Mich. LEXIS 2895 (Mich. Nov. 6, 1998), app. denied, 459 Mich. 898, 589 N.W.2d 278, 1998 Mich. LEXIS 2903 (Mich. 1998).

The policy under which the Department of Corrections denies approval of a transfer of a foreign inmate from a Michigan prison to a prison in the foreigner's home country if the foreigner is serving a sentence of life imprisonment for a conviction of first-degree murder does not violate the Treaty Between the United States and Canada on the Execution of Penal Sentences. Walton v. Dep't of Corrections, 212 Mich. App. 455, 538 N.W.2d 66, 1995 Mich. App. LEXIS 351 (Mich. Ct. App. 1995), app. denied, 451 Mich. 878, 549 N.W.2d 571, 1996 Mich. LEXIS 884 (Mich. 1996).

Felony murder consists of the killing of a human being with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in § 750.316. People v. Lee, 212 Mich. App. 228, 537 N.W.2d 233, 1995 Mich. App. LEXIS 331 (Mich. Ct. App. 1995), app. denied, 453 Mich. 884, 554 N.W.2d 12, 1996 Mich. LEXIS 2199 (Mich. 1996).

Homicide is the killing of one human being by another; homicide is not a crime in Michigan; however, murder and manslaughter are crimes. People v. Campbell, 124 Mich. App. 333, 335 N.W.2d 27, 1983 Mich. App. LEXIS 2885 (Mich. Ct. App. 1983), app. denied, 418 Mich. 905, 342 N.W.2d 519, 1984 Mich. LEXIS 1245 (Mich. 1984).

The term "suicide" excludes by definition a homicide. People v. Campbell, 124 Mich. App. 333, 335 N.W.2d 27, 1983 Mich. App. LEXIS 2885 (Mich. Ct. App. 1983), app. denied, 418 Mich. 905, 342 N.W.2d 519, 1984 Mich. LEXIS 1245 (Mich. 1984).

Attempted suicide has not been held to be attempted murder at common law; it is extremely doubtful that incitement to suicide is a crime under the common law. People v. Campbell, 124 Mich. App. 333, 335 N.W.2d 27, 1983 Mich. App. LEXIS 2885 (Mich. Ct. App. 1983), app. denied, 418 Mich. 905, 342 N.W.2d 519, 1984 Mich. LEXIS 1245 (Mich. 1984).

It is unfair to convict a person of felony murder where the death involved was purely accidental. People v. Woods, 124 Mich. App. 645, 335 N.W.2d 112, 1983 Mich. App. LEXIS 2850 (Mich. Ct. App. 1983), app. denied, 419 Mich. 859, 362 N.W.2d 216, 1984 Mich. LEXIS 1337 (Mich. 1984).

The statute on felony murder requires the prosecution to establish that a homicide occurred, that the homicide is murder, and that the murder occurred in the perpetration or attempt to perpetrate one of the enumerated felonies; it is essential to show that there was in fact a murder and, once that has been proved beyond a reasonable doubt, the statute frees the prosecution from the burden of showing premeditation, deliberation, and wilfulness; premeditation is not an element of felony murder. People v. Small, 120 Mich. App. 442, 327 N.W.2d 504, 1982 Mich. App. LEXIS 3556 (Mich. Ct. App. 1982).

The term "burglary" as used in the felony-murder statute prior to the 1980 amendment to that statute referred to the common-law crime of burglary which was a breaking and entering of a dwelling house in the nighttime; accordingly, prior to the 1980 amendment of the felony-murder statute, a conviction for felony murder could not be sustained upon proofs of a breaking and entering in the daytime. People v. Whetstone, 119 Mich. App. 546, 326 N.W.2d 552, 1982 Mich. App. LEXIS 3482 (Mich. Ct. App. 1982).

The supreme court decision abrogating the common-law felony-murder rule as of the date of that decision, November 24, 1980, does not apply retroactively to trials occurring prior to that date. People v. Hartford, 117 Mich. App. 413, 324 N.W.2d 31, 1982 Mich. App. LEXIS 3287 (Mich. Ct. App. 1982), app. denied, 419 Mich. 859, 346 N.W.2d 843, 1984 Mich. LEXIS 1087 (Mich. 1984).

The decision abrogating the felony-murder doctrine which allowed the element of malice required for murder to be satisfied by the intent to commit the underlying felony was not given retroactive effect and applied only to trials in progress on, and

those commencing after, November 24, 1980. People v. Till, 115 Mich. App. 788, 323 N.W.2d 14, 1982 Mich. App. LEXIS 3149 (Mich. Ct. App. 1982).

The legislature failed to express a clear intent in the statute on first-degree felony murder to authorize multiple convictions and cumulative punishment for both the crime of murder and the underlying enumerated felony on the face of the statute. People v. Alexander, 104 Mich. App. 545, 305 N.W.2d 262, 1981 Mich. App. LEXIS 2816 (Mich. Ct. App. 1981).

Year and day rule applies to all prosecutions for statutory first-degree felony murder. People v. Stevenson, 101 Mich. App. 61, 300 N.W.2d 449, 1980 Mich. App. LEXIS 3011 (Mich. Ct. App. 1980), aff'd, 416 Mich. 383, 331 N.W.2d 143, 1982 Mich. LEXIS 635 (Mich. 1982).

Enactment of criminal sexual conduct statute did not manifest legislative intent to repeal or modify felony murder statute and would not preclude prosecution under latter statute grounded on underlying felony of common-law rape. People v. Terry, 86 Mich. App. 64, 272 N.W.2d 198, 1978 Mich. App. LEXIS 2560 (Mich. Ct. App. 1978).

Prosecutor in murder prosecution was not required to elect between theories of premeditated murder and felony murder where distinct offenses were charged in different counts, both were committed by means of same acts at same time, and same testimony was required for conviction. People v. Hall, 83 Mich. App. 632, 269 N.W.2d 476, 1978 Mich. App. LEXIS 2355 (Mich. Ct. App. 1978).

Legislative purpose underlying felony murder rule is to discourage persons who would commit or attempt to commit felonies inherently dangerous to human life by imposing greater penalty than would otherwise obtain for deaths attributable to their acts in furtherance of felonious purpose. People v. Till, 80 Mich. App. 16, 263 N.W.2d 586, 1977 Mich. App. LEXIS 1253 (Mich. Ct. App. 1977), rev'd, 406 Mich. 641, 281 N.W.2d 297, 1979 Mich. LEXIS 386 (Mich. 1979), rev'd in part, 411 Mich. 982, 308 N.W.2d 110, 1981 Mich. LEXIS 452 (Mich. 1981).

Argument as to wisdom of felony murder rule would be required to be addressed to legislature, not court on review of conviction under felony murder statute. People v. Martin, 75 Mich. App. 6, 254 N.W.2d 628, 1977 Mich. App. LEXIS 1071 (Mich. Ct. App. 1977).

This section, specifically declaring degree of murder when crime is committed by certain means and under certain circumstances would be held to control over general statutory provision of § 750.318 that jury shall, by their verdict, determine degree of murder. People v. Craig, 66 Mich. App. 406, 239 N.W.2d 390, 1976 Mich. App. LEXIS 1202 (Mich. Ct. App. 1976).

This section includes common-law offenses of murder and felony murder. People v. Buresh, 63 Mich. App. 629, 234 N.W.2d 736, 1975 Mich. App. LEXIS 1208 (Mich. Ct. App. 1975).

Deceased's civil cause of action for injuries or death does not eliminate defendant's criminal responsibility for injury which placed deceased in position of peril. People v. Flenon, 42 Mich. App. 457, 202 N.W.2d 471, 1972 Mich. App. LEXIS 953 (Mich. Ct. App. 1972).

Where the district court held that Miller v. Alabama operated retroactively to invalidate MCLS 791.234(6), which imposed a sentence of mandatory life without parole for persons younger than 18 at the time they committed first-degree murder, and issued an injunctive order requiring state officials to comply with Miller, in view of intervening legal changes, including the enactment of Michigan statutes requiring sentencing courts to follow Miller, the orders were vacated and the case was remanded so the parties could amend the pleadings and supplement the record. Hill v. Snyder, 821 F.3d 763, 2016 FED App. 0112P, 2016 U.S. App. LEXIS 8632 (6th Cir. Mich. 2016).

*Unpublished decision:* Where an arrestee was arrested for the death of a nine-day-old daughter, a detective was properly denied summary judgment based on qualified immunity and governmental immunity as to the arrestee's federal and state false arrest claims because, inter alia, the arrestee presented evidence that the detective intentionally misrepresented the arrestee's statements to the state judge. Richardson v. Nasser, 421 Fed. Appx. 611, 2011 FED App. 0295N, 2011 U.S. App. LEXIS 9354 (6th Cir. Mich. 2011).

**⚓ 2.5. Double jeopardy.**

Under Mich. Const. art. I, § 15, defendant could be punished for both felony murder under MCL 750.316(1)(b) and first-degree criminal sexual conduct under MCL 750.520b(1) because each offense contained an element that the other did not; first-degree criminal sexual conduct required sexual penetration, which was not required with first-degree felony murder, and first-degree felony murder required the killing of another human being, which was not required for first-degree criminal sexual conduct. People v. Ream, 481 Mich. 223, 750 N.W.2d 536, 2008 Mich. LEXIS 1163 (Mich. 2008).

**⚓ 3. Degrees of murder.**

Malice aforethought is "grand criterion" which elevates homicide, which may be innocent or criminal, to murder. People v. Aaron, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

Term murder as used in this section includes all types of murder at common law. People v. Aaron, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

To constitute murder, even though malice may be implied from felonious act, killing must be attributable to accused and not to cofelons. People v. Aaron, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

Murder is where a person of sound memory and discretion unlawfully kills any reasonable creature in being, in the peace of the state, with malice prepense or aforethought, either express or implied. People v. Aaron, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

Homicide is the killing of one human being by another; it is not necessarily a crime but may be innocent or criminal. People v. Allen, 390 Mich. 383, 212 N.W.2d 21, 1973 Mich. LEXIS 150 (Mich. 1973).

Murder is criminal homicide committed with malice aforethought; manslaughter is criminal homicide committed without malice aforethought. People v. Allen, 390 Mich. 383, 212 N.W.2d 21, 1973 Mich. LEXIS 150 (Mich. 1973).

Murder is an unlawful, malicious killing. People v. Carter, 387 Mich. 397, 197 N.W.2d 57, 1972 Mich. LEXIS 172 (Mich. 1972).

To constitute murder, even though malice may be implied from felonious acts, the killing must be attributable to accused. People v. Carter, 387 Mich. 397, 197 N.W.2d 57, 1972 Mich. LEXIS 172 (Mich. 1972).

Term "homicide" has reference to the unlawful killing of one human being by another. Wozniak v. John Hancock Mut. Life Ins. Co., 288 Mich. 612, 286 N.W. 99, 1939 Mich. LEXIS 558 (Mich. 1939).

Homicide is the killing of a human being by a human being and may or may not be felonious and, if felonious, it is either murder or manslaughter, dependent upon the facts and circumstances surrounding the killing. People v. Austin, 221 Mich. 635, 192 N.W. 590, 1923 Mich. LEXIS 512 (Mich. 1923).

Murder is killing by person of sound memory and discretion unlawfully of any reasonable creature in being, in peace of state, with malice prepense or aforethought. People v. Martin, 75 Mich. App. 6, 254 N.W.2d 628, 1977 Mich. App. LEXIS 1071 (Mich. Ct. App. 1977).

Victim of a felony need not be one who is murdered in order to obtain conviction in felony-murder prosecution, so long as murder occurs as natural result of either commission of crime or escape from it. People v. Graves, 52 Mich. App. 326, 217 N.W.2d 78, 1974 Mich. App. LEXIS 1032 (Mich. Ct. App. 1974).

A criminal intent, coupled with accidental occurrence, cannot constitute either first or second-degree murder. People v. Schafer, 36 Mich. App. 316, 193 N.W.2d 925, 1971 Mich. App. LEXIS 1318 (Mich. Ct. App. 1971).

Where two or more persons combine to commit a felony and a murder is committed in furtherance thereof, all parties to agreement to commit felony are liable for murder even though a homicide was not planned. People v. Smith, 33 Mich. App. 336, 189 N.W.2d 833, 1971 Mich. App. LEXIS 1763 (Mich. Ct. App. 1971).

**☞ 4. First-degree murder.**

First-degree murder is second-degree murder plus element of premeditation of perpetration or attempt to perpetrate enumerated felony. People v. Carter, 395 Mich. 434, 236 N.W.2d 500, 1975 Mich. LEXIS 173 (Mich. 1975).

Second-degree murder is first-degree murder minus element of premeditation or enumerated felony and, as such, is lesser-included offense of first-degree murder or first-degree felony-murder. People v. Carter, 395 Mich. 434, 236 N.W.2d 500, 1975 Mich. LEXIS 173 (Mich. 1975).

Second-degree murder is always lesser included offense of first-degree murder. People v. Carter, 395 Mich. 434, 236 N.W.2d 500, 1975 Mich. LEXIS 173 (Mich. 1975).

First-degree murder statute includes common-law offense of murder and felony-murder. People v. Dupie, 395 Mich. 483, 236 N.W.2d 494, 1975 Mich. LEXIS 179 (Mich. 1975).

Murder in first degree requires proof of premeditation, deliberation, and malice. People v. Younger, 380 Mich. 678, 158 N.W.2d 493, 1968 Mich. LEXIS 172 (Mich. 1968).

Trial court did not err in convicting him of first-degree premeditated murder under MCL § 750.316, for the double murder of two of his co-workers because the evidence concerning any relationship between defendant and the victims did not give rise to adequate provocation, because although defendant claimed he was enraged when he saw the victims kissing, defendant did not have any romantic relationship with one of the victims, he did not know the other victim, and defendant had to drive more than three hours to get his rifle and ammunition. People v. Tierney, 266 Mich. App. 687, 703 N.W.2d 204, 2005 Mich. App. LEXIS 1430 (Mich. Ct. App. 2005), app. denied, 474 Mich. 1068, 711 N.W.2d 303, 2006 Mich. LEXIS 295 (Mich. 2006).

Mere conscious indifference to likelihood of death as result of accused's intentional act is insufficient to support first-degree charge, since defendant must have acted with purpose of causing death. People v. Milton, 81 Mich. App. 515, 265 N.W.2d 397, 1978 Mich. App. LEXIS 2157 (Mich. Ct. App.), modified, 403 Mich. 821, 282 N.W.2d 926, 1978 Mich. LEXIS 1136 (Mich. 1978).

First-degree murder is murder in second-degree plus element of perpetration of statutorily enumerated forcible felony, and accordingly, since law may not impute essential element of malice to second-degree murder, it may not impute malice requisite to first-degree murder. People v. Wright, 80 Mich. App. 172, 262 N.W.2d 917, 1977 Mich. App. LEXIS 1265 (Mich. Ct. App. 1977), aff'd, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

First-degree murder consists of common-law offense of murder committed under any of circumstances enumerated by statute. People v. Meadows, 80 Mich. App. 680, 263 N.W.2d 903, 1977 Mich. App. LEXIS 1298 (Mich. Ct. App. 1977).

First-degree murder is murder committed with malice aforethought and deliberation or premeditation. People v. Vertin, 56 Mich. App. 669, 224 N.W.2d 705, 1974 Mich. App. LEXIS 772 (Mich. Ct. App. 1974).

Charge of "murder languishing" charged murder in first degree. People v. Hoerle, 3 Mich. App. 693, 143 N.W.2d 593, 1966 Mich. App. LEXIS 714 (Mich. Ct. App. 1966).

Sufficient evidence supported petitioner's conviction for the first degree premeditated murder of a 19–year–old woman; the evidence showed that shortly after petitioner picked up the victim at a bar, he took her to his home and forced her to perform sexual acts upon him. He and a third party took her to another location where the victim was killed; after she was dead, petitioner doused her body with gasoline and burned it. Alder v. Burt, 240 F. Supp. 2d 651, 2003 U.S. Dist. LEXIS 982 (E.D. Mich. 2003).

☏ 5. —Essential requisites.

Common law felony murder doctrine, which defined malice as intent to commit an underlying felony is abolished. If the jury determines malice existed when the killing occurs, and that it occurred in the perpetration or attempted perpetration of an enumerated felony, by statute the murder would become first degree murder. People v. Aaron, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

Kicking a man to death may constitute first-degree murder, if the clear intent to kill is present. People v. Van Camp, 356 Mich. 593, 97 N.W.2d 726, 1959 Mich. LEXIS 409 (Mich. 1959).

First-degree premeditated murder differs from crime of first-degree felony murder in that in former it is act of premeditation and deliberation that elevates crime to first degree, whereas in latter it is act of committing murder during perpetration of felony that aggravates nature of offense. People v. Wright, 80 Mich. App. 172, 262 N.W.2d 917, 1977 Mich. App. LEXIS 1265 (Mich. Ct. App. 1977), aff'd, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

Premeditated and felony murder are separate crimes within first-degree murder statute and differ in that former requires act of premeditation and deliberation, while latter requires act of murder committed during perpetration of a felony, all other murders being murder in second degree. People v. Martin, 75 Mich. App. 6, 254 N.W.2d 628, 1977 Mich. App. LEXIS 1071 (Mich. Ct. App. 1977).

Prerequisites to establishing felony murder offense are homicide constituting murder in perpetration or attempt to perpetrate one of statutorily enumerated felonies. People v. Bryant, 70 Mich. App. 279, 245 N.W.2d 716, 1976 Mich. App. LEXIS 843 (Mich. Ct. App. 1976).

Murder committed while attempting to escape from felony scene constitutes felony-murder if it is immediately connected with underlying felony. People v. Jones, 66 Mich. App. 223, 238 N.W.2d 813, 1975 Mich. App. LEXIS 916 (Mich. Ct. App. 1975).

Theory of felony murder had no application to prosecution for first-degree murder of victim fatally strangled by defendant after struggle in victim's home. People v. Charles, 58 Mich. App. 371, 227 N.W.2d 348, 1975 Mich. App. LEXIS 1709 (Mich. Ct. App. 1975).

Essential requirement in first-degree murder prosecution brought under felony-murder statute is proof of one of independent felonies listed in statute. People v. Olsson, 56 Mich. App. 500, 224 N.W.2d 691, 1974 Mich. App. LEXIS 751 (Mich. Ct. App. 1974).

A homicide committed immediately after robbery, apparently for purpose of preventing detection, constitutes statutory felony-murder. People v. Smith, 55 Mich. App. 184, 222 N.W.2d 172, 1974 Mich. App. LEXIS 804 (Mich. Ct. App. 1974).

Even if a manslaughter should occur during perpetration, or attempt to perpetrate, one of felonies enumerated in this section, there would be no felony murder since it is essential to show that there was in fact a murder. People v. Wimbush, 45 Mich. App. 42, 205 N.W.2d 890, 1973 Mich. App. LEXIS 1054 (Mich. Ct. App. 1973).

To convict defendant on a charge of felony murder, prosecution must establish (1) a homicide, (2) that the homicide is murder, and (3) that the murder occurred in perpetration or attempt to perpetrate one of the enumerated felonies; thus, more must be shown than that one of the named felonies occurred, during course of which a human being died. People v. Wimbush, 45 Mich. App. 42, 205 N.W.2d 890, 1973 Mich. App. LEXIS 1054 (Mich. Ct. App. 1973).

Felony-murder rule supports a conviction of first-degree murder against an accomplice of murderer, if accomplice entered into felony with contemplation, actual or implied, that resistance from citizens or police could be expected. People v. Bowen,

12 Mich. App. 438, 162 N.W.2d 911, 1968 Mich. App. LEXIS 1211 (Mich. Ct. App. 1968).

Record in murder prosecution under Michigan law provided sufficient evidence for charge of first-degree murder, and thus, petitioner's Fourteenth Amendment right to due process was not violated by submission to jury of that charge, despite the possibility that conviction for second-degree murder may have been compromise verdict because the petitioner pursued the victim with a gun and shot him, then followed him, engaged him in mortal combat, stabbed him several times, allegedly declaring his intent to kill victim and, therefore, jury instructions could not have deprived petitioner a fair trial. Daniels v. Burke, 83 F.3d 760, 1996 FED App. 0135P, 1996 U.S. App. LEXIS 10466 (6th Cir. Mich.), cert. denied, 519 U.S. 942, 117 S. Ct. 327, 136 L. Ed. 2d 241, 1996 U.S. LEXIS 6356 (U.S. 1996).

☏ 6. —Poisoning or furnishing poison.

Common law definition of murder does not encompass act of intentionally providing means by which a person commits suicide. People v. Kevorkian, 447 Mich. 436, 527 N.W.2d 714, 1994 Mich. LEXIS 3033 (Mich. 1994), cert. denied, 514 U.S. 1083, 115 S. Ct. 1795, 131 L. Ed. 2d 723, 1995 U.S. LEXIS 2903 (U.S. 1995).

Where a defendant merely is involved in events leading up to the death, such as providing the means to commit suicide, the proper charge is assisting in a suicide, not murder. People v. Kevorkian, 447 Mich. 436, 527 N.W.2d 714, 1994 Mich. LEXIS 3033 (Mich. 1994), cert. denied, 514 U.S. 1083, 115 S. Ct. 1795, 131 L. Ed. 2d 723, 1995 U.S. LEXIS 2903 (U.S. 1995).

First-degree murder is common-law crime of murder with added element of perpetration by means of poison, lying in wait, or any other kind of willful, deliberate and premeditated killing. People v. Nadeau, 75 Mich. App. 369, 254 N.W.2d 893, 1977 Mich. App. LEXIS 1111 (Mich. Ct. App. 1977).

Poison would be held to include narcotics such as morphine, which was administered to deceased by accused. People v. Brown, 37 Mich. App. 192, 194 N.W.2d 560, 1971 Mich. App. LEXIS 1175 (Mich. Ct. App. 1971).

☏ 7. —Killing committed in perpetration of robbery.

Defendant's out-of-court statement that he had seen the victim with money prior to the stabbing fell under the admission by a party opponent exception to the hearsay rule; defendant's inconsistent statement helped prove the underlying larceny in that defendant or his girlfriend knew that the victim had money and decided to seize the moment to rob and murder the victim. People v. Lundy, 467 Mich. 254, 650 N.W.2d 332, 2002 Mich. LEXIS 1599 (Mich. 2002).

The enumeration of burglary in the former first-degree murder statute as aggravating conduct which would support a conviction of first-degree murder where a homicide occurred during a burglary required proof of all the elements of common-law burglary including the breaking and entering of a dwelling in the nighttime with the intent to commit a felony. People v. Young, 418 Mich. 1, 340 N.W.2d 805, 1983 Mich. LEXIS 259 (Mich. 1983).

Malice, the intention to kill, do great bodily harm or the wanton and willful disregard of the likelihood that the tendency of defendant's behavior is to cause death or great bodily harm, is an essential element of murder, whether murder occurs in the course of a felony or otherwise. People v. Aaron, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

Shooting and killing of one of three robbers by intended victim during robbery attempt, did not make defendants, as two remaining felons, guilty of murder in first degree, within meaning of this section, since to construe it in that way would be a policy decision which would be properly prerogative of legislature. People v. Austin, 370 Mich. 12, 120 N.W.2d 766, 1963 Mich. LEXIS 353 (Mich. 1963).

When a felon's attempt to commit robbery sets in motion a chain of events which were or should have been within his contemplation when motion was initiated, he should be held responsible for any death which by direct and inevitable sequence results from initial criminal act. People v. Podolski, 332 Mich. 508, 52 N.W.2d 201, 1952 Mich. LEXIS 589 (Mich.), cert. denied, 344 U.S. 845, 73 S. Ct. 62, 97 L. Ed. 657, 1952 U.S. LEXIS 1923 (U.S. 1952).

Homicide in commission of robbery would not constitute murder in first degree unless defendant was at scene of crime either with intent to rob or in actual act of robbing. People v. Wright, 315 Mich. 81, 315 Mich. 82, 23 N.W.2d 213, 1946 Mich. LEXIS 305 (Mich. 1946).

Under this section, the killing of another during an attempt to rob constitutes murder of the first degree. People v. Crandell, 270 Mich. 124, 258 N.W. 224, 1935 Mich. LEXIS 662 (Mich. 1935).

The fact that the confession of defendant who killed another during an attempted robbery stated that the firing of the revolver was unintentional did not reduce the degree of murder. People v. Crandell, 270 Mich. 124, 258 N.W. 224, 1935 Mich. LEXIS 662 (Mich. 1935).

Under this section, providing a penalty for murder while committing robbery, the robbery and the murder are a single criminal act so that acquittal of either robbery or murder is a bar to conviction for the other. People v. Miccichi, 264 Mich. 581, 250 N.W. 316, 1933 Mich. LEXIS 1067 (Mich. 1933).

In a prosecution for robbery of a store while armed, where, during the attempt to rob the proprietor of the store, a customer who entered while the robbery was in progress was killed, and, in a prosecution for common-law murder of such customer defendant was acquitted, the killing and robbery were not a single criminal act under this section, and a plea of former

acquittal was not a sufficient answer to the charge of robbery. People v. Micclchi, 264 Mich. 581, 250 N.W. 316, 1933 Mich. LEXIS 1067 (Mich. 1933).

One who, knowing that his companions were about to commit a robbery, loaned them his loaded revolver and drove them in his automobile to a point near the scene of the crime and waited there for them, was guilty as a principal of a first-degree murder resulting from the attempted robbery. People v. Peranio, 225 Mich. 125, 195 N.W. 670, 1923 Mich. LEXIS 547 (Mich. 1923).

All murder committed in the perpetration or attempt to perpetrate any robbery is murder in the first degree and all parties knowingly aiding, abetting or participating in the robbery are equally guilty. People v. Peranio, 225 Mich. 125, 195 N.W. 670, 1923 Mich. LEXIS 547 (Mich. 1923).

There is no statutory distinction between armed or unarmed robbery as one of enumerated felonies forming basis for felony murder charge. People v. Bryant, 70 Mich. App. 279, 245 N.W.2d 716, 1976 Mich. App. LEXIS 843 (Mich. Ct. App. 1976).

A homicide committed immediately after a robbery for purpose of attempting escape or preventing detection constitutes felony-murder. People v. Oliver, 63 Mich. App. 509, 234 N.W.2d 679, 1975 Mich. App. LEXIS 1196 (Mich. Ct. App. 1975).

Defendant who fatally shot state trooper and sped away after latter approached his automobile with gun drawn few miles away from scene and within half hour of commission of armed robbery by defendant could not successfully contend that felony of armed robbery was complete at time of shooting as would preclude conviction under felony-murder doctrine. People v. Oliver, 63 Mich. App. 509, 234 N.W.2d 679, 1975 Mich. App. LEXIS 1196 (Mich. Ct. App. 1975).

For purposes of felony-murder statute, robber is engaged in perpetration of crime while he is endeavoring to escape and make away with goods taken. People v. Smith, 55 Mich. App. 184, 222 N.W.2d 172, 1974 Mich. App. LEXIS 804 (Mich. Ct. App. 1974).

In felony-murder prosecution resulting from accomplice's fatal shooting of robbery victim's husband in grocery store within half-hour or less of robbery, defendant's conviction of first-degree murder was proper even though deceased was not person robbed, where presence of someone other than victim, at 11:30 a.m. time of robbery, could be said to have been naturally expected by robbers. People v. Graves, 52 Mich. App. 326, 217 N.W.2d 78, 1974 Mich. App. LEXIS 1032 (Mich. Ct. App. 1974).

Felony-murder rule was properly applicable so as to warrant conviction for first-degree murder as against defendant who fatally shot his cofelon during latter's struggle with intended victim of armed robbery. People v. Warren, 44 Mich. App. 567, 205 N.W.2d 599, 1973 Mich. App. LEXIS 1031 (Mich. Ct. App. 1973).

Provisions of § 750.529, superseding common-law offense of armed robbery, would be held not to have precluded prosecution based for felony murder laid under common-law offense of robbery so as to justify finding of first-degree murder for killing perpetrated during commission of armed robbery, thereby obviating necessity of proving malice. People v. Gavin, 37 Mich. App. 335, 194 N.W.2d 498, 1971 Mich. App. LEXIS 1230 (Mich. Ct. App. 1971).

Where during "perpetration" of an armed robbery a killing occurs at hands of felon or someone acting in concert with him in furtherance of common objective or purpose, all codefendants are guilty of first-degree murder. People v. Goree, 30 Mich. App. 490, 186 N.W.2d 872, 1971 Mich. App. LEXIS 2252 (Mich. Ct. App. 1971).

Defendant who was convicted of first-degree murder under felony-murder rule for accomplice's fatal shooting of police officer during bank robbery could not successfully contend that shooting was separate and independent act of accomplice because of agreement not to injure anyone during robbery, since defendant by undertaking robbery thereby intended to commit felony and, in view of his own use of weapon to wound another officer and his urging of accomplice to shoot, it could not be said that he had not contemplated violent reaction by him to any resistance during robbery. People v. Bowen, 12 Mich. App. 438, 162 N.W.2d 911, 1968 Mich. App. LEXIS 1211 (Mich. Ct. App. 1968).

In first-degree murder prosecution resulting from fatal shooting of police officer by defendant's accomplice while both were attempting to escape from bank they had robbed, defendant's contention that robbery was fully consummated at time of shooting and was being "perpetrated" within meaning of felony-murder rule was without merit, where at time of shooting defendant was still in bank and could not be said to have carried through entire contemplated robbery, including escape. People v. Bowen, 12 Mich. App. 438, 162 N.W.2d 911, 1968 Mich. App. LEXIS 1211 (Mich. Ct. App. 1968).

Inmate's habeas petition was denied where the evidence was sufficient to support the guilty verdict of the inmate for felony murder where the inmate's attempt to escape after committing a robbery resulted in two deaths from a car accident. Terry v. Bock, 208 F. Supp. 2d 780, 2002 U.S. Dist. LEXIS 12068 (E.D. Mich. 2002), aff'd, 79 Fed. Appx. 128, 2003 U.S. App. LEXIS 21841 (6th Cir. Mich. 2003).

In prosecution for murder committed while perpetrating or attempting to perpetrate robbery, where defendant admitted everything essential to offense except his intent to rob and claimed that death was accidental, and where prosecution did not and could not know that case would take on that aspect until after defendant had testified, it was proper for prosecution in rebuttal to show intent by cross-examination or any other competent testimony, including defendant's confession if lawfully obtained, even though state from inception of trial had burden of proving that defendant had

committed robbery or had intent to rob. People v. Wright, 315 Mich. 81, 315 Mich. 82, 23 N.W.2d 213, 1946 Mich. LEXIS 305 (Mich. 1946).

*Unpublished decision:* Following unsuccessful appeals from his convictions for first degree murder, armed robbery, and felony firearm, a prisoner's petition for a writ of habeas corpus under 28 USCS § 2254 was granted where the prisoner demonstrated that his trial counsel was deficient for failing to interview an accomplice witness before making a determination as to whether to call him as a witness because the prisoner's trial counsel had a duty under U.S. Const. amend. 6 to investigate all potential relevant witnesses, which he recognized but refused to follow, and only after the prisoner's counsel talked to the accomplice witness could he have made an informed decision about whether to call him, and the prisoner demonstrated prejudice from his counsel's failure to interview the accomplice witness because his counsel's failure to talk to the accomplice witness deprived the prisoner of an opportunity to present a critical component of his defense and, had the accomplice witness testified as expected that the prisoner was not involved in the robbery and murder, it could not be said that the result of the trial would have been the same. Towns v. Smith, 2003 U.S. Dist. LEXIS 10772 (E.D. Mich. June 25, 2003), aff'd, 395 F.3d 251, 2005 FED App. 0009P, 2005 U.S. App. LEXIS 240 (6th Cir. Mich. 2005).

## ☏ 8. —Killing committed in perpetration of rape.

Passage of present criminal sexual conduct statute and repeal of former carnal knowledge statute did not effect concept of rape in first-degree murder statute, thus crime of first-degree murder based on rape could properly be charged in information, and no error occurred in prosecution of case for murder committed during perpetration or attempted perpetration of rape, since rape as formerly defined under carnal knowledge law survived for purposes of prosecution. People v. McDonald, 409 Mich. 110, 293 N.W.2d 588, 1980 Mich. LEXIS 232 (Mich. 1980).

Killing in an attempt to rape involves an intent to have sexual intercourse by force and against the will, and is murder in the first degree under the statute. People v. Best, 218 Mich. 141, 187 N.W. 393, 1922 Mich. LEXIS 548 (Mich. 1922).

Evidence from which jury could find rape was sufficient to support jury's finding of guilt against two defendants on two counts of premeditated murder and felony murder arising out of killing of single victim in perpetration of rape. People v. Ramsey, 89 Mich. App. 260, 280 N.W.2d 840, 1979 Mich. App. LEXIS 2068 (Mich. Ct. App. 1979).

Felony murder statute incorporating rape as one of enumerated felonies while excluding other forms of felonious criminal sexual conduct involving forcible sexual penetration, thereby subjecting only males as principals to prosecution for felony murder-rape in accord with definition of rape as carnal knowledge of woman by force and against her will, would be held to comply with equal protection of laws as bearing fair and reasonable relation to legislative determination that rape is more inherently dangerous to human life than other forms of sexual assault. People v. McDonald, 86 Mich. App. 5, 272 N.W.2d 179, 1978 Mich. App. LEXIS 2552 (Mich. Ct. App. 1978), aff'd, 409 Mich. 110, 293 N.W.2d 588, 1980 Mich. LEXIS 232 (Mich. 1980).

Offense of felony murder-rape was not abolished by enactment of criminal sexual conduct statute under which offense formerly known as rape became punishable as criminal sexual conduct either in first or third degree. People v. McDonald, 86 Mich. App. 5, 272 N.W.2d 179, 1978 Mich. App. LEXIS 2552 (Mich. Ct. App. 1978), aff'd, 409 Mich. 110, 293 N.W.2d 588, 1980 Mich. LEXIS 232 (Mich. 1980).

Circumstantial evidence was sufficient to justify reasonable person in concluding that all elements of rape or attempted rape were established beyond reasonable doubt so as to support conviction in prosecution for murder in perpetration or attempt to perpetrate rape. People v. McDonald, 86 Mich. App. 5, 272 N.W.2d 179, 1978 Mich. App. LEXIS 2552 (Mich. Ct. App. 1978), aff'd, 409 Mich. 110, 293 N.W.2d 588, 1980 Mich. LEXIS 232 (Mich. 1980).

## ☏ 9. —Killing committed in perpetration of other crimes.

If there has been a killing during commission of one of felonies enumerated under first-degree murder statute, this establishes the degree; if the killing occurs during commission of some other felony, malice may be implied but nature of felonious act must be considered, since many felonies are not inherently dangerous to human life and to hold that in all cases it is murder if a killing occurs in commission of any felony would take from jury the essential question of malice. People v. Carter, 387 Mich. 397, 197 N.W.2d 57, 1972 Mich. LEXIS 172 (Mich. 1972).

While the statute constitutes murder committed in the perpetration of burglary as in the first degree it does not exclude all lesser degrees if the evidence warrants. People v. Treichel, 229 Mich. 303, 200 N.W. 950, 1924 Mich. LEXIS 892 (Mich. 1924).

Home invasion was properly considered an underlying felony to support a conviction for first-degree felony murder. People v. Warren, 228 Mich. App. 336, 578 N.W.2d 692, 1998 Mich. App. LEXIS 56 (Mich. Ct. App. 1998), aff'd in part and rev'd in part, 462 Mich. 415, 615 N.W.2d 691, 2000 Mich. LEXIS 1421 (Mich. 2000).

Arson is predicate felony in felony murder statute and shares no common elements with homicide as would justify merger based on lesser included or cognate offense analysis in prosecution for felony-murder and premeditated first-degree murder by means of arson. People v. Densmore, 87 Mich. App. 434, 274 N.W.2d 811, 1978 Mich. App. LEXIS 2691 (Mich. Ct. App. 1978).

Felony murder is second-degree murder with additional element of perpetration or attempt to perpetrate enumerated felony. People v. Crown, 75 Mich. App. 206, 254 N.W.2d 843, 1977 Mich. App. LEXIS 1092 (Mich. Ct. App. 1977).

Offense of unlawfully driving away automobile does not require proof of intent to permanently deprive owner of his property and, accordingly, does not constitute larceny within meaning of felony murder statute designating felony murder as murders committed in perpetration of larceny of any kind. People v. Goodchild, 68 Mich. App. 226, 242 N.W.2d 465, 1976 Mich. App. LEXIS 696 (Mich. Ct. App. 1976).

Jury in felony-murder prosecution could not be properly charged in supplemental instruction that they could find defendant guilty of second-degree murder rather than first-degree murder if they also found that defendant was involved in perpetration of underlying felony, such charge being contrary to law mandating verdict of first-degree murder if jury found that murder was perpetrated in commission of felony. People v. Craig, 66 Mich. App. 406, 239 N.W.2d 390, 1976 Mich. App. LEXIS 1202 (Mich. Ct. App. 1976).

For a defendant to be found guilty under felony-murder provision of this section, he must have committed murder during perpetration of crime. People v. Aaron, 63 Mich. App. 230, 234 N.W.2d 462, 1975 Mich. App. LEXIS 1156 (Mich. Ct. App. 1975).

First-degree murder includes that perpetrated by means of poison, lying in wait or committed during perpetration or attempt to perpetrate any arson, rape, robbery, burglary, larceny of any kind, extortion or kidnapping. People v. Vertin, 56 Mich. App. 669, 224 N.W.2d 705, 1974 Mich. App. LEXIS 772 (Mich. Ct. App. 1974).

A killing committed while attempting to escape from or prevent detection of felony is felony-murder provided it is committed as part of continuous transaction with or is otherwise immediately connected with underlying felony. People v. Smith, 55 Mich. App. 184, 222 N.W.2d 172, 1974 Mich. App. LEXIS 804 (Mich. Ct. App. 1974).

Felony-murder statute applicable to crimes of arson, rape, robbery and burglary was not applicable to alleged murder committed during commission of felony of attempted jail escape, and accordingly, affirmative proof that killing was deliberate and premeditated would be required to be shown in prosecution for such crime. People v. Macklin, 46 Mich. App. 297, 208 N.W.2d 62, 1973 Mich. App. LEXIS 1204 (Mich. Ct. App. 1973).

### ☞ 10. First and second-degree murder distinctions.

Second-degree and first-degree murder are separate offenses, and offenders are subject to significantly different penalties. People v. Allen, 390 Mich. 383, 212 N.W.2d 21, 1973 Mich. LEXIS 150 (Mich. 1973).

Murder, called second-degree murder in Michigan, is a common-law crime and first-degree is a statutory crime; it is the common-law crime of murder with an added element. People v. Allen, 390 Mich. 383, 212 N.W.2d 21, 1973 Mich. LEXIS 150 (Mich. 1973).

A defendant's conviction of first-degree, premeditated murder was vacated and changed to second-degree murder where premeditation and deliberation were not established beyond a reasonable doubt; defendant did not have the ability to engage in the "cool and orderly reflection" necessary to elevate his crime to first-degree murder where the defendant shot the victim during a brawl during a "heated situation," and the defendant had a blood alcohol level of approximately 0.10 percent during the shooting. People v. Plummer, 229 Mich. App. 293, 581 N.W.2d 753, 1998 Mich. App. LEXIS 113 (Mich. Ct. App. 1998), app. denied, 457 Mich. 864, 581 N.W.2d 730, 1998 Mich. LEXIS 937 (Mich. 1998), app. denied, 459 Mich. 900, 590 N.W.2d 58, 1998 Mich. LEXIS 2910 (Mich. 1998), cert. denied, 568 U.S. 1131, 133 S. Ct. 949, 184 L. Ed. 2d 738, 2013 U.S. LEXIS 762 (U.S. 2013).

A conviction for felony murder based upon a felony other than one of the felonies enumerated in the felony-murder statute should be reduced to a conviction for second-degree murder, since the trier of fact under such circumstances necessarily found that the defendant had committed all the elements necessary to sustain a conviction for second-degree murder. People v. Whetstone, 119 Mich. App. 546, 326 N.W.2d 552, 1982 Mich. App. LEXIS 3482 (Mich. Ct. App. 1982).

First-degree murder is distinguished from second-degree murder in that the prosecution must prove that the death was the result of a premeditated, deliberate intent to kill before a defendant can be convicted of first-degree murder. People v. Brown, 119 Mich. App. 656, 326 N.W.2d 834, 1982 Mich. App. LEXIS 3492 (Mich. Ct. App. 1982).

First-degree murder is distinguished from second-degree murder in that for a conviction for first-degree murder the prosecution must prove that the death was the willful result of the defendant's premeditated and deliberate intent to kill. People v. Boose, 109 Mich. App. 455, 311 N.W.2d 390, 1981 Mich. App. LEXIS 3287 (Mich. Ct. App. 1981).

First-degree murder consists of killing of human being with malice aforethought and premeditation or deliberation, and without certain mitigating circumstances. People v. Folkes, 71 Mich. App. 95, 246 N.W.2d 403, 1976 Mich. App. LEXIS 924 (Mich. Ct. App. 1976).

First-degree and second-degree murder are consistently treated as two divisions of same crime, not as distinctly separate crimes. People v. Spells, 42 Mich. App. 243, 201 N.W.2d 361, 1972 Mich. App. LEXIS 922 (Mich. Ct. App. 1972).

Signed in as State Of Michigan Michigan DOC - Staff.

State of Michigan DOC   🔍          Client:-None-⌄    History    Help    Sign Out    More

Document:                    MCLS § 750.157                    Actions⌄

✉  ⤓  ⎘  | Go to ⌄ | 750.157  1 of 2 ⌄ | ∧ ∨ | Search Document 🔍          ⟨ 1 of 2 | Results list ⟩

⟨ Previous                                                                Next ⟩

## MCLS § 750.157

[ **Copy Citation** ]

This document is current through Act 149 of the 2024 Regular Legislative Session and E.R.O. 2024-2

**Michigan Compiled Laws Service**   **Chapter 750 Michigan Penal Code (§§ 750.1 — 750.568)**   **Act 328 of 1931 (§§ 750.1 — 750.568)**   **Chapter XXIV Conspiracy (§§ 750.151 — 750.157c)**

### § **750.157**. Providing incriminating testimony or evidence; use of truthful testimony, evidence, or other information against witness in criminal case.

Sec. 157.

A person shall not be excused from attending and testifying or producing any books, papers, or other documents before a court or magistrate upon an investigation, proceeding, or trial for a violation of this chapter on the ground that the testimony or evidence may tend to degrade or incriminate the person. Truthful testimony, evidence, or other truthful information compelled under this section and any information derived directly or indirectly from that truthful testimony, evidence, or other truthful information shall not be used against the witness in a criminal case, except for impeachment purposes or in a prosecution for perjury or otherwise failing to testify or produce evidence as required.

## History

Pub Acts 1931, No. 328, Ch. XXIV, § 157, eff September 18, 1931; amended by Pub Acts 1999, No. 251, imd eff December 28, 1999.

---

▼  Annotations

---

### Notes

**Prior codification:**

MSA § 28.354

**Amendment Notes**

**The 1999 amendment** substituted "A" for "No"; inserted "not" following "shall"; substituted "a" for "any" following "before"; substituted "an" for "any" following "upon"; deleted "of any of the provisions" following "violations"; substituted "on" for ", upon"; deleted "or for the reason" following "ground"; deleted ", documentary or otherwise, required of him" following "evidence"; substituted "the person. Truthful testimony, evidence, or other truthful information compelled under this section and any information derived directly or indirectly from that truthful testimony, evidence, or other truthful information shall not be used against the witness in a criminal case, except for impeachment purposes or in a prosecution for perjury or otherwise failing to testify or produce evidence as required" for "him; but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may so testify or produce evidence, documentary or otherwise, and no testimony so given or produced shall be received against him

upon any criminal investigation, proceeding or trial: Provided, That no person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying"; and made changes in punctuation.

## NOTES TO DECISIONS

Court of appeals erred when it reversed a first degree murder conviction and conspiracy to commit murder because the prosecution elicited testimony from its "key witness" that he had taken and passed polygraph test where, although the introduction of that testimony was error, the Michigan Supreme Court found that, given the substantial evidence corroborating the witness' testimony and establishing defendant's guilt and defense counsel's prior, improper attempt to create a false inference that the witness had failed a polygraph test, the additional improper bolstering created by the testimony that the witness had taken and passed a polygraph test was not outcome-determinative, and the unpreserved, nonconstitutional error had not affected defendant's substantial rights. People v. Jones, 468 Mich. 345, 662 N.W.2d 376, 2003 Mich. LEXIS 1193 (Mich. 2003).

## Research References & Practice Aids

**LexisNexis® Michigan analytical references:**

Michigan Law and Practice, Criminal Law and Procedure §§ 68, 719

**Michigan Digest references:**

Criminal Law and Procedure §§ 739.30, 755

**Hierarchy Notes:**

MCLS Ch. 750, Act 328

Michigan Compiled Laws Service
Copyright © 2024 All rights reserved.

‹ Previous

Next ›



About     Cookie Policy     ℞ RELX™

Privacy Policy     Terms & Conditions     Copyright © 2024 LexisNexis.

Signed in as State Of Michigan Michigan DOC - Staff.

State of Michigan DOC   🔍      Client:-None-∨   History   Help   Sign Out   More

| Document: | MCLS § 750.317 | Actions∨ |
|---|---|---|

‹ Previous      Next ›

### MCLS § 750.317

**Copy Citation**

This document is current through Act 149 of the 2024 Regular Legislative Session and E.R.O. 2024-2

**Michigan Compiled Laws Service**   **Chapter 750 Michigan Penal Code (§§ 750.1 — 750.568)**   **Act 328 of 1931 (§§ 750.1 — 750.568)**   **Chapter XLV Homicide (§§ 750.316 — 750.329a)**

## § 750.317. Second degree murder; penalty.

Sec. 317.

Second degree murder—All other kinds of murder shall be murder of the second degree, and shall be punished by imprisonment in the state prison for life, or any term of years, in the discretion of the court trying the same.

## History

Pub Acts 1931, No. 328, Ch. XLV, § 317, eff September 18, 1931.

▼   Annotations

## Notes

**Prior codification:**

RS 1846, Ch. 153, § 1; CL 1857, § 5712; CL 1871, § 7511; How § 9076; CL 1897, § 11471; CL 1915, § 15193; CL 1929, § 16709.

MSA § 28.549

## NOTES TO DECISIONS

⬇ 1. Second-degree murder generally.
⬇ 2. Second-degree murder distinguished.
⬇ 3. Elements of offense.
⬇ 4. —Malice.
⬇ 5. —Intent.
⬇ 6. Presumptions and inferences.
⬇ 7. Justification and excuse.
⬇ 8. —Intoxication.
⬇ 9. Admissibility and sufficiency of evidence.
⬇ 10. —Corpus delicti and cause of death.
⬇ 11. —Admissions.
⬇ 12. —Self-defense.

⬇ **12.5 —Duress.**
⬇ **13. —Identification of defendant.**
⬇ **14. —Res gestae or excited utterance.**
⬇ **15. —Prior actions and conduct of accused.**
⬇ **16. —Mental condition of defendant.**
⬇ **17. —Malice and intent.**
⬇ **18. —Circumstantial evidence.**
⬇ **19. —Rebuttal testimony.**
⬇ **20. Habeas corpus proceedings.**
⬇ **21. Conduct of prosecutor.**
⬇ **22. Double jeopardy.**
⬇ **23. Instructions to jury.**
⬇ **24. —Lesser-included offense.**
⬇ **25. —Manslaughter.**
⬇ **26. —Cause of death.**
⬇ **27. —Presumption of innocence and burden of proof.**
⬇ **28. —Aiding and abetting.**
⬇ **29. —Self-defense.**
⬇ **30. —Intoxication.**
⬇ **31. —Malice.**
⬇ **32. Unanimity.**
⬇ **33. Questions for jury.**
⬇ **34. Verdict.**
⬇ **35. Sentence.**
⬇ **36. —Guidelines.**
⬇ **37. Probation.**
⬇ **38. Appeal and error.**
⬇ **39. Sufficient evidence.**
⬆ **1. Second-degree murder generally.**

Assault with intent to do great bodily harm less than murder is cognate lesser included offense of second degree murder. People v. Bailey, 451 Mich. 657, 549 N.W.2d 325, 1996 Mich. LEXIS 1423 (Mich.), amended, 453 Mich. 1204, 551 N.W.2d 163, 1996 Mich. LEXIS 1939 (Mich. 1996).

In resisting arrest for intoxication a party was guilty of a felony, under a former Act, and where, in the course of such resistance, a revolver in his hands inflicted a fatal wound on the officer, he was guilty of murder in the second degree. People v. Arnett, 239 Mich. 123, 214 N.W. 231, 1927 Mich. LEXIS 731 (Mich. 1927).

MCL 750.317 was not unconstitutionally vague where it was not the element of justification or excuse that was optional, but the need to read that portion of the jury instruction if no justification or excuse defense was presented. Moreover, the defenses of justification and excuse were well-established in the common law, as well as the subject of innumerable court decisions and legal treatises. People v. Schurr, 2024 Mich. App. LEXIS 662 (Mich. Ct. App. Jan. 25, 2024).

Defendant's conviction for second–degree murder was proper where the evidence proved beyond a reasonable doubt the necessary element of malice and his intent to commit second–degree murder; there was ample evidence that cast doubt on defendant's claim that he gently shook the victim two or three times by the shoulders and medical evidence established that the victim was severely shaken and died from a fatal head injury. People v. Bulmer, 256 Mich. App. 33, 662 N.W.2d 117, 2003 Mich. App. LEXIS 190 (Mich. Ct. App. 2003).

A conviction of second-degree murder requires a showing of the killing of a person by another with malice and without justification or excuse. People v. Simmons, 134 Mich. App. 779, 352 N.W.2d 275, 1984 Mich. App. LEXIS 2675 (Mich. Ct. App. 1984).

The prosecution in a trial for second-degree murder must prove that the death was caused by an act of the defendant and there must be a finding that the defendant intended to kill, or that he intended to do great bodily harm, or that he committed a wanton and willful act the natural tendency of which is to cause death or great bodily harm; there must be a strong, plain likelihood that death or serious bodily harm will result and the defendant must have willfully and wantonly disregarded the knowledge of the possible consequence of death or serious injury, if the third of the alternative mental states is to be proved (CJI 16:3:01). People v. Klave, 130 Mich. App. 388, 343 N.W.2d 565, 1983 Mich. App. LEXIS 3430 (Mich. Ct. App. 1983).

It is improper to charge a jury as to conspiracy to commit second-degree murder because such a crime cannot logically exist, it being anomalous to speak in terms of planning a crime which by definition is committed without premeditation and deliberation. People v. Perry, 115 Mich. App. 533, 321 N.W.2d 719, 1982 Mich. App. LEXIS 3131 (Mich. Ct. App. 1982).

Second-degree murder conviction can be sustained if there is proof of defendant's intent to cause the very harm which results or some harm of same general nature or act done in wanton or willful disregard of plain and strong likelihood that some harm will result. People v. Clayton, 97 Mich. App. 815, 296 N.W.2d 177, 1980 Mich. App. LEXIS 2716 (Mich. Ct. App. 1980).

Second-degree murder is not specific intent crime. People v. Barnard, 93 Mich. App. 590, 286 N.W.2d 870, 1979 Mich. App. LEXIS 2463 (Mich. Ct. App. 1979).

All murder, other than premeditated or felony murder, is murder in second degree. People v. Martin, 75 Mich. App. 6, 254 N.W.2d 628, 1977 Mich. App. LEXIS 1071 (Mich. Ct. App. 1977).

Proof of premeditation and proof of felony serve same purpose in a murder prosecution of elevating otherwise second-degree murder to crime of murder in first-degree. People v. Embree, 68 Mich. App. 40, 241 N.W.2d 753, 1976 Mich. App. LEXIS 675 (Mich. Ct. App. 1976).

Second-degree murder is always lesser included offense of first-degree murder. People v. Goodchild, 68 Mich. App. 226, 242 N.W.2d 465, 1976 Mich. App. LEXIS 696 (Mich. Ct. App. 1976).

A wilful and voluntary act which directly tends to destroy a person's life may be said to have been intended to destroy such person's life consistent with intent required for second-degree murder. People v. Carl, 11 Mich. App. 226, 160 N.W.2d 801, 1968 Mich. App. LEXIS 1277 (Mich. Ct. App. 1968).

Michigan's second-degree-murder statute fell within the generic definition of murder since: (1) the malice required to prove murder required the wanton and willful disregard that the natural tendency of the defendant's behavior was to cause death or great bodily harm; (2) Model Penal Code § 210.2 stated that criminal homicide constituted murder when it was committed recklessly under circumstances manifesting extreme indifference to the value of human life; and (3) a law dictionary defined murder as the killing of a human being with malice aforethought, and depraved-heart murder as a murder resulting from an act so reckless and careless of the safety of others that it demonstrated the perpetrator's complete lack of regard for human life. United States v. Hopskin, 702 Fed. Appx. 335, 2017 FED App. 0439N, 2017 U.S. App. LEXIS 13740 (6th Cir. Mich. 2017).

☗ **2. Second-degree murder distinguished.**

Second-degree murder is first-degree murder minus element of premeditation or enumerated felony and, as such, is lesser-included offense of first-degree murder or first-degree felony murder. People v. Carter, 395 Mich. 434, 236 N.W.2d 500, 1975 Mich. LEXIS 173 (Mich. 1975).

A defendant's conviction of first-degree, premeditated murder was vacated and changed to second-degree murder where premeditation and deliberation were not established beyond a reasonable doubt; defendant did not have the ability to engage in the "cool and orderly reflection" necessary to elevate his crime to first-degree murder where the defendant shot the victim during a brawl during a "heated situation," and the defendant had a blood alcohol level of approximately 0.10 percent during the shooting. People v. Plummer, 229 Mich. App. 293, 581 N.W.2d 753, 1998 Mich. App. LEXIS 113 (Mich. Ct. App. 1998), app. denied, 457 Mich. 864, 581 N.W.2d 730, 1998 Mich. LEXIS 937 (Mich. 1998), app. denied, 459 Mich. 900, 590 N.W.2d 58, 1998 Mich. LEXIS 2910 (Mich. 1998), cert. denied, 568 U.S. 1131, 133 S. Ct. 949, 184 L. Ed. 2d 738, 2013 U.S. LEXIS 762 (U.S. 2013).

Premeditated and felony murder are separate crimes within first-degree murder statute and differ in that former requires act of premeditation and deliberation, while latter requires act of murder committed during perpetration of a felony, all other murders being murder in second degree. People v. Martin, 75 Mich. App. 6, 254 N.W.2d 628, 1977 Mich. App. LEXIS 1071 (Mich. Ct. App. 1977).

To justify submission of second-degree murder charge to trier of fact, there must be evidence that there was killing, that accused killed with malice aforethought but without premeditation and deliberation, that accused formed intent to kill upon sudden provocation prior to and accompanying act, and that such provocation did not foreclose exercise of reason and thereby reduce crime from murder to manslaughter. People v. Stanek, 61 Mich. App. 573, 233 N.W.2d 89, 1975 Mich. App. LEXIS 1570 (Mich. Ct. App. 1975).

Offense of second-degree murder requires unlawful killing and purpose to kill formed suddenly, preceding and accompanying act, without such deliberation and premeditation distinguishing murder in first degree but not with such sudden provocation and stirring of passions which precludes exercise of reason as would exclude, in legal sense, idea of malice aforethought and thereby reduce offense to manslaughter. People v. Stinson, 58 Mich. App. 243, 227 N.W.2d 303, 1975 Mich. App. LEXIS 1698 (Mich. Ct. App. 1975).

Second-degree murder involves purpose to kill without that deliberation and premeditation requisite to murder in first degree, but without such provocation and stirring of blood which preludes exercise of reason as would in legal sense exclude idea of malice aforethought and thereby reduce killing to manslaughter. People v. Bryant, 43 Mich. App. 659, 204 N.W.2d 746, 1972 Mich. App. LEXIS 1076 (Mich. Ct. App. 1972).

To constitute murder in second degree there must be an unlawful killing and purpose to kill, formed suddenly, preceding and accompanying act, without that deliberation and premeditation which distinguishes murder in first degree, but not such sudden provocation and stirring of passions which precludes exercise of reason as would, in a legal sense, exclude idea of malice aforethought, and thereby reduce homicide to manslaughter. People v. Dawson, 29 Mich. App. 488, 185 N.W.2d 581, 1971 Mich. App. LEXIS 1987 (Mich. Ct. App. 1971).

**⏻ 3. Elements of offense.**

Often-recited fourth element of second-degree murder, without justification or excuse, actually is part of the cluster of ideas of second-degree murder; it is not an element of the offense. Because without justification or excuse is not an element of the offense, the trial court was not required to establish a factual basis in that regard under Mich. Ct. R. 6.302(D)(1), and the trial court did not violate Mich. Ct. R. 6.302(B) when accepting defendant's guilty plea. People v. Spears, 2023 Mich. App. LEXIS 2817 (Mich. Ct. App. Apr. 20, 2023).

The evidence was sufficient for a rational trier of fact to find that the essential elements of second-degree murder, including malice, were proved beyond a reasonable doubt where the defendants intentionally committed an act, drag racing at very high speeds into an intersection while intoxicated, that was in disregard of life-endangering consequences and that was in wanton and wilful disregard of the likelihood that the natural tendency of such behavior was to cause death or great bodily harm; defendants' motions for directed verdict properly denied. People v. Aldrich, 246 Mich. App. 101, 631 N.W.2d 67, 2001 Mich. App. LEXIS 107 (Mich. Ct. App. 2001), app. denied, 465 Mich. 952, 640 N.W.2d 872, 2002 Mich. LEXIS 101 (Mich. 2002).

The elements of second-degree murder are: (1) that a death occurred, (2) that it was caused by the defendant, (3) that the killing was done with malice, and (4) without justification or excuse. People v. Smith, 148 Mich. App. 16, 384 N.W.2d 68, 1985 Mich. App. LEXIS 3140 (Mich. Ct. App. 1985).

It is incumbent upon the people to establish each and every element of the offense of second-degree murder beyond a reasonable doubt in a trial for second-degree murder. People v. Klave, 130 Mich. App. 388, 343 N.W.2d 565, 1983 Mich. App. LEXIS 3430 (Mich. Ct. App. 1983).

Michigan second-degree murder was "violent felony" under Armed Career Criminal Act (ACCA) as it required level of culpability almost indistinguishable from purposeful or knowing and necessarily involved use of force, and because second-degree murder was element of defendant's juvenile felony-firearm conviction, that conviction, which necessarily involved possession of firearm, qualified as ACCA predicate offense; thus, defendant had three qualifying offenses and properly received enhanced sentence under ACCA. United States v. Jamison, 85 F.4th 796, 2023 FED App. 236P, 2023 U.S. App. LEXIS 28462 (6th Cir. Mich. 2023), cert. denied, 144 S. Ct. 613, 217 L. Ed. 2d 327, 2024 U.S. LEXIS 238 (U.S. 2024).

Because provocation is not an element of second degree murder under Michigan law, the prosecution was not required to prove it beyond a reasonable doubt. Cook v. Stegall, 56 F. Supp. 2d 788, 1999 U.S. Dist. LEXIS 8784 (E.D. Mich. 1999).

**⏻ 4. —Malice.**

Defendant's motion to quash a charge of second-degree murder was properly denied where there was sufficient evidence of malice to support the charge; there was evidence that the defendant committed an act that was in disregard of life-endangering consequences and that was in wanton and wilful disregard of the likelihood that the natural tendency of such behavior was to cause death or great bodily harm in that the defendant drove at excessive speeds while weaving through traffic and cutting off other drivers within hours after being warned about the dangers of a loose sway bar on his car. People v. Mayhew, 236 Mich. App. 112, 600 N.W.2d 370, 1999 Mich. App. LEXIS 150 (Mich. Ct. App. 1999), app. denied, 461 Mich. 962, 607 N.W.2d 728, 2000 Mich. LEXIS 421 (Mich. 2000).

The absence of provocation is not an actual element of the crime of second-degree murder that the prosecutor must prove beyond a reasonable doubt; the mental state or malice that the prosecutor must prove is the intent to kill, an intent to inflict great bodily harm, or the wanton and wilful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm. People v. Hopson, 178 Mich. App. 406, 444 N.W.2d 167, 1989 Mich. App. LEXIS 325 (Mich. Ct. App. 1989), app. denied, 1990 Mich. LEXIS 558 (Mich. Mar. 30, 1990).

Malice is the intent to kill, actual or implied, under circumstances which do not constitute excuse or justification or mitigate the degree of the killing to manslaughter. People v. Watts, 149 Mich. App. 502, 386 N.W.2d 565, 1986 Mich. App. LEXIS 2497 (Mich. Ct. App. 1986).

Malice may be inferred from the defendant's use of a deadly weapon for purposes of determining whether sufficient evidence is presented to bind a defendant over on a charge of second-degree murder. People v. Smith, 148 Mich. App. 16, 384 N.W.2d 68, 1985 Mich. App. LEXIS 3140 (Mich. Ct. App. 1985).

The states of mind encompassed by the term "malice aforethought" which satisfy the intent element of second-degree murder are the specific intent to kill, the intent to do great bodily harm, and wanton and wilful disregard of the natural tendency of behavior to cause death or great bodily harm. People v. Gjidoda, 140 Mich. App. 294, 364 N.W.2d 698, 1985 Mich. App. LEXIS 2435 (Mich. Ct. App. 1985).

One of the elements of second-degree murder is malice, a mental state consisting of the intent to kill, cause great bodily harm, or do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. People v. Vasquez, 129 Mich. App. 691, 341 N.W.2d 873, 1983 Mich. App. LEXIS 3274 (Mich. Ct. App. 1983).

The driving of an automobile at a grossly excessive speed, in summary disregard of traffic signals, after nightfall, on a main traffic artery of general access may be such conduct as to imperil the life and limb of any police officer or uninvolved citizen in the immediate vicinity and could constitute the element of malice for purposes of a criminal charge of second-degree murder. People v. Vasquez, 129 Mich. App. 691, 341 N.W.2d 873, 1983 Mich. App. LEXIS 3274 (Mich. Ct. App. 1983).

In second-degree murder prosecution against defendant training school supervisor who administered fatal beating to school resident by striking him with rubber hose 30 to 100 times during 45 to 60 minute period after removing resident's pants and binding his hands behind him with rope looped over tree limb, element of malice necessary to finding of second-degree murder was manifested by circumstances of beating and natural tendency thereof to cause great bodily harm. People v. Thomas, 85 Mich. App. 618, 272 N.W.2d 157, 1978 Mich. App. LEXIS 2444 (Mich. Ct. App. 1978).

Offense of second-degree murder, essential element for which is malice, is necessarily included offense of first-degree felony murder. People v. Wright, 80 Mich. App. 172, 262 N.W.2d 917, 1977 Mich. App. LEXIS 1265 (Mich. Ct. App. 1977), aff'd, 409 Mich. 672, 299 N.W.2d 304, 1980 Mich. LEXIS 254 (Mich. 1980).

Malice is essential element to crime of second-degree murder and may be present without actual intent to kill where actual intent is to inflict great bodily harm or to engage in behavior naturally tending to cause death or great bodily harm. People v. Davis, 76 Mich. App. 187, 256 N.W.2d 576, 1977 Mich. App. LEXIS 901 (Mich. Ct. App. 1977).

Malice aforethought, as element of second-degree murder, requires either intent to cause specific harm that resulted or some harm of same general nature, or acts done in wanton or wilful disregard of plain and strong likelihood that some such harm will result. People v. Stinson, 58 Mich. App. 243, 227 N.W.2d 303, 1975 Mich. App. LEXIS 1698 (Mich. Ct. App. 1975).

Unplanned or impulsive homicides or those committed in sudden heat of passion, but which are intentional and committed with malice aforethought, are murder in second-degree. People v. Stinson, 58 Mich. App. 243, 227 N.W.2d 303, 1975 Mich. App. LEXIS 1698 (Mich. Ct. App. 1975).

Second-degree murder is unlawful, malicious killing requiring malice aforethought as essential element thereof. People v. Stinson, 58 Mich. App. 243, 227 N.W.2d 303, 1975 Mich. App. LEXIS 1698 (Mich. Ct. App. 1975).

☏ 5. —Intent.

Second-degree murder is not a specific-intent crime. In re Robinson, 180 Mich. App. 454, 447 N.W.2d 765, 1989 Mich. App. LEXIS 582 (Mich. Ct. App. 1989).

The absence of provocation is not an actual element of the crime of second-degree murder that the prosecutor must prove beyond a reasonable doubt; the mental state or malice that the prosecutor must prove is the intent to kill, an intent to inflict great bodily harm, or the wanton and wilful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm. People v. Hopson, 178 Mich. App. 406, 444 N.W.2d 167, 1989 Mich. App. LEXIS 325 (Mich. Ct. App. 1989), app. denied, 1990 Mich. LEXIS 558 (Mich. Mar. 30, 1990).

The intent to kill may be implied where the actor actually intends to inflict great bodily harm or the natural tendency of his behavior is to cause death or great bodily harm. People v. Watts, 149 Mich. App. 502, 386 N.W.2d 565, 1986 Mich. App. LEXIS 2497 (Mich. Ct. App. 1986).

A defendant, convicted of the second-degree murder of his child, could have been found beyond a reasonable doubt to have violently hit and struck the child in such a manner that he must have known he was endangering the child's life where the evidence regarding the defendant's beatings of the child, the duration and the severity of the beatings, and the way they were carried out convinced the court beyond a reasonable doubt that the beatings were recklessly and wrongfully administered while the defendant was conscious of the risk involved. People v. Klave, 130 Mich. App. 388, 343 N.W.2d 565, 1983 Mich. App. LEXIS 3430 (Mich. Ct. App. 1983).

A criminal defendant, to be convicted of murder, must be shown to have acted with an intent to kill or to inflict great bodily harm or with a wanton and willful disregard of the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. People v. Major, 112 Mich. App. 354, 315 N.W.2d 542, 1981 Mich. App. LEXIS 3496 (Mich. Ct. App. 1981).

Intent to kill, as element of second-degree murder, may be implied where defendant actually intends to inflict great bodily harm on victim or natural tendency of his behavior is to cause death or great bodily harm. People v. Thomas, 85 Mich. App. 618, 272 N.W.2d 157, 1978 Mich. App. LEXIS 2444 (Mich. Ct. App. 1978).

Actual intent to kill is not essential element of crime of second-degree murder. People v. Davis, 76 Mich. App. 187, 256 N.W.2d 576, 1977 Mich. App. LEXIS 901 (Mich. Ct. App. 1977).

Conviction for second-degree murder grounded on intent to produce bodily injury requires that defendant knew or intended that his acts created strong probability of death or great bodily harm. People v. McFee, 35 Mich. App. 227, 192 N.W.2d 355, 1971 Mich. App. LEXIS 1434 (Mich. Ct. App. 1971).

**⚓ 6. Presumptions and inferences.**

A killing may be murder even though the actor harbored no ill will against the victim and even though he acted on the spur of the moment. People v. Watts, 149 Mich. App. 502, 386 N.W.2d 565, 1986 Mich. App. LEXIS 2497 (Mich. Ct. App. 1986).

Since inference that it was accused who shot police officer guarding prisoner in hospital with fellow officer's gun was based directly on eyewitness testimony, and not on any speculative or uncertain facts, such inference is therefore permissible. People v. Clay, 95 Mich. App. 152, 289 N.W.2d 888, 1980 Mich. App. LEXIS 2443 (Mich. Ct. App. 1980).

In determining whether a defendant had opportunity to subject his actions to second look for purpose of establishing premeditation in murder prosecution, consideration is properly given to parties' previous relationship, acts prior to actual killing, circumstances of killing itself and defendant's conduct thereafter. People v. Walker, 93 Mich. App. 189, 285 N.W.2d 812, 1979 Mich. App. LEXIS 2413 (Mich. Ct. App. 1979).

Malice or intent to kill, as element of second-degree murder, may be inferred from acts of defendant. People v. Thomas, 85 Mich. App. 618, 272 N.W.2d 157, 1978 Mich. App. LEXIS 2444 (Mich. Ct. App. 1978).

Malice aforethought as element of second-degree murder may be shown by inference drawn from evidence, including use of lethal weapon. People v. Turner, 62 Mich. App. 467, 233 N.W.2d 617, 1975 Mich. App. LEXIS 1080 (Mich. Ct. App. 1975).

Element of malice required for second-degree murder conviction may be inferred from type of weapon used and manner in which crime was committed. People v. Stanek, 61 Mich. App. 573, 233 N.W.2d 89, 1975 Mich. App. LEXIS 1570 (Mich. Ct. App. 1975).

Assault by blows without weapon may, under certain circumstances, permit jury inference of intent to kill so as to support charge of second-degree murder. People v. Stinson, 58 Mich. App. 243, 227 N.W.2d 303, 1975 Mich. App. LEXIS 1698 (Mich. Ct. App. 1975).

Malice and felonious intent required for second-degree murder can be inferred from totality of circumstances as disclosed by testimony. People v. McBride, 30 Mich. App. 201, 186 N.W.2d 70, 1971 Mich. App. LEXIS 2195 (Mich. Ct. App. 1971).

**⚓ 7. Justification and excuse.**

In a prosecution for second degree murder, where, as a matter of law, no reasonable jury could find that claimed provocation was adequate to mitigate the homicide to voluntary manslaughter, the court may exclude evidence of the provocation and decline to instruct the jury regarding voluntary manslaughter. People v. Pouncey, 437 Mich. 382, 471 N.W.2d 346, 1991 Mich. LEXIS 1505 (Mich. 1991).

One charged with murder because of the shooting of a sheriff who was attempting to arrest him for intoxication did not excuse himself at all in claiming that he was attempting to cast the revolver away so it would not be found on his person and that the officer seized the revolver and was trying to take it when it was discharged. People v. Arnett, 239 Mich. 123, 214 N.W. 231, 1927 Mich. LEXIS 731 (Mich. 1927).

In nonjury prosecution grounded on fatal stabbing of victim by defendant during fight in street, proofs, although sufficient to support manslaughter conviction, failed to manifest measure of malice and absence of excuse or justification necessary to support conviction for second-degree murder. People v. Bryant, 43 Mich. App. 659, 204 N.W.2d 746, 1972 Mich. App. LEXIS 1076 (Mich. Ct. App. 1972).

In a prosecution for defendant's open murder of her husband, defendant was not prejudiced by counsel's recommendation that she accept a plea to second-degree murder because a reasonable defendant would have accepted the second-degree murder plea in light of the prosecutor's stance that, even with expert testimony on battered spouse syndrome, he would not have further reduced the charge to manslaughter. Shimel v. Warren, 838 F.3d 685, 2016 FED App. 0239P, 2016 U.S. App. LEXIS 17320 (6th Cir. Mich. 2016), cert. denied, 581 U.S. 939, 137 S. Ct. 1821, 197 L. Ed. 2d 759, 2017 U.S. LEXIS 2636 (U.S. 2017).

In a prosecution for defendant's murder of her husband, counsel was not rendered ineffective by advising her to plead guilty rather than presenting a battered spouse/self-defense theory at trial because expert testimony on battered spouse syndrome would not have improved her result, given the evidence that the husband suffered nine gunshot wounds, seven in the back, that the shooting was precipitated by defendant's gambling problem, and that defendant reloaded the gun and then continued to shoot her husband. Shimel v. Warren, 838 F.3d 685, 2016 FED App. 0239P, 2016 U.S. App. LEXIS 17320 (6th Cir. Mich. 2016), cert. denied, 581 U.S. 939, 137 S. Ct. 1821, 197 L. Ed. 2d 759, 2017 U.S. LEXIS 2636 (U.S. 2017).

**⚓ 8. —Intoxication.**

The defense of voluntary intoxication is not available to a charge of second-degree murder because it is a crime of general intent. People v. Langworthy, 416 Mich. 630, 331 N.W.2d 171, 1982 Mich. LEXIS 631 (Mich. 1982).

Voluntary intoxication does not negate the element of malice in a second-degree murder charge because such a crime is a crime of general intent. People v. Vasquez, 129 Mich. App. 691, 341 N.W.2d 873, 1983 Mich. App. LEXIS 3274 (Mich. Ct. App. 1983).

Voluntary drug intoxication is not a defense to charge of second-degree murder or manslaughter. People v. Coffey, 42 Mich. App. 683, 202 N.W.2d 456, 1972 Mich. App. LEXIS 983 (Mich. Ct. App. 1972).

**☏ 9. Admissibility and sufficiency of evidence.**

There was sufficient evidence adduced at the preliminary examination to bind the defendant over on charges of second-degree murder under either a subjective or objective standard; evidence supported findings that defendant was drunk and speeding in the middle of a city, that his lack of self-control caused him to narrowly miss striking a vehicle, and that he thereafter ran through a stoplight, struck another vehicle, and killed its occupant. People v. Goecke, 457 Mich. 442, 579 N.W.2d 868, 1998 Mich. LEXIS 1293 (Mich. 1998).

Causing the death of another while operating a motor vehicle in an intoxicated state, by itself and without other aggravating circumstances, may establish that a defendant acted with malice sufficient to support a charge of second-degree murder. People v. Goecke, 454 Mich. 853, 558 N.W.2d 726, 1997 Mich. LEXIS 32 (Mich. 1997).

On conviction of defendant of second-degree murder, it was held that there was testimony to justify verdict of guilty beyond a reasonable doubt. People v. Collins, 303 Mich. 34, 5 N.W.2d 556, 1942 Mich. LEXIS 352 (Mich. 1942).

Sufficient evidence supported defendant's convictions for MCLS 750.136b(2) first-degree child abuse and MCLS **750.317** second-degree murder. Under the evidence presented, a reasonable juror could have concluded that defendant intentionally smothered defendant's newborn child, so that defendant's mother who would have been angry knowing that defendant was pregnant, would not hear the baby cry. People v. Portellos, 298 Mich. App. 431, 827 N.W.2d 725, 2012 Mich. App. LEXIS 2233 (Mich. Ct. App. 2012), overruled in part, People v. Calloway, 500 Mich. 180, 895 N.W.2d 165, 2017 Mich. LEXIS 941 (Mich. 2017).

Victim's testimony that defendant was one of men who attacked him and fired 50 rounds of ammunition into the vehicle in which the victim and two other men were sitting, along with data showing defendant's cell phone was in the vicinity of the shooting and the description matching defendant's vehicle, provided sufficient evidence for a factfinder to conclude that defendant was one of the perpetrators of second-degree murder. People v. Jones, 2013 Mich. App. LEXIS 2061 (Mich. Ct. App. Dec. 17, 2013).

Defendant's conviction for second-degree murder was upheld as defendant was seriously intoxicated when he got into his car and knew from a recent experience that he might blackout while driving. People v. Werner, 254 Mich. App. 528, 659 N.W.2d 688, 2002 Mich. App. LEXIS 2269 (Mich. Ct. App. 2002), app. denied, 468 Mich. 926, 664 N.W.2d 214, 2003 Mich. LEXIS 1280 (Mich. 2003).

Evidence of motive is always relevant in a murder prosecution. People v. Sutherland, 149 Mich. App. 161, 385 N.W.2d 637, 1985 Mich. App. LEXIS 3171 (Mich. Ct. App. 1986).

In prosecution for second-degree murder, test of whether evidence of accused's criminal responsibility and malice aforethought was sufficient was whether evidence presented by prosecution would have justified reasonable person in concluding that all elements of charged offense had been established beyond reasonable doubt, and jurors were entitled to draw reasonable inferences from circumstantial evidence. People v. Barnard, 93 Mich. App. 590, 286 N.W.2d 870, 1979 Mich. App. LEXIS 2463 (Mich. Ct. App. 1979).

Evidence in murder prosecution established elements necessary to support finding of guilt of second-degree murder. People v. Robertson, 87 Mich. App. 109, 273 N.W.2d 501, 1978 Mich. App. LEXIS 2655 (Mich. Ct. App. 1978).

Evidence is legally insufficient for conviction where it cannot support finding of guilt beyond doubt. People v. Turner, 62 Mich. App. 467, 233 N.W.2d 617, 1975 Mich. App. LEXIS 1080 (Mich. Ct. App. 1975).

Evidence supported jury's finding defendant guilty of murder in second degree. People v. Wallace, 33 Mich. App. 182, 189 N.W.2d 861, 1971 Mich. App. LEXIS 1716 (Mich. Ct. App. 1971).

Evidence was sufficient from which jury could conclude beyond reasonable doubt that defendant was guilty of second-degree murder. People v. Dawson, 32 Mich. App. 336, 188 N.W.2d 676, 1971 Mich. App. LEXIS 1901 (Mich. Ct. App. 1971).

Evidence was sufficient to establish elements of crime in prosecution for second-degree murder. People v. Bryant, 24 Mich. App. 296, 180 N.W.2d 198, 1970 Mich. App. LEXIS 1701 (Mich. Ct. App. 1970).

Testimony of witnesses for prosecution supported trial court's finding that defendant, who pleaded guilty to open charge of murder, was guilty of second-degree murder, as against contention that defendant was guilty at most of manslaughter. People v. Middleton, 22 Mich. App. 694, 177 N.W.2d 652, 1970 Mich. App. LEXIS 2034 (Mich. Ct. App. 1970).

There was sufficient evidence for a rational trier of fact to conclude that the inmate committed the crime of second-degree murder, either as the principal, or as an aider and abettor; a witness testified that she witnessed the co-defendant pull the decedent out of the apartment with the inmate's help and while the two men were dragging the decedent outside, the co-

defendant was repeatedly hitting or punching the decedent hard to his face, chest, and upper part of the body. Another witness testified that he witnessed the inmate pull the decedent off of a female and start hitting and kicking the decedent repeatedly and that the inmate and another man started hitting the decedent; such testimony, if believed, would be sufficient to establish that the inmate was guilty of second-degree murder, either as a principal or as an aider and abettor. Couch v. Booker, 650 F. Supp. 2d 683, 2009 U.S. Dist. LEXIS 85291 (E.D. Mich. 2009), aff'd, 632 F.3d 241, 2011 FED App. 0031P, 2011 U.S. App. LEXIS 2105 (6th Cir. Mich. 2011).

⚓ 10. —Corpus delicti and cause of death.

Evidence of malice need not be shown to establish the corpus delicti of second-degree murder. People v. Watts, 149 Mich. App. 502, 386 N.W.2d 565, 1986 Mich. App. LEXIS 2497 (Mich. Ct. App. 1986).

In prosecution for second-degree murder of 12-year-old child who, after being beaten with bed slat, cord, and belts by defendant foster parent, suffered cardiac arrest when undigested particles of food struck vocal cord and activated normal coughing reflex, evidence that beating started chain reaction which resulted in child's death, coupled with evidence of type of beating inflicted, its duration and severity, and systematic nature in which it was carried out, warranted jury inference that defendant knowingly committed act with murderous intent necessary to sustain conviction, notwithstanding fact that final cause of death was cardiac arrest. People v. McFee, 35 Mich. App. 227, 192 N.W.2d 355, 1971 Mich. App. LEXIS 1434 (Mich. Ct. App. 1971).

In prosecution for second-degree murder of 12-year-old child who, after being beaten with bed slat, cord, and belts by defendant foster parent, suffered cardiac arrest when undigested particles of food struck vocal cord and activated normal coughing reflex, medical testimony that child's great fear at time of beating slowed his digestion so that food particles became lodged in his throat and triggered automatic coughing reflex which in turn caused cardiac arrest constituted sufficient evidence from which jury could find causal relationship between child's death and beating inflicted by defendant. People v. McFee, 35 Mich. App. 227, 192 N.W.2d 355, 1971 Mich. App. LEXIS 1434 (Mich. Ct. App. 1971).

Although the inmate contended that there was insufficient evidence to establish the cause of death in this case, the medical examiner testified that the decedent's death was a homicide caused by the complainant aspirating and choking on his own blood as a result of the beating. Such evidence, if believed, would be sufficient to establish the cause of decedent's death so as to defeat the inmate's sufficiency of evidence claim. Couch v. Booker, 650 F. Supp. 2d 683, 2009 U.S. Dist. LEXIS 85291 (E.D. Mich. 2009), aff'd, 632 F.3d 241, 2011 FED App. 0031P, 2011 U.S. App. LEXIS 2105 (6th Cir. Mich. 2011).

⚓ 11. —Admissions.

Where it is shown, without reference to a defendant's confession, that a common-law or statutory second-degree murder was committed by the defendant, no injustice results in admitting a defendant's confession which shows that the murder, in addition, was deliberate and premeditated and thereby results in proving the statutorily heightened crime of first-degree murder. People v. Williams, 422 Mich. 381, 373 N.W.2d 567, 1985 Mich. LEXIS 947 (Mich. 1985).

On conviction of defendant of second-degree murder, it was held that statement made by defendant at police station after his arrest was admissible, notwithstanding that he was permitted to have a small drink of whiskey at his home, where there was no claim that statement was not voluntarily made, the whiskey had no intoxicating effect on defendant, and defendant, an attorney, was warned of his rights and declared he was willing to make a voluntary statement. People v. Collins, 303 Mich. 34, 5 N.W.2d 556, 1942 Mich. LEXIS 352 (Mich. 1942).

Where defendant admitted shooting deceased with her revolver when they were in her automobile at night in a cemetery to which she had driven, her conviction of second-degree murder was not disturbed though her claim of self-defense was supported by evidence that she was heard to scream before the shots were fired, where the evidence showed that they were sweethearts; that she was jealous of defendant and had threatened to kill him; that she at times had his revolver and had purchased cartridges for it and received instructions in loading and shooting it; and that deceased was a large and powerful man, so that her claim that he produced the revolver and threatened to kill her and that she wrested it from him and shot while trying to get away, was improbable. People v. Morgan, 264 Mich. 350, 249 N.W. 885, 1933 Mich. LEXIS 1013 (Mich. 1933).

Evidence admitted prior to defendant's allegedly erroneously introduced confession was sufficient to warrant submission of first-degree murder charge to jury in prosecution resulting in defendant's conviction for second-degree murder. People v. Nadeau, 75 Mich. App. 369, 254 N.W.2d 893, 1977 Mich. App. LEXIS 1111 (Mich. Ct. App. 1977).

Trial court did not err in accepting defendant's guilty plea to second-degree murder after learning that defendant had entered an unfamiliar house, did not know where he was or why he was there, and had no intention of committing crime therein, where court, upon extensive interrogation, elicited from defendant admission that while stabbing victim in home he knew that death would result, thereby establishing intent to kill. People v. Carl, 11 Mich. App. 226, 160 N.W.2d 801, 1968 Mich. App. LEXIS 1277 (Mich. Ct. App. 1968).

⚓ 12. —Self-defense.

In a trial for second-degree murder under MCL 750.317, there was sufficient evidence to find that defendant did not in fact fear for his life or fear great bodily injury at the victim's hands and therefore to rebut a claim of self-defense under MCL 780.972. There was evidence that the victim was not armed and that the victim's actions, although confrontational and physical, were not particularly violent. People v. Roper, 286 Mich. App. 77, 777 N.W.2d 483, 2009 Mich. App. LEXIS 2213 (Mich. Ct. App. 2009).

Evidence in nonjury murder prosecution supported trial court's finding that defendant did not act in self-defense and that he was guilty of murder in second degree beyond reasonable doubt. People v. Hood, 28 Mich. App. 553, 184 N.W.2d 527, 1970 Mich. App. LEXIS 1227 (Mich. Ct. App. 1970).

Although testimony of witnesses varied as to details and some witnesses did not observe entire series of events, testimony of eight res gestae witnesses that defendant removed gun from his pocket and shot decedent during argument over outcome of wager on pool game was sufficient, if believed by jury, to justify verdict finding defendant guilty of second-degree murder, as against claim of self-defense. People v. Lewis, 26 Mich. App. 290, 182 N.W.2d 86, 1970 Mich. App. LEXIS 1442 (Mich. Ct. App. 1970).

On appeal from conviction of defendant of second-degree murder, contention of defendant that evidence clearly established that he acted in self-defense and was in fear of his life when he shot deceased, and that jury's verdict was against weight of evidence, was held to be without merit, where testimony was sufficient to establish that decedent was shot in the back while 15–20 feet from defendant and that decedent was leaving defendant's home. People v. Jefferson, 18 Mich. App. 9, 170 N.W.2d 476, 1969 Mich. App. LEXIS 1024 (Mich. Ct. App. 1969).

☏ 12.5 —Duress.

Trial court's order preventing defendant from raising a duress defense to a second-degree murder charge that relied on a depraved-heart theory of malice was error, and it was not harmless. The denial of the defense, coupled with the trial court's exclusion of any evidence that a passenger in the car threatened defendant, effectively left defendant with no defense at all. People v. Gafken, 510 Mich. 503, 990 N.W.2d 826, 2022 Mich. LEXIS 2264 (Mich. 2022).

☏ 13. —Identification of defendant.

Evidence which included identification of defendant rather than his companion as person who fired lethal shot supported jury's finding of guilt beyond reasonable doubt in prosecution for second-degree murder. People v. McKee, 28 Mich. App. 610, 184 N.W.2d 750, 1970 Mich. App. LEXIS 1250 (Mich. Ct. App. 1970).

☏ 14. —Res gestae or excited utterance.

In nonjury second-degree murder prosecution against defendant who allegedly inflicted fatal beating upon wife, wife's statement to neighbor that defendant "did this to her" at time she was swollen, bleeding, shaking and nervous, was properly admitted within discretion of trial court as res gestae or excited utterance exception to hearsay rule on record from which trial court could infer that there had been startling event resulting in nervous excitement from wife's physical condition, that such event was recent, and that wife's statement related to occurrence. People v. Mosley, 74 Mich. App. 145, 254 N.W.2d 33, 1977 Mich. App. LEXIS 709 (Mich. Ct. App. 1977).

☏ 15. —Prior actions and conduct of accused.

Trial court did not abuse its discretion during defendant's trial on charges of second-degree murder and possession of a firearm during the commission of a felony by allowing the State to introduce evidence that defendant possessed a weapon similar to one that was used to commit the murder, three days before the murder was occurred. People v. Houston, 261 Mich. App. 463, 683 N.W.2d 192, 2004 Mich. App. LEXIS 860 (Mich. Ct. App. 2004), aff'd, 473 Mich. 399, 702 N.W.2d 530, 2005 Mich. LEXIS 1189 (Mich. 2005).

In prosecution for second-degree murder of victim whose death was caused by blows of blunt instrument, evidence as to prior actions and conduct of accused in relation to victim sufficient to show that accused killed upon sudden provocation prior to and accompanying act, and that such provocation did not foreclose exercise of reason as would reduce crime from second-degree murder to manslaughter. People v. Stanek, 61 Mich. App. 573, 233 N.W.2d 89, 1975 Mich. App. LEXIS 1570 (Mich. Ct. App. 1975).

In second-degree murder prosecution in which claim of self-defense was raised, trial court did not err in permitting as evidence of prior altercation testimony by decedent's wife that nine months before incident in question defendant in her presence asked decedent to fight him and displayed switchblade knife. People v. Godsey, 54 Mich. App. 316, 220 N.W.2d 801, 1974 Mich. App. LEXIS 1240 (Mich. Ct. App. 1974).

Testimony of one eyewitness that he observed defendant draw and fire pistol at victim and of two other eyewitnesses that, while they did not actually see defendant shoot victim, they saw defendant with weapon in his hand immediately before and after they heard report of a shot was sufficient to sustain jury's verdict finding defendant guilty of second-degree murder. People v. Smith, 30 Mich. App. 242, 185 N.W.2d 912, 1971 Mich. App. LEXIS 2208 (Mich. Ct. App. 1971).

In prosecution against defendant who allegedly strangled victim after argument with her, evidence, including testimony of witness who heard argument and crying of victim, testimony as to threats uttered by defendant in regard to victim, and

medical examiner's testimony that death was caused by strangulation, supported jury's finding of guilt of murder in second degree. People v. Dawson, 29 Mich. App. 488, 185 N.W.2d 581, 1971 Mich. App. LEXIS 1987 (Mich. Ct. App. 1971).

**☂ 16. —Mental condition of defendant.**

In nonjury trial for second-degree murder, evidence presented was sufficient to support finding of trial judge that defendant was sane when he murdered his father-in-law. People v. Dubois, 9 Mich. App. 30, 155 N.W.2d 692, 1967 Mich. App. LEXIS 392 (Mich. Ct. App. 1967).

**☂ 17. —Malice and intent.**

The evidence was sufficient to sustain a conviction for second-degree murder in that a reasonable jury could infer malice under either a subjective or objective standard; evidence established that the defendant lived within one mile of the scene of the accident, had a blood-alcohol content of 0.18 percent, drove well in excess of the speed limit, ran a red stoplight, drover through an intersection at a time when he could have seen at least three vehicles properly traveling through the intersection, narrowly missed hitting two cars before hitting the victims' car, and killed two people. People v. Goecke, 457 Mich. 442, 579 N.W.2d 868, 1998 Mich. LEXIS 1293 (Mich. 1998).

The evidence was sufficient to sustain a conviction for second-degree murder in that a reasonable jury could infer malice under either a subjective or objective standard; evidence established that the defendant was highly intoxicated when he left a bar, that he twice backed into a parked vehicle when trying to leave the bar, drove at a high rate of speed through a residential subdivision, swerved to avoid hitting a car stopped at a stop sign, ran through the stop sign, nearly hit a car driving in the opposite direction, ignored advice from his passengers to slow down, and after colliding with a vehicle parked on the side of the road, traveled across lane, over a curb, across some grass, and struck and killed the victim. People v. Goecke, 457 Mich. 442, 579 N.W.2d 868, 1998 Mich. LEXIS 1293 (Mich. 1998).

Evidence was insufficient to warrant second-degree murder conviction of defendant who fatally injured unknown intruder by shots aimed at intruder's legs, while defendant was excited and afraid, in view of absence of evidence from which malice could be inferred. People v. Hansen, 368 Mich. 344, 118 N.W.2d 422, 1962 Mich. LEXIS 335 (Mich. 1962).

Sufficient evidence supported defendant's conviction for aiding and abetting second-degree murder because he passed a gun to the shooter during a group confrontation that had already become violence, either intending or knowing that the shooter intended to discharge the gun. People v. Blevins, 314 Mich. App. 339, 886 N.W.2d 456, 2016 Mich. App. LEXIS 280 (Mich. Ct. App. 2016).

Evidence was sufficient to establish the requisite malice for second-degree murder under MCL **750.317** because defendant admitted he grabbed a knife and stabbed the victim. Defendant's intent could also be inferred from the fact that, after he stabbed the victim, defendant followed him out of the home and began to kick and stomp on him while taunting him. People v. Roper, 286 Mich. App. 77, 777 N.W.2d 483, 2009 Mich. App. LEXIS 2213 (Mich. Ct. App. 2009).

Evidence that defendant acted with malice in wilful and wanton disregard that death or great bodily harm would be the natural consequences of her actions supporting jury verdict of second-degree murder in smothering of two year-old child. People v. Biggs, 202 Mich. App. 450, 509 N.W.2d 803, 1993 Mich. App. LEXIS 440 (Mich. Ct. App. 1993), app. denied, 453 Mich. 934, 557 N.W.2d 307, 1996 Mich. LEXIS 2809 (Mich. 1996).

Sufficient evidence of malice existed to support the conviction of accused for second-degree murder even absent erroneously-admitted testimony of police detective on powder burns and contact wounds. People v. Jones, 95 Mich. App. 390, 290 N.W.2d 154, 1980 Mich. App. LEXIS 2472 (Mich. Ct. App. 1980).

Second-degree murder conviction does not require proof of defendant's specific intent to kill, but rather "malice aforethought" is proved if it is established that defendant intended to inflict great bodily harm or to engage in act with wanton or willful disregard of likelihood that such harm would result. People v. Hill, 94 Mich. App. 777, 288 N.W.2d 408, 1979 Mich. App. LEXIS 2559 (Mich. Ct. App. 1979).

Malice may be implied for purpose of conviction of second-degree murder in felony murder prosecution upon proof of commission of felony other than those enumerated in felony murder statute. People v. Butts, 85 Mich. App. 435, 271 N.W.2d 265, 1978 Mich. App. LEXIS 2419 (Mich. Ct. App. 1978), reinstated in part, vacated, 411 Mich. 1041, 309 N.W.2d 187, 1981 Mich. LEXIS 1629 (Mich. 1981).

In nonjury prosecution for second-degree murder resulting from fatal shooting in bar, element of intent to kill was properly established by inferences flowing from circumstances surrounding crime, including defendant's use of lethal weapon and fact that he thrice shot at victim, as well as judge's fact-finding that defendant acted with intent to do great bodily harm with knowledge that his actions created strong probability of death or great bodily harm, which finding could not be said to be clearly erroneous. People v. Turner, 62 Mich. App. 467, 233 N.W.2d 617, 1975 Mich. App. LEXIS 1080 (Mich. Ct. App. 1975).

In prosecution for murder of victim whose death was attributable to brain injury caused by blow or blows to head with blunt instrument, totality of evidence including inferences drawn from type of weapon used and manner in which crime was committed was sufficient to warrant finding of malice required for second-degree murder. People v. Stanek, 61 Mich. App. 573, 233 N.W.2d 89, 1975 Mich. App. LEXIS 1570 (Mich. Ct. App. 1975).

**A** Neutral
As of: November 20, 2024 4:47 PM Z

## *Does v. Whitmer*

United States District Court for the Eastern District of Michigan, Southern Division

September 27, 2024, Decided; September 27, 2024, Filed

Case No. 22-cv-10209

**Reporter**
2024 U.S. Dist. LEXIS 176146 *

JOHN DOES et al., Plaintiffs, v. GRETCHEN WHITMER et al., Defendants.

**Prior History:** *Does v. Whitmer, 2023 U.S. Dist. LEXIS 68481, 2023 WL 3004101 ( E.D. Mich., Apr. 19, 2023)*

## Core Terms

registrants, Plaintiffs', sex offender, registry, offenders, convicted, sexual, internet, travel, Tier, identifiers, modified, punctuation, offenses, registration requirement, reporting requirements, regulation, required to register, register, retroactively, recidivism, sex, strict scrutiny, violates, parties, zones, subclass, ex post facto, individualized, rights

**Counsel:** [*1] For John Doe A, John Doe B, John Doe C, John Doe D, John Doe E, John Doe F, John Doe G, John Doe H, Mary Doe, Mary Roe, Plaintiffs: Daniel S. Korobkin, American Civil Liberties Union Fund of Michigan, Detroit, MI; Dayja Sade Tillman, ACLU of Michigan, Western Michigan Regional Office, Grand Rapids, MI; Lauren Carbajal, Roshna B. Keen, Loevy & Loevy, Chicago, IL; Paul D. Reingold, University of Michigan, Ann Arbor, MI; Syeda F. Davidson, ACLU of Michigan, ACLU of Michigan, Detroit, MI; Miriam J. Aukerman, American Civil Liberties Union of Michigan, West Michigan Regional Office, Grand Rapids, MI.

For Gretchen Whitmer, Governor of the State of Michigan, Joseph Gasper, Defendants: Eric M. Jamison, Michigan Department of Attorney General, State Operations Division, Lansing, MI; Scott L. Damich, Department of Attorney General, Revenue & Collections Division, Lansing, MI.

For Alyson Oliver, Interested Party: Alyson L. Oliver, Oliver Law Group PC, Troy, MI.

**Judges:** HON. MARK A. GOLDSMITH, United States District Judge.

**Opinion by:** MARK A. GOLDSMITH

## Opinion

**OPINION AND ORDER (1) GRANTING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Dkt. 123) and (2) GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 129)**

**TABLE [*2] OF CONTENTS**

Go to table1

### I. INTRODUCTION [*3]

Plaintiffs filed this class action challenging the constitutionality of *Michigan's Sex Offender Registration Act, Mich. Comp. L. § 28.723, et seq*, as it was amended in 2021 (SORA 2021). Over the past decade, prior versions of SORA have faced similar challenges, and multiple courts within Michigan and the Sixth Circuit have found that predecessor versions of SORA were unconstitutional. This Court is not writing on a blank slate, but rather, in the wake of a long history of case law and legislative amendments.

Plaintiffs bring eleven claims, alleging that *SORA 2021* violates constitutional protections regarding ex post facto, due process, equal protection, privileges and immunities, and the *First Amendment*. After extensive discovery, both parties have moved for summary judgment.[1] Each side's motion is denied in part and

---

[1] The Court set a briefing schedule for the cross-motions for

2024 U.S. Dist. LEXIS 176146, *3

granted in part.

As explained in detail below, the Court sustains some of the challenges and rejects others. Plaintiffs are correct that making registrants subject to certain provisions that were not adopted at the time they committed their crimes violates the Constitution's protection against ex post facto laws. The Court also agrees that individuals who committed a crime that does not have a sexual element or circumstance cannot be labeled as sex [*4] offenders and saddled with registration requirements. However, the Court rejects the claim that all sex offenders are entitled to an individualized hearing, either before being placed on the registry or periodically thereafter, to determine if they are or remain dangerous. A right to a hearing will be recognized (beyond the limited circumstances currently allowed under the statute) for individuals who have been convicted of an offense without a sexual element that the state claims is a registrable offense based on a sexual circumstance. A right to a hearing will also be recognized where a non-Michigan offense triggers registration in Michigan based on the offense being substantially similar to a registerable Michigan offense. Regarding Plaintiffs' *First Amendment* challenges, the Court finds that some of SORA 2021's requirements violate free-speech rights, while others do not. The challenge regarding plea bargains is moot. The challenge based on various terms being vague will require further proceedings.

## II. BACKGROUND

### A. History of SORA

---

summary judgment (Dkt. 121). Plaintiffs filed a motion for summary judgment (Dkt. 123). Defendants filed a combined motion for summary judgment and response in opposition to Plaintiffs' motion (Dkt. 129). Plaintiffs filed a combined reply in support of their motion and response in opposition to Defendants' motion (Dkt. 131). Defendants filed a reply in support of their motion (Dkt. 132). The parties also filed a joint summary of arguments (Dkt. 133). The Court later directed supplemental briefing on the applicability of two cases, *Doe v. Lee, 102 F.4th 330 (6th Cir. 2024)* and *People v. Lymon, N.W.3d    , No. 164685, 2024 Mich. LEXIS 1439, 2024 WL 3573528 (Mich. July 29, 2024)*. Plaintiffs filed a Lee brief (Dkt. 146) and a Lymon brief (Dkt. 155). Defendants filed a Lee brief (Dkt. 145) and a Lymon brief (Dkt. 154).

Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See *E.D. Mich. LR 7.1(f)(2)*; *Fed. R. Civ. P. 78(b)*.

Michigan passed its first SORA in 1994, creating a non-public registry maintained solely for law enforcement use. See *Mich. Pub. Act 295 (1994)*. Since then, the legislature has amended SORA [*5] multiple times, most notably in 2006, 2011, and 2021. A brief history of SORA provides context for Plaintiffs' challenge to SORA 2021.

• 1994 — Michigan created its first sex offender registry, effective October 1, 1995. The registry established a non-public law enforcement database. No regular verification or reporting was required; the only reporting obligation was to notify law enforcement within 10 days of a change of address, which did not need to be done in-person. Registry information was maintained for 25 years for people convicted of one offense and for life for those with multiple offenses. See *Mich. Pub. Act 295* (1994).

• 1997 — A paper copy of registry information was made available to the public for inspection during regular business hours at local law enforcement agencies. See Mich. Pub. Act 494 (1996).

• 1999 — The registry became public on the internet for the first time, with the names, addresses, physical descriptions, and birth dates of registered sex offenders available online. Registrants started being required to report in person quarterly or yearly, depending on their offense. The list of registrable offenses and categories of individuals required to register for life expanded. See Mich. Pub. Act 85 (1999).

• 2002 [*6] — Required registrants to report in person when they enrolled, disenrolled, worked, or volunteered at an institution of higher education. See Mich. Pub. Act. 542 (2002).

• 2004 — Photographs of registered sex offenders were published online; a fee was imposed on registrants, with failure to pay a crime. See Mich. Pub. Acts 237, 238 (2004).

• 2006 — Created "exclusion zones" which prohibited registrants from living, working, or loitering within 1,000 feet of a school, with criminal penalties for noncompliance; created a system allowing subscribers to receive electronic notifications when a person registers in or moves into a particular zip code. See Mich. Pub. Acts 121, 127, 132 (2005).

• 2011 — Divided registrants into three tiers, based on offense, that determine the length of registration and reporting frequency; expanded the number of registrants required to register for life; required all registrants to appear in person within three business days to update certain personal information. See Mich. Pub. Acts 17, 18 (2011).

• 2021 — Removed exclusion zones; created a new option for the Michigan State Police (MSP) to designate a method other than in-person reporting for certain information; eliminated tier information from the public SORA website. See Mich. Pub. Act 295 (2020).

The amendments most [*7] relevant to the present case are those enacted in 2006, 2011, and 2021. The 2006 amendment introduced exclusion zones (sometimes called "school zones" or "student-safety zones"), which barred registrants from living, working, or loitering within 1,000 feet of a school, with few exceptions. Mich. Pub. Acts 121, 127 (2005).

The 2011 amendments introduced a three-tier system that classifies registrants based on their offense.[2] Mich.

Pub. Acts 17, 18 (2011). The parties agree that the three-tier system remains largely unchanged in SORA 2021. Pls. Statement of Material Facts (SOMF) ¶ 139; Defs. Resp. to Pls. SOMF ¶ 139. A registrant's tier determines their length of registration, reporting requirements, inclusion in the public registry, and ability to petition for removal from the registry, as shown in the table below.

**SORA 2021 Tier System[3]**

⊞Go to table2

The parties agree that before the introduction of the three-tier system in 2011, almost three-quarters of Michigan's registrants [*8] were 25-year registrants. Pls. SOMF ¶ 103 (citing Answer to Am. Compl. ¶¶ 179-180) (Dkt. 111)).[9] After the 2011 amendments, almost three-quarters of registrants were assigned lifetime registration terms. Id. Plaintiffs estimate that, after the enactment of SORA 2011, almost 17,000 people suddenly had to register for the rest of their lives, without any individualized assessment. Id.

SORA 2011 also imposed additional reporting requirements. In addition to requiring registrants to report in person at specified intervals, SORA 2011 required registrants to report in person within three

---

[2] The Court notes that the section of SORA that defines Tier I, Tier II, and Tier III offenses, Mich. Comp. Law § 28.722, is difficult to follow. Section 28.722 cites to more than 20 sections of the Michigan penal code—many of which contain numerous subsections themselves—and adds various exclusions and limitations to those sections. Below is a non-exhaustive list of offenses generally corresponding to each tier. Plaintiffs submitted as an exhibit a chart listing crime codes, crime descriptions, and tiers, that appears to be a comprehensive list of registrable offenses. See Pls. SOMF ¶ 103 (citing Crime Codes Chart (Dkt. 127-23)). Plaintiffs do not describe, however, how this chart was created (whether by Plaintiffs or the MSP) or for what purpose it is used. Defendants did not voice any objections to the contents of the chart.

Tier I offenses include possession of child sexually abusive material; indecent exposure involving fondling; unlawful imprisonment of a minor; criminal sexual conduct in the fourth degree; surveillance or photography of an unclothed person if the victim is a minor. Mich. Comp. L. § 28.722(r)(i)-(xi).

Tier II offenses include soliciting a minor under 16 years of age for an immoral purpose; involving a child in sexually abusive activities or materials; or producing or financing such materials; using a computer to communicate with any person for the purpose of committing other specified offenses against minors; most crimes against nature or sodomy against a minor; most crimes of gross indecency against a minor 13

years of age or older; recruiting or providing a minor for commercial sexual activity; criminal sexual conduct in the fourth degree; criminal sexual conduct in the second and fourth degree committed against a minor between 13 and 18 years of age. Id. § 28.722(t)(i)-(xii). A Tier I offender who is subsequently convicted of a Tier I offense is also considered a Tier II offender. Id. § 28.722(s)(i).

Tier III offenses include gross indecency against a minor less than 13 years of age; kidnapping of a minor; leading away of a child under 14 years of age; criminal sexual conduct in the first, second, or third degree against a minor less than 13 years of age; sexual contact with a dead human body; and assault with intent to commit criminal sexual conduct. Id. § 28.722(v)(i)-(vii). A Tier II offender who is subsequently convicted of a Tier I or Tier II offense is also considered a Tier III offender. Id. § 28.722(u)(i).

[3] This table was created by the Court.

[9] Unless otherwise specified, if the Court cites to a party's statement of material facts for a proposition that the Court is accepting as an established fact, the Court does so because the opposing party either admits or does not dispute the fact.

business days[10] whenever they changed their name, address, employment, schooling, travel plans, vehicle information, or internet identifiers.[11]

Following rulings in an earlier federal case (discussed further below), the legislature passed SORA 2021, which removed the exclusion zones so that there are no longer any restrictions on where a registrant can live or work. But SORA 2021 left intact many of the amendments introduced in SORA 2011, including the three-tier system that retroactively increased the registration length for many offenders. The only significant change with respect to the tier system in SORA 2021 [*9] is that a registrant's tier is no longer published on the public website. *Mich. Comp. L. § 28.728(3)(e)*.

The parties agree that SORA 2021 maintains the bulk of the reporting requirements introduced in SORA 2011. Pls. SOMF ¶¶ 144, 146; Defs. Resp. to Pls. SOMF ¶¶ 144, 146. Registrants are still required to report changes in the personal information listed above to law enforcement within three business days, although the requirement to report internet identifiers no longer applies to pre-2011 registrants. *Id.* SORA 2021 allows for, but does not require, the MSP to establish methods other than in-person reporting for certain required updates. *Mich. Comp. L. 28.725(1)*. In practice, the MSP requires registrants to report in person within three business days whenever they change their name, address, employment, or schooling. See Pls. SOMF ¶ 271 (citing Explanation of Duties Form at ¶¶ 6, 9 (Dkt. 126-17)); Defs. Resp. to Pls. SOMF ¶ 271. Only changes in travel plans, vehicle information, internet identifiers, and telephone numbers can be reported by mail, and the MSP could, in theory, return to requiring in-person updates at any time. MSP did not promulgate rules or seek public comment on the required manner of reporting, but Defendants note that the [*10] current requirements mirror those of the federal *Sex Offender*

*Registration and Notification Act (SORNA), 34 U.S.C. § 20901 et seq.* Pls. SOMF ¶ 270; Defs. Resp. to Pls. SOMF ¶¶ 270-271.

Plaintiffs argue that "SORA 2021 makes minimal changes to the structure, substance, and overall requirements of [SORA 2011], and is, if anything, more complex, vaguer, and harder to understand than the version that preceded it." Am. Compl. ¶ 213 (Dkt. 108). They note that SORA 2021 "retains the identical tier system, the identical lengthy/lifetime registration periods, and the virtually identical onerous reporting requirements and online public registry, all without any individual assessment of risk . . . ." *Id.* ¶ 214. Defendants, on the other hand, argue that "[t]he new SORA amended and repealed the provisions of the old SORA that were found to be unconstitutional." Defs. Br. Supp. Mot. for Summ. J. at 4.

Because SORA 2021 retains features of its predecessor statutes, the Court begins by summarizing prior cases that addressed constitutional challenges to prior iterations of SORA.

**B. Related Litigation**

In an earlier action, six registered sex offenders challenged the constitutionality of SORA 2011. See *John Doe 1-4 v. Snyder, 932 F. Supp. 2d 803 (E.D. Mich. 2013)*, rev'd and remanded sub nom. *Doe #1-5 v. Snyder, 834 F.3d 696 (6th Cir. 2016)* (Does I).[12] The plaintiffs sued Michigan's Governor and the director [*11] of the MSP, alleging violations of: (i) the *Ex Post Facto Clause*; (ii) the plaintiffs' fundamental rights to travel; (iii) the plaintiffs' fundamental rights to engage in common occupations of life; (iv) the plaintiffs' rights to direct the education and upbringing of their children; (v) the *First Amendment*; (vi) the *Due Process Clause* because of the retroactive and oppressive nature of the act; (vii) the *Due Process Clause* because certain provisions were vague and impossible to comply with; and (viii) the *Headlee Amendment to the Michigan Constitution*. *Does I, 932 F. Supp. 2d at 808*.

In a series of three opinions, the district court rejected most of the plaintiffs' constitutional claims, including the ex post facto challenge. See *Does I, 932 F. Supp. 2d 803 (E.D. Mich. 2014)*; *Does I, 101 F. Supp. 3d 672*

---

[10] As Plaintiffs point out, Am. Compl. ¶ 609, SORA 2011 required registrants to report this information "immediately," which was defined as three business days. *Mich. Comp. L. § 28.722(g)* (2020). SORA 2021 ceased using the word "immediately" but maintains the same three business day requirement. *Mich. Comp. L. § 28.725(1)* (2021). Plaintiffs refer to this change as "cosmetic" rather than "substantive." Am. Compl. ¶ 609.

[11] "Internet identifier" means "all designations used for self-identification or routing in internet communications or posting." *Mich. Comp. L. § 28.722(g)*.

[12] The Court refers to all district and circuit court opinions from the earlier case as *Does I*, with reporter information listed to identify the specific opinion.

(E.D. Mich 2015); Does I, 101 F. Supp. 3d 722 (E.D. Mich. 2015). The court ruled in plaintiffs' favor as to some claims, finding that certain provisions of SORA 2011 were constitutionally vague; that imposing strict liability for compliance violations violated due process; and that the retroactive application of certain internet-reporting requirements violated the First Amendment.

On appeal, the Sixth Circuit reversed. See Does I, 834 F.3d at 706. The court addressed the plaintiffs' ex post facto challenge first and found that SORA 2011 imposed punishment within the meaning of that doctrine. Id. at 699-705. Accordingly, the court held that the "retroactive application of SORA's 2006 and 2011 amendments to [p]laintiffs is [*12] unconstitutional, and it must therefore cease." Id. at 706. The court declined to opine on the plaintiffs' other constitutional arguments because its ex post facto decision meant that "none of the contested provisions [could] be applied to the plaintiffs in [the] lawsuit . . . ." Id. But the court did note that the "[p]laintiffs' arguments on these other issues are far from frivolous and involve matters of great public importance." Id. The Sixth Circuit remanded to the district court for entry of a judgment. Id.

In January 2018, the district court entered a stipulated final judgment. See Stipulated Final Judgment, Does I, No. 12-11194 (E.D. Mich. Jan. 26, 2018) (Dkt. 153).[13] Among other things, the judgment declared that "retroactive application of [SORA's] 2006 and 2011 amendments violates the Ex Post Facto Clause of the U.S. Constitution" and enjoined "defendants, their officers, agents[,] servants, employees, and attorneys, and other persons in active concert or participation with them . . . from enforcing the 2006 and 2011 SORA amendments against the plaintiffs." Id. at 2. The judgment also ordered that "if the Michigan legislature amends or replaces SORA to implement the Sixth Circuit's holding in [Does I], this injunction shall terminate on the effective date of any such amendments or new statute." Id. at [*13] 4.

A class action was filed just days after the Sixth Circuit's decision in Does I in 2016, bringing largely the same constitutional challenges to SORA 2011 as were brought in Does I, but this time seeking relief on behalf of all class members, not just the Does I plaintiffs. See Doe v. Snyder, 449 F. Supp. 3d 719 (E.D. Mich. 2020) (Does II). But after filing Does II, "the parties agreed to focus their resources on legislative reform," and the

briefing schedule was repeatedly delayed. Does II, 449 F. Supp. 3d at 726. In May 2019, the district court entered a stipulated order in Does II, granting declaratory relief for the plaintiffs, holding that "the 2006 and 2011 amendments were unconstitutional as applied to the ex post facto subclass." Id. Eventually, after legislative relief failed to materialize, plaintiffs filed renewed motions for partial summary judgment. Id.

In February 2020, the court in Does II granted plaintiffs' motions for summary judgment, finding that "[f]or several years, registrants have been forced to comply with unconstitutional provisions of SORA." Id. at 737. The court entered permanent injunctive relief and stated that, upon the entry of final judgment, Defendants would be "permanently enjoined from enforcing any provision of SORA against members of the [*14] ex post facto subclasses" and would be permanently enjoined from enforcing certain unconstitutional provisions against any registrant. Id. The court gave the parties 60 days to formulate a joint, proposed form of judgment. Id. Before those 60 days passed, however, the COVID-19 pandemic swept the nation, delaying the entry of the final judgment for more than a year, until August 2021. Am. Compl. ¶¶ 203-205. During that time, the legislature passed SORA 2021, which took effect on March 24, 2021. Mich. Pub. Act 295 (2020).

As Does I and Does II were being litigated, a criminal case concerning the constitutionality of SORA was proceeding through the Michigan state courts. See People v. Betts, 507 Mich. 527, 968 N.W.2d 497 (Mich. 2021). In Betts, the defendant had pled guilty to second-degree criminal sexual conduct in 1993, two years before SORA took effect. Id. at 501. In 2012, after he had successfully completed parole, Betts failed to report his change of residence, e-mail address, and purchase of a new vehicle within three business days, as required by SORA 2011. Id. Charged with violating SORA 2011's registration requirements, he sought dismissal of the criminal proceeding, arguing that retroactive application of SORA 2011 violated ex post facto protections. Id. at 501-502.

The Michigan Supreme [*15] Court ultimately agreed with Betts, holding that SORA 2011, "when applied to registrants whose criminal acts predated the enactment of the 2011 SORA amendments, violates the constitutional prohibition on ex post facto laws." Id. at 521. The court ordered that the defendant's conviction of failure to register as a sex offender be vacated. Id.

In the wake of that decision, the Michigan Supreme

---

[13] To the Court's knowledge, the stipulated final judgment does not appear on Westlaw.

Court held that SORA 2021 constitutes punishment and violates the Michigan Constitution's prohibition of cruel or unusual punishment insofar as it applies to non-sexual offenders. See People v. Lymon, ___ N.W.3d ___, No. 164685, 2024 Mich. LEXIS 1439, 2024 WL 3573528 (Mich. July 29, 2024). In Lymon, the defendant was convicted of torture, unlawful imprisonment, felonious assault, and possession of a firearm during the commission of a felony. 2024 Mich. LEXIS 1439, [WL] at *3. These convictions stemmed from an incident where the defendant held his wife and children at gunpoint overnight and repeatedly threatened to kill them. 2024 Mich. LEXIS 1439, [WL] at *2-*3. Although Lymon's offenses did not include a sexual component, he was placed on the Michigan sex offender registry as a Tier I offender because two of his three unlawful-imprisonment convictions involved minors. 2024 Mich. LEXIS 1439, [WL] at *3. The court held that the defendant was entitled to removal from the sex-offender registry. 2024 Mich. LEXIS 1439, [WL] at *17.

## C. The Present Case

The ten named [*16] Plaintiffs in this case—John Does A, B, C, D, E, F, G, H, Mary Doe, and Mary Roe—filed this action seeking declaratory and injunctive relief on behalf of themselves and all others similarly situated. All named Plaintiffs are or have been required to register as sex offenders. The backgrounds of each named Plaintiff are summarized below.

• **John Doe A** (John Doe #1 in Does I) — In 1990, John Doe A committed an armed robbery, during which he forced a mother and her teenage son into a building. He pled guilty to armed robbery and weapons charges and no contest to kidnapping. He was sentenced to 20 to 40 years in prison. At the time of John Doe A's arrest, Michigan did not have a sex offender registry. When he was released from prison, he was retroactively required to register as a sex offender, because kidnapping of a minor triggers registration. After the 2011 SORA amendments, he was retroactively classified as a Tier III offender, and his registration period was extended from 25 years to life. Pls. SOMF ¶¶ 3-8.

• **John Doe B** (John Doe #3 in Does I) — In 1998, when John Doe B was 19 years old, he had a sexual relationship with a 14-year-old girl. He pled guilty to attempted criminal sexual [*17] conduct in the third degree for having sex with a minor. He was sentenced to four years of probation under the

Holmes Youthful Trainee Act (HYTA), a record sealing statute for young offenders. His HYTA status was later revoked because he missed a reporting deadline. After the 2011 SORA amendments, he was retroactively classified as a Tier III offender, and his registration period was extended from 25 years to life. Id. ¶¶ 9-17.

• **John Doe C** (John Doe #4 in Does I) — In 2005, when John Doe C was 23 years old, he had a sexual relationship with a 15-year-old girl. He pled guilty to attempted criminal sexual conduct in the third degree. John Doe C was required to register for 25 years. After the 2011 SORA amendments, he was retroactively classified as a Tier III offender, and his registration period was extended from 25 years to life. Id. ¶¶ 18-23.

• **John Doe D** (John Doe #1 in Does II) — In 2000, when John Doe D was 19 years old, he had a sexual relationship with a 14-year-old girl. He pled guilty to attempted criminal sexual conduct in the third degree under the HYTA. He served about a month in jail and was sentenced to three years of probation. After his release, his HYTA status was revoked because [*18] he violated the terms of his probation. After the 2011 SORA amendments, he was retroactively classified as a Tier III offender, and his registration period was extended from 25 years to life. Id. ¶¶ 41-48.

• **John Doe E** (John Doe #3 in Does II) — In 1994, when John Doe E was 21 years old, he pled no contest to three counts of criminal sexual conduct in the second degree after being accused of engaging in inappropriate touching of his six-year-old nephew. At the time, Michigan did not have a sex offender registry. He was sentenced to 90 days in custody and five years of probation. When SORA was first enacted in 1995, he was subject to registration for 25 years. As a result of the 2011 amendments, he was retroactively reclassified as a Tier III offender, and his registration period was extended from 25 years to life. Id. ¶¶ 49-56.

• **John Doe F** (John Doe #4 in Does II) — In 2013, John Doe F pled guilty to a two-year misdemeanor of sexual misconduct in the fourth degree. He was classified as a Tier II registrant, which remains the case under SORA 2021. Id. ¶¶ 57-63.[14]

---

[14] Plaintiffs filed a notice that John Doe F "has expunged his conviction and has been removed from the sex offender

• **John Doe G** (John Doe #5 in <u>Does II</u>) — In 2006, John Doe G was convicted of third-degree sexual assault of a child in Nebraska. **[*19]** He was required to register for 10 years. In 2010, he moved to Michigan to be closer to his family. In Michigan, he was required to register for 25 years. As a result of the 2011 amendments, he was retroactively reclassified as a Tier III offender, and his registration period was extended from 25 years to life. <u>Id.</u> ¶¶ 64-68.

• **John Doe H** (John Doe #6 in <u>Does II</u>) — In 2015, John Doe H pled no contest to criminal sexual conduct in the fourth degree for sexually touching a woman. He was sentenced to five years of probation. He was classified as a Tier I offender and required to register for 15 years. Under SORA 2021, this remains the same. <u>Id.</u> ¶¶ 69-71.

• **Mary Doe** (Mary Doe in <u>Does I</u>) — In 2003, while living in Ohio, Mary Doe pled no contest to unlawful conduct with a minor for having a sexual relationship with a 15-year-old male. She was sentenced to three years in prison and required to register for 10 years. After serving fewer than eight months, Mary Doe was granted judicial release. The terms of her probation required her to move to Michigan to live with her parents. Under Michigan law at the time, she was required to register for 25 years. As a result of the 2011 amendments, she was retroactively **[*20]** reclassified as a Tier III offender, and her registration period was extended from 25 years to life. <u>Id.</u> ¶¶ 24-32.

• **Mary Roe** (Mary Roe in <u>Does I</u>) — In 2002, at the age of 19, Mary Roe had sex with a 14-year-old boy. She pled guilty to criminal sexual conduct in the third degree. She served about 2.5 years in prison. At the time of her conviction, Mary Roe was required to register for 25 years. As a result of the 2011 amendments, she was retroactively reclassified as a Tier III offender, and her registration period was extended from 25 years to life. In 2016, she was threatened with prosecution because her job was within 1,000 feet of a school, as prohibited by the 2016 amendments to SORA. She filed a suit challenging SORA's constitutionality. <u>See Roe v. Snyder, 240 F. Supp. 3d 697 (E.D. Mich. 2017)</u>. Pursuant to a settlement

in that case, her registration term was reduced from life to 25 years and she was removed from the public registry. But under SORA 2021, she is required to register and comply for life again. <u>Id.</u> ¶¶ 33-40.

Plaintiffs filed a motion for class certification, which the Court granted in a stipulated order. <u>See</u> Mot. to Certify Class (Dkt. 5); 5/18/22 Order (Dkt. 35). The Court certified a "primary class," defined **[*21]** as "people who are or will be subject to registration under Michigan's [SORA]," as well as seven subclasses. 5/18/22 Order; 5/9/23 Order (Dkt. 109). Plaintiffs John Does A, B, C, D, E, F, G, H, Mary Doe, and Mary Roe are named as representatives of the primary class. 5/18/22 Order at 1-2. As of January 24, 2023, the primary class consisted of 45,145 people subject to SORA. Pls. SOMF ¶ 72 (citing Class Data Report ¶¶ 1, 24, 127-128 (Dkt. 123-6)). A description of the seven subclasses is below:

> • **Pre-2011 ex post facto subclass** (31,249 people, 69% of the primary class) — Defined as "members of the primary class who committed the offense(s) requiring registration before July 1, 2011." Plaintiffs John Does A, B, C, D, E, F, G, Mary Doe, and Mary Roe are class representatives.

> • **Retroactive extension of registration subclass** (16,723 people, 37% of the primary class) — Defined as "members of the primary class who were retroactively required to register for life as a result of amendments to SORA." Plaintiffs John Does A, B, C, D, E, G, Mary Doe, and Mary Roe are class representatives.

> • **Barred from petitioning subclass** (size unknown) — Defined as "members of the primary class who are ineligible **[*22]** to petition for removal from the registry and for whom ten or more years will have elapsed since the date of their conviction for the registrable offense(s) or from their release from any period of confinement for that offense(s), whichever occurred last, and who (a) have not been convicted of any felony or any registrable offense since; (b) have successfully completed their assigned periods of supervised release, probation, or parole without revocation at any time of that supervised release, probation, or parole; and (c) have successfully completed an appropriate sex offender treatment program, if successful completion of a sex offender treatment program was a condition of the registrant's confinement, release, probation, or parole." Plaintiffs John Does

---

registry." <u>See</u> Pl's 8/6/24 Notice at 1 (Dkt. 156). "The class and subclasses for which Mr. Doe F is a named representative all are represented by other class and subclass representatives." <u>Id.</u>

2024 U.S. Dist. LEXIS 176146, *22

A, C, E, F, G, Mary Doe, and Mary Roe are class representatives.

• **Non-sex-offense subclass** (298 people, 0.7% of the primary class) — Defined as "members of the primary class who are or will be subject to registration for an offense without a sexual component including convictions for violating *M.C.L. § 750.349* (other than convictions for violating *M.C.L. § 750.349(1)(c)* or *M.C.L. § 750.349(1)(f)*), *§ 750.349b*, *§ 750.350*, or a substantially similar offense in another jurisdiction." Plaintiff John Doe A is the [*23] class representative.

• **Non-Michigan offense subclass** (3,100 people, 7% of the primary class) — Defined as "members of the primary class who are or will be subject to sex offender registration under *Mich. Comp. Laws 28.722(r)(x)*; *(t)(xiii)*; *(v)(viii)*; or *28.723(1)(d)*, for a conviction or adjudication from a jurisdiction other than Michigan." Plaintiffs John Doe G and Mary Doe are class representatives.

• **Plea bargain subclass** (size unknown) — Defined as "members of the primary class who gave up their right to trial and pled guilty to a registrable offense in Michigan and who, as a result of retroactive amendments to SORA, (a) were retroactively subjected to SORA even though there was no registration requirement at the time of their plea; or (b) had their registration terms retroactively extended beyond that in effect at the time of their plea." Plaintiffs John Does A, B, C, D, E, and Mary Roe are class representatives.

• **Post-2011 subclass** (13,848 people, 31% of the primary class) — Defined as "members of the primary class who committed the offense(s) requiring registration on or after July 1, 2011." Plaintiff John Doe H is the class representative.

5/18/22 Order; 5/9/23 Order; Pls. SOMF ¶¶ 80-85 (citing Class Data Report ¶¶ 24, 129-149); Defs. [*24] Resp. to Pls. SOMF ¶¶ 80-85.

Plaintiffs previously filed a motion for a preliminary injunction (Dkt. 7), which the Court denied without prejudice. *See* 9/15/22 Order (Dkt. 54). In the same order, the Court also denied Defendants' motion to dismiss Plaintiffs' complaint (Dkt. 41). *Id.* The Court explained that it would be premature to consider either motion before the parties had the opportunity to develop a factual record. *Id.* Since then, the parties have

engaged in significant discovery, and a thorough factual record is now before the Court. The Court will address each of Plaintiffs' claims in turn.

## III. ANALYSIS[15]

### A. Retroactive Application of SORA 2021

Plaintiffs bring two counts regarding the retroactive application of SORA 2021 to registrants. In Count I, Plaintiffs assert that retroactively applying SORA 2021 to John Does A, B, C, D, E, F, G, Mary Doe, Mary Roe, and the pre-2011 ex post facto subclass violates the *Ex Post Facto clause of the Constitution*. Am. Compl. ¶¶ 727-736. In Count II, Plaintiffs contend that retroactively requiring lifetime registration for John Does A, B, C, D, E, G, Mary Doe, Mary Roe, and the retroactive extension subclass violates the *Ex Post Facto Clause*. *Id.* ¶¶ 737-745.[16] The Court awards summary judgment to Plaintiffs [*25] on both counts. Specifically, the Court finds that retroactively increasing reporting requirements and extending registration terms violates the *Ex Post Facto Clause*.

The *Ex Post Facto Clause* provides that "No State shall . . . pass any . . . ex post facto Law." *U.S. Const. art. I, § 10, cl. 1*. The clause proscribes retroactive punishment.

---

[15] The Court applies the traditional summary judgment standard as articulated in *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)*. The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can only survive summary judgment by coming forward with evidence showing there is a genuine issue for trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 324-325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

[16] In Count II, Plaintiffs also allege that retroactively requiring lifetime registration violates due process. Am. Compl. ¶¶ 742-743. Because the Court finds that retroactive application of SORA 2021 violates the *Ex Post Facto Clause*, the Court declines to address Plaintiffs' alternate due process argument. Granting Plaintiffs' requested relief on more than one basis would be "unnecessary and inefficient . . . especially [as to] the resolution of any constitutional claims, which should be avoided whenever possible . . . ." *Doe #1 v. Lee, 518 F. Supp. 3d 1157, 1206 (M.D. Tenn. 2021)* (collecting cases).

2024 U.S. Dist. LEXIS 176146, *25

_Does I, 834 F.3d at 699_. "A law qualifies as ex post facto if it changes the legal consequences of acts committed before its effective date." _Doe v. Lee, 102 F.4th 330, 336 (6th Cir. 2024)_ (punctuation modified).

Plaintiffs offer two arguments in support of their ex post facto claims. First, Plaintiffs argue that _Does I_—in which the Sixth Circuit held that certain provisions from SORA 2011 violate the _Ex Post Facto Clause_—requires a finding that SORA 2021 also violates the _Ex Post Facto Clause_. Second, Plaintiffs argue that even if _Does I_ does not control, SORA 2021 constitutes punishment, rendering it an ex post facto law. The Court addresses both arguments in turn.

**1. Controlling Precedent**

The parties disagree about which case controls this Court's decision. Plaintiffs argue that _Does I_ controls. Pls. Br. Supp. Mot. for Summ. J. at 5-9. Defendants, on the other hand, argue that _Willman v. Att'y Gen. of U.S., 972 F.3d 819 (6th Cir. 2020)_, a case addressing federal SORNA, controls.[17] Br. Supp. Def. Mot. Summ. J. at 3. Neither party is fully correct.

Defendants argue that because SORA 2021 "is almost [*26] identical to federal SORNA in all material respects, the _Willman_ decision binds this Court and requires it to dismiss the Ex Post Facto challenge." Id. at 3. Defendants err because the factual context and legal issues in _Willman_ differ from those present in the instant case, and the terse discussion of the _Ex Post Facto Clause_ in that case offers no explanation as to how it might be applicable here.

The plaintiff in _Willman_ was convicted in a Michigan

court in 1993 of assault with intent to commit criminal sexual conduct involving sexual penetration. _Willman, 972 F.3d at 822_. He was required to register under Michigan SORA when it became effective in 1995. Id. More than two decades later, Congress passed federal SORNA in 2006, which required him to register as a matter of federal law. Id. In 2019, Willman filed a federal court action challenging his registration requirements under Michigan state law and federal SORNA. Id. The district court entered a stipulated order regarding Willman and the state defendants, declaring that Willman no longer had to register under Michigan SORA. Id. The U.S. Attorney General, the only remaining defendant, filed a motion to dismiss, arguing that the stipulated order had "no bearing on Willman's [*27] obligations under federal law (i.e., SORNA)." Id. The district court granted the motion to dismiss. Id.

On appeal, the Sixth Circuit described the "principal issue" as "whether the registration and notification obligations set forth in [federal SORNA] apply to sex offenders who are convicted under state law but are not subject to that state's sex offender registration and notification requirements." Id. at 821. The Sixth Circuit held that "federal SORNA obligations are independent of state-law sex offender duties," requiring Willman to register with Michigan as a matter of federal law. Id. at 824.

In addition to his statutory claim that he was not required to register, Willman brought several constitutional challenges to SORNA, including an ex post facto challenge, all of which were rejected.[18] But _Willman_'s analysis was terse, offering no guidance here. The specific ex post facto argument was not even set forth in the opinion. Without any description of the claim, the court simply rejected it, citing a prior decision, _United States v. Felts, 674 F.3d 599, 605-606 (6th Cir. 2012)_. Id. at 824. By contrast, _Felts_ engaged in a broader discussion of that plaintiff's ex post facto claim.

---

[17] Congress passed SORNA in 2006. _Willman, 972 F.3d at 822_ (citing _Pub. L. No. 109-248; 120 Stat. 590_; _34 U.S.C. § 20901 et seq_). "The statute aimed to make more uniform what had remained a patchwork of federal and 50 individual state registration systems, with loopholes and deficiencies that had resulted in an estimated 100,000 sex offenders becoming missing or lost." Id. (punctuation modified). SORNA does not create its own registration system; instead, SORNA states that "[a] sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student." Id. (citing _34 U.S.C. § 20913(a)_). "Instead of imposing requirements on states, SORNA conditions federal funds on states' voluntary compliance with a federal sex offender registration regime." _Id. at 824 n.2_.

[18] Willman's constitutional challenges were brought on the following grounds: (i) the _Ex Post Facto Clause_, (ii) the _Fifth Amendment Double Jeopardy Clause_, (iii) the _Eighth Amendment_ prohibition of cruel and unusual punishment, (iv) the _First Amendment's_ right to privacy, (v) the _Fourteenth Amendment Privileges Or Immunities Clause_, (vi) _Article IV's Privileges And Immunities Clause_, (vii) the _Fourth Amendment_ prohibition of unreasonable seizures, (viii) the _First Amendment_ overbreadth doctrine, and (ix) the _Fourteenth Amendment Due Process Clause_. _Willman, 972 F.3d at 824-827_.

2024 U.S. Dist. LEXIS 176146, *27

However, a review of the Felts opinion shows why the case is not applicable here.

In Felts, the [*28] plaintiff was convicted in Tennessee of rape of a child and aggravated sexual battery. Felts, 674 F.3d at 602. After his release from prison, Felts moved to different states without notifying the Tennessee registration authorities. Id. Felts was then convicted of failing to register under federal SORNA, even though Tennessee had not completely implemented the act. Id. Felts argued that his new conviction violated the Ex Post Facto Clause because it increased the level of punishment for his crimes. Id. at 605-606. The Sixth Circuit rejected this argument, explaining that "SORNA provides for a conviction for failing to register; it does not increase the punishment for the past conviction. Felts's crime of failing to update his sex offender registry after the enactment of SORNA was entirely separate from his crime of rape of a child and aggravated sexual battery." Id. at 606.

The context, issues, and holding in Felts are entirely distinguishable from those present here. Plaintiffs here argue that SORA 2021 imposes retroactive punishment solely for their original convictions; Felts addressed whether the later failure-to-register conviction was vulnerable on ex post facto grounds. Neither Felts nor Willman controls here.

Does I, on the other hand, is controlling, [*29] in part. In Does I, the Sixth Circuit held that two provisions from the 2006 and 2011 amendments to SORA violated the Ex Post Facto Clause: (i) the exclusion zones introduced in 2006 and (ii) the requirement that registrants report in person within three business days to update certain personal information introduced in 2011. Does I, 834 F.3d at 706. SORA 2021 no longer contains exclusion zones, but it does contain the same onerous reporting requirements.[19] Does I, therefore, requires the finding that the in-person reporting requirement violates the Ex Post Facto Clause.

Plaintiffs argue that Does I went even further, purportedly holding that all amendments introduced in 2006 and 2011 violate the Ex Post Facto Clause, including the retroactive application of increased

registration length for certain offenders, which was introduced along with the three-tier system in 2011 and remains in SORA 2021. Pls. Br. Supp. Mot. for Summ. J. at 6-9. Plaintiffs rely on the Sixth Circuit's pronouncement that "[t]he retroactive application of SORA's 2006 and 2011 amendments to [p]laintiffs is unconstitutional, and it must therefore cease." Id. at 6 (citing Does I, 834 F.3d at 706). But Does I focused only on exclusion zones and reporting requirements; the court did not even discuss the retroactive extension [*30] of registration terms.

The Sixth Circuit's recent opinion in Lee, 102 F.4th 330, a case challenging Tennessee's sex offender registration act, confirms this interpretation. In describing the court's holding in Does I, the court stated that, "[i]n 2016, we enjoined enforcement of two amendments to Michigan's sex offender registry law, known as SORA n [Does I], two sex offenders challenged the 2006 and 2011 amendments to SORA which prohibited registrants from living, working, or loitering within 1,000 feet of a school and required all registrants to appear in person immediately to update information such as new vehicles or internet identifiers . . . ." Lee, 102 F.4th at 337. This confirms that the "amendments" referenced in the Does I holding were the exclusion zones and in-person reporting requirements specifically discussed by the court.

Does I is also controlling in that it describes the framework used to analyze ex post facto challenges to SORA. In the next section, the Court applies this framework to SORA 2021 and finds that the retroactive extension of registration terms also violates the Ex Post Facto Clause.

## 2. SORA 2021 Constitutes Punishment

The Supreme Court has laid out a two-part framework for determining whether a law constitutes retroactive [*31] punishment:

> The determinative question is whether the legislature meant to establish civil proceedings. If the intention was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, the [c]ourt must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil.

Smith v. Doe, 538 U.S 84, 85, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003). This framework was adopted by the

---

[19] As discussed previously, SORA 2021 allows for, but does not require, the MSP to establish methods other than in-person reporting for certain required updates. Because this is optional, it does not provide meaningful relief to Plaintiffs. The Court views the 2021 reporting requirement as substantially similar to the 2011 requirement.

Case 5:24-cv-12647-JEL-KGA   ECF No. 64-1, PageID.1503   Filed 12/19/24   Page 79 of 100

Page 11 of 51
2024 U.S. Dist. LEXIS 176146, *31

Sixth Circuit in <u>Does I</u>, <u>Does I, 834 F.3d at 700</u>. Thus, the Court's first question is whether the Michigan legislature intended to impose punishment in passing SORA 2021. Finding that the legislature did not intend to impose punishment, the Court then asks whether SORA 2021 is so punitive either in purpose or effect as to negate the legislature's intention.[20] The Count finds that it is.

### a. Legislative Intent

To determine legislative intent, "courts must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." <u>Id. at 93</u>. The Supreme Court warned in <u>Smith</u> that "because the Court ordinarily defers to the legislature's stated intent . . . only the clearest proof will suffice to override legislative [*32] intent and transform what has been denominated a civil remedy into a criminal penalty." <u>Id.</u> (punctuation modified).

The Michigan legislature included the following statement of purpose in SORA 2021, unchanged from SORA 2011:

> The legislature declares that the sex offenders registration act was enacted pursuant to the legislature's exercise of the police power of the state with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders. The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger.

<u>Mich. Comp. L. § 28.721a</u>.

---

[20] The Court notes that there is an inherent contradiction imbedded in this test, as the "intent" inquiry of the first prong seems similar to the "purpose" inquiry of the second prong. The Court's understanding is that the first prong focuses on legislative intent, whereas the second prong focuses on the effect of the statute in practice.

The Sixth Circuit analyzed this statement of purpose in <u>Does I</u> and found that it "evinces no punitive intent." <u>Does I, 834 F.3d at 700</u>. The court admitted that the plaintiffs [*33] pointed to "some features [of SORA 2011] that might suggest a punitive aim—<u>e.g.</u>, SORA is triggered solely by criminal offenses and the registration requirement is recorded on the judgment; registration is handled by criminal justice agencies like the police; SORA imposes criminal sanctions; and it is codified in Chapter 28 of the Michigan Code, a chapter that deals with police-related laws " <u>Id.</u> But the court noted that similar arguments had been previously raised and rejected by the Supreme Court, <u>id.</u> (citing <u>Smith, 538 U.S. at 95</u>), so the court found "no warrant for concluding that SORA's intent is punitive," <u>id. at 701</u>.

In the present case, Plaintiffs argue that new facts warrant a finding that SORA 2021 is intended to punish. Pls. Br. Supp. Mot. for Summ. J. at 9-10. Plaintiffs highlight that the legislature chose to maintain some of the 2011 amendments that <u>Does I</u> criticized and adopted SORA 2021 "after being presented with uncontroverted evidence that registries don't work." <u>Id.</u> at 9. In sum, Plaintiffs argue that "[t]he facts in the record on legislative animus coupled with the legislature's decision to ignore both <u>Does I</u> and evidence-based information support a finding that the new law is intended to punish." <u>Id.</u> [*34] at 9-10.

In response, Defendants argue that "it is part of the political process to disagree over how to address contentious issues" and take issue with Plaintiffs' claim that the legislature was presented with "uncontroverted evidence" that registries do not work. Defs. Br. Supp. Mot. for Summ. J. at 5. Defendants emphasize that it is difficult to measure the effect of a law designed to prevent future potential crimes. <u>Id.</u> at 5-6.

The Court agrees with Defendants and finds insufficient evidence to declare that the legislature's intent was punitive. True, the legislature maintained one provision that <u>Does I</u> criticized—the onerous in-person reporting requirements. But it also removed the amendment <u>Does I</u> criticized most strongly—the exclusionary zones. And as discussed later in this opinion, Plaintiffs' evidence does not conclusively establish that registries like SORA 2021 do not work. Such evidence does not constitute "the clearest proof" that the legislature adopted SORA 2021 with a punitive intent.

The Michigan Supreme Court reached the same conclusion regarding the legislature's non-punitive intent in its recent analysis of SORA 2021. <u>Lymon, 2024 Mich.</u>

Case 5:24-cv-12647-JEL-KGA   ECF No. 64-1, PageID.1504   Filed 12/19/24   Page 80 of 100

Page 12 of 51
2024 U.S. Dist. LEXIS 176146, *34

*LEXIS 1439, 2024 WL 3573528, at \*5-\*6*. The court noted that the legislature did not amend the statement [\*35] of intent in SORA 2021, "nor did it amend the statute in any other way that would imply its intent in enacting the statute had changed." *2024 Mich. LEXIS 1439, [WL] at \*6*. "To the contrary, the Legislature's choice to remove provisions [the Michigan Supreme Court] identified in *Betts* as especially punitive in effect supports a theory that the Legislature's recent amendments were made to support a characterization of SORA as civil." Id.

In harmony with these cases, the Court concludes that the legislature's intent in adopting SORA 2021 was not punitive.

**b. SORA 2021's Actual Effects**

The second step is to ask whether SORA 2021's actual effects are punitive. The Supreme Court has identified five factors that are particularly relevant in ex post facto challenges to registration statutes. See *Smith, 538 U.S. at 97* (citing *Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-169, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963)*). These include whether the challenged law: (i) has been regarded in our history and traditions as a punishment, (ii) imposes an affirmative disability or restraint, (iii) promotes the traditional aims of punishment, (iv) has a rational connection to a nonpunitive purpose, or (v) is excessive with respect to this purpose. Id. These factors are "neither exhaustive nor dispositive, . . . but useful guideposts." Id. (punctuation modified). The Court [\*36] considers each factor in turn.

**i. History and Tradition**

As to the first factor, the relevant question is whether the regulatory scheme has been regarded in the nation's history and traditions as punishment. Id. Courts typically consider whether a statute's restrictions resemble the traditional punishments of banishment, shaming, and parole/probation. See, e.g., *Smith, 538 U.S. at 97-99*; *Does I, 834 F.3d at 701-703*; *Lymon, 2024 Mich. LEXIS 1439, 2024 WL 3573528, at \*7*; *Betts, 968 N.W. 2d at 508-510*.

In *Does I*, the Sixth Circuit held that SORA 2011 resembled traditional punishment. *Does I, 834 F.3d at 701-703*. With respect to banishment, the court particularly criticized exclusionary zones, explaining that exclusion zones "resemble[s], in some respects at least,

the ancient punishment of banishment." *Id. at 701-702*. The court also found that SORA 2011's requirement for public disclosure of information resembled traditional shaming punishments. *Id. at 702-703*. The court noted that SORA 2011 went beyond republishing information that was already publicly available, like criminal history, and published public "tier classifications corresponding to the state's estimation of present dangerousness without providing for any individualized assessment." *Id. at 702*. In addition, the court noted that SORA 2011 sometimes disclosed "otherwise non-public information," such as sealed criminal records. *Id. at 703*. [\*37] Finding also that SORA 2011 resembled parole/probation, the court referenced the statute's exclusion zones, in-person reporting requirements, and imposition of imprisonment for failure to comply. Id. For all these reasons, the court held that the first factor weighed in Plaintiffs' favor. Id.

Defendants argue that SORA 2021 does not resemble banishment because it no longer contains exclusion zones. Defs. Br. Supp. Mot. for Summ. J. at 6-7. In Lymon, the Michigan Supreme Court came to the same conclusion: "[A]lthough we conclude that [SORA 2021] resembles shaming and parole, we conclude that [SORA 2021] no longer resembles banishment because its present iteration no longer includes a prohibition on registrants living, working, or loitering within 1,000 feet of school property." *Lymon, 2024 Mich. LEXIS 1439, 2024 WL 3573528, at \*7 n.11*.

The Court agrees with Defendants that SORA 2021 no longer resembles banishment. But as the Michigan Supreme Court held, the Court still finds that SORA 2021 resembles shaming and parole/probation.

Plaintiffs criticize the registry's public website as "a world-wide wall of shame where registrants are 'branded [as] a potentially violent menace by the state.'" Pls. Br. Supp. Mot. for Summ. J. at 12 (citing *Betts, 968 N.W. 2d at 514*). In response, Defendants argue [\*38] that the website does not expressly state that any registrant is currently dangerous. Defs. Resp. to Pls. SOMF ¶ 242. Plaintiffs do not dispute this, but they contend that the website implies that registrants are currently dangerous, nonetheless. As explained by Plaintiffs, "[t]he initial search page signals dangerousness, stating: 'This registry is made available through the Internet with the intent to better assist the public in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders.'" Pls. SOMF ¶ 242 (citing Lageson Report ¶¶ 32, 43 (Dkt. 123-14); Registry Screenshots at 1-2 (Dkt. 127-24)). Dr. Sarah

Lageson, an expert for Plaintiffs whose research focuses on the impact of digital technologies on criminal punishment, believes that "[t]his messaging signals a highly dangerous type of criminal who requires constant public monitoring and scrutiny." Lageson Report ¶¶ 3, 43. The Court agrees. There is no disputing that the public website implies that the registrants listed might be dangerous.

Defendants also argue that the public website does not constitute shaming because most of the information it includes is already public. Defs. [*39] Br. Supp. Mot. for Summ. J. at 7. But not all public information is made equal; re-packaging information and providing it to the public in a different form can in and of itself increase shaming. The electronic notification system is particularly troublesome. As the Michigan Supreme Court explained in _Betts_, the notification system reduces the effort required to obtain registry information, thereby "increase[ing] the likelihood of social ostracism based on registration." _Betts, 968 N.W.2d at 501-502_.

For these reasons, the Court finds that SORA 2021 resembles shaming.

Plaintiffs argue that "SORA 2021 resembles the traditional punishment of parole/probation." Pls. Br. Supp. Mot. for Summ. J. at 10 (punctuation modified). As Plaintiffs put it, "registrants are under significant state supervision, and a failure to comply, like the failure to comply with parole conditions, potentially subjects the offender to imprisonment." _Id._ at 10-11 (punctuation modified). Plaintiffs go so far as to contend that the "range of affirmative requirements and adverse consequences experienced as a result of registration well exceed those associated with customary probation and parole." _Id._ at 11 (citing Wayne Logan, Knowledge as Power: Criminal Registration [*40] and Community Notification Laws in America 138 (1st ed. 2009)).

In response, Defendants contend that SORA is less severe than probation/parole because it is notification based, not permission based. Defs. Br. Supp. Mot. for Summ. J. at 9-12. The crux of Defendants' argument is that, under the probation/parole system, authorities can dictate certain choices for probationers/parolees, such as requiring individuals to work, dictating where a person can or cannot be, and prohibiting association with anyone under the age of 18. _Id._ at 10. They contend that SORA, on the other hand, allows registrants to make their own choices and merely requires them to notify law enforcement of certain changes. _Id._ According to Defendants,

Probation or parole dictates whom someone can date, requires that they must work, mandates disclosure of internet passwords, requires installation and payment for monitoring systems, dictates where a person can be or cannot be, mandates agreement to warrantless searches, prohibits possession of children's toys, and prohibits association with anyone under the age of 18 Those types of conditions pale in comparison to notifying police of changes to personal information and [*41] periodic reporting.

Defs. Br. Supp. Mot. for Summ. J. at 10. Plaintiffs disagree, arguing that "[s]ome probationers/parolees will have permission-based restrictions" but "[o]thers will not." Pls. Reply at 11 (citing Sample Probation Order (Dkt. 128-18)).

The Court finds that Plaintiffs have the better of the argument. With its significant restraints on registrants, including requiring regular in-person reporting and the threat of imprisonment for failure to comply, SORA 2021 resembles the traditional punishments of parole/probation.

In light of all these considerations, SORA 2021 resembles traditional forms of punishment.

**ii. Affirmative Disability or Restraint**

The second factor requires an inquiry into "how the effects of the [act] are felt by those subject to it." _Smith, 538 U.S. at 99-100_. "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." _Id._

The Sixth Circuit found that SORA 2011 imposed significant restraints. _Does I, 834 F.3d at 703-704_. The court called the exclusion zones the statute's "most significant" restraint, but also cited in-person registration and the threat of imprisonment for failure to comply as important restraints. _Id. at 703_.

SORA 2021 removed the exclusion zones, allowing registrants to live and work anywhere. [*42] But as previously discussed, SORA 2021 maintained the bulk of SORA 2011's in-person reporting requirements. Registrants are still required to report in person at regular intervals throughout the year, depending on tier, and within three days whenever certain personal information changes. As the Michigan Supreme Court explained in _Lymon_,

Overall, [SORA 2021] continues to impose significant obligations on registrants by requiring the immediate disclosure of extensive personal

information, annual (or more-frequent) in-person visits to law enforcement, and the payment of fees. [SORA 2021] ensures compliance with these requirements through the potential for imprisonment, which is the paradigmatic affirmative restraint Accordingly, this factor weighs toward a finding that [SORA 2021] constitutes punishment—although it weighs less heavily in that regard than [SORA 2011], which additionally restricted registrants' choices and actions through student-safety zones and imposed more-frequent in-person reporting requirements.

*Lymon, 2024 Mich. LEXIS 1439, 2024 WL 3573528, at *10*.

The Court agrees with Lymon's characterization of SORA 2021. Although SORA 2011 imposed more significant restraints than SORA 2021, the Court still finds that SORA 2021 imposes significant [*43] restraints on registrants.

### iii. Traditional Aims of Punishment

In Does I, the Sixth Circuit found that "[SORA 2011] advances all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence." *Does I, 834 F.3d at 704*. As the court explained, "[SORA 2011's] very goal is incapacitation insofar as it seeks to keep sex offenders away from opportunities to reoffend. It is retributive in that it looks back at the offense (and nothing else) in imposing its restrictions Finally, its professed purpose is to deter recidivism . . . and it doubtless serves the purpose of general deterrence." Id. None of this changed with SORA 2021. See *Lymon, 2024 Mich. LEXIS 1439, 2024 WL 3573528, at *10-*11* (noting that "the changes to [SORA 2021] have not materially affected [the court's] analysis of this factor" and holding that SORA 2021 still supports the aims of general deterrence, specific deterrence, and retribution). This factor weighs in Plaintiffs' favor.

### iv. Rational Connection to a Non-Punitive Purpose

The statute's rational connection to a nonpunitive purpose is "'a most significant' factor in [the Court's] determination that the statute's effects are not punitive." *Does I, 834 F.3d at 704* (quoting *Smith, 538 U.S. at 102*). The parties seem to agree that the stated goal of SORA 2021, which is to promote [*44] public safety,

constitutes a valid, non-punitive purpose. The parties strongly disagree, however, regarding the efficacy of SORA in achieving that purpose.

In evaluating whether sex offender registration systems bear a rational relationship to a non-punitive purpose, courts have considered social-science evidence. Plaintiffs urge that this Court do the same here, contending that it shows that SORA 2021 fails to reduce sexual recidivism, and may possibly increase it. See Pl. SOMF ¶ 153; Pl. Br. Supp. Mot. for Summ. J. at 16-17. Plaintiffs point to a body of scholarship, including reports of their experts, supporting that view. Pl. SOMF ¶ 153.[21] However, as discussed below, courts reviewing the scientific literature have expressed the view that there is no universally accepted scientific view about the efficacy of registration systems. And the parties' submissions confirm that there is no unanimity of scientific opinion on the subject. While the Court concludes that there are strong, science-based opinions challenging the impact of registration systems like SORA 2021 on recidivism, it cannot conclude that the state of scientific opinion mandates a finding that SORA 2021 bears no rational connection [*45] to a non-punitive purpose.

The Michigan Supreme Court concluded that the efficacy of sex offender registry regimes, like SORA 2021, is the subject of "robust scientific debate [with] no universally accepted conclusion on the matter[]." *Lymon, 2024 Mich. LEXIS 1439, 2024 WL 3573528, at *12 n.18*. The court looked back at its earlier decision in *Betts, 968 N.W.2d 497*, where it had found that certain "studies demonstrate that, at a minimum, [SORA 2011's] efficacy is unclear." Id. at 12. It confirmed in Lymon that its prior conclusion remains true with respect to SORA 2021. See id. ("The same and additional studies continue to support the uncertainty of SORA's general efficacy.").

The same conclusion was reached in a 2017 U.S. Department of Justice report, which analyzed studies about sex offender registration and notification (SORN) systems and found that "research on the effectiveness of [SORN] remains relatively limited and findings from the studies are somewhat inconclusive." U.S. Department of Justice, Sex Offender Management Assessment and Planning Initiative at 202 (March

---

[21] Plaintiffs point to expert reports of Elizabeth Letourneau (Dkt. 123-9), J.J. Prescott (Dkt. 123-10), Kelly Socia (Dkts. 123-11, 123-12, 123-13), Kristen Zgoba (Dkt. 123-15), and Karl Hanson (Dkt. 123-7, 123-8).

2024 U.S. Dist. LEXIS 176146, *45

2017).[22] As the study explains:

Studies based on a comparison of outcomes for sex offenders subject and not subject to SORN also produced mixed findings. An arguable lack of sufficient scientific [*46] rigor may further cloud the import of studies in this area. Therefore, the results of SORN research undertaken to date continue to leave open questions about the effects of registration and community notification requirements.

Id.

One potential shortcoming of studies measuring the efficacy of registries on recidivism is the difficulty in measuring the prevalence of sexual offending. As the study points out, "[e]ven with the best sources of data, it is extremely difficult to estimate the actual number of sex crimes committed because of low levels of reporting." Id. at 3. Moreover, "conclusions about the extent of sex offender recidivism and the propensity of sex offenders to reoffend over the life course inherently involve some uncertainty." Id. at 121. In part, because of these difficulties in measuring offenses and, more specifically, recidivism rates, "problems found in sex offender recidivism research no doubt have contributed to a lack of consensus among researchers regarding the proper interpretation of some research findings and the validity of certain conclusions." Id. at 107.

Similar conclusions can be found in a 2022 report prepared by the Federal Research Division of the Library of [*47] Congress under an interagency agreement with the U.S. Department of Justice's Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking. See Office of Justice Programs, Sex Offender Registration and Notification Act—Summary and Assessment of Research (April 2022).[23] The report finds that "research is not conclusive about whether SORN laws have mitigated sex offender recidivism." Id. at 18-19. The study adds that "[a]s a whole, literature on the impacts of registration on [registered sex offenders] was indeterminate in its findings" with limitations "caused by methodological shortcomings restricting reliability,

validity, and/or applicability of findings to only those individuals in the samples." Id. at 2. Ultimately, the report concludes that "drawing sound conclusions about policy decisions" regarding SORN laws "is difficult due to the current cohort of limited research and lack of convincing data." Id. at 23.

In opposing this conclusion, Plaintiffs present significant expert opinions that the registries lack efficacy, arguing that they demonstrate a "broad scientific consensus" that registries do not reduce—and may increase— sexual recidivism. Pls. SOMF ¶ [*48] 153. While the expert reports do reach the ultimate conclusion that public notification registration systems, like SORA 2021, do not significantly reduce recidivism and may increase it, there are concessions within the reports acknowledging that some studies do show some public benefit through reduction of recidivism. Further, some studies show that registration systems can have the separate public benefit of deterring first-time offenders.

For example, Elizabeth Letourneau, a public health professor at Johns Hopkins University, reported on a number of studies bearing on these issues. While many supported Plaintiffs' position, some diverged. See Letourneau Report ¶ 7 (Dkt. 123-9) (acknowledging that of "14 studies [that] specifically examined policy effects on sexual re-offense rates . . . . [a]ll but two fail[ed] to find any effect on sexual or violent re-offense rates"). One divergent analysis was a 2009 New Jersey study, which detected declining rates of sex crimes during and after implementation of that state's registration law in 1994. Id.[24] This finding was tempered by a 2012 follow-up study, which found that "registration had no effect on sexual or violent re-offense rates." Id. [*49] [25] Similarly, a 2010 South Carolina study found a "small but significant deterrent effect on first-time sex crimes following implementation of the registration in 1995," but "no effect on re-offense rates." Id.[26] A Minnesota study

---

---

[24] Citing Veysey, B. M., Zgoba, K., & Dalessandro, M., A preliminary step towards evaluating the impact of Megan's Law: A trend analysis of sexual offenses in New Jersey from Justice 1985 to 2005, Justice Research and Policy, 10, 1-18 (2008).

[25] Citing Tewksbury, R., Jennings, W. G., & Zgoba, K. M., A longitudinal examination of sex offender recidivism prior to and following the implementation of SORN, Behavioral Sciences and the Law, 30, 308-328.

[26] Citing Letourneau, E. J., Levenson, J. S., Bandyopadhyay, D., Armstrong, K. S., & Sinha, D., Effects of South Carolina's

2024 U.S. Dist. LEXIS 176146, *49

found "lower recidivism risk . . . relative to what was predicted based on their risk scores" following implementation of a registration law. Id.[27] A Washington study found that adoption of a revision in the registration law "was associated with a significant reduction in recidivism." Id.[28]

Another expert for Plaintiffs, Michigan Law Professor J.J. Prescott, also opined that community notification laws, like SORA, reduce offenses by non-registrants. [*50] See Prescott Report ¶ 11 (Dkt. 123-10) ("The threat of becoming subject to a community notification regime—and the shame and collateral effects that accompany being publicly identified as a 'sex offender'—appear to have a measurable deterrent effect (i.e., it reduces offenses) by nonregistrants.").[29]

To be sure, these divergent studies were accompanied by critiques and limitations.[30] But there is at least some evidence supporting the view that registration systems, like SORA 2021, promote some non-punitive goal. It is not fair to say that scientific studies mandate a finding of no public benefit at all.

While Plaintiffs focus primarily on the impact registration systems may or may not have on recidivism, they fail to adequately address other potential benefits of SORA. As just discussed, some studies cited by Plaintiffs show that registration systems can have a deterrent effect on first-time offenders, which is undoubtedly a benefit to public safety. In addition, SORA provides members of the public with valuable information that they can use to

protect themselves and their families. As explained by Defendants, "SORA is a tool for the people to use to potentially prevent criminal [*51] sexual activity from happening in the first instance." Defs. Reply at 2. "It provides factual information to the public so residents may decide how to interact with individuals [who] are registered sex offenders[] (e.g., a member of the public may decide not to date someone on the registry; or a member of the public may decide not to let their children be cared for [by] a neighbor that is a registered sex offender.)" Id. at 2-3.

Plaintiffs' singular focus on recidivism might have been prompted by the stated goal of preventing harm from repeat offenders found in SORA's legislative declaration, Mich. Comp. L. § 28.721a. But "[i]n our review of governmental purposes . . . we need not rely only upon those purposes the legislature, litigants, or [other courts] have espoused, but may also consider any other rational purposes possibly motivating enactment of the challenged statute." Mountain Water Co. Mont. Dep't of Pub. Serv. Regul., 919 F.2d 593, 597 (9th Cir. 1990).

Here, there is apparently undisputed evidence showing that SORN laws promote the goal of public safety, at least by deterring first-time offenders, although there is also mixed evidence regarding whether they reduce recidivism. SORN laws also serve the goal of providing the public with information they can use to protect themselves. [*52] For these reasons, the Court finds that SORA is rationally connected to a non-punitive purpose.

### v. Excessive with Respect to Purpose

The final factor—whether the statute is excessive with respect to its purpose—weighs in Plaintiffs' favor. It is clear that SORA 2021 exacts a heavy toll on registrants. This includes requiring frequent in-person reporting, publishing personal information online, and often requiring registration for life. Yet, as discussed above, there is a spirited debate regarding its effectiveness, particularly as it relates to reducing recidivism. While it is true that SORA contributes to public safety by deterring first-time offenders and providing members of the public with information they can use to protect themselves, it is not clear that these purposes alone justify the heavy toll on registrants. Notably, this weighing of factors takes place in the "ex post facto" context, where the state has changed the "rules of the game" after registrants have committed their offenses—

---

sex offender registration and notification policy on deterrence of adult sex crimes, Criminal Justice Review, 35, 295-317 (2010).

[27] Citing Duwe, G., & Donnay, W., The impact of Megan's Law on sex offender recidivism: The Minnesota experience, Criminology, 46(2), 411-446 (2008).

[28] Citing Barnoski, R., Sex offender sentencing in Washington state: Did community notification influence recidivism?, Olympia: Washington State Institute for Public Policy (2005).

[29] Prescott also concluded that "it is very unlikely that these laws are reducing recidivism by registrants; instead, it is probable that these laws are actually increasing recidivism " (emphasis in original). Prescott Report ¶ 11.

[30] For example, the Minnesota study was questioned because it involved registrants who were subject to "intensive supervised release conditions." Letourneau Report ¶ 7. The Washington study was questioned by Letourneau because it did not appear in a peer-reviewed journal. Id.

2024 U.S. Dist. LEXIS 176146, *52

a context in which the Constitution has provided express protection. This leads the Court to conclude that SORA 2021 is excessive for purposes of its ex post facto analysis. This is in harmony with other courts [*53] addressing the same issue. See *Does I, 834 F.3d at 705*; *Betts, 968 N.W.2d. at 513-515*.

Taking all the *Mendoza-Martinez* factors into account supports a finding that SORA 2021 constitutes punishment. The Court holds that the 2006 and 2011 amendments to SORA violate the *Ex Post Facto Clause*.[31]

### B. Lack of Individualized Review

Plaintiffs allege that SORA 2021 violates equal protection and due process by imposing lengthy and lifetime registration without individualized consideration of risk. Am. Compl. ¶¶ 746-756. According to Plaintiffs, SORA is a "one-size-fits-all regime designed for the highest risk offenders, without any individualized assessment of current risk. It presumes that all those convicted of a sex offense pose the same high risk to public safety . . . ." Id. ¶ 250.

Plaintiffs are correct that SORA 2021, like many other sex offender registration acts across the nation, is an offense-based statute that does not offer individualized review in most circumstances.[32] But SORA 2021 is not a "one-size-fits-all" regime as Plaintiffs contend. As discussed already, SORA categorizes registrants into three tiers based on their offense. A registrant's tier determines their length of registration, frequency of reporting, inclusion in the public registry, and ability to petition for removal from the registry. Thus, [*54] not all registrants are treated the same; the severity of a registrant's offense determines their registration requirements. Regardless, Plaintiffs argue that SORA 2021's lack of individualized review "restricts the liberty of thousands of people who pose no appreciable risk with no public benefit." Pls. Br. Supp. Mot. for Summ. J. at 28-29.

---

[31] To be clear, this holding means that the in-person reporting requirements and retroactive extension of registration terms originally introduced in SORA 2011 cannot be applied to a registrant who committed an offense before SORA 2011 was enacted.

[32] As discussed later in the opinion, SORA 2021 provides individual review for certain individuals convicted of offenses without a sex element.

Plaintiffs do not specify exactly what they mean by "individualized review." In their amended complaint, Plaintiffs argue that "[a]ctuarial risk assessment instruments—which are used to determine the statistical likelihood that an individual will reoffend based on known diagnostic indicators—are far better at predicting recidivism risk than the fact of a conviction." Am. Compl. ¶ 283 (citing Hanson Report ¶ 27-32 (Dkt. 1-4); Zgoba Report ¶ 36-37 (Dkt. 1-8)). Plaintiffs discuss two actuarial instruments, the Static-99R and its predecessor the Static-99, in detail in both their amended complaint and statement of material facts. But Plaintiffs do not mention either in their brief supporting their motion for summary judgment, and they do not explicitly endorse using Static-99R to determine registration requirements. Further, they do not specify when [*55] and how often they think an individualized risk assessment should occur. For instance, one can imagine a system that conducts an initial individualized review when determining a registrant's reporting requirements. Alternatively, one can imagine an individualized review that occurs later, to determine if a registrant's risk-level has changed. Plaintiffs also do not say who should perform this review—whether a court, the MSP, or some other decisionmaker.

Because both parties submitted evidence regarding the Static-99R, the Court will briefly address its feasibility as a tool for individualized review.

Plaintiffs describe Static-99R as "[t]he most widely used and well-researched sex offense risk assessment instrument[] in the world." Pls. SOMF ¶ 232. Plaintiffs submitted an expert report by Dr. Karl Hanson, who, along with a colleague, created the Static-99 in 1999 and the Static-99R in 2009. See Hanson Report (Dkt. 123-7). As explained by Dr. Hanson, the Static-99 "assess the recidivism risk of adult male with a history of sexual crime . . . ." Id. ¶ 29. The Static-99 groups individuals into five levels of risk for sexual offending, Level I (the lowest risk category) through Level V (the [*56] highest risk category). Id. at ¶ 36. The assessment is based on ten factors, including the nature of the sex-related offense, demographics (including age at release and relationship history), sexual criminal history, and general criminal history. Id. at ¶ 29. The static-99R is truly "static" in that it estimates risk at a specific point in time based on factors present at that time. Id. at 34.

According to Defendants, Static-99 is a flawed measure because it predicts recidivism—i.e., the chances of someone being convicted for a subsequent

offense—and not re-offenses, i.e., the chances of someone committing another offense. Defs. Br. Supp. Mot. for Summ. J. at 19. Defendants argue that Static-99 scores do not account for offenses that were never reported by the victim; offenses that were reported by the victim, but not reported to law enforcement; offenses reported to law enforcement but not resulting in charges or arrests; arrests not resulting in convictions; cases of criminal sexual conduct that were pled down to non-sexual offenses; or cases that do not end in a conviction for criminal sexual conduct. Id. at 18-19. Defendants also submit that the five risk levels used by Static-99R [*57] are arbitrary. Id. at 18.

Defendants note that Dr. Hanson testified that he was not aware of any state that uses Static-99 as a basis for determining how long someone needs to register as a sex offender. Id. at 22 (citing Hanson Dep. Tr. at 64 (Dkt. 125-3)). Dr. Hanson testified that he is aware of various states that utilize Static-99R "within their correctional systems," but he did not elaborate how. Hanson Dep. Tr. at 64. He also stated that his recommendation "would be not to write in a specific measure [into the law] but to write in a risk level, which is . . . associated with the appropriate levels of intervention." Id. at 63.

In addition to debating the utility of Static-99R, the parties also dispute whether performing individualized review of any sort would be economically feasible. Defendants argue that "the legislature opted to use a simple conviction-based statute rather than a complicated, time consuming and expensive individualized risk assessment." Defs. Resp. to Pls. SOMF ¶ 64. But the parties dispute exactly how expensive and time-consuming individualized review might be.

Defendants cite the report submitted by Dr. Darrel Turner, which estimates that an individualized [*58] risk assessment costs between $8,000 to $20,000 and takes between eight and 26 hours to complete. Defs. Resp. to Pls. SOMF ¶ 151 (citing Turner Decl. at PageID.7091 (Dkt. 128-22)). Based on this estimate, conducting an individualized risk assessment for all current SORA registrants—roughly 44,000 people—would cost between $352 million and $880 million and take between 352,000 and 1.1 million hours. Id. Defendants also cite the declaration of Dr. Anna Salter, who stated that she spends at least 15 hours on each sex offender evaluation. Id. (citing Salter Decl. at 16). Based on that estimate, it would take 660,000 hours to conduct evaluations for all registrants. Id.

Plaintiffs argue that these estimates are based on "comprehensive evaluations . . . performed for civil commitment proceedings by psychologists," and that "routine risk assessments" would be "far less complicated and much less expensive." Pls. Resp. to Defs. SOMF ¶ 83 (punctuation modified) (citing Hanson Rebuttal Report at 24-25 (Dkt. 123-8)). Plaintiffs cite the testimony of James Kissinger, the State Administrative Manager for Sexual Abuse Prevention Services for the Michigan Department of Corrections (MDOC), who estimated [*59] that calculating the Static-99R for an individual can take as little as 15 minutes. Id. (citing Kissinger Dep. Tr. at 62-63 (Dkt. 126-5)). But as Defendants point out, Kissinger stated that it can take anywhere from 15 minutes to an hour to calculate a Static-99R. Defs. Resp. to Pls. SOMF ¶ 151 (citing Kissinger Dep. Tr. at 62-63). Using this estimate, it would take 11,000 to 44,000 hours to calculate a Static-99R for all registrants. Id. Plaintiffs do not provide a cost estimate for calculating a Static-99R for all registrants, but they contend that many registrants have already been assessed by MDOC. Pls. Resp. to Defs. SOMF ¶ 83 (citing Kissinger Dep. Tr. at 29-35).

Aside from potentially towering costs, an individualized assessment scheme carries another risk: the risk of making poor predictions of dangerousness. Whether the assessment is made at the outset of registration, or periodically throughout the term, there is an unknown risk that the evaluators will make a mistake about who should be required to register and for how long. A legislature might conclude that an offense-based system at least gives some certainty that those who commit serious offenses are monitored for significant [*60] periods, perhaps for life, and thereby mitigate the risk of an erroneous prediction. Making choices about whether to adopt bright-line rules or customized assessments of people, entities, or transactions subject to government regulation is the hallmark of the legislative function. "Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson v. Skrupa, 372 U.S. 726, 729, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963)*. There is nothing irrational in choosing a bright-line rule for a sex offender registration system.

In sum, it is not clear what form of individualized review Plaintiffs envision, or what the associated costs would be. What is clear is that the legislature could reasonably conclude that individualized review carried risks not deemed worth taking.

In any case, Plaintiffs' claim is vulnerable for another

2024 U.S. Dist. LEXIS 176146, *60

reason: Any potential right to review would require a showing of entitlement to avoid or remedy a constitutional violation. As discussed below, Plaintiffs' two claimed bases for constitutional violations—due process and equal protection—come up short.

## 1. Due Process

The *Due Process Clause of the Fourteenth Amendment* protects citizens from government deprivation of "life, liberty, or property, without due process [*61] of law." U.S. Const. amend. XIV, § 1. Due process has two components: procedural and substantive. *Bambach v. Moegle, 92 F.4th 615, 624 (6th Cir. 2024)*. Procedural due process rights "protect individuals from deficient procedures that lead to the deprivation of cognizable liberty interests." Id. (punctuation modified). Substantive due process rights "ensure that—regardless of the procedural protections available—the government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose." Id. (punctuation modified).

Plaintiffs do not specify whether they bring a procedural or substantive due process claim, but it appears they bring only a substantive claim.[33] Because arguing that SORA lacks individualized review is akin to arguing that SORA's procedures are inadequate, the Court analyzes Plaintiffs' claim under both due process components.

### a. Procedural Due Process

To the extent Plaintiffs argue that SORA 2021's lack of individualized review violates procedural due process, this claim fails. The Supreme Court has held that registrants are not entitled to a hearing to determine risk where that fact is irrelevant to a state's statutory scheme, as is the case here. See *Conn. Dep't of Pub. Safety v. Doe, 538 U.S. 1, 8, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003)* (DPS).

In DPS, the Supreme Court addressed [*62] a procedural due process challenge to Connecticut's sex offender registry. Like SORA 2021, the Connecticut statute at issue was conviction-based; "the law's

requirements turn[ed] on an offender's conviction alone." *DPS, 538 U.S. at 2*. The plaintiff argued that Connecticut law "deprive[d] him of a liberty interest . . . without notice or a meaningful opportunity to be heard." *Id. at 6*. Without deciding whether the plaintiff properly alleged deprivation of a liberty interest, the court held that there was no procedural due process violation. *Id. at 8*.

The Supreme Court explained that the plaintiff was not entitled to a hearing to determine whether he was currently dangerous because that fact was irrelevant to Connecticut's statute, which was strictly conviction-based. *Id. at 7-8*. The court explained that "even if respondent could prove that he is not likely to be currently dangerous, Connecticut has decided that the registry information of *all* sex offenders—currently dangerous or not—must be publicly disclosed." *Id. at 7* (emphasis in original). In enacting an offense-based statute, Michigan has made the same decision here. Because "[p]laintiffs who assert a right to a hearing under the *Due Process Clause* must show that the facts they seek to establish [*63] in that hearing are relevant under the statutory scheme," *id. at 8*, Plaintiffs have not established a procedural due process violation.

The Sixth Circuit has previously rejected an attempt to distinguish SORA from DPS. See *Fullmer v. Mich. Dep't of State Police, 360 F.3d 579 (6th Cir. 2004)*. In *Fullmer*, the plaintiff argued that the registration and public disclosure aspects of SORA deprived him of a constitutionally-protected liberty interest without "giving him notice and an opportunity to be heard on whether he is a threat to the public safety." *Fullmer, 360 F.3d at 581* (punctuation modified). The plaintiff attempted to distinguish DPS because a provision in Michigan's SORA states that "[t]he legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people" and that "[t]he registration requirements of this act are intended to provide law enforcement and the people . . . an . . . effective means to monitor those persons who pose such a potential danger." *Id. at 582* (citing *Mich. Comp. L. § 28.721a*). The plaintiff contended that, unlike in DPS, dangerousness was a component of the registration scheme under SORA.

The court rejected this argument, explaining that "[r]egardless of [*64] the language in the statute, the information on the registry's website makes it clear to anyone accessing the registry that all sex offenders

---

[33] In their motion for summary judgment, Defendants state that "[i]t appears that Plaintiffs assert only a substantive Due Process claim . . . ." Defs. Br. Supp. Mot. for Summ. J. at 28. Plaintiffs do not refute this in their response. Pls. Resp. at 14-15.

convicted after a certain date are listed, without exception. Moreover, there is nothing on the website to indicate that the state has made an individual determination as to a registrant's dangerousness." _Id. at 582_. Relying on _DPS_, the court found that a determination regarding dangerousness was irrelevant to Michigan's statutory scheme, which was also conviction-based. _Id. at 581-583_. The court held that there was no procedural due process violation and noted that the plaintiff had not brought a substantive due process claim. _Id. at 582_.

Nothing of significance to the analysis of this claim has changed since _Fullmer_ was decided. SORA 2021 contains the same provision regarding the legislature's determination, and the registry's current website does not indicate that the state has made an individual determination as to a registrants' dangerousness. Therefore, any procedural due process claim brought by Plaintiffs fails under _DPS_ and _Fullmer_.

**b. Substantive Due Process**

Substantive due process "ensure[s] that—regardless of the procedural protections available—the government may not deprive individuals of [*65] fundamental rights unless the action is necessary and animated by a compelling purpose." _Bambach, 92 F.4th at 624_. Rights protected by the _Due Process Clause_ must be "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." _Gore v. Lee, 107 F.4th 548, 562 (6th Cir. 2024)_ (quoting _Washington v. Glucksberg, 521 U.S. 702, 720-721, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)_). If legislation infringes on a fundamental right, strict scrutiny applies. _Does I, 932 F. Supp. 2d at 814_. Where no fundamental right is implicated, the statute need only survive rational basis review. _Id._ (citing _City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)_).

Plaintiffs argue that the aspects of SORA 2021 that restrict their fundamental rights to work and travel should be analyzed under strict scrutiny.[34] Pls. Br.

Supp. Mot. for Summ. J. at 29. "With respect to the rest of SORA [2021]," _id._, Plaintiffs argue that an "exacting rational basis scrutiny" applies because the law was motivated by animus, _id._ at 29-32. But even if standard rational basis applies, Plaintiffs contend that SORA 2021 is unconstitutional because it irrationally imposes extensive burdens with no public safety benefit. _Id._ at 33-35. The Court disagrees. As explained below, Plaintiffs have not shown that SORA 2021 significantly burdens any fundamental right. Further, Plaintiffs have failed to show that SORA 2021 was motivated by animus. Finally, [*66] as explained below, SORA 2021 passes constitutional muster under the rational basis standard.

**i. Fundamental Rights**

Plaintiffs argue that SORA restricts their fundamental rights to work and travel. The Court begins by addressing the fundamental right to work, then turns to travel. With respect to work, Plaintiffs argue that SORA impacts them in the following ways:

- "Registrants' work addresses are posted online, meaning that employers who hire registrants will have their business address show up in registry searches." Pls. SOMF ¶ 339 (citing _Mich. Comp. L. § 28.728(2)(d)_).[35]

- While Michigan's unemployment rate was 4.3% in January 2023, 45% of class members who are not incarcerated report no current employment. _Id._ ¶ 340 (citing Class Data Report ¶¶ 20, 109-110 (Dkt. 123-6)).[36]

- According to Plaintiffs, "research demonstrates that being on a sex offender registry dramatically reduces employment options for registrants, and frequently results in job loss." _Id._ ¶ 339. Plaintiffs cite two expert reports in support of this claim. _Id._ (citing Socia Report ¶¶ 22-23 (Dkt. 123-11); Zgoba Report ¶¶ 25-30 (Dkt. 123-15)). Both reports cite surveys where roughly 40% of respondents

---

[34] Plaintiffs also contend that SORA impacts their fundamental right to speak. Pls. Br. Supp. Mot. for Summ. J. at 29. Plaintiffs' right to speak is already protected by the _First Amendment_, and the Court will address the _First Amendment_ implications of SORA later in this opinion.

[35] Plaintiffs do not explain whether and why it would violate the law for employers to choose not to hire convicted sex offenders.

[36] The Court notes that this is not an apples-to-apples comparison. Plaintiffs' 45% statistic does not account for whether individuals are actively looking for work, which is the definition used by Michigan (as well as the federal government) to track unemployment.

reported losing a job because of their registration status. [*67]  Socia Report ¶ 27; Zgoba Report ¶ 25.[37]

In response, Defendants admit that registrants may have more difficulty finding employment but note that this is also true for individuals with criminal histories. Defs. Resp. to Pls. SOMF ¶ 339. Defendants argue that the HR policies of certain employers may prohibit employing individuals with criminal histories, and that some individuals with criminal histories may "lack the motivation and hard or soft skills to obtain[] employment." Id.

According to Plaintiffs, "[r]egistrants report that it is appearing on the online registry, not their conviction, that turns employers away." Pls. SOMF ¶ 354. Plaintiffs provide various examples of registrants who claim that their registry status has impeded their job opportunities, but many of their specific facts are contested by defense.[38]

---

[37] Neither expert report explains how the surveys controlled for the impact of registrants' criminal record, separate from their registry status.

[38] For example, Plaintiffs make the following claims, which Defendants contest:

- Plaintiffs claim that John Doe B worked at a family business for many years because he "learned from experience that he would be unable to find work elsewhere." Pls. SOMF ¶ 342 (citing Doe B Dep. Tr. at 8, 60-61 (Dkt. 125-5)). He now has his real estate license but he has had sales fall through when a buyer or seller learned he was on the registry. Id. In response, Defendants [*68] point out that John Doe B has earned a good livelihood, making $70,000 a year in the family business and approximately $100,000 a year as a real estate agent. Defs. Resp. to Pls. SOMF ¶ 342 (citing Doe B Dep. Tr. at 8-10).

- Plaintiffs claim that John Doe C has been "repeatedly terminated because he is on the registry." Pls. SOMF ¶ 342 (citing Doe C Dep. Tr. at 9, 17-18, 54-55 (Dkt. 125-6)). He was fired from one job because "an anonymous caller exposed his status." Id. He was fired from another job after a copy of a newspaper publishing registry listings, including his, appeared in the break room at work. Id. In response, Defendants note that John Doe C has been at the same employer for a decade. Defs. Resp. to Pls. SOMF ¶ 343 (citing John Doe C Dep. Tr. at 10-11).

- Plaintiffs claim that Mary Doe received a certificate in medical billing near the top of her class, but her

Regardless of whether there are actual employment difficulties, no court decision of which the Court is aware has found that employment in the private sector is a fundamental right. In fact, the district court in Does I considered and rejected such an argument. Does I, 932 F. Supp. 2d 803. As that court explained, "[w]hile the freedom to choose and pursue a career, to engage in any of the common occupations of life, qualifies as a liberty interest . . . there is no 'general right to private employment.'" Id. at 817 (punctuation modified) (citing Cutshall v. Sundquist, 193 F.3d 466, 479 (6th Cir. 1999)). Stated differently, legislation that bars individuals from pursuing particular careers may infringe on a fundamental right, but legislation that incidentally makes obtaining private employment more difficult does not. Finding that SORA 2011 did not bar the plaintiffs from freely electing a particular career, the court rejected their due process [*70] argument on that ground. Id. at 817-818.

SORA 2021—like SORA 2011—does not prohibit registrants from pursuing any particular career. SORA 2021 may make it more difficult for registrants to find employment in general, but as the Does I court noted, there is no general right to private employment. And SORA 2021 imposes less of a burden on finding work than SORA 2011, which prohibited registrants from working within 1,000 feet of a school, thereby eliminating certain job opportunities. "A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation." Cutshall, 193 F.3d at 478 (punctuation modified) (holding that Tennessee sex registration statute did not deprive registrant of procedural due process based on impact on his job possibilities, because any past judicial recognition of a constitutionally-protected interest related to employment involved termination of government employment, not private employment).

While Plaintiffs undoubtedly face more difficulty finding

---

externship placement "was unwilling to hire her because its name and address would be posted on the registry." Pls. SOMF ¶ 348 (citing Mary Doe Dep. Tr. at 27-40 (Dkt. 125-10). She submitted over 100 resumes for other jobs before finding one. Id. Her current employer is unaware of her registry status, but Mary Doe [*69] expects she would be fired if it were discovered. Id. In response, Defendants submit that Mary Doe was at one employer from 2017 through 2022, and that she left that position voluntarily for a new position with a "huge increase in salary and benefits" that she is still in. Defs. Resp to Pls. SOMF ¶ 348 (citing Mary Doe Dep. Tr. at 38-41).

employment than those who have not been convicted of a sex offense, they have not shown a fundamental right has been infringed.

With respect to travel, Plaintiffs argue that SORA impacts [*71] them in the following ways:

- For any travel of more than seven days, registrants must provide advance notice to the police. Registrants must state where they are going, where they will stay, and when they will return. Pls. SOMF ¶ 360 (citing *Mich. Comp. L. §§ 28.725(1)(e)*;[39] *28.727(1)(e)*. Plaintiffs contend that the practical effect of this requirement is that "[a]lmost all Plaintiffs limit travel to no more than six days . . . ." Id. ¶ 366.[40]

- For international travel of more than seven days, registrants must report in person at least 21 days in advance. Id. ¶ 360 (citing *Mich. Comp. L. §§ 28.725(8)*).

- Registrants "must plan to travel so that they are able to register in person at specified intervals." Id ¶ 361 (citing *Mich. Comp. L. §§ 28.725a(3)*).

- "Because registration in one state generally triggers registration in other states, if registrants travel, they must comply with all applicable registration laws in other jurisdictions. Any travel out-of-state requires extensive research to determine what the registry requirements are in the states through which and to which registrants travel." According to Plaintiffs, this "significantly restricts registrants' ability to associate with family or friends out of state, or indeed to leave the state for any purpose." Id. ¶ 363.[41]

- Registrants [*72] convicted of an offense against

---

[39] Plaintiffs cite *Mich. Comp. L. § 28.725(1)(e)*, but this appears to be a typo. The correct provision should be § 28.725(2)(b).

[40] Plaintiffs do not cite to the record in support of this contention. In response, Defendants admit that "several plaintiffs, who are only a few of the approximately 44,000 registrants, made the statement." Defs. Resp. to Pls. SOMF ¶ 366.

[41] Plaintiffs do not explain why Michigan should be faulted for aspects of other states' registration systems that may be triggered by virtue of an individual being required to register as a sex offender in Michigan.

---

a minor can only get passports that identify them as sex offenders. Id. ¶ 365 (citing *22 U.S.C. § 212b(c)(l)*; *34 U.S.C § 21503(f)*).

Plaintiffs provide numerous examples of individual plaintiffs who would like to travel but do not do so, or who have experienced difficulty while traveling, because of their registration status. Id. ¶¶ 367-378. For example:

> SORA's three-week notice requirement for international travel limits Doe G's career advancement, as he has had to tell his employer he cannot travel internationally. He was forced to cancel a business trip to China because he would have been away for 30 days during his reporting period. He doesn't visit his father in Florida or sister in Illinois for fear of violating those states' laws or ending up on those states' registries. He missed his niece's graduation for similar reasons.

Id. ¶ 373 (citing Doe G Dep. Tr. at 20-22 (Dkt. 125-9).

The right to travel has been recognized as fundamental in certain situations. As explained in *Does I*, "[n]either the Supreme Court nor the Sixth Circuit has recognized [] a generically defined fundamental 'right [to travel].'" Instead the Supreme Court has found a fundamental right to *interstate* travel that is comprised of three [*73] distinct components: (1) 'the right of a citizen of one State to enter and to leave another state'; (2) 'the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State'; and (3) 'for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.'" *Does I, 932 F. Supp. 2d. at 814-815* (emphasis in original) (citing *Saenz v. Roe, 526 U.S. 489, 500, 119 S. Ct. 1518, 143 L. Ed. 2d 689 (1999)*). The court further explained that "the Sixth Circuit, in the absence of any express statement by the Supreme Court, has also recognized a fundamental right to intrastate travel, which it found to include the 'right to travel locally through public spaces and roadways.'" *Id. at 815* (citing *Johnson v. City of Cincinnati, 310 F.3d 484, 498 (6th Cir. 2002)*).[42]

---

[42] In *Johnson*, the Sixth Circuit struck down a city's drug-exclusion ordinance, which banned an individual for up to ninety days from public streets and sidewalks in all drug-exclusion zones if the individual is arrested or taken into custody within any drug-exclusion zone for one of several enumerated drug offenses. *Johnson, 310 F.3d at 487*. The ordinance in *Johnson* is distinguishable from SORA 2021, which does not ban registrants from entering any particular areas within the state.

2024 U.S. Dist. LEXIS 176146, *73

But the Does I court also noted that SORA 2011 did not create any actual barriers preventing registrants from entering or exiting the state. Id. at 815. The court explained that the requirement that registrants report travel of greater than seven days "does not . . . make out-of-state travel impossible." Id. "It merely requires more advanced planning and less spontaneity on the part of a traveling registrant." Id. The court held that "mere burdens on a person's ability to travel from state to state are not necessarily a violation of their [*74] right to travel" and that although SORA 2011 "imposes some burdens on registrants who wish to travel for extended period of times, the burdens cannot be fairly characterized as substantial or unreasonable." Id. The same is true with respect to SORA 2021, which contains the same requirement that registrants report travel of greater than seven days and adds no new restrictions with respect to travel.

The court next addressed the quarterly in-person reporting requirement and held that "[a]t most, the provision imposes only a de minimis, incidental burden on registrants who wish to travel during these periods." Id. at 816. Again, the same is true of SORA 2021, which requires registrants to report in person either once, twice, or four times a year, depending on their tier. SORA 2021 assigns required reporting months, but registrants can choose any day within those months to report in person. At most, this requirement prevents certain registrants from traveling on four days within the year, and registrants have a fair degree of flexibility in choosing those days. The Does I court's description of this burden as "de minimis" is accurate.

Notably, SORA 2021 imposes significantly less of a burden on travel than [*75] SORA 2011, which contained exclusion zones. Yet the Does I court found that SORA 2011, even with exclusion zones, did not substantially burden Plaintiffs' rights to interstate or intrastate travel because the exclusion zones "[did] not restrict registrants from entering or traveling through" exclusion zones. Id. at 816. Rather, the court explained that the exclusion zones "regulat[ed] the type of activity registrants [could] engage in when they are within 1,000 feet of school property." Id. The court held that the exclusionary zones were "tailored to prohibit only the type of conduct the state has reasonably identified as creating potential harm to children." Id. at 817. In the present case, SORA 2021 imposes no restrictions on the activities registrants can engage in when they are within 1,000 feet of a school.

Because SORA 2021 only imposes incidental burdens on a registrant's ability to travel, strict scrutiny does not apply.[43]

### ii. Animus

Even if SORA 2021 does not violate a fundamental right, Plaintiffs argue that an "exacting rational relationship standard" must apply because SORA 2021 was motivated by animus. Pls. Br. Supp. Mot. for Summ. J. at 29-32. Plaintiffs contend that "[t]his more searching form of rational basis review [*76] applies when a law exhibits a desire to harm a politically unpopular group." Id. at 29 (citing Lawrence v. Texas, 539 U.S. 558, 580, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (O'Connor, J., concurring). This argument is echoed in the amicus curie brief filed by law professors William Araiza, Eric Janus, and Sandra Mayson in support of Plaintiffs' equal protection and substantive due process claims. See Araiza Br. (Dkt. 136).

The amicus brief refers to a line of United States Supreme Court cases—which the amici refer to as the "animus cases"—where the court applied the exacting rational relationship standard to laws that "might reflect prejudice or stereotype." Id. at 7-9. According to the brief, these cases "illustrate the objective features of legislation that suggest potential stereotype or prejudice." Id. at 7. These features include: (i) "laws that target a politically disfavored group," (ii) laws that "impose[] broad or severe burdens on the disadvantaged group," and (iii) "rarity," or laws that impose "discriminations of an unusual character." Id. at 7-8 (punctuation modified). Plaintiffs cite similar factors to consider when determining whether a statute was motivated by animus.[44] Pls. Br. Supp. Mot. for Summ. J. at 30-31. In addition to the amicus brief factors, Plaintiffs [*77] contend that courts should consider legislative history and background. Id.

A consideration of these factors, however, does not establish that SORA 2021 was motivated by animus. As

---

[43] Other courts in this circuit have reached the same conclusion with respect to Tennessee's sex offender registration statute, which is similar to SORA 2021. See, e.g., Doe v. Rausch, 648 F. Supp. 3d 925, 949 (W.D. Tenn. 2023); Jefferies v. Lee, No. 22-cv-02258, 2023 U.S. Dist. LEXIS 55333, 2023 WL 2724249, at *8 (W.D. Tenn. Mar. 30, 2023).

[44] The Court notes that Plaintiffs and the amicus brief provide no authority showing that a court has adopted these factors as a test.

an initial matter, the present case is distinguishable from the "animus cases" cited by the amicus brief because those cases addressed the regulation of politically disfavored groups who did not do anything wrongful or objectionable. See *Romer v. Evans, 517 U.S. 620, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996)* (LGBTQ people); *Cleburne, 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)* (severely intellectually disabled); *Plyler v. Doe, 457 U.S. 202, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982)* (children of undocumented immigrants); *U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 93 S. Ct. 2821, 37 L. Ed. 2d 782 (1973)* (hippies). Unlike these groups, sex offenders did do something wrongful by committing dangerous acts that are often violent in nature. And, in many cases, they did so in extremely concerning ways. If they are "politically disfavored," that is explainable based on conduct that is understandably troubling to law-abiding citizens. None of the "animus cases" addressed an unpopular group whose members had been convicted of similarly dangerous crimes.

Plaintiffs rely heavily on *Bannum, Inc. v. City of Louisville, 958 F.2d 1354 (6th Cir. 1992)*. In *Bannum*, the plaintiff argued that a city zoning ordinance violated equal protection because it required community treatment centers for federal offenders (CTCs) to obtain a special permit to operate but did not require operators [*78] of other group residences to do the same. *Bannum, 958 F.2d at 1355-1356*. The CTC program was intended to facilitate the reintegration of federal offenders into society. *Id. at 1355*. The court applied a "rational relationship level of review," which asked "whether the classifications drawn by the zoning ordinance are rationally related to a legitimate state interest." *Id. at 1360*. The court described the standard as "highly deferential" but also warned that rational relationship review can be "exacting" in that "the desire to impede a politically unpopular group is not a legitimate state interest." Id. (punctuation modified).

The city's main justification for the ordinance was that the occupants of a CTC are more likely to commit crimes than a person never having been convicted of a crime. Id. The Sixth Circuit held that "[i]f the city's goal was to protect its residents from recidivists, then some data reflecting the extent of the danger must exist in order to render the different treatment of CTCs rationally related to that goal." *Id. at 1360-1361*. Explaining that the city's expert witness found that literature on the topic was inconclusive, the court rejected the city's proffered purpose. Id. Instead, the court concluded that "the purpose behind [*79] different treatment of CTCs . . . is to assure residents . . . that they would not find

themselves with a CTC as a neighbor." *Id. at 1361*. The court held that this justification was invalid. Id.

*Bannum* does not provide clear guidance here. Its holding seems to be that the special permit requirement reflected a naked fear of felons generally, without any evidence that they would likely re-offend. *Id. at 1360* ("The city was able to present the district court with no evidence supporting its contention that CTCs present a danger to the community."). That is different from the present case because, as discussed above, there is at least some evidence of recidivism being thwarted by the registration system. It is also different from the present case because, as discussed above, there is some evidence that registration systems deter first-time offenders, and registration systems serve the goal of empowering individuals to pursue measures to promote their own safety.

Further, *Bannum* appeared to qualify its pronouncement that naked fear of federal offenders justified heightened scrutiny when it stated that "[i]t is important to note that the CTCs . . . do not house felons convicted of crimes of violence involving firearms, or [*80] sexual offenders." *Id. at 1361 n.3* (emphasis added). Similarly, it also stated that "the city may well have a legitimate interest in requiring a conditional use permit of an institution housing those with a prior record of violent felony offenses." *Id. at 1361*. Thus, *Bannum* does not suggest that a regulation impacting convicted sex offenders must pass exacting scrutiny on the theory that the law operates against a politically unpopular group. Violent offenders and sex offenders, in particular, gain no right to invoke special constitutional protection under that decision. The "politically unpopular" factor does not weigh in favor of Plaintiffs.

As to the second factor, it is clear that SORA imposes burdens on registrants. Plaintiffs discuss these burdens in detail, particularly as they relate to SORA's impact on access to housing, employment, education, and travel. Defendants do not seem to dispute that SORA imposes such burdens on registrants. This factor weighs in Plaintiffs' favor.

As to the third factor, Plaintiffs argue that SORA is a structural aberration because it is "unlike other laws." Pls. Br. Supp. Mot. for Summ. J. at 32. According to Plaintiffs, SORA "criminalizes ordinary behavior (that is not criminal [*81] for non-registrants) and imposes extensive supervision for decades/life on a disfavored group without any individual assessment." Id. Plaintiffs contend that other "[n]on-punitive systems that impose

significant restrictions on liberty (e.g., child protective services, guardianships, medication compliance for mentally ill), all turn on individual assessments and periodic review to ensure these restrictions are warranted." Id.

The only case Plaintiffs cite in support of this claim is _Bassett v. Snyder, 59 F. Supp. 3d 837 (E.D. Mich. 2014)_. In _Bassett_, five same-sex couples, each with one partner employed by a local municipality, challenged the constitutionality of a Michigan law that prohibited public employers from providing health care and other fringe benefits to the domestic partners of their employees. _Id. at 839_. The plaintiffs argued that the law was "nothing more than a mean-spirited attempt to deny health care benefits to the same-sex domestic partners of public employees on the basis of their sexual preference, . . . ." in violation of equal protection. Id.

In determining whether the law was motivated by animus, the court asked, in part, whether it was a structural aberration. _Id. at 847, 855_. The court explained that "[s]tructural aberration occurs when [a] law [*82] (1) 'impose[s] wide-ranging and novel deprivations upon the disfavored group;' or (2) 'stray[s] from the historical territory of the lawmaking sovereign to eliminate privileges that a group would otherwise receive.'" _Id. at 847_ (citing _Bishop v. Smith, 760 F.3d 1070 at 1100 (10th Cir. 2014)_ (Holmes, J., concurring)). The court found that the law in question was a structural aberration because "the legislature took the unusual step of telling local governments that they could not offer employee fringe benefits to a specific class of people who had been receiving them up to then." _Id. at 855_.

_Bassett_ is distinguishable from the present case. For one, _Bassett_ is more similar to the traditional "animus cases" discussed above because it dealt with a politically unpopular group whose members had not done something violent or dangerous. In addition, the law at issue in _Bassett_ deprived individuals of benefits they had previously been receiving, due to no fault of the individual. To the extent SORA 2021 deprives registrants of any benefits, it does so because the registrant has been convicted of a dangerous crime.

Further, Plaintiffs admitted in the ex post facto context that "SORA 2021 resembles the traditional punishment of parole/probation." Pls. Br. Supp. Mot. for Summ. J. at 10 (punctuation [*83] modified). In an about-face, Plaintiffs now try to point out various ways in which

SORA 2021 differs from parole and probation.[45] For the reasons already discussed in the ex post facto section, the Court finds that SORA 2021 resembles probation and parole. This and Plaintiffs' lack of case law supporting the rarity of SORA 2021 weigh in favor of finding that SORA is not a structural aberration.

Lastly, Plaintiffs argue that SORA's legislative history indicates that it was motivated by animus. Pls. Br. Supp. Mot. for Summ. J. at 31-32. Plaintiffs cite to legislators who have called registrants 'beasts," "monsters," "animals," and "the human equivalent of toxic waste." Id. at 31 (citing Wayne Logan, Knowledge as Power: Criminal Registration and Community Notification Laws in America 95 (1st ed. 2009)). But the Michigan legislature consists of 38 senators and 110 representatives—statements from a handful of members do not represent the views of the legislature at large. See _Mich. Const. art. IV, §§ 2-3_.

Moreover, courts have recognized the combative tenor of political discourse, instructing that the _First Amendment_ reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." _Snyder v. Phelps, 562 U.S. 443, 452, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011)_. For better or worse, the use of inflammatory language is fairly widespread throughout the continuum of political issues. But "[a]s a Nation we have chosen . . . to protect even hurtful speech on public issues to

---

[45] Plaintiffs note the following distinctions between SORA 2021 and probation/parole:

- Probation and parole are individually determined, while sex offender registration requirements are not. Pls. Resp. to Defs. SOMF ¶ 44 (citing SORA, Probation & Parole Comparison Chart (Dkt. 131-10)).

- Probation and parole usually only last for two to four years, while registration requirements can last for decades or life. Id. (citing SORA, Probation & Parole Comparison Chart). But the Court notes that, depending on the severity of the crime, parole-like systems like supervised release can last for life. See _United States v. Zabel, 35 F.4th 493, 508 (6th Cir. 2022)_ ("There is no question that the district court had authority to impose a life term of supervised release. Congress insists that lifetime supervision be available to courts in sentencing sexual offenders ") (punctuation modified).

- Most probationers and parolees can petition to be discharged early, whereas [*84] most sex offender registrants cannot. Id. (citing SORA, Probation & Parole Comparison Chart).

2024 U.S. Dist. LEXIS 176146, *84

ensure that we do not stifle public debate." *Id. at 461*. There is nothing unique [*85] in that regard pertaining to the sex offender registration issue. While demeaning comments are certainly troubling, the use of strong language in debates about sex offenders should not be surprising. All sex offenses are condemnable and many involve particularly heinous conduct.

Plaintiffs also emphasize that, for recent enactments of SORA, legislators ignored a "scientific consensus that registries don't work." Pls. Br. Supp. Mot. for Summ. J. at 31. But as already discussed, the literature regarding the effect of registries on recidivism is not conclusive. These arguments, therefore, fail to establish that the legislative history demonstrates that SORA was motivated by animus.

In sum, considering all of the factors that courts have considered in the animus cases, the present case hardly seems like it falls within that category. Further, the Court is not aware of any case holding that sex offenders are subject to exacting scrutiny or otherwise comparing sex offenders to the groups at issue in the cases cited by Plaintiffs and amici.

### iii. Rational Basis Review

Plaintiffs argue that SORA 2021 is unconstitutional no matter what standard of review is applied because it cannot survive even rational [*86] basis review. Pls. Br. Supp. Mot. for Summ. J. at 33-35. Under rational basis review, the relevant question is whether the statute at issue is "rationally related to legitimate government interests." *Doe v. Mich. Dep't of State Police, 490 F.3d 491, 501 (6th Cir. 2007)* (citing *Washington v. Glucksberg, 521 U.S. 702, 728, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)*). "That deferential standard does not require States to show that a classification is in any way, the best way, or even the most defensible way to achieve their interests." *Gore v. Lee, 107 F.4th 548, 561 (6th Cir. 2024)*.

Plaintiffs argue that SORA 2021 does not meet this standard because "imposing extensive burdens that have no public safety benefit on thousands of people who present no appreciable risk is irrational." Pls. Br. Supp. Mot. for Summ. J. at 33 (punctuation modified). According to Plaintiffs, "unrebutted evidence" shows SORA does not promote public safety and instead shows that SORA undermines the key factors for reentry (housing, employment, and social connections) and harms survivors. *Id.* at 33. Further, Plaintiffs

contend that SORA wastes millions of dollars each year on "a system that undermines its very purpose." *Id.* In response, Defendants argue that the state has a compelling interest in protecting public safety. Defs. Br. Supp. Mot. for Summ. J. at 31.

As already discussed, the social science regarding [*87] the efficacy of SORA in reducing recidivism is mixed. And Plaintiffs' theory that SORA is irrational because it promotes recidivism by impeding "key factors for reentry" to society such as housing and employment, Pls. Br. Supp. Mot. for Summ. J. at 33, has been questioned by the Office of Justice Programs report cited above. It noted that studies examining the impacts of registration on offenders' "employment and finances, housing, and physical and psychological well-being" were limited in that the studies were largely based on "self-reported data provided by [registrants], their family members, and treatment providers in surveys and interviews with researchers." Office of Justice Programs, Sex Offender Registration and Notification Act—Summary and Assessment of Research, at 9 (April 2022). Given the apparent indeterminate state of the scientific record, it cannot be said that Michigan has selected an irrational registration scheme on the theory that it promotes recidivism.

The indeterminate state of scientific opinion also serves to temper the assertion of Plaintiffs that lengthy registration periods—and in particular lifetime registration—is irrational. This is predicated on the contention [*88] that after several years—perhaps as few as 10—the recidivism rate for registrants with an average risk level who remain offense-free equals risk of offending for all males in the general population. Pls. SOMF ¶ 187.

However, determining who is offense-free is a fraught undertaking, given the severe problem of underreporting of sex offenses. As Rachel Lovell, director of the Criminology Research Center at Cleveland State University, stated in her declaration: "[s]exual recidivism research based on official, court/administrative records from criminal justice agencies provides biased and unrepresentative estimates of repeat sexual offending." Lovell Decl. ¶ 6 (Dkt. 128-19). According to Lovell, sexual assault "is the most underreported violent crime" in the country. *Id.* Only about a third of such offenses are reported to law enforcement and five percent or less result in a conviction. *Id.* Thus "sexual recidivism cannot be used interchangeably with repeat sexual offending." *Id.* ¶ 4. Lovell opines that one meta-analysis of 808 empirical studies reported sexual recidivism rates that

varied from 0 to 68%. Id. ¶ 7. Lovell asserts that sexual recidivism estimates cannot be reliably used [*89] to determine if sexual offenders live offense-free. Id. at ¶ 9.

Similar conclusions are reached by Rachel Goodman-Williams, an assistant professor of psychology at Wichita State University. She opined:

> Recidivism studies based solely on criminal history data are therefore not measuring sexual offenders' behaviors so much as they are measuring the behavior of the criminal legal system; they are not effectively measuring multiple instances of sexual offending so much as they are measuring multiple instances of being caught and held accountable by a system with a uniquely poor track record of doing so. Measures of serial sexual offending that include data less vulnerable to case attrition suggest that approximately 40% of sexual offenders are serial sexual offenders.

Goodman-Williams Decl. ¶¶ 1, 51 (Dkt. 128-20) (emphasis omitted). Thus, there is nothing irrational in maintaining a registration system with lengthy periods of registration.

Nor is it irrational for the system to cover people who have a low risk of reoffending. As an example, even accepting one of Plaintiffs' expert's statistics that 80% to 90% of convicted male offenders will never be reconvicted of a new sex crime, Letourneau [*90] Report ¶ 12, that still leaves 10% to 20% who well may recidivate. Rationality does not demand a perfect or even a "good" success rate to pass constitutional muster. See Gore, 107 F.4th at 561 (6th Cir. 2024).

For the same reason, Plaintiffs' contention that most sex offenses are not committed by strangers, but by persons known to their victims, is of no constitutional moment. See Pls. SOMF ¶ 159 (citing Socia Report ¶ 4 (Dkt. 123-11); Prescott Report ¶ 32 (Dkt. 123-10); Lovell Decl. ¶ 10). Their theory appears to be that registration serves no purpose as to victims who know their perpetrator because they already are aware of their perpetrator's past. Id. ¶ 160. But other victims do not know of that past and may want to avoid becoming a fresh victim. And even according to Plaintiffs' estimates, 13-15% of sex crimes reported to the police are committed by strangers. Id. ¶ 159. Providing information that will help the public protect themselves from even a portion of reported sex crimes is a legitimate goal. Again, the Constitution does not demand legislative perfection.

As discussed previously, rationality is further established by recognizing that SORA serves at least

two other legitimate purposes completely unrelated to [*91] recidivism: deterring first-time offenders and providing information that individuals can use to protect themselves and their families. These purposes alone are each legitimate government purposes sufficient to justify SORA under rational basis review.

Although there are no federal cases adopting Plaintiffs' argument, Plaintiffs cite to certain state cases that they contend "have held that non-reviewable lifetime registration without any opportunity for judicial review violates due process . . . ." Pls. Br. Supp. Mot. for Summ. J. at 34. All are distinguishable.

In Powell v. Keel, 433 S.C. 457, 860 S.E.2d 344 (S.C. 2021), the respondent was convicted of a sex offense and required to register under South Carolina's SORA for life. Powell, 860 S.E.2d at 345-346. As explained by that state's supreme court, South Carolina's SORA "generally mandate[d] that a person required to register as a sex offender must do so biannually for life." Id. at 347. The respondent challenged the constitutionality of this lifetime requirement, arguing that it violated various constitutional protections, including due process. Id. at 346.

The court agreed with the respondent and held that "SORA's lifetime registration requirement without judicial review violated due process." Id. at 348. But the court specifically held that [*92] "the initial mandatory imposition of sex offender registration" was constitutional. Id. Powell only found that "SORA's lifetime registration requirement without any opportunity for judicial review to assess the risk of re-offending" violated due process. Id.

But Michigan SORA 2021, unlike South Carolina SORA, only imposes lifetime registration on Tier III offenders—there is a degree of tailoring imbedded in the statute. This ameliorates the Powell court's concern that "there is no evidence in the record that current statistics indicate all sex offenders generally pose a high risk of re-offending."[46] Id. at 349. Under Michigan SORA, not

---

[46] The court in Powell described the State's purpose in enacting SORA as "protecting the public from a high risk of re-offending." Powell, 433 S.C. at 466. The "high risk of re-offending" language most likely came from the "purpose" provision of South Carolina's SORA, which states that "[s]tatistics show that sex offenders often pose a high risk of re-offending." Id. at 348 (citing S.C. Code Ann. § 23-3-400 (2007 & Supp. 2020)). This Court notes that Michigan SORA 2021 does not include the same language in its statement of

all sex offenders are required to register for life. And as already discussed, the social science regarding the risk of recidivism is mixed. The Michigan legislature has determined that individuals who committed certain offenses should be required to register for life without any chance for reassessment. This determination is far more reasonable than requiring all registrants to register for life. *Powell*, therefore, is not directly applicable to the present case.

Plaintiffs also cite to *Doe v. Dep't of Pub. Safety, 444 P.3d 116 (Alaska 2019)*. In that case, the plaintiff argued that the *Alaska Sexual Offender Registration Act (ASORA)* violated the *due process clause of the Alaska Constitution* by requiring all sex offenders [*93] to register without providing a procedure for them to establish that they do not represent a threat to the public. *Id. at 119*. The plaintiff alleged that ASORA infringed on a number of fundamental rights: the right to integrate into society, the right to privacy, the right to be let alone, and the right to pursue employment. *Id. at 124*. Finding that the right to privacy "is an explicitly enumerated right under the Alaska Constitution" that "should generally be considered fundamental," the court employed strict scrutiny. *Id. at 126*. The court ultimately held that "ASORA's coverage is excessive to the extent it applies to sex offenders who do not present a danger of committing new sex offenses." *Id. at 132*. But rather than invalidate ASORA, the *Doe v. Dep't of Pub. Safety* court allowed the plaintiff to file a civil action in the superior court "in which he would be permitted to attempt to prove that he no longer poses a risk to the public that justifies continued registration." *Id. at 135*.

*Doe v. Dep't of Pub. Safety* is distinguishable because it was grounded in the Alaska constitution's guaranty of privacy. There is no case finding an analogous right in the U.S. Constitution applicable to a sex offender registry challenge. Indeed, Plaintiffs [*94] make no claim that any alleged right to privacy is at issue in this case.

Lastly, Plaintiffs cite to *State v. Bani, 97 Haw. 285, 36 P.3d 1255 (Haw. 2001)*, as amended on clarification

purpose. Instead, Michigan SORA 2021 states that "[t]he legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state." *Mich. Comp. L. § 28.721a*. The legislature could reasonably consider an individual with even a low risk of reoffending to be a "potential serious menace and danger."

(Dec. 6, 2001). In *Bani*, the appellant argued that Hawaii's sex offender registration and notification statute violated his procedural due process rights by failing to provide him with notice and an opportunity to be heard before being subjected to the statute's public notification provisions. *Bani, 36 P.3d at 1262-1263*. As discussed above, federal precedents require rejection of any procedural due process challenge to SORA.

## 2. Equal Protection

Plaintiffs also argue that SORA 2021 violates equal protection by failing to provide for individualized review. Am. Compl. ¶¶ 746-756. But Plaintiffs do not develop this argument in their brief supporting their motion for summary judgment beyond mentioning equal protection in a section header and arguing that a lack of individualized review fails rational basis review. Pls. Br. Supp. Mot. for Summ. J. at 28-35. Plaintiffs do not attempt to show that they have been disparately treated as compared to similarly-situated persons, as is required of any equal protection claim. See *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 379 (6th Cir. 2011)*.

"It is not the court's responsibility to craft winning legal arguments for" the [*95] parties. *United States v. Mungarro, No. 07-20076, 2020 U.S. Dist. LEXIS 70576, 2020 WL 1933816, at *3 (E.D. Mich. Apr. 22, 2020)*. Accordingly, the Court declines to address Plaintiffs' equal protection claim as it relates to a lack of individualized review.

## C. Unequal Opportunity to Petition for Removal

Plaintiffs argue that denying similarly-situated registrants the opportunity to petition for removal from the registry violates the *Equal Protection Clause*. Am. Compl. ¶¶ 757-772. But Plaintiffs have failed to show that they have been treated disparately than similarly-situated persons, so this claim fails.

Under SORA 2021, only two groups of registrants are allowed to petition for removal.[47] First, Tier I registrants

---

[47] For those eligible to petition, SORA 2021 establishes the required procedure. *Mich. Comp. L § 28.728c(4)-(11)*. A copy of the petition must be filed with the office of the prosecuting attorney that prosecuted the case against the registrant, and any known victim must be notified. Id. *§ 28.728c(7)* and *(8)*.

can petition for removal ten years after the later of their conviction or release from confinement if they meet certain conditions.[48] _Mich. Comp. L. § 28.728c(1)_, _(12)_. Tier I registrants are required to register for 15 years, so this means that they can petition for removal from the registry up to five years early.

Second, registrants subject to SORA 2021 for a juvenile adjudication can petition for removal from the registry 25 years after the later of their adjudication or release from confinement if they meet certain conditions.[49] _Mich. Comp. L. § 28.728c(2)_, _(13)_. Although not emphasized by either party, the Court notes that juveniles are only required to register under SORA 2021 if their adjudication [*96] is for the commission of an offense that would classify the individual as a Tier III offender. _Mich. Comp. L. § 28.722(a)(iii)_. So unlike Tier III adult registrants who are required to register for life and may never petition for removal from the registry, Tier III juveniles may petition after 25 years. This still allows many juvenile registrants to live free from registration requirements for many years, if not decades, of their lives.

Tier I registrants and juvenile registrants account for 7% and 5% of all registrants, respectively. Pls. SOMF ¶ 218, 433 (citing Class Data Report ¶¶ 5, 18, 42, 93-98 (Dkt. 123-6)). This means that only 12% of SORA registrants can petition for removal, and even then, only if they meet certain conditions. The other 88% of registrants

---

The court must then conduct a hearing, at which the victim may speak. The court must consider the following factors in determining whether to allow the individual to discontinue registration: (i) the individual's age and level of maturity at the time of the offense, (ii) the victim's age and level of maturity at the time of the offense, (iii) the nature of the offense, (iv) the severity of the offense, (v) the individual's prior juvenile or criminal history, (vi) the individual's likelihood to commit further listed offenses, (vii) any impact statement submitted by the victim, and (viii) any other information considered relevant by the court. _Id. § 28.728c(11)_. But the court "shall not grant the petition if the court determines that the individual is a continuing threat to the public." _Id._

[48] Tier I registrants may petition for removal ten years after the later of conviction or release from confinement if they: (i) have not since been convicted of any felony or other registrable offense, (ii) have successfully completed their assigned periods of supervised release, probation, or parole, and (iii) have successfully completed a sex offender treatment program. _Mich. Compl. L. § 28.728c(1)_, _(12)_.

[49] Juvenile registrants must meet the same conditions as Tier I registrants described in the footnote above.

can never petition for removal. Plaintiffs argue that such a scheme "violates equal protection because (1) the barred-from-petitioning sub-class is treated differently than others . . . who are similarly situated in all material respects, and (2) the state has no rational basis for the different treatment." Pls. Br. Supp. Mot. for Summ. J. at 35-36 (punctuation modified).

The _Equal Protection Clause_ prevents a state from denying its citizens "equal protection of the laws." U.S. Const. amend. XIV, § 1. [*97] The provision "does not forbid States from drawing distinctions in their laws [b]ut it does prohibit States from allocating benefits and burdens based on suspect and irrational classifications." _Gore, 107 F.4th at 555_.

"To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." _Ctr. for Bio-Ethical Reform, Inc., 648 F.3d at 379_ (punctuation modified). The "threshold element" of an equal protection claim is disparate treatment. _Id._ "[O]nce disparate treatment is shown, the equal protection analysis is to be applied is determined by the classification used by government decision-makers." _Id._ "Laws that discriminate based on suspect classifications, such as race or sex, receive heightened review." _Gore, 107 F.4th at 555_ (citing _City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440-441, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)_). If a law does not discriminate based on a suspect classification, it is "presumed to be valid" and rational basis review will apply. _Id._

As a threshold matter, the barred-from-petitioning subclass is not similarly situated to other SORA 2021 registrants. Plaintiffs argue that "[t]he barred-from-petitioning subclass is similarly situated [*98] to petition-eligible registrants in all respects material to that purpose: both groups have registered for ten years; have not been convicted of another registrable offense or felony; and have successfully completed supervised release, probation or parole, and any required sex offender treatment. The only difference (their tier) is not relevant to the statutory goal of providing a path off the registry for people who are rehabilitated. Individuals in any tier can be rehabilitated." Pls. Br. Supp. Mot. for Summ. J. at 37-38. But the characterization of tier as "the only difference" between the barred-from-petitioning subclass and other registrants is inaccurate. The barred-from petitioning subclass, by definition,

committed offenses that the legislature has deemed more serious than other registrants, either because of the nature of the offense itself, or the age of the offender. This is a material difference.

But even if the Court found that the barred-from-petitioning subclass was similarly situated to other SORA 2021 registrants, the statutory scheme satisfies rational basis review. Plaintiffs' various arguments to the contrary fail for the following reasons.

Plaintiffs contend that [*99] "[s]tates may punish some offenses more severely than others, but equal protection forbids line-drawing based on offense history where such line-drawing is not related to the statutory purpose." Id. at 38. In support of this proposition, Plaintiffs rely on Baxstrom v. Herold, 383 U.S. 107, 86 S. Ct. 760, 15 L. Ed. 2d 620 (1966). But Plaintiffs' reliance on Baxstrom is misguided.

In Baxstrom, the petitioner was certified as insane by a prison physician shortly after he was sentenced to a term of two and one-half to three years in a New York prison. Id. at 107. The petitioner was transferred from prison to a New York Department of Corrections hospital for mentally ill prisoners. Id. Shortly before the petitioner's sentence was over, the director of the hospital filed a petition requesting that the petitioner be civilly committed. Id. The petitioner was committed without a jury trial. Id. at 108-109. The Supreme Court held that denying prisoners a jury trial to determine their sanity, while affording such a right to people not in prison facing civil commitment, violated equal protection. Id. at 110-115. As the Supreme Court explained,

> The capriciousness of the classification employed by the State is thrown sharply into focus by the fact that the full benefit of a judicial hearing to determine dangerous tendencies is withheld [*100] only in the case of civil commitment of one awaiting expiration of penal sentence. A person with a past criminal record is presently entitled to a hearing on the question whether he is dangerously mentally ill so long as he is not in prison at the time civil commitment proceedings are instituted. Given this distinction, all semblance of rationality of the classification, purportedly based upon criminal propensities, disappears.

Id. at 115. Baxstrom, therefore, does not stand for the proposition that equal protection forbids line-drawing based on offense history; it prohibited line-drawing

based on custodial status.

Plaintiffs also argue that SORA 2021's scheme is irrational because tier classifications do not correspond to risk. Pls. Br. Supp. Mot. for Summ. J. at 39. But the legislature could reasonably conclude that adults who committed more serious crimes should be monitored for longer periods of time without the opportunity for removal. Making a mistaken judgment about who is not dangerous carries potentially more severe consequences when made about a more serious offender.

Lastly, the Court notes that Plaintiffs' arguments regarding juvenile offenders are inaccurate. Plaintiffs contend that "[r]equiring [*101] juveniles to wait 15 years longer than adults to petition is [] irrational" and argue that "[c]ourts have repeatedly struck down laws that subject juvenile registrants to stricter requirements than adults." Id. at 39-40. But as already explained, SORA 2021 does not subject juvenile registrants to stricter requirements than adults. In fact, the opposite is true: SORA 2021 allows all juvenile registrants to petition for removal after 25 years, whereas Tier II and Tier III adults can never petition for removal.

For these reasons, Plaintiffs' equal protection claim based on registrants' unequal opportunity to petition for removal fails.

### D. Plea Agreements

Plaintiffs argue that SORA 2021 violates due process by retroactively changing the terms of plea agreements. Am. Compl. ¶¶ 789-797. Plaintiffs bring this claim on behalf of the plea bargain subclass, which is defined as "members of the primary class who gave up their right to trial and pled guilty to a registrable offense in Michigan and who, as a result of retroactive amendments to SORA, (a) were retroactively subjected to SORA even though there was no registration requirement at the time of their plea; or (b) had their registration terms retroactively extended beyond that in [*102] effect at the time of their plea." 5/18/22 Order at 3.

Plaintiffs argue that due process protects plea agreements in two ways: by requiring (i) defendants' waiver of constitutional rights to be knowing and voluntary and (ii) agreements with defendants to be fulfilled. Pls. Br. Supp. Mot. for Summ. J. at 48-49. According to Plaintiffs, "[b]y retroactively lengthening or imposing lifetime registration on people who reasonably expected no or shorter registration in return for pleading

2024 U.S. Dist. LEXIS 176146, *102

guilty, Michigan has changed the terms of plea deals." Id. at 52. Plaintiffs contend that this violates both due process protections afforded to plea agreements. Id. at 50.

However, the Court has now determined that SORA 2021 violates the _Ex Post Facto Clause_, which ruling will prohibit retroactive enforcement of amendments to SORA. This means that no plea agreements will be retroactively modified or go unfulfilled. It does not appear that any further finding need be reached with respect to this claim. This claim is therefore moot.

## E. Non-Sex Offenses

Plaintiffs make two arguments regarding non-sex offenses. Am. Compl. ¶¶ 798-808. First, Plaintiffs argue that the state cannot label someone as a sex offender, by including that person on [*103] a sex offender registry, unless that person's offense involved sex as an element or circumstance. Pls. Br. Supp. Mot. for Summ. J. at 53-55. Second, Plaintiffs argue that if the elements of an offense do not include a sexual element, then the offender has a right to a judicial determination regarding whether or not the circumstances of the offense involved sex. Id. at 55-57.

According to Plaintiffs, there are two situations where SORA 2021 requires registration for offenses without a sex element. Am. Compl. ¶¶ 799-801. The first is the "catch-all" provision, which requires registration for an offense "that by its nature constitutes a sexual offense against an individual who is a minor." Id. ¶ 800 (citing _Mich. Comp. L. § 28.722(r)(vii)_). For such offenses, the statute requires a judicial determination of whether the offense "by its nature constitute[d] a sexual offense." Id. (citing _Mich. Comp. L. § 769.1(13)_).[50] Plaintiffs do not challenge the constitutionality of this "catch-all" provision. Id. ¶ 801.

In addition, SORA 2021 requires registration for people convicted of certain offenses against minors, regardless of whether there is a sexual component to the crime. Id. ¶ 801.[51] For these offenses, registration is required

automatically. Plaintiffs argue that procedural due process [*104] requires a judicial determination that a person committed a sex offense before the state can brand them as a sex offender. Plaintiffs also argue that the current scheme—in which some non-sex offenders are provided a judicial determination whereas others are not—violates equal protection. Id. at 56-57.

Rather than responding to the merits of Plaintiffs' constitutional arguments, Defendants contend that Plaintiffs' claims are moot and that class-wide relief is not appropriate. Defs. Mot. for Summ. J. at 22-28. The Court disagrees.

### 1. Mootness

Defendants argue that Plaintiffs' claims are moot. Id. at 22-26. In _People v. Lymon, ___ N.W.3d ___, No. 164685, 2024 Mich. LEXIS 1439, 2024 WL 3573528 (Mich. July 29, 2024)_, the Michigan Supreme Court affirmed a Michigan Court of Appeals decision holding that requiring non-sex offenders to register under SORA 2021 violates Michigan's constitutional protection against cruel or unusual punishment.[52]

The parties agree that after the Michigan Court of Appeals decision in _Lymon_, the MSP created a procedure to remove certain offenders convicted of offenses without a sex element from the registry. Defs. SOMF ¶¶ 122-123; Pls. Resp. to Defs. SOMF ¶¶ 122-123. As part of this procedure, the MSP identified people registered based solely on a Michigan offense without a sex [*105] element. Defs. SOMF ¶ 122. The MSP notified the convicting courts, law enforcement agencies, prosecutors, affected registrants, and the Prosecuting Attorneys Association of Michigan that "[a]ffected registrants would be removed from the

---

[50] Plaintiffs note that "[t]he statutory cross-references to SORA in _MCL § 769.1(13)_ were not amended when SORA was amended, and thus refer to an older version of SORA." Am. Compl. ¶ 800 n.26.

[51] These offenses include: (i) kidnapping a minor (_Mich. Comp. L. § 750.349_); (ii) unlawful imprisonment of a minor (id. §

_750.349b_); (iii) leading away of child under 14 (id. _§ 750.350_); or (iv) a comparable out-of-state offense. Id. _§ 28.722(r)(iii), (r)(x), (v)(ii), v(iii), (v)(vii)_. Kidnapping a minor and leading away of a child under 14 constitute Tier III offenses, which require lifetime registration. Id. _§ 28.722(v)(ii)-(iii)_. Unlawful imprisonment of a minor is a Tier I offense, requiring 15-year registration. Id. _28.722(r)(iii)_.

[52] The Michigan Supreme Court vacated the Michigan Court of Appeals opinion "insofar as its conclusions went beyond the consideration of non-sexual offenders" but "affirm[ed] its judgment that defendant and other offenders whose crimes lacked a sexual component are entitled to removal from the sex-offender registry." _Lymon, 2024 Mich. LEXIS 1439, 2024 WL 3573528, at *17_.

registry unless the prosecutor provided information indicating that there was a sexual component to a registrant's crime." Id. ¶ 123. Prosecutors were given 90 days to decide whether the affected registrant must be required to register. Pls. SOMF ¶ 458 (citing Lymon Prosecutor Letter (Dkt. 128-7)). Prosecutors were told that their assessment should be based on whether the underlying offense conduct had a sexual component. Id. (citing Lymon Prosecutor Letter). This process resulted in the removal of all people registered based solely on a Michigan offense without a sex element, except for 14 individuals for whom the prosecutor determined that the offense was sexual in nature. Defs. SOMF ¶ 124.

Defendants argue that the MSP removed "nearly all" of the non-sex offense subclass from the registry in the wake of Lymon. Defs. Mot. for Summ. J. 24. Plaintiffs disagree and estimate that about 146 members of the non-sex offense subclass remain on the registry. [*106] Pls. SOMF ¶ 460 (citing Elbakr Decl. ¶¶ 7-12 (Dkt. 123-27); Class Data Report ¶ 24.d). The exact reason for the parties' disagreement is not clear. The parties agree that the MSP's process did not apply to people subject to SORA based on out-of-state convictions for offenses without a sex element. Pls. SOMF ¶ 459; Defs. Resp. to Pls. SOMF ¶ 459. They also agree that it did not apply to people with convictions for both a sex offense and an offense without a sex element.[53] Defs. SOMF ¶ 125; Pls. Resp. to Defs. SOMF ¶ 125. Defendants dispute Plaintiffs' claim that roughly 146 members of the non-sex offense subclass remain on the registry, but they do not explain the basis for their dispute or offer a different estimate. Defs. Resp. to Pls. SOMF ¶ 460.

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969). Here, at the very least, the parties agree that 14 individuals remain on the registry for offenses without a sex element. As Plaintiffs note, the Michigan Supreme Court in Lymon "had no reason to consider—and did not consider—what procedures should apply to determine who is a 'non-sex offender.'" Pls. Lymon [*107] Br. at 4. Therefore, the issue of whether these 14 individuals were afforded proper process constitutes a live issue for

the Court to decide.

## 2. Class-Wide Relief

Defendants also argue that class wide relief is not appropriate for the offenders convicted of offenses without a sex element who were not removed as a result of Lymon. Defs. Br. Supp. Mot. for Summ. J. at 27-28. Because there are "no longer questions of fact common to the class," Defendants contend that these registrants would have to file an independent lawsuit seeking relief under Lymon. Id. In response, Plaintiffs argue that "[t]he subclass is seeking common relief: a bar on registration absent a judicial determination that their offense was sexual in nature. Subclass members thus share a claim for procedural relief, even if the requested judicial determinations will result in varied outcomes." Pls. Reply at 22.

Plaintiffs are correct that a common claim regarding inadequate procedures is appropriate for class treatment. See, e.g., Barry v. Lyon, 834 F.3d 706, 721-722 (6th Cir. 2016) (finding that class certification was appropriate for a group of plaintiffs challenging Michigan's procedure for terminating food assistance benefits for persons with an outstanding felony warrant). [*108]

Because Plaintiffs' non-sex claim is not moot and is appropriate for class treatment, the Court turns to the merits of Plaintiffs' claim.

## 3. Merits of Plaintiffs' Non-Sex Claim

First, Plaintiffs argue that the state cannot label someone as a sex offender unless that person's offense involved sex. Pls. Br. Supp. Mot. for Summ. J. at 53-55. Defendants do not dispute this point, and for good reason. As already discussed, the Michigan Supreme Court recently held that requiring non-sexual offenders to register under SORA 2021 violates Michigan's constitutional protection against cruel or unusual punishment. Lymon, 2024 Mich. LEXIS 1439, 2024 WL 3573528, at *17. Multiple other courts have also held that requiring people to register as sex offenders when their offense did not involve sex violates substantive due process. See, e.g., ACLU of New Mexico v. City of Albuquerque, 2006- NMCA 078, 139 N.M. 761, 137 P.3d 1215 (N.M. Ct. App. 2006); People v. Bell, 3 Misc. 3d 773, 778 N.Y.S.2d 837 (N.Y. Ct. Sup. 2003); State v. Small, 162 Ohio App. 3d 375, 2005- Ohio 3813, 833

---

[53] Plaintiffs explain that "because the removal of the non-sex offense can affect a person's tiering (which controls both registration obligations and length of registration), some such class members may be entitled to reduced obligations or be entitled to removal if the registration term for their sex offense has run." Pls. Lymon Br. at 3 n.2 (Dkt. 155).