_N.E.2d 774 (Ohio Ct. App. 2005)_.

Second, Plaintiffs argue that the MSP's procedure violates procedural due process.[54] Pls. Br. Supp. Mot. to Dismiss. at 55-56. As mentioned earlier, procedural due process rights "protect individuals from deficient procedures that lead to the deprivation of cognizable liberty interests." _Bambach v. Moegle, 92 F.4th 615, 624 (6th Cir. 2024)_ (punctuation modified). The fundamental requirement of due process "is the opportunity to be heard at a meaningful time and in a meaningful [*109] manner." _Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)_ (punctuation modified). As explained by Plaintiffs, "[t]he MSP left it to prosecutors to decide whether registration should be required, based on their assessment of the alleged facts. There was no notice, no opportunity to be heard, and no judicial determination that the offense was sexual in nature." Pls. Lymon Br. at 2 (emphasis in original).

Multiple circuit courts that have considered the issue have held that persons who have never been convicted of a sex offense are entitled to procedural due process before being classified as a sex offender. See, e.g., _Renchenski v. Williams, 622 F.3d 315, 320-332 (3d Cir. 2010)_ (holding that defendant convicted of murder that involved a sexual component was entitled to "an effective but informal hearing" before being classified as a sex offender); _Coleman v. Dretke, 395 F. 3d 216, 221-225 (5th Cir. 2004)_ (holding that state was required to provide procedural protections before imposing sex offender registration on prisoner who was convicted of burglary of a habitation); _Kirby v. Siegelman, 195 F.3d 1285, 1290-1292 (11th Cir. 1999)_ (holding that a prisoner convicted of murder was entitled to due process before the state declared him to be a sex offender). This Court reaches the same conclusion.

---

[54] This due process argument is distinct from that rejected by the Supreme Court in _Conn. Dep't of Pub. Safety v. Doe (DPS), 538 U.S. 1, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003)_. As Plaintiffs explain, DPS "rejected a procedural due process claim because registration turned solely on whether the person had been convicted of a sex crime, a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest [b]y contrast, for a person who was not convicted of a sex crime, there is no prior adversarial proceeding (with due process protections) where it was determined that a sex crime was committed, and so procedural protections are required." Pls. Br. Supp. Mot. for Summ. J. at 55 (punctuation modified).

The MSP's procedure of relying on unilateral input from prosecutors does not afford individuals notice or any opportunity [*110] to be heard. Sex offender registration imposes a significant burden on registrants. Registration involves regular reporting and public disclosure of personal information and can impact a registrant's career and housing opportunities. For individuals convicted of offenses without a sex element, the harm that would come from being required to register as a sex-offender despite not committing a crime that was sexual in nature would be significant. Individuals have a right to provide input regarding that determination.

Individuals also have the right to a hearing before a neutral decisionmaker. See _Hicks v. Comm'r of Soc. Sec., 909 F.3d 786, 800 (6th Cir. 2018)_ (holding that "any time a citizen is deprived of notice of the factual basis for a governmental determination and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker, the risk of [an erroneous deprivation] is too high.") (punctuation modified). Unlike judges, prosecutors and police do not play a neutral role in our adversarial legal system. Allowing judges to make the final decision regarding an individual's registration requirements is the long-recognized way to reduce the risk of an erroneous deprivation of a constitutionally-protected interest.

As [*111] to the government's interest, it is not clear how much more burdensome requiring a judicial determination of whether an offense without a sex element was sexual in nature would be as compared to MSP's current procedures. Neither party offered an estimate of the costs or burdens associated with judicial review. But given the fact that judicial review is already the procedure employed for offenses falling under the "catch-all" provision, it seems likely that requiring judicial review for all offenses where sex is not an element would not be unduly burdensome.

The Court awards summary judgment to Plaintiffs on this claim. The specific form of judicial determination that must be afforded to people convicted of offenses without a sex element will be addressed at a later phase in this case.

## F. Non-Michigan Convictions

Plaintiffs argue that the MSP's process for registering people with non-Michigan convictions is unconstitutional because (i) registrants are not given notice or an

opportunity to be heard before being placed on the registry, in violation of due process; and (ii) people with out-of-state convictions are subjected to harsher treatment than people with Michigan convictions, in violation [*112] of equal protection.[55] Pls. Mot. for Summ. J. at 67-72. The Court agrees with Plaintiffs on both points.

Under SORA 2021, individuals with out-of-state convictions who live, work, or go to school in Michigan are required to register as sex-offenders in Michigan in two circumstances: (i) if they have been convicted of an offense that is "substantially similar" to a registrable Michigan offense, *Mich. Comp. L. § 28.722(r)(x), (t)(xiii), (v)(viii)*; and (ii) if they are required to register or otherwise be identified as a sex or child offender or predator under a comparable statute of another state, *id. § 28.723(1)(d)*. The parties agree that SORA does not define what it means for an offense to be substantially similar to a registrable Michigan offense. Pls. SOMF ¶ 544; Defs. Resp. to Pls. SOMF ¶ 544.

The process for deciding whether someone with a non-Michigan conviction must register under SORA—and if registration is required, at what tier—is currently handled by the Sex Offender Registry (SOR) Unit of the MSP. Pls. SOMF ¶ 536; Defs. Resp. to Pls. SOMF ¶ 536. In making this determination, SOR Unit staff may utilize flow charts approved by MSP's legal division. Pls. SOMF ¶ 537 (citing Jegla Dep. Tr. at 92-98, 146 (Dkt. 126-4), Beatty Dep. Tr. at [*113] 138-139 (Dkt. 126-1), MSP Flowcharts (Dkt. 127-10)); Defs. Resp. to Pls. SOMF ¶ 537 (citing Beatty Dep. Tr. at 137-140). The flow chart for out-of-state adult convictions asks whether there is a comparable Michigan conviction, whether the convicting state requires registration, whether the conviction was discharged on or after October 1, 1995, and whether the comparable Michigan offense, if there is one, would be a Tier III offense. MSP Flowcharts at PageID.6546.

To determine whether an out-of-state conviction has a comparable Michigan offense, SOR Unit staff utilize a spreadsheet listing more than 2,200 out-of-state offenses, 1,471 of which are assigned a SORA tier classification. Pls. SOMF ¶ 540 (citing PACC Code Chart (Dkt. 127-1), Jegla Dep. Tr. at 101, Elbakr Decl. ¶ 21); Defs. Resp. to Pls. SOMF ¶ 540. But only 43 offenses in the spreadsheet are assigned a "comparable Michigan code," which Defendants contend is because some out-of-state offenses have language that requires review on a case-by-case-basis. Pls. SOMF ¶ 541 (citing PACC Code Chart); Defs. Resp. to Pls. SOMF ¶ 541 (citing Morris Dep. Tr. at 149-152 (Dkt. 126-8)). Of those 43, only 18 are shown as "approved by MSP legal." [*114] Pls. SOMF ¶ 541 (citing PACC Code Chart).

MSP's legal advisor has admitted that different people can reach different conclusions about whether a given non-Michigan offense is "substantially similar" to a given Michigan offense. Pls. SOMF ¶ 545 (citing Beatty Dep. Tr. at 158, 186, 214-215); Defs. Resp. to Pls. SOMF ¶ 545 (citing Beatty Dep. Tr. at 157-160). It is also possible that a non-Michigan offense may be similar to multiple Michigan offenses. Pls. SOMF ¶ 545; Defs. Resp. to Pls. SOMF ¶ 545. Defendants explain that this is "because a non-Michigan offense may exist under a statute that has alternative elements." Defs. Resp. to Pls. SOMF ¶ 545 (citing Beatty Dep. Tr. at 157-160). Therefore, MSP must examine the facts of the non-Michigan offense to determine the basis for the conviction. *Id.* (citing Beatty Dep. Tr. at 157-160).

The Court agrees with Plaintiffs that the current procedure for determining whether people with out-of-state convictions should register under SORA is constitutionally deficient. As already explained, the fundamental requirement of procedural due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews, 424 U.S. at 333 (1976)* (punctuation modified). [*115] Under the MSP's current procedure, people with out-of-state convictions have no notice or opportunity to be heard before the MSP decides whether an individual must register.[56] And as

---

[55] Plaintiffs also argue that the treatment of people with out-of-state convictions violates the *Privileges and Immunities Clause, U.S. Const. art. IV, § 2, cl. 1*. See Pls. Br. Supp. Mot. for Summ. J. at 70-72. Because the Court holds that such treatment violates equal protection, the Court need not address Plaintiffs' alternate argument.

[56] Defendants admit that there is no hearing offered before an individual is required to register, but they argue that individuals can challenge registration determinations after they are made, and that individuals have made such challenges in the past. Defs. Resp. to Pls. SOMF ¶ 560 (citing Beatty Dep. Tr. at 225-236). But the process for challenging registration determinations, as they are described by MSP Legal Advisor Steven Beatty, are informal at best. See Beatty Dep. Tr. at 233 ("[I]f someone brings to our attention . . . a concern over a particular registration or obligation, the SOR Unit will typically look into that and then take whatever appropriate action is necessary. That's not to say that we have a published, 'if you believe,' blah, blah, blah. I think it's just implied."). This does

2024 U.S. Dist. LEXIS 176146, *115

Defendants admit, the decision is not a simple matter of mapping an offense to an identical Michigan offense. It can be fact-intensive, and different people can arrive at differing conclusions.

A meaningful opportunity to be heard includes the right to a hearing before a neutral decisionmaker. See *Hicks, 909 F.3d at 800*. The MSP does not fill that job description. It is not an independent and disinterested arbiter of the law. It is a law enforcement agency tasked with maintaining the registry. As with the determination of what constitutes a non-sex offense, allowing judges to make the final decision regarding an individual's registration requirements is the best way to protect the constitutional interests of that individual.

Neither party discussed how burdensome it would be to require a judicial determination of whether a person with a non-Michigan offense must register under SORA. But given that only 7% of current registrants, or 3,100 people, have convictions from another jurisdiction, the Court believes that the costs of [*116] providing judicial determinations will be outweighed by the benefits. Class Data Report ¶¶ 16, 36, 86. Individuals required to register as a result of Michigan offenses are afforded procedural due process when they are convicted. People with out-of-state convictions are afforded similar due process when they are convicted, but not when it is determined that they will be branded as a sex offender in Michigan, potentially for life. See *Kvech v. N.M. Dep't of Pub. Safety, 987 F. Supp. 2d 1162, 1214 (D.N.M. 2013)* (holding that a plaintiff convicted of a sex offense in Colorado was entitled to "notice of the charges, an opportunity to present witnesses and evidence in defense of those charges, and a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action" before being required to register in New Mexico).

The Court also finds that SORA's treatment of people with non-Michigan convictions violates equal protection with regard to certain disparities between Michigan and other states. Plaintiffs contend that SORA treats people with non-Michigan convictions more harshly than people with Michigan convictions in two ways.[57] Pls. Br. Supp.

Mot. for Summ. J. at 71; Pls. SOMF ¶¶ 552-553. First, people convicted of "substantially [*117] similar" out-of-state offenses must register for the duration required by Michigan or the adjudicating state, whichever is longer.[58] Pls. SOMF ¶ 552 (citing SORA Op. Proceds., 307, 315 (Dkts. 127-5, 127-9), Jegla Dep. Tr. ¶ 95, 135, 145, Morris Dep. Tr. at 143-144, Beatty Dep. Tr. at 145); Defs. Resp. to Pls. SOMF ¶ 552. Second, if an offense would not require registration in Michigan, but the offense requires registration in the convicting state, the person must register in Michigan.[59] Pls. SOMF ¶ 553 (citing MSP Flowcharts, Jegla Dep. Tr. at 94-99, Beatty Dep. Tr. at 140-141, 148); Defs. Resp. to Pls. SOMF ¶ 553. In such a case, the MSP assigns the tier and duration requirements applicable to the substantially similar Michigan offense. Id.

Defendants do not dispute that SORA treats people with non-Michigan convictions more harshly in these ways. Defs. Resp. to Pls. SOMF ¶¶ 552-553. Nor do Defendants offer any explanation or justification for the disparate treatment.[60] Instead, Defendants argue that

---

Because the Court holds that a judicial determination is required before an individual with an out-of-state conviction can be required to register, the Court need not address this argument.

[58] Plaintiffs offer the following example, which Defendants do not contest: "if the offense is 'substantially similar' to a Michigan 25-year offense, but the convicting state requires a longer period, Michigan will impose the convicting state's longer period." Pls. SOMF ¶ 552; Defs. Resp. to Pls. SOMF ¶ 552.

[59] Plaintiffs reference age-of-consent laws, which vary by state, as an example. Pls. SOMF ¶ 554. "A person required to register in another state for consensual sex with a 17-year-old would have to register in Michigan though the same act is legal in Michigan." Id. (citing Beatty Dep. Tr. at 150-151). Defendants do not dispute this example. Defs. Resp. to Pls. SOMF ¶ 554.

[60] In their response to Plaintiffs' statement of material facts, Defendants reference giving "full faith and credit" to the convicting state's laws. Defs. Resp. to Pls. SOMF ¶ 553. But this argument is not developed in their motion for summary judgment briefing, and Defendants do not explain how the *Full Faith and Credit Clause* is relevant to the treatment of people with out-of-state convictions. This passing reference is precisely the sort of argument that Courts deem waived. See *McPherson v. Kelsey, 125 F.3d 989, 996 (6th Cir. 1997)* ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put

---

not constitute a meaningful opportunity to be heard.

[57] In addition to these two theories, Plaintiffs also contend that people with non-Michigan convictions are treated more harshly than people with Michigan convictions because MSP staff use unproven allegations about offense conduct to make registration decisions for people with out-of-state convictions. Pls. Br. Supp. Mot. for Summ. J. at 71; Pls. SOMF ¶ 556.

2024 U.S. Dist. LEXIS 176146, *117

because rational-basis review applies, Plaintiffs bear "the burden of negating all possible rational justifications for the classification." Defs. Mot. for Summ. J. at 70 (citing *League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 536 (6th Cir. 2007)*).

While [*118] it is correct that "[a] statute will be considered constitutional under rational basis review if there is 'any reasonably conceivable set of facts that could provide a rational basis for' it the Supreme Court has nonetheless instructed that 'even in the ordinary equal protection case calling for the most deferential standards, we insist on knowing the relation between the classification adopted and the object to be obtained.'" *Doe v. Penn. Bd. of Prob. & Parole, 513 F.3d 95, 107 (3d Cir. 2008)* (citing *Fcc v. Beach Commc'ns, 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1992)*; *Romer v. Evans, 517 U.S. 620, 632, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996)*). Here, Defendants have offered no supposed relation between the classification and any particular objective. For this reason, Michigan's imposition of harsher registration terms on people with out-of-state convictions does not survive rational-basis review.

The Court awards summary judgment to Plaintiffs with respect to their non-Michigan convictions claim. The specific form of judicial determination that must be afforded to people with out-of-state convictions will be addressed at a later phase in this case.

### G. Compelled Speech

Plaintiffs argue that SORA 2021's reporting requirements compel their speech in violation of the *First Amendment* by (i) forcing Plaintiffs to provide certain personal information that they otherwise would not and (ii) "us[ing] the compelled [*119] information to widely disseminate a message that they are dangerous sex offenders"—a message with which they disagree. Pls. Br. Supp. Mot. for Summ. J. at 41-42.[61] According

flesh on its bones.") (punctuation modified).

[61] SORA 2021 requires registrants to report their legal names, aliases, social security numbers, birth dates, home addresses, employer names and addresses, telephone numbers, email addresses, internet identifiers, driver's license numbers, occupational licensing information, and physical descriptors. *See* Am. Compl. ¶ 365 (citing *Mich. Comp. L. § 28.727*). The online public registry website includes registrants': name, date of birth, registration number, photo, registration details, physical characteristics, known alias(es), scars, marks,

to Plaintiffs, SORA 2021's reporting requirements "force [Plaintiffs] to alter their own speech to assist the government in disseminating a message they believe to be false," and therefore, SORA 2021 is a "content-based regulation subject to strict scrutiny." Id. at 43.

Defendants contest this view. They argue that the reporting requirements are content-neutral because the SORA 2021's reporting regulations "make no reference to the content of speech," and therefore, are subject to intermediate scrutiny. Defs. Br. Supp. Mot. for Summ. J. at 45-46. In Defendants' view, SORA 2021's reporting requirements survive such scrutiny because the statute is narrowly tailored, serves a significant government interest, and leaves open ample alternatives for the communication of information. Id. at 47-48 (citing *Doe v. Lee, 518 F. Supp. 3d 1157, 1211 (M.D. Tenn. 2021)*).

As discussed below, the Court declines to adopt wholesale either of the positions advocated by the parties. The Court concludes that SORA 2021's disclosure requirements do not implicate the *First Amendment's* prohibition of compelled speech such that a heightened-scrutiny—i.e., [*120] either intermediate or strict scrutiny—analysis is required. However, even if the statute's disclosure requirements were to trigger heightened scrutiny, as Plaintiffs contend, such disclosure requirements would survive strict scrutiny.

### 1. Compelled Speech Under the *First Amendment*

The *First Amendment* protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard, 430 U.S. 705, 714, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977)*. "[O]utside [of the commercial] context [the government] may not compel affirmance of a belief with which the speaker disagrees . . . . this general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 573, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995)* (punctuation modified). Regulations "[m]andating speech that a speaker would not otherwise make necessarily alter[] the content of the speech" and are therefore content-based. *Riley v. Nat'l Fed'n of the Blind*

tattoos, offense information, address information, campus information, employment information, and vehicle information. *See* MSP, Sex Offender Registry FAQ, https://www.michigan.gov/msp/services/sex-offender-reg.

*of N.C., Inc., 487 U.S. 781, 795, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988)*. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, 576 U.S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015)*. Laws that are content-neutral, however, are subject to intermediate scrutiny. *Phelps-Roper v. Strickland, 539 F.3d 356, 361 (6th Cir. 2008)*.

To [*121] argue that SORA 2021 is a content-based regulation such that strict scrutiny applies, Plaintiffs rely on cases that fall roughly in two camps: (i) cases addressing regulations requiring dissemination of a particular message and (ii) cases addressing the regulations that impinge on associational rights.[62] As the Court discusses below, however, neither context applies readily to the sort of compelled-speech claim that Plaintiffs assert here.

In *Wooley,* the Supreme Court held that a New Hampshire law requiring license plates to show unobstructed the state's motto "Live Free or Die" violated the *First Amendment*. *Wooley, 430 U.S. 705*. In that case, the court explained that the *First Amendment* protects the right of individuals to "hold a point of view different from the majority" and found that the law effectively rendered private property a "mobile billboard for the State's ideological message . . . ." *Id. at 715*. Given the New Hampshire law's restriction on the appellants' speech rights, the court applied strict scrutiny, examining whether the state's interest was sufficiently compelling to justify the regulation.[63] *Id. at*

---

[62] See Pls. Br. Supp. Mot. for Summ. J. at 40-45. As to the cases involving regulations requiring the dissemination of messages, Plaintiffs cite *Wooley v. Maynard, 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977); Pacific Gas & Electric Co. (PG&E) v. Public Utilities Comm'n of Cal., 475 U.S. 1, 106 S. Ct. 903, 89 L. Ed. 2d 1 (1986); Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988); Nat'l Inst. of Family and Life Advocs. v. Becerra, 585 U.S. 755, 138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018)*. Plaintiffs rely on *Ams. for Prosperity Found. v. Bonta, 594 U.S. 595, 141 S. Ct. 2373, 210 L. Ed. 2d 716 (2021)*, which involved association rights under the *First Amendment*.

[63] Although *Wooley* did not employ the term "strict scrutiny" it nevertheless applied that analysis by determining whether New Hampshire's interests were "sufficiently compelling" and whether the means used to achieve that goal could be more "narrowly achieved." *Wooley, 430 U.S. at 715*.

715-716. The court found that New Hampshire's stated interests of facilitating identification of passenger vehicles and promotion of state history were [*122] not sufficiently compelling. *Id. at 716-717*. The court further reasoned that the state could achieve these goals through less restrictive means. Because the regulation did not meet the requirements of the heightened-scrutiny analysis, the Court held that the regulation violated appellees' *First Amendment* rights against compelled speech.

*Pacific Gas & Electric Co. (PG&E) v. Public Utils. Comm'n of Cal., 475 U.S. 1, 106 S. Ct. 903, 89 L. Ed. 2d 1 (1986)* reached a similar result. There, the Supreme Court invalidated a California utility commission order requiring the state's privately-owned utility provider, PG&E, to include in its billing envelopes political editorials of a third-party interest group, with which PG&E disagreed. The Court reasoned that, because the commissioner's order "required [PG&E] to assist in disseminating [the third party's] views" the commissioner's order violated PG&E's "right to be free from government restrictions that abridge its own rights in order to enhance the relative voice of its opponents." *Id. at 14* (punctuation modified). Finding that the commission order was not narrowly tailored to support a compelling state interest, the court held the order invalid under the *First Amendment*. *Id.* at 20.

Plaintiffs also rely on *Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 798, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988)* which held unconstitutional North Carolina's regulation requiring professional charity fundraisers [*123] to disclose to potential donors the percentage of contributions collected during the previous year that were actually given to charity. Because the regulation "mandat[ed] speech that a speaker would not otherwise make," the regulation was content-based and subject to "exacting *First Amendment* scrutiny."[64] *Riley, 487 U.S. at 795*. Notably, the court rejected the state's argument that the regulation did not burden a speaker's right under the *First Amendment* because the regulation required statements of opinion, rather than fact. *Id. at 797-798*. In applying "exacting scrutiny," the court found that (i) the state's asserted interest of informing charitable donors how the charities spend donated funds was not "as weighty" as the state asserted and (ii) the disclosure

---

[64] The "exacting scrutiny" standard under *Riley* required the regulation to be narrowly tailored to the state's asserted interest. See *Riley, 487 U.S. at 787-794*.

rule was not sufficiently tailored because the state could have achieved the same goal via narrower means, such as by publishing charities' financial disclosure forms. *Id. at 798-800*. The court accordingly held that the regulation compelled speech in violation of the *First Amendment*. Id.

Plaintiffs also cite *Nat'l Inst. of Family and Life Advocs. v. Becerra, 585 U.S. 755, 138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018)*, which held that a law requiring clinics that serve pregnant women to notify clients that California provides low-cost services—including abortions— violated the *First Amendment*. As the court explained, by requiring the clinics [*124] to "provide a government-drafted script," the regulation "alter[ed] the content" of the clinics' speech, and therefore, was subject to strict scrutiny. *Id. at 766-767*. The court held that the notice did not survive strict scrutiny because the notice was "not sufficiently drawn" to achieve the state's purpose of providing low-income women with information about state-sponsored services. *Id. at 773*. Viewing the disclosure as furthering the goal of educating women about health care services the state provides, the notice requirement was "wildly underinclusive" in that it applied only to family-planning clinics. *Id. at 774*. The court further noted that the same goal could be achieved without burdening a speaker with unwarranted speech via a public-information campaign or other public postings. *Id. at 775*. Because the regulation was not narrowly tailored to the government's asserted goal, it failed to survive strict scrutiny.

Here, Plaintiffs' fail to establish that SORA 2021's registration requirements constitute compelled speech such that the statute must survive strict scrutiny. As an initial matter, unlike the challenged provisions in *Wooley, Pacific Gas, Riley,* and *Becerra*, SORA 2021 does not require registrants to disseminate [*125] a message. The message—whatever it might be—is being disseminated by the state. This alone distinguishes the present case from the cases cited by Plaintiffs.

Further, case law does not establish that Plaintiffs' supplying of information to MSP constitutes Plaintiffs' "support" of the message. None of Plaintiffs' cases involved a compelled-speech claim based on the mere disclosure of factual information that is later publicized by the state. As discussed below, such disclosures that assist essential government operations do not violate the *First Amendment*. SORA 2021 bears little resemblance to regulations compelling individuals to disseminate government messaging.

Plaintiffs are no better served by their reliance on compelled disclosure cases in the context of the right to associate. See Pls. Br. Supp. Mot. for Summ. J. at 43. Plaintiffs chiefly rely on *Ams. for Prosperity Found. v. Bonta, 594 U.S. 595, 141 S. Ct. 2373, 210 L. Ed. 2d 716 (2021)*. In that case, the court invalidated California's regulatory requirement that charities disclose to the state their top donors, donor addresses, and contributions. The court evaluated the regulation as a burden on charities' right to associate with others. *Id. at 605-606*. As the court explained, "'compelled disclosure of affiliation with groups engaged in advocacy may constitute [*126] as effective a restraint on freedom of association as [other] forms of governmental action.'" *Id. at 606* (quoting *NAACP v. Patterson, 357 U.S. 449, 462, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958)*).[65]

Here, Plaintiffs' compelled-speech claim does not involve the sort of associational rights at issue in *Bonta*. Although Plaintiffs vaguely assert that that registration requirements "implicate" their ability to associate, Pls. Br. Supp. Mot. for Summ. J. at 47 n.22, they fail to explain how registration requirements burden their associational rights for purposes of speech. See *Hartwell v. Houghton Lake Cmty. Schs., 755 Fed. Appx. 474, 477 (6th Cir. 2018)* (punctuation modified) (explaining that the *First Amendment* implicitly protects "the right to associate for the purpose of speaking"). To the extent Plaintiffs contend that their inclusion on the registry burdens their ability to form relationships, such allegations do not give rise to a *First Amendment* claim. *Doe v. Lee, No. 3:21-cv-00028, 2021 U.S. Dist. LEXIS*

---

[65] Contrary to Plaintiffs' briefing, Bonta declined to apply strict scrutiny in this context. It explained that the compelled disclosures are subject to a lesser, but still "exacting scrutiny," which Bonta defined as a "substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Bonta, 594 U.S. at 607* (punctuation modified). Notably, the court rejected the argument that the lesser "exacting scrutiny" standard should be applied only in the context of election-related disclosures, explaining: "[r]egardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *Id. at 608*. Applying exacting scrutiny, the court reasoned that although California had an important interest in preventing fraud by charities, the disclosure regime was overbroad. It noted that California's disclosure regulation failed to produce a "single, concrete instance" of advancing the state attorney general's fraud enforcement efforts. *Id. at 613*. Given the mismatch between the amount of information required by the disclosure regime and its limited utility, the court concluded that the regime failed to survive exacting scrutiny. *Id. at 614-615*.

2024 U.S. Dist. LEXIS 176146, *126

90631, 2021 WL 1907813, at *18 (M.D. Tenn. May 12, 2021) ("There is simply no ground for concluding, under current caselaw, that an accurate government record that reflects poorly on a person, in and of itself, gives rise to a plausible association-based claim.").

In short, the claims at issue in Plaintiffs' cited case law are distinguishable from the claim asserted by Plaintiffs here. Plaintiffs have not established that SORA 2021's reporting requirements implicate their *First Amendment* rights against [*127] compelled speech; therefore, heightened scrutiny is not applicable.[66]

As the Court discusses below, courts have rejected compelled-speech claims related to sex-offender registry requirements.

In *United States v. Arnold, 740 F.3d 1032 (5th Cir. 2014)*, the Fifth Circuit held that federal SORNA's registration requirements did not compel speech in violation of the *First Amendment*. The court did not characterize the plaintiff's claim as being subject to any form of heightened scrutiny. Instead, it reasoned that the plaintiff's speech had not been compelled in a manner that violates the *First Amendment*. While it acknowledged that the *First Amendment* "protects the right to remain silent," the court further noted that "[t]here is no right to refrain from speaking when essential operations of government require it for the preservation of an orderly society " *Id. at 1034-1035* (quoting *United States v. Sindel, 53 F.3d 874, 878 (8th Cir.1995)* (rejecting claim that compelled disclosure of information on IRS form was compelled speech)). Because the court viewed SORNA's registration requirements as a function of the "essential operation of the government," similar to requiring disclosures of information for tax collection, SORNA's registration requirements did not unlawfully compel the plaintiff's speech. *Id. at 1035*.

Other courts have similarly recognized that disclosures

made [*128] in furtherance of "essential operation[s]" of government do not implicate the *First Amendment's* prohibition of compelled speech. See, e.g., *Full Value Advisors, LLC v. S.E.C., 633 F.3d 1104, 1108-1109, 394 U.S. App. D.C. 204 (D.C. Cir. 2011)* (holding that SEC rules requiring institutional investment managers to disclose "among other things, the names, shares, and fair market value of the securities over which the institutional managers exercise control" was "indistinguishable from oft unnoticed forms of disclosure the Government requires for its 'essential operations'"); *Sindel, 53 F.3d at 878* (explaining that "[t]here is no right to refrain from speaking when essential operations of government may require it for the preservation of an orderly society[]—as in the case of compulsion to give evidence in court") (punctuation modified); *Morales v. Daley, 116 F. Supp. 2d 801, 816 (S.D. Tex. 2000)* (holding that government requirement that plaintiffs classify themselves by racial categories for purposes of the census did not implicate *First Amendment* right against compelled speech).

The Court adopts the Fifth Circuit's approach set forth in *Arnold*. SORA 2021's reporting requirements are in furtherance of the State of Michigan's essential operation of operating the sex offender registry website. The law does not require that Plaintiffs speak a particular message, nor does it burden Plaintiffs' associational [*129] rights. SORA 2021, therefore, does not implicate Plaintiffs' *First Amendment* rights against compelled speech.

## 2. SORA 2021 Reporting Requirements and Strict Scrutiny

While the Court concludes that SORA 2021 does not implicate Plaintiffs' *First Amendment* rights against compelled speech such that the statute is subject to heightened scrutiny, the Court recognizes that other courts have nonetheless proceeded to scrutinize sex offender registration requirements under strict scrutiny. See *United States v. Doby, No. 18-cr-40057, 2019 U.S. Dist. LEXIS 193881, 2019 WL 5825064, at *3 (D. Kan. Nov. 7, 2019)* (concluding that, "to the extent [federal SORNA] compels speech, it passes strict scrutiny") (punctuation modified); *United States v. Fox, 286 F. Supp. 3d 1219, 1222-1224 (D. Kan. 2018)* (following *Arnold* and proceeding to find that the federal SORNA statute's reporting requirements survived strict scrutiny). Even if SORA's 2021 disclosure requirements did compel speech such that strict scrutiny applied, the Court finds that SORA 2021 withstands scrutiny.

---

[66] In addition to *Bonta*, Plaintiffs also cite *Brown v. Socialist Workers '74 Campaign Comm., 459 U.S. 87, 103 S. Ct. 416, 74 L. Ed. 2d 250 (1982)*; *NAACP v. Patterson, 357 U.S. 449, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958)*; *Buckley v. Valeo, 424 U.S. 1, 74, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)*; *Shelton v. Tucker, 364 U.S. 479, 81 S. Ct. 247, 5 L. Ed. 2d 231 (1960)*, Pls. Br. Supp. Mot. for Summ. J. at 43 n.19. These cases are not applicable to Plaintiffs' claims here because they address the validity of disclosure requirements under *First-Amendment* association rights, which, as discussed, are not implicated by SORA 2021's disclosure requirements.

To survive strict scrutiny, the government must prove that the restriction (i) furthers a compelling interest and (ii) is narrowly tailored to achieve that interest. _Reed v. Town of Gilbert, 576 U.S. 155, 171, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015)_. SORA 2021 satisfies both prongs of the analysis.

As to the first prong—the asserted interest—Defendants assert that SORA 2021's intent is to "assist law enforcement officers and the people of this state in preventing and protecting [*130] against the commission of future criminal sexual acts by convicted sex offenders." Defs. Br. Supp. Mot. for Summ. J. at 48 (citing _Mich. Comp. L. § 28.721a_). Plaintiffs agree that such an interest is sufficiently compelling, acknowledging that the state has a "strong interest in preventing sexual recidivism." Pls. Br. Supp. Mot. for Summ. J. at 46. SORA 2021's registration requirements serve a compelling government interest.

Turning to the second prong—tailoring—Defendants argue that SORA 2021's registration requirements are narrowly tailored because they "efficiently and effectively provide[] all the relevant information that the people of Michigan need to know to prevent and protect against the potential commission of future criminal sexual acts." Defs. Br. Supp. Mot. for Summ. J. at 49-50.

The Court agrees with Defendants that the reporting requirements are narrowly tailored. The viability of a registry system depends on the ability—of the public or law enforcement—to use the information provided on the registry to accurately locate and identify registrants to protect against future sex crimes. For this reason, courts analyzing the validity of sex offender registry disclosure requirements under the _First Amendment_ have [*131] repeatedly found that such disclosure requirements survive strict scrutiny. _Fox, 286 F. Supp. 3d at 1224_ (explaining that federal SORNA's disclosure requirements—which include name, social security number, certain addresses registrants frequent, and international travel plans—satisfied strict scrutiny because such information "provide[d] the public and state law enforcement officials with the necessary information to track [registrants] effectively"); _Doby, 2019 U.S. Dist. LEXIS 193881, 2019 WL 5825064, at *4_ (relying on the reasoning provided in _Fox_ to find that federal SORNA is narrowly tailored).

Like the required disclosures in _Fox_ and _Doby_, the disclosures required under SORA 2021 serve the purpose of tracking registrants for protective purposes.

Specifically, registrants are required to disclose information regarding their (i) identity (names/aliases, conviction summaries), (ii) appearance (photograph, weight, hair and eye color, tattoos) and (iii) location (address, associated vehicle information, employer and/or school address). Each of these categories serves the purpose of empowering members of the public to identify registrants and take appropriate precautions to protect themselves.

Notably, SORA 2021's disclosure requirement mirrors the sort of regime endorsed by the Supreme [*132] Court in _Riley_. As the court explained in that case, "as a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file [with the State]. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation." _Riley, 487 U.S. at 800_. Here, SORA 2021 adopts this same approach in that the state publicizes the disclosure information it requires from registrants through its public sex offender registry website.

Plaintiffs counter that SORA 2021's registration requirements are not narrowly tailored because (i) "registries nor reporting requirements reduce recidivism," (ii) registrants are not subject to individualized risk reviews, so SORA's speech burdens are not limited to those who may pose a risk, and (iii) in-person reporting requirements "have no relationship to public safety at all." Pls. Br. Supp. Mot. for Summ. J. at 47. None of these arguments has merit.

Plaintiffs' first and second arguments fail for the same reason: even if SORA does not reduce recidivism and includes some convicted offenders who no longer post a risk, the statute's compelling interest is not [*133] limited to that goal. As noted above, an asserted goal of SORA is to assist the public in protecting themselves against future sexual crimes. The registry's disclosure requirements provide a narrow means of accomplishing that goal.[67] And while the requirement that Plaintiffs report some information in person does impose a burden on Plaintiffs, they fail to explain how that requirement impinges on their speech rights. _Id._

---

[67] Although Plaintiffs also aver that much of the information on the registries is available to law enforcement through other sources, Pls. Br. Supp. Mot. for Summ. J. at 46; Pl. SOMF ¶ 447, the same cannot be said for the general public, who would not have the access or ability to obtain the same information made available on the public registry.

2024 U.S. Dist. LEXIS 176146, *133

Plaintiffs also rely on _State v. Hill, 341 So. 3d 539 (La. 2020)_ and _Doe 1 v. Marshall, 367 F. Supp. 3d 1310, 1318 (M.D. Ala. 2019)_ to argue that the registration requirements do not survive strict scrutiny. Pls. Br. Supp. of Mot. Summ. J. at 45. Both cases are distinguishable, however, because they did not involve challenges to the reporting aspect of the applicable sex offender laws.

In _Hill_, the Louisiana Supreme Court held that a statute requiring convicted sex offenders to carry an identification card branded "sex offender" was not narrowly tailored because the state could have adopted another "symbol, code, or . . . letter designation" to inform law enforcement of an individual's sex-offender status. _Hill, 341 So. 3d at 553_. Importantly, the court found that the regulation was overbroad because the state already had in place a "sex offender registry" and "notification [was] available to those [*134] who have a need to seek out that information, while also not unnecessarily requiring disclos[ure] [of] that information to others via a branded identification." _Id._

_Marshall_ reached a similar result. In that case, the district court assessed whether Alabama's statute requiring convicted sex offenders to carry an ID reading "CRIMINAL SEX OFFENDER" survived strict scrutiny. _Marshall, 367 F. Supp. 3d at 1324-1327_. The court found that the statute lacked tailoring because was not the least restrictive means—i.e., the ID could have "use[d] a single letter to designate sex offenders." _Id. at 1326-1327_.

SORA 2021's registration requirements bear no resemblance to the branded-ID cards at issue in _Hill_ and _Marshall_. SORA 2021 does not require registrants to carry IDs or otherwise broadcast such a state-sponsored message.[68] Neither case supports the proposition that sex offender registry reporting requirements—which are essential to the functioning of a public registry—are not narrowly tailored to furthering the goal of empowering the public to protect themselves against future sexual crimes by convicted offenders.

SORA 2021's reporting requirements do not compel

---

[68] Federal SORNA does require that sex offenders' passports contain a unique identifier. _See 22 U.S.C § 212b_. ("Except as provided under _paragraph (2)_, the Secretary of State shall not issue a passport to a covered sex offender unless the passport contains a unique identifier, and may revoke a passport previously issued without such an identifier of a covered sex offender.").

speech in a manner that implicates Plaintiffs' _First Amendment_ rights because they are in furtherance of an essential [*135] government operation—i.e., maintenance of the registry. To the extent the registration requirements do compel speech, these requirements do not violate the _First Amendment_ because they are narrowly tailored to serve a compelling interest of allowing the public to protect themselves against future sexual crimes committed by committed sex offenders. Defendants are entitled to summary judgment on Plaintiffs' compelled-speech claim.

### H. Forced Admission of Understanding

Plaintiffs allege that SORA 2021 violates the _First Amendment_ by requiring them to sign a form attesting: "I [the registrant] understand my registration duties." Pls. Br. Supp. Mot. Summ. J. at 61 (citing Explanation of Duties Form (Dkt. 126-17), Mail-in Update Form (Dkt. 126-18)). Plaintiffs assert that they are compelled, under threat of prosecution, to state that they understand SORA 2021's registration requirements even if that is not true. _Id._

Turning to the relevant statutory provisions, SORA 2021 provides that a registrant "shall sign a registration and notice . . . ." _Mich. Comp. L. § 28.727(4)_. An "individual who willfully fails to sign a registration and notice as provided in [§ 28.727(4)] is guilty of a misdemeanor punishable by imprisonment . . . or a fine . . . ." _Id. § 28.729(3)_. Although SORA 2021's [*136] statutory language does not require that Plaintiffs' attest to understanding their registration requirements, the registration and notice form that Plaintiffs are required to sign provides: "I [the registrant] understand my registration duties." Explanation of Duties Form at PageID.6208. The form reiterates the registrant's obligation to sign the form, providing: "I am required to sign the required registration form(s). Failure to sign the required registration form(s) is a misdemeanor and may result in criminal prosecution." _Id._ at PageID.6206.

### 1. Applicable Scrutiny

Plaintiffs argue that strict scrutiny applies. Pls. Br. Supp. Mot. for Summ. J. at 61-62. Defendants, on the other hand, presume that intermediate scrutiny applies. Defs. Br. Supp. Mot. for Summ. J. at 50-51. Neither party cites case law squarely addressing the sort of claim that

him guilty under a sexually violent predator specification. (*Id.*) Thereafter, the trial court sentenced Petitioner to life in prison with eligibility for parole after thirty years and classified him as a Tier III sex offender. (*Id.*, PAGEID # 91-92.)

On direct appeal, the Fifth District Court of Appeals described the evidence against Petitioner as follows:

On the morning of September 26, 1998, Robert Kremer drove to the Dillon State Park hunting area in Nashport, Ohio to do some groundhog hunting. As he drove down a gravel access road into the park, he came upon a half-naked, blood-soaked woman standing in a field off the side of the road. Kremer stopped, grabbed a blanket in his truck and approached the woman.

Kremer observed the woman was bleeding profusely from a horrible injury on the top of her head. She was shaking, appeared to be in shock, and could only say "help." Kremer wrapped the blanket around the woman and attempted to call 911, but had no cell phone reception. He put the woman into his truck, drove back to the main road and tried again. Unsuccessful, Kremer drove further up the road to a home and asked the occupants to phone for help.

Muskingum County [*4] Sheriff's Office Lieutenant Franklin Pete Fisher arrived on the scene at approximately 9:30 a.m. to find the bloodied woman seated in Kremer's truck, wrapped in the blanket and otherwise wearing nothing but a t-shirt and one sock. He attempted to speak to the woman, but she was incoherent. Fisher could not even determine her name. Detective Steve Welker arrived second on the scene, and then Natural Resource Officer Mike Reed. Welker stayed with the woman to await an ambulance while Fisher and Reed followed Kremer back to where he found the woman.

The men searched the area where the woman was found. Fisher eventually located a pile of clothing — jeans, tennis shoes and underwear. Leading up to the area where the clothing was found, he additionally found bloody drag marks on the ground and a pool of blood. Fischer called for an evidence technician to process the scene.

Meanwhile, Detective Welker accompanied the woman to Good Samaritan Hospital. Once there he could see she had a serious head injury. Her skull was visible in several places. She also had other injuries over her entire body which Welker photographed. Although she was in and out of consciousness, Welker eventually got the [*5] woman's name, J.M., a phone number for her aunt, and the fact that she had been physically and sexually assaulted by one person.

Nurse Vickie Bell completed a rape kit on J.M. that morning which was later transferred to the Bureau of Criminal Investigations (BCI) for testing. She completed the appropriate steps and collected the appropriate samples.

J.M.'s aunt, T.H., arrived at the emergency room and spoke with law enforcement. She advised that J.M. had been out with her friend Ricky Allen the evening before and that detectives should speak with him. J.M.'s mother wanted Allen arrested because before J.M. went into surgery, she told her mother Allen had done this. Later, however, J.M. told her aunt John Iden had done this to her. T.H. passed this information on to law enforcement.

J.M.'s injuries were extensive, and potentially fatal. She was seen in the emergency room by a neurosurgeon, Dr. Michael Bruce Shannon. J.M had linear lacerations to her face, neck and extremities. These were torn-tissue lacerations as opposed to cut lacerations, some of which required sutures. J.M. additionally had bruises and linear abrasions on her arms, legs and buttocks consistent with the drag marks observed [*6] by Fischer at the scene. She also suffered a posterior depressed skull fracture. Shannon opined these injuries were inflicted, and not caused by a fall or other accident. He further opined J.M. had been held down, partially strangled, and that she had attempted to fight off her attacker.

Dr. Shannon performed the surgery to repair J.M.'s skull. He removed debris and bone fragments and repaired a tear in the dura, the thick protective membrane encasing the brain, and from which spinal fluid was leaking. He then closed the scalp. J.M later required 2 additional surgeries. One when the bones in her skull became infected, and a second to repair the defect in her skull and add a skin graft to close the area. J.M. was left permanently scarred.

J.M.'s brain injury may have been more severe had she not been hypothermic upon arrival in the emergency room. Still, the portion of J.M.'s brain that was injured impacted speech, understanding, and both short and long-term memory. These deficits are permanent. J.M was unable to recall the event that left her with life-threatening injuries.

A few days after arriving at the hospital, J.M. was also seen by gynecologist Dr. John Lepi. Lepi's vaginal [*7] exam revealed a half-inch tear at J.M.'s posterior fourchette, the area between her vagina and rectum. The tear had begun to heal on its own. Dr. Lepi further observed on the right side of J.M.'s vagina, and to the right of her cervix, an area of denuded epithelium. In other words, the inside surface layer of the vagina had been abraded. Lepi explained this was indicative of some type of forced entry which would not occur with normal intercourse.

The subsequent investigation in to this matter revealed that J.M. was at her neighbor's house around 12:30 a.m. where Ricky Allen was also visiting. When Allen said he was leaving to go to a bar, J.M. asked if she could ride along. The two went to a bar called the Lighthouse and split up. Later, while Allen was dancing, J.M. approached and introduced him to a man Allen believed she had picked up — Iden. She told Allen that they were leaving and Iden would give her a ride home.

Allen got home around 3:30 a.m. Later that day, he discovered Detective Stutes of the Muskingum County Sheriff's Department wanted to talk to him about J.M. Allen spoke with Stutes, and cooperated fully. He told Stutes what he knew and permitted Stutes to search his car [*8] and seize the clothing he had been wearing the evening before. Later testing of these items revealed nothing of evidentiary value. Presented with a photo array, Allen identified Iden as the man J.M. left the Lighthouse with.

Detective Stutes was able to speak with J.M on September 28, 1998, even though she was in critical condition. She identified her attacker as "Mark," said she worked with him at Union Tools, and that he had given her a ride to and from work a few times. She also recalled he drove a white Ford Tempo. She told Stutes that he had been to the Lighthouse, City Limits, and Beach Ridge bars. She had no recollection, however, of events from the time she left the Beach Ridge until she woke up in the hospital.

Following up on this information, detectives retraced J.M.'s travels on the night in question. They spoke with Lighthouse bartender Darlena Compton, who stated J.M. is her cousin and that she saw J.M. at the Lighthouse in the early morning hours of September 26, 1998. Compton stated J.M. arrived with Ricky Allen, but left with John Iden. Compton had not met Iden before that evening,

him guilty under a sexually violent predator specification. (*Id.*) Thereafter, the trial court sentenced Petitioner to life in prison with eligibility for parole after thirty years and classified him as a Tier III sex offender. (*Id.*, PAGEID # 91-92.)

On direct appeal, the Fifth District Court of Appeals described the evidence against Petitioner as follows:

On the morning of September 26, 1998, Robert Kremer drove to the Dillon State Park hunting area in Nashport, Ohio to do some groundhog hunting. As he drove down a gravel access road into the park, he came upon a half-naked, blood-soaked woman standing in a field off the side of the road. Kremer stopped, grabbed a blanket he had in his truck and approached the woman.

Kremer observed the woman was bleeding profusely from a horrible injury on the top of her head. She was shaking, appeared to be in shock, and could only say "help." Kremer wrapped the blanket around the woman and attempted to call 911, but had no cell phone reception. He put the woman into his truck, drove back to the main road and tried again. Unsuccessful, Kremer drove further up the road to a home and asked the occupants to phone for help.

Muskingum County [*4]  Sheriff's Office Lieutenant Franklin Pete Fisher arrived on the scene at approximately 9:30 a.m. to find the bloodied woman seated in Kremer's truck, wrapped in the blanket and otherwise wearing nothing but a t-shirt and one sock. He attempted to speak to the woman, but she was incoherent. Fisher could not even determine her name. Detective Steve Welker arrived second on the scene, and then Natural Resource Officer Mike Reed. Welker stayed with the woman to await an ambulance while Fisher and Reed followed Kremer back to where he found the woman.

The men searched the area where the woman was found. Fisher eventually located a pile of clothing — jeans, tennis shoes and underwear. Leading up to the area where the clothing was found, he additionally found bloody drag marks on the ground and a pool of blood. Fischer called for an evidence technician to process the scene.

Meanwhile, Detective Welker accompanied the woman to Good Samaritan Hospital. Once there he could see she had a serious head injury. Her skull was visible in several places. She also had other injuries over her entire body which Welker photographed. Although she was in and out of consciousness, Welker eventually got the [*5]  woman's name, J.M., a phone number for her aunt, and the fact that she had been physically and sexually assaulted by one person.

Nurse Vickie Bell completed a rape kit on J.M. that morning which was later transferred to the Bureau of Criminal Investigations (BCI) for testing. She completed the appropriate steps and collected the appropriate samples.

J.M.'s aunt, T.H., arrived at the emergency room and spoke with law enforcement. She advised that J.M. had been out with her friend Ricky Allen the evening before and that detectives should speak with him. J.M.'s mother wanted Allen arrested because before J.M. went into surgery, she told her mother Allen had done this. Later, however, J.M. told her aunt John Iden had done this to her. T.H. passed this information on to law enforcement.

J.M.'s injuries were extensive, and potentially fatal. She was seen in the emergency room by a neurosurgeon, Dr. Michael Bruce Shannon. J.M had linear lacerations to her face, neck and extremities. These were torn-tissue lacerations as opposed to cut lacerations, some of which required sutures. J.M. additionally had bruises and linear abrasions on her arms, legs and buttocks consistent with the drag marks observed [*6]  by Fischer at the scene. She also suffered a posterior depressed skull fracture. Shannon opined these injuries were inflicted, and not caused by a fall or other accident. He further opined J.M. had been held down, partially strangled, and that she had attempted to fight off her attacker.

Dr. Shannon performed the surgery to repair J.M.'s skull. He removed debris and bone fragments and repaired a tear in the dura, the thick protective membrane encasing the brain, and from which J.M.'s spinal fluid was leaking. He then closed the scalp. J.M later required 2 additional surgeries. One when the bones in her skull became infected, and a second to repair the defect in her skull and add a skin graft to close the area. J.M. was left permanently scarred.

J.M.'s brain injury may have been more severe had she not been hypothermic upon arrival in the emergency room. Still, the portion of J.M.'s brain that was injured impacted speech, understanding, and both short and long-term memory. These deficits are permanent. J.M. was unable to recall the event that left her with life-threatening injuries.

A few days after arriving at the hospital, J.M. was also seen by gynecologist Dr. John Lepi. Lepi's vaginal [*7]  exam revealed a half-inch tear at J.M.'s posterior fourchette, the area between her vagina and rectum. The tear had begun to heal on its own. Dr. Lepi further observed on the right side of J.M.'s vagina, and to the right of her cervix, an area of denuded epithelium. In other words, the inside surface layer of the vagina had been abraded. Lepi explained this was indicative of some type of forced entry which would not occur with normal intercourse.

The subsequent investigation in to this matter revealed that J.M. was at her neighbor's house around 12:30 a.m. where Ricky Allen was also visiting. When Allen said he was leaving to go to a bar, J.M. asked if she could ride along. The two went to a bar called the Lighthouse and split up. Later, while Allen was dancing, J.M. approached and introduced him to a man Allen believed she had picked up — Iden. She told Allen that they were leaving and Iden would give her a ride home.

Allen got home around 3:30 a.m. Later that day, he discovered Detective Stutes of the Muskingum County Sheriff's Department wanted to talk to him about J.M. Allen spoke with Stutes, and cooperated fully. He told Stutes what he knew and permitted Stutes to search his car [*8]  and seize the clothing he had been wearing the evening before. Later testing of these items revealed nothing of evidentiary value. Presented with a photo array, Allen identified Iden as the man J.M. left the Lighthouse with.

Detective Stutes was able to speak with J.M on September 28, 1998, even though she was in critical condition. She identified her attacker as "Mark," said she worked with him at Union Tools, and that he had given her a ride to and from work a few times. She also recalled he drove a white Ford Tempo. She told Stutes that she had been to the Lighthouse, City Limits, and Beach Ridge bars. She had no recollection, however, of events from the time she left the Beach Ridge until she woke up in the hospital.

Following up on this information, detectives retraced J.M.'s travels on the night in question. They spoke with Lighthouse bartender Darlena Compton, who stated J.M. is her cousin and that she saw J.M. at the Lighthouse in the early morning hours of September 26, 1998. Compton stated J.M. arrived with Ricky Allen, but left with John Iden. Compton had not met Iden before that evening,

Count six, kidnapping with sexual motivation, a felony of the first degree. This count contained a sexual motivation specification and a sexually violent predator specification.

Iden pled not guilty to the charges and elected to proceed to a jury trial.

Before trial, on July 2, 2018, the state filed a notice of intent to introduce prior bad acts. In this motion the state outlined anticipated testimony from nine women Iden had sexually assaulted in similar, albeit in less violent [*15] fashion, in his car and in the same State Park or nearby rural area between 1994 and 1999. At trial, counsel for Iden objected to presentation of testimony from any of the women, but the trial court granted the motion over Iden's objection. The state ultimately presented testimony from five women, A.T., M.C., R.F.S., C.O., and T.K.M., all of whom testified Iden forced them to engage in sexual intercourse against their will, in his car, and in the Dillon State Park area.

The state further presented evidence from Iden's ex-wife, J.W., who testified they would go to the Dillon State Park area to have sex while they were dating.

J.M. testified as well, stating she recalled the evening of September 25-26, 1998, up until closing at the Beach Ridge Lounge. She does not recall leaving the Beach Ridge, nor anything that happened thereafter until she woke up in the hospital. She further had no recollection of anything she told law enforcement officials or anyone else immediately thereafter.

After hearing all the evidence, the jury was provided with instructions from the trial court which included a limiting instruction as to the evidence of other crimes, wrongs, or acts. After deliberating, the [*16] jury found Iden guilty as charged. He was subsequently sentenced to an aggregate total of 30 years to life and classified as a Tier III sex offender.

(Record, PAGEID # 130-43); *State v. Iden*, No. CT2019-0004, 2020 Ohio 176, 2020 WL 412200, *1-5 (Ohio Ct. App. Jan. 21, 2020). The Court of Appeals affirmed his convictions and sentence on direct appeal. (Record, PAGEID # 144.)

Petitioner sought further review from the Supreme Court of Ohio, which declined to review the case. (Record, PAGEID # 145, 168); *State v. Iden*, 158 Ohio St. 3d 1506, 2020- Ohio 2819, 144 N.E.3d 445 (table) (Ohio 2020). Petitioner did not seek further review from the Supreme Court of the United States. (Petition, PAGEID # 3.) Any petition for a writ of certiorari to that Court would have been due 150 days after the Supreme Court of Ohio's decision, or by October 9, 2020. A more detailed discussion of this deadline follows in a later section.

Instead, Petitioner filed an application to reopen his direct appeal in the Ohio Court of Appeals on August 26, 2020. (Record, PAGEID # 169-74.) The Court of Appeals denied his application as untimely (*id.*, PAGEID # 178-79), but the Supreme Court of Ohio summarily reversed and remanded for a proper time calculation. (Record, PAGEID # 200; *State v. Iden*, 162 Ohio St. 3d 1427, 2021- Ohio 1202, 166 N.E.3d 30 (table) (Ohio 2021). On remand, the Court of Appeals found the application to reopen timely but denied it on its merits. (Record, PAGEID # 201-06.) [*17]

Petitioner again appealed to the Supreme Court of Ohio, which again declined further review. (Record, PAGEID # 207, 228); *State v. Iden*, 166 Ohio St. 3d 1497, 2022- Ohio 1485, 186 N.E.3d 835 (table) (Ohio 2022). It does not appear that Petitioner sought a writ of certiorari from the Supreme Court of the United States at this point either. Any such petition would have been due 90 days later, or by August 8, 2022. This deadline is also discussed further below.

On August 1, 2023, Petitioner submitted the instant Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Petition, PAGEID # 15.) It was opened on this Court's docket on August 4, 2023. Petitioner raises Grounds for Relief concerning the fairness of the prosecutor's introduction of other bad acts; the alleged ineffectiveness of trial and appellate counsel for failing to challenge the sufficiency of the indictment; and the violation of his speedy trial rights. After a preliminary review, the Court ordered Respondent to file an Answer. (ECF No. 2.)

Respondent sought leave to file a motion to dismiss rather than an answer, which the Court allowed. (ECF Nos. 6, 9.) Respondent filed a partial state-court record [2 ⬇] and moved to dismiss the Petition as time-barred. (ECF Nos. 7, 8.) Petitioner filed a response to the motion, Respondent filed [*18] a reply, and Petitioner filed a sur-reply. (ECF Nos. 10, 11, 12.)

On January 25, 2024, non-party Joseph Clark filed a "Memorandum Regarding Petitioner's False Allegations and Attempt to Pull a Fraud Upon this Court." (ECF No. 14.) Petitioner requested that the Court disregard Mr. Clark's memorandum. (ECF No. 13.) Petitioner also filed "Supplemental Evidence" to support his opposition to dismissal. (ECF No. 15.) Respondent did not thereafter address Petitioner's sur-reply, Mr. Clark's memorandum, Petitioner's request for the Court to disregard it, or the supplemental evidence.

## II. ANALYSIS

### A. Proper Filings

Before discussing the timeliness issue underlying Respondent's Motion to Dismiss, the Court considers which filings are properly before it. This Court's Local Rules anticipate only two filings in response to a motion: a memorandum in opposition to the motion and a reply memorandum. S.D. Ohio Civ. R. 7.2(a)(2) ("No additional memoranda beyond those enumerated are permitted except upon leave of court for good cause shown.").

Here, Petitioner did not seek leave of Court to file his sur-reply or supplemental evidence. (ECF Nos. 12, 15.) He may have been unaware of the rule, but his *pro se* status does not exempt [*19] him from compliance. See *Greer v. Home Realty Co. of Memphis, Inc.*, No. 2:07-cv-2639, 2010 U.S. Dist. LEXIS 142817, 2010 WL 6512339, at *2 (W.D. Tenn. July 12, 2010) (quoting *Whitfield v. Snyder*, 263 F. App'x 518, 521 (7th Cir. 2008)); *Moore v. Westcomb*, No. 2:20-cv-179, 2021 U.S. Dist. LEXIS 88434, 2021 WL 1851130, at *1 (W.D. Mich. May 10, 2021) (quoting *In re Sharwell*, 129 F.3d 1265 (6th Cir. 1997) (table)) ("While [the party] was proceeding *pro se* and may not have fully understood the rules of procedure, he was still required to comply with the rules; his *pro se* status does not exempt him from compliance."). The Court therefore will not consider and hereby **STRIKES** Petitioner's sur-reply and supplemental evidence (ECF Nos. 12, 15) because they were filed without leave of Court and contrary to rule.

Count six, kidnapping with sexual motivation, a felony of the first degree. This count contained a sexual motivation specification and a sexually violent predator specification.

Iden pled not guilty to the charges and elected to proceed to a jury trial.

Before trial, on July 2, 2018, the state filed a notice of intent to introduce prior bad acts. In this motion the state outlined anticipated testimony from nine women Iden had sexually assaulted in similar, albeit in less violent [*15] fashion, in his car and in the same State Park or nearby rural area between 1994 and 1999. At trial, counsel for Iden objected to presentation of testimony from any of the women, but the trial court granted the motion over Iden's objection. The state ultimately presented testimony from five women, A.T., M.C., R.F.S., C.O., and T.K.M., all of whom testified Iden forced them to engage in sexual intercourse against their will, in his car, and in the Dillon State Park area.

The state further presented evidence from Iden's ex-wife, J.W., who testified they would go to the Dillon State Park area to have sex while they were dating.

J.M. testified as well, stating she recalled the evening of September 25-26, 1998, up until closing at the Beach Ridge Lounge. She does not recall leaving the Beach Ridge, nor anything that happened thereafter until she woke up in the hospital. She further had no recollection of anything she told law enforcement officials or anyone else immediately thereafter.

After hearing all the evidence, the jury was provided with instructions from the trial court which included a limiting instruction as to the evidence of other crimes, wrongs, or acts. After deliberating, the [*16] jury found Iden guilty as charged. He was subsequently sentenced to an aggregate total of 30 years to life and classified as a Tier III sex offender.

(Record, PAGEID # 130-43); _State v. Iden_, No. CT2019-0004, 2020 Ohio 176, 2020 WL 412200, *1-5 (Ohio Ct. App. Jan. 21, 2020). The Court of Appeals affirmed his convictions and sentence on direct appeal. (Record, PAGEID # 144.)

Petitioner sought further review from the Supreme Court of Ohio, which declined to review the case. (Record, PAGEID # 145, 168); _State v. Iden_, 158 Ohio St. 3d 1506, 2020- Ohio 2819, 144 N.E.3d 445 (table) (Ohio 2020). Petitioner did not seek further review from the Supreme Court of the United States. (Petition, PAGEID # 3.) Any petition for a writ of certiorari to that Court would have been due 150 days after the Supreme Court of Ohio's decision, or by October 9, 2020. A more detailed discussion of this deadline follows in a later section.

Instead, Petitioner filed an application to reopen his direct appeal in the Ohio Court of Appeals on August 26, 2020. (Record, PAGEID # 169-74.) The Court of Appeals denied his application as untimely (_id._, PAGEID # 178-79), but the Supreme Court of Ohio summarily reversed and remanded for a proper time calculation. (Record, PAGEID # 200); _State v. Iden_, 162 Ohio St. 3d 1427, 2021- Ohio 1202, 166 N.E.3d 30 (table) (Ohio 2021). On remand, the Court of Appeals found the application to reopen timely but denied it on its merits. (Record, PAGEID # 201-06.) [*17]

Petitioner again appealed to the Supreme Court of Ohio, which again declined further review. (Record, PAGEID # 207, 228); _State v. Iden_, 166 Ohio St. 3d 1497, 2022- Ohio 1485, 186 N.E.3d 835 (table) (Ohio 2022). It does not appear that Petitioner sought a writ of certiorari from the Supreme Court of the United States at this point either. Any such petition would have been due 90 days later, or by August 8, 2022. This deadline is also discussed further below.

On August 1, 2023, Petitioner submitted the instant Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Petition, PAGEID # 15.) It was opened on this Court's docket on August 4, 2023. Petitioner raises Grounds for Relief concerning the fairness of the prosecutor's introduction of other bad acts; the alleged ineffectiveness of trial and appellate counsel for failing to challenge the sufficiency of the indictment; and the violation of his speedy trial rights. After a preliminary review, the Court ordered Respondent to file an Answer. (ECF No. 2.)

Respondent sought leave to file a motion to dismiss rather than an answer, which the Court allowed. (ECF Nos. 6, 9.) Respondent filed a partial state-court record[2±] and moved to dismiss the Petition as time-barred. (ECF Nos. 7, 8.) Petitioner filed a response to the motion, Respondent filed [*18] a reply, and Petitioner filed a sur-reply. (ECF Nos. 10, 11, 12.)

On January 25, 2024, non-party Joseph Clark filed a "Memorandum Regarding Petitioner's False Allegations and Attempt to Pull a Fraud Upon this Court." (ECF No. 14.) Petitioner requested that the Court disregard Mr. Clark's memorandum. (ECF No. 13.) Petitioner also filed "Supplemental Evidence" to support his opposition to dismissal. (ECF No. 15.) Respondent did not thereafter address Petitioner's sur-reply, Mr. Clark's memorandum, Petitioner's request for the Court to disregard it, or the supplemental evidence.

## II. ANALYSIS

### A. Proper Filings

Before discussing the timeliness issue underlying Respondent's Motion to Dismiss, the Court considers which filings are properly before it. This Court's Local Rules anticipate only two filings in response to a motion: a memorandum in opposition to the motion and a reply memorandum. S.D. Ohio Civ. R. 7.2(a)(2) ("No additional memoranda beyond those enumerated are permitted except upon leave of court for good cause shown.").

Here, Petitioner did not seek leave of Court to file his sur-reply or supplemental evidence. (ECF Nos. 12, 15.) He may have been unaware of the rule, but his _pro se_ status does not exempt [*19] him from compliance. See _Greer v. Home Realty Co. of Memphis, Inc._, No. 2:07-cv-2639, 2010 U.S. Dist. LEXIS 142817, 2010 WL 6512339, at *2 (W.D. Tenn. July 12, 2010) (quoting _Whitfield v. Snyder_, 263 F. App'x 518, 521 (7th Cir. 2008)); _Moore v. Westcomb_, No. 2:20-cv-179, 2021 U.S. Dist. LEXIS 88434, 2021 WL 1851130, at *1 (W.D. Mich. May 10, 2021) (quoting _In re Sharwell_, 129 F.3d 1265 (6th Cir. 1997) (table)) ("While [the party] was proceeding _pro se_ and may not have fully understood the rules of procedure, he was still required to comply with the rules; his pro se status does not exempt him from compliance."). The Court therefore will not consider and hereby **STRIKES** Petitioner's sur-reply and supplemental evidence (ECF Nos. 12, 15) because they were filed without leave of Court and contrary to rule.

The first judgment at issue in this case was the Supreme Court of Ohio's entry declining review on May 12, 2020, which is within the above-referenced March 19, 2020 through July 18, 2021 window. [*25] (Record, PAGEID # 168.) The second judgment at issue was that court's entry declining review on May 10, 2022, which is outside the window. (Id., PAGEID # 228.) Consequently, Petitioner had 150 days to seek certiorari after the first entry and 90 days to seek certiorari after the second entry. Any certiorari petitions were therefore due on October 9, 2020 (150 days after May 12, 2020) and August 8, 2022 (90 days after May 10, 2022), respectively.

Petitioner asserts that the statute of limitations for this habeas corpus case began to run after the second of these occasions—after the Supreme Court of Ohio declined to review the denial of his application to reopen his direct appeal in 2022, and he did not seek certiorari. (Petition, PAGEID # 13; Resp., PAGEID # 260-61.) By Petitioner's calculation, the one-year statute began to run on August 10, 2022 (which is after the three months during which he could have sought certiorari). His Petition filed on August 1, 2023—within one year of that date—would be timely. 8⬇

In contrast, Respondent asserts that the statute of limitations began to run after the first occasion—after the Supreme Court of Ohio declined to review the affirmance of Petitioner's [*26] conviction on direct appeal in 2020. (See Mot., PAGEID # 250.) Respondent calculates this as 90 days after the first entry, or by August 10, 2020. (Id.)

The resolution of this disagreement turns on whether proceedings to reopen a direct appeal under Ohio App. R. 26(B) are part of "direct review," after which the statute begins to run, or are considered "collateral review," which tolls an already running statute rather than delaying its start. 9⬇

Petitioner relies on a 2003 decision from the Sixth Circuit, Lambert v. Warden, Ross Corr., 81 F. App'x 1, 2 (6th Cir. 2003). (Resp., PAGEID # 260-63.) Lambert, in turn, relied on White v. Schotten, 201 F.3d 743 (6th Cir. 2000). While expressing some skepticism, the Lambert court held that it was "bound to follow the holding of White that [Ohio App. R.] 26(B) applications are part of direct review" and therefore delayed the running of the statute until such proceedings are concluded. Lambert, 81 F. App'x at 10.

However, the Sixth Circuit overruled White in 2005, concluding that:

> [T]he relevant state law, the distinctions between direct review and collateral review, and the structure and function of the AEDPA support the conclusion that a Rule 26(B) application to reopen is a collateral matter rather than part of direct review...[.] We therefore overrule White v. Schotten.

Lopez v. Wilson, 426 F.3d 339, 352 (6th Cir. 2005) (en banc) (footnote omitted). Accordingly, Lopez implicitly overruled or undermined Lambert as well, because [*27] Lambert was explicitly based on White and because it is contrary to the binding decision in Lopez. 10⬇ Since Lopez, federal courts in Ohio have routinely relied upon Lopez to hold that proceedings on an application to reopen are part of collateral review, which does not delay the start of the statute of limitations but can toll (or pause) a statute that is already running. See, e.g., Peyton v. Warden, Franklin Med. Ctr., No. 1:18-cv-684, 2019 U.S. Dist. LEXIS 139077, 2019 WL 3892432, at *4 (S.D. Ohio Aug. 16, 2019) (Litkovitz ⬇, M.J.), report and recommendation adopted, 2019 U.S. Dist. LEXIS 159437, 2019 WL 4562426 (S.D. Ohio Sept. 19, 2019) (Bertelsman, J.) (citing Lopez, 426 F.3d at 352) ("A Rule 26(B) application to reopen an appeal is a collateral, post-conviction relief procedure."); Coley v. Bagley, No. 1:02-cv-457, 2010 U.S. Dist. LEXIS 33063, 2010 WL 1375217, at *21 (N.D. Ohio Apr. 5, 2010), aff'd, 706 F.3d 741 (6th Cir. 2013) ("[T]he Lopez court held that, upon reviewing 'the relevant state law, the distinctions between direct review and collateral review, and the structure and function of the AEDPA,' the application to reopen procedure in Ohio was not part of the direct appeal but a post-conviction proceeding[.]").

Applying these principles here, the one-year statute of limitations for the instant habeas corpus matter began to run when "the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). That is 150 days after May 12, 2020, when the Supreme Court of Ohio declined to review [*28] the affirmance of Petitioner's conviction on direct appeal, and any petition for a writ of certiorari was due on Friday, October 9, 2020. (Record, PAGEID #168.) When no petition was filed, the statute began to run the next business day (Monday, October 12, 2020). 11⬇

However, the statute was immediately tolled by Petitioner's already-filed application to reopen his direct appeal, which had been filed a few weeks earlier on August 26, 2020. (Record, PAGEID # 159-174); 28 U.S.C. § 2244(d)(2). Proceedings on the application concluded on May 10, 2022, when the Supreme Court of Ohio declined to review the matter further. (Record, PAGEID # 228.) The one-year statute of limitations continued running the next day, Wednesday, May 11, 2022. It ran for one year (365 days) and expired on May 11, 2023. The Petition was thereafter filed on August 1, 2023. (Petition, PAGEID # 15.)

Petitioner argues that the statute should also be tolled during the time in which he could have filed his second petition for a writ of certiorari, during the 90 days after the Supreme Court of Ohio issued its May 10, 2022 entry. (Petition, PAGEID # 13; Resp., PAGEID # 261; see also Record, PAGEID # 228.) Respondent disagrees with this argument based [*29] on the Supreme Court's decision in Lawrence v. Fla., 549 U.S. 327, 127 S. Ct. 1079, 166 L. Ed. 2d 924 (2007). (Reply, PAGEID # 287.) At issue in Lawrence was whether the habeas limitations period was tolled while a petition for certiorari was pending in the Court after the denial of relief in a collateral post-conviction proceeding. Lawrence, 549 U.S. at 331-32. The Supreme Court found in the negative:

> Read naturally, the text of the statute must mean that the statute of limitations is tolled only while state courts review the application. As we stated in Carey v. Saffold, 536 U.S. 214, 220, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002), (internal quotation marks omitted), a state postconviction application "remains pending" "until the application has achieved final resolution through the State's postconviction procedures." This [United States Supreme] Court said that it was not a part of a "State's post-conviction procedures." State review ends when the state courts have finally resolved an application for state postconviction relief. After the State's highest court has issued its mandate or denied review, no other state avenues for relief remain open. And an application for state postconviction review no longer exists. All that remains is a separate certiorari petition pending before a federal court. The application for state postconviction review is therefore not "pending" [*30] after the state court's postconviction review is complete, and § 2244(d)(2) does not toll the 1-year limitations period during the pendency of a petition for certiorari.

Id. at 332 (emphasis in original). And as this Court has explained:

> Petitioner was not entitled to an additional 90 days of tolling of the limitations period in which he could have petitioned for certiorari to the United States Supreme Court from ... the denial of his Rule 26(B) application[.] His Rule 26(B) application is considered an application for state post-conviction relief, see Lopez v. Wilson, 426 F.3d 339, 340-41 (6th Cir. 2005), which, unlike

The first judgment at issue in this case was the Supreme Court of Ohio's entry declining review on May 12, 2020, which is within the above-referenced March 19, 2020 through July 18, 2021 window. [*25] (Record, PAGEID # 168.) The second judgment at issue was that court's entry declining review on May 10, 2022, which is outside the window. (Id., PAGEID # 228.) Consequently, Petitioner had 150 days to seek certiorari after the first entry and 90 days to seek certiorari after the second entry. Any certiorari petitions were therefore due on October 9, 2020 (150 days after May 12, 2020) and August 8, 2022 (90 days after May 10, 2022), respectively.

Petitioner asserts that the statute of limitations for this habeas corpus case began to run after the second of these occasions—after the Supreme Court of Ohio declined to review the denial of his application to reopen his direct appeal in 2022, and he did not seek certiorari. (Petition, PAGEID # 13; Resp., PAGEID # 260-61.) By Petitioner's calculation, the one-year statute began to run on August 10, 2022 (which is after the three months during which he could have sought certiorari). His Petition filed on August 1, 2023—within one year of that date—would be timely.[8⬇]

In contrast, Respondent asserts that the statute of limitations began to run after the first occasion—after the Supreme Court of Ohio declined to review the affirmance of Petitioner's [*26] conviction on direct appeal in 2020. (See Mot., PAGEID # 250.) Respondent calculates this as 90 days after the first entry, or by August 10, 2020. (Id.)

The resolution of this disagreement turns on whether proceedings to reopen a direct appeal under Ohio App. R. 26(B) are part of "direct review," after which the statute begins to run, or are considered "collateral review," which tolls an already running statute rather than delaying its start.[9⬇]

Petitioner relies on a 2003 decision from the Sixth Circuit, Lambert v. Warden, Ross Corr., 81 F. App'x 1, 2 (6th Cir. 2003). (Resp., PAGEID # 260-63.) Lambert, in turn, relied on White v. Schotten, 201 F.3d 743 (6th Cir. 2000). While expressing some skepticism, the Lambert court held that it was "bound to follow the holding of White that [Ohio App. R.] 26(B) applications are part of direct review" and therefore delayed the running of the statute until such proceedings were concluded. Lambert, 81 F. App'x at 10.

However, the Sixth Circuit overruled White in 2005, concluding that:

> [T]he relevant state law, the distinctions between direct review and collateral review, and the structure and function of the AEDPA support the conclusion that a Rule 26(B) application to reopen is a collateral matter rather than part of direct review...[.] We therefore overrule White v. Schotten.

Lopez v. Wilson, 426 F.3d 339, 352 (6th Cir. 2005) (en banc) (footnote omitted). Accordingly, Lopez implicitly overruled or undermined Lambert as well, because [*27] Lambert was explicitly based on White and because it is contrary to the binding decision in Lopez.[10⬇] Since Lopez, federal courts in Ohio have routinely relied upon Lopez to hold that proceedings on an application to reopen are part of collateral review, which does not delay the start of the statute of limitations but can toll (or pause) a statute that is already running. See, e.g., Peyton v. Warden, Franklin Med. Ctr., No. 1:18-cv-684, 2019 U.S. Dist. LEXIS 139077, 2019 WL 3892432, at *4 (S.D. Ohio Aug. 16, 2019) (Litkovitz ⬇, M.J.), report and recommendation adopted, 2019 U.S. Dist. LEXIS 159437, 2019 WL 4562426 (S.D. Ohio Sept. 19, 2019) (Bertelsman, J.) (citing Lopez, 426 F.3d at 352) ("A Rule 26(B) application to reopen an appeal is a collateral, post-conviction relief procedure."); Coley v. Bagley, No. 1:02-cv-457, 2010 U.S. Dist. LEXIS 33063, 2010 WL 1375217, at *21 (N.D. Ohio Apr. 5, 2010), aff'd, 706 F.3d 741 (6th Cir. 2013) ("[T]he Lopez court held that, upon reviewing 'the relevant state law, the distinctions between direct review and collateral review, and the structure and function of the AEDPA,' the application to reopen procedure in Ohio was not part of the direct appeal but a post-conviction proceeding[.]").

Applying these principles here, the one-year statute of limitations for the instant habeas corpus matter began to run when "the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). That is 150 days after May 12, 2020, when the Supreme Court of Ohio declined to review [*28] the affirmance of Petitioner's conviction on direct appeal, and any petition for a writ of certiorari was due on Friday, October 9, 2020. (Record, PAGEID # 168.) When no petition was filed, the statute began to run the next business day (Monday, October 12, 2020).[11⬇]

However, the statute was immediately tolled by Petitioner's already-filed application to reopen his direct appeal, which had been filed a few weeks earlier on August 26, 2020. (Record, PAGEID # 159-174); 28 U.S.C. § 2244(d)(2). Proceedings on the application concluded on May 10, 2022, when the Supreme Court of Ohio declined to review the matter further. (Record, PAGEID # 228.) The one-year statute of limitations continued running the next day, Wednesday, May 11, 2022. It ran for one year (365 days) and expired on May 11, 2023. The Petition was thereafter filed on August 1, 2023. (Petition, PAGEID # 15.)

Petitioner argues that the statute should also be tolled during the time in which he could have filed his second petition for a writ of certiorari, during the 90 days after the Supreme Court of Ohio issued its May 10, 2022 entry. (Petition, PAGEID # 13; Resp., PAGEID # 261; see also Record, PAGEID # 228.) Respondent disagrees with this argument based [*29] on the Supreme Court's decision in Lawrence v. Fla., 549 U.S. 327, 127 S. Ct. 1079, 166 L. Ed. 2d 924 (2007). (Reply, PAGEID # 287.) At issue in Lawrence was whether the habeas limitations period was tolled while a petition for certiorari was pending in the Court after the denial of relief in a collateral post-conviction proceeding. Lawrence, 549 U.S. at 331-32. The Supreme Court found in the negative:

> Read naturally, the text of the statute must mean that the statute of limitations is tolled only while state courts review the application. As we stated in Carey v. Saffold, 536 U.S. 214, 220, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002) (internal quotation marks omitted), a state postconviction application "remains pending" "until the application has achieved final resolution through the State's postconviction procedures." This [United States Supreme] Court is not part of a "State's post-conviction procedures." State review ends when the state courts have finally resolved an application for state postconviction relief. After the State's highest court has issued its mandate or denied review, no other state avenues for relief remain open. And an application for state postconviction review no longer exists. All that remains is a separate certiorari petition pending before a federal court. The application for state postconviction review is therefore not "pending" [*30] after the state court's postconviction review is complete, and § 2244(d)(2) does not toll the 1-year limitations period during the pendency of a petition for certiorari.

Id. at 332 (emphasis in original). And as this Court has explained:

> Petitioner was not entitled to an additional 90 days of tolling of the limitations period in which he could have petitioned for certiorari to the United States Supreme Court from ... the denial of his Rule 26(B) application[.] His Rule 26(B) application is considered an application for state post-conviction relief, see Lopez v. Wilson, 426 F.3d 339, 340-41 (6th Cir. 2005), which, unlike

[2] It appears that Respondent filed the written record of Petitioner's cases in state court but did not file the voluminous transcript of his arraignment, trial, and sentencing. (See Mot., PAGEID # 245, n.3.)

[3] The Habeas Rules do provide that the Federal Rules of Civil Procedure may be applied where they are not inconsistent with the Habeas Rules or statutory law. See Rule 12 of the Habeas Rules. The Court is not aware of any rule of civil procedure that allows non-parties to freely and without leave file memoranda in cases to which they are not a party. Formal intervention—which was not sought here—does not appear to be appropriate either and would require a proper filing that includes, among other things, the proposed intervenor's full address.

[4] Specifically, there is no argument or indication in the record that an "impediment to filing an application created by State action in violation of the Constitution or laws of the United States [was] removed" (§ 2244(d)(1)(B)); that an applicable "constitutional right ... was ... newly recognized by the Supreme Court and made retroactive" (§ 2244(d)(1)(C)); or that the "factual predicate of the ... claim presented" was discovered later (§ 2244(d)(1)(D)). Accordingly, the statute began to run as described in § 2244(d)(1)(A): on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Petitioner appears to acknowledge this in his Petition. (See Petition, PAGEID # 13 (asserting that the "[t]riggering event is the expiration of the time for filing a petition for a writ of certiorari in this case even if not sought[.]").)

[5] During that time, United States Supreme Court Rule 13.1 provided:

Unless otherwise provided by law, a petition for a writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort or a United States court of appeals (including the United States Court of Appeals for the Armed Forces) is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment. A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk [*24] within 90 days after entry of the order denying discretionary review.

[6] Also available at https://www.supremecourt.gov/orders/ordersofthecourt/19 (last accessed Sept. 5, 2024).

[7] Also available at https://www.supremecourt.gov/orders/ordersofthecourt/20 (last accessed Sept. 5, 2024).

[8] Absent any evidence to the contrary, the Court uses the date that a petitioner signed a petition and deposited it for mailing to the Court as the date of filing. See Brand v. Motley, 526 F.3d 921, 925 (6th Cir. 2008) (citing, among other sources, Houston v. Lack, 487 U.S. 266, 108 S. Ct. 2379, 101 L. Ed. 2d 245 (1988), and discussing the "prison mailbox rule"). Here, the Petition was signed on August 1, 2023. (Petition, PAGEID # 15.) With no contrary evidence, the Court uses August 1, 2023, as the date of filing.

[9] Under § 2244(d)(1)(A), the statute of limitations begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review[.]" And, under § 2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

[10] "En banc" review in the Sixth Circuit means that "all judges in regular active service at the time" heard and decided the case, rather than the usual three-judge panel. See 6 Cir. I.O.P. 35(c). Petitioner appears to suggest that the Lopez court could not overrule White, based on the rule that a panel of the Sixth Circuit cannot overrule a decision of a previous panel. (Memo Opp., PAGEID # 262.) Although this rule is indeed true, it does not apply to later en banc decisions. Thus, Lopez—as a decision of the court sitting en banc—did overrule the previous panel decision in Lambert. See 6 Cir. R. 32.1(b) ("Published panel opinions are binding on later panels. A published opinion is overruled only by the court en banc."); Gerth v. Warden, Allen Oakwood Corr. Inst., 938 F.3d 821, 830 (6th Cir. 2019) (recognizing that "sitting en banc [in Lopez], we concluded that the [Ohio App. R.] 26(B) application is 'part of the collateral, postconviction process rather than direct review'").

[11] Under Fed. R. Civ. P. 6(a)(1)(C), "if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."

**2** It appears that Respondent filed the written record of Petitioner's cases in state court but did not file the voluminous transcript of his arraignment, trial, and sentencing. (*See* Mot., PAGEID # 245, n.3.)

**3** The Habeas Rules do provide that the Federal Rules of Civil Procedure may be applied where they are not inconsistent with the Habeas Rules or statutory law. *See* Rule 12 of the Habeas Rules. The Court is not aware of any rule of civil procedure that allows non-parties to freely and without leave file memoranda in cases to which they are not a party. Formal intervention—which was not sought here—does not appear to be appropriate either and would require a proper filing that includes, among other things, the proposed intervenor's full address.

**4** Specifically, there is no argument or indication in the record that an "impediment to filing an application created by State action in violation of the Constitution or laws of the United States [was] removed" (§ 2244(d)(1)(B)); that an applicable "constitutional right ... was ... newly recognized by the Supreme Court and made retroactive" (§ 2244(d)(1)(C)); or that the "factual predicate of the ... claim presented" was discovered later (§ 2244(d)(1)(D)). Accordingly, the statute began to run as described in § 2244(d)(1)(A): on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Petitioner appears to acknowledge this in his Petition. (*See* Petition, PAGEID # 13 (asserting that the "[t]riggering event is the expiration of the time for filing a petition for a writ of certiorari in this case even if not sought[.]").)

**5** During that time, United States Supreme Court Rule 13.1 provided:

> Unless otherwise provided by law, a petition for a writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort or a United States court of appeals (including the United States Court of Appeals for the Armed Forces) is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment. A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk **[*24]** within 90 days after entry of the order denying discretionary review.

**6** Also available at https://www.supremecourt.gov/orders/ordersofthecourt/19 (last accessed Sept. 5, 2024).

**7** Also available at https://www.supremecourt.gov/orders/ordersofthecourt/20 (last accessed Sept. 5, 2024).

**8** Absent any evidence to the contrary, the Court uses the date that a petitioner signed a petition and deposited it for mailing to the Court as the date of filing. *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (citing, among other sources, *Houston v. Lack*, 487 U.S. 266, 108 S. Ct. 2379, 101 L. Ed. 2d 245 (1988), and discussing the "prison mailbox rule"). Here, the Petition was signed on August 1, 2023. (Petition, PAGEID # 15.) With no contrary evidence, the Court uses August 1, 2023, as the date of filing.

**9** Under § 2244(d)(1)(A), the statute of limitations begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review[.]" And, under § 2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

**10** "En banc" review in the Sixth Circuit means that "all judges in regular active service at the time" heard and decided the case, rather than the usual three-judge panel. *See* 6 Cir. I.O.P. 35(c). Petitioner appears to suggest that the *Lopez* court could not overrule *White*, based on the rule that a panel of the Sixth Circuit cannot overrule a decision of a previous panel. (Memo Opp., PAGEID # 262.) Although this rule is indeed true, it does not apply to later en banc decisions. Thus, *Lopez*—as a decision of the court sitting en banc—did overrule the previous panel decision in *Lambert*. *See* 6 Cir. R. 32.1(b) ("Published panel opinions are binding on later panels. A published opinion is overruled only by the court en banc."); *Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 830 (6th Cir. 2019) (recognizing that "sitting en banc [in *Lopez*], we concluded that the [Ohio App. R.] 26(B) application is 'part of the collateral, postconviction process rather than direct review'").

**11** Under Fed. R. Civ. P. 6(a)(1)(C), "if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2024 LexisNexis.

## *MCLS § 600.5827*

This document is current through Act 149 of the 2024 Regular Legislative Session and E.R.O. 2024-2

*Michigan Compiled Laws Service > Chapter 600 Revised Judicature Act of 1961 (§§ 600.101 — 600.11119) > Act 236 of 1961 (Chs. 1 — 99) > Chapter 58 Limitation of Actions (§§ 600.5801 — 600.5869)*

# § 600.5827. Accrual of claim.

Sec. 5827.

Except as otherwise expressly provided, the period of limitations runs from the time the claim accrues. The claim accrues at the time provided in sections 5829 to 5838, and in cases not covered by these sections the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results.

## History

Pub Acts 1961, No. 236, Ch. 58, § 5827, by § 9911 eff January 1, 1963.

Annotations

## Notes

**Prior codification:**

MSA § 27A.5827

**Editor's notes:**

See Editor's notes at act heading.

## Commentary

**Committee Notes**

**Committee Comment**

*Section 600.5827* clarifies the effect of subsequent sections.

(Comments as written by the Committee for the original version of the statute.)

# NOTES TO DECISIONS

266 Mich. App. 297, *297; 701 N.W.2d 756, **756; 2005 Mich. App. LEXIS 1070, ***1

Governments > Legislation > Statute of
Limitations > Time Limitations

Governments > Legislation > Statute of
Limitations > General Overview

*HN5*[🔽] **Tolling of Statute of Limitations, Discovery
Rule**

When the discovery rule has been applied, it has
involved a weighing of the need to protect defendants
from the harms intended to be prevented by statutes of
limitation against the benefit to a plaintiff afforded by
application of the rule. The balancing of these
competing interests is facilitated where there is objective
evidence of injury and causal connection guarding
against the danger of stale claims and a verifiable basis
for the plaintiffs inability to bring their claims within the
statutorily proscribed limitation period.

Civil Procedure > ... > Statute of
Limitations > Tolling of Statute of
Limitations > Discovery Rule

Governments > Legislation > Statute of
Limitations > Time Limitations

*HN6*[🔽] **Tolling of Statute of Limitations, Discovery
Rule**

When the discovery rule is applicable, a claim does not
accrue until the plaintiff discovers, or with the exercise
of reasonable diligence should have discovered, (1) an
injury and (2) a causal connection between the plaintiffs
injury and the defendant's breach of duty. The test
applied to determine when a cause of action accrues is
an objective one, based on objective facts, and not on
what a particular plaintiff subjectively believed. Pursuant
to the discovery rule, a limitations period begins to run if
a plaintiff is aware that there is a possible cause of
action against a defendant, i.e., when a plaintiff is aware
of an injury and its possible cause. It is not necessary
that a plaintiff be capable of proving each element of a
cause of action before the limitations period begins to
run.

Civil Procedure > ... > Statute of
Limitations > Tolling of Statute of
Limitations > Discovery Rule

Governments > Legislation > Statute of
Limitations > Time Limitations

*HN7*[🔽] **Tolling of Statute of Limitations, Discovery
Rule**

The discovery rule applies when an element of a cause
of action has occurred but is undiscoverable using
reasonable diligence for a period of time.

Civil Procedure > ... > Statute of
Limitations > Tolling of Statute of
Limitations > Discovery Rule

Governments > Legislation > Statute of
Limitations > Extensions & Revivals

Governments > Legislation > Statute of
Limitations > General Overview

Governments > Legislation > Statute of
Limitations > Time Limitations

*HN8*[🔽] **Tolling of Statute of Limitations, Discovery
Rule**

In those instances in which the court has applied the
common-law discovery rule to extend the statute of
limitations, the dispute between parties has been based
on evaluation of a factual, tangible consequence of
action by the defendant, measured against an objective
external standard. The presence of this external
standard addresses the concern for reliable fact finding
that is the underlying rationale for precluding untimely
claims.

Torts > Negligence > General Overview

*HN9*[🔽] **Torts, Negligence**

Negligence is comprised of (a) a duty, (2) breach of the
duty, (3) causation, and (4) damages.

Civil Procedure > ... > Summary
Judgment > Opposing Materials > General
Overview

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > General Overview

266 Mich. App. 297, *297; 701 N.W.2d 756, **756; 2005 Mich. App. LEXIS 1070, ***1

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN10*[⤓] **Summary Judgment, Opposing Materials**

A party opposing a summary disposition motion, pursuant to _Mich. Ct. R. 2.116(C)(10)_, has the burden of demonstrating by evidentiary materials or documents that a genuine issue of disputed fact exists. The nonmoving party may not rest upon mere allegations or denials but must come forward with documentary evidence demonstrating the existence of a genuine issue for trial. The mere promise to provide factual support at trial is not sufficient. However, courts are liberal in finding a genuine issue of material fact.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > Discovery & Disclosure > General Overview

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > Timing of Motions & Responses

*HN11*[⤓] **Summary Judgment, Entitlement as Matter of Law**

Generally, a motion for summary disposition is premature if granted before discovery on a disputed issue is complete. Summary disposition may ultimately be appropriate if further discovery does not stand a reasonable chance of uncovering factual support for the opposing party's position.

**Counsel:** *Cox, Hodgman & Giarmarco, P.C.* (by *David A. Binkley*, *Elise V. Iarate*, and *Tonie M. Franzese*), for Dayle Trentadue.

*Gault Davison, P.C.* (by *Edward B. Davison*), for Shirley and Laurence Gorton.

*Garan Lucow Miller, P.C.* (by *Joseph Kochis* and *Robert D. Goldstein*), for Carl F. Bekofske.

*Bodman, Longley & Dahling LLP* (by *Charles S. Hegarty* and *Christine E. Ficks*) for Todd M. Bakos and S. Victor Nyberg.

*Law Offices of Catherine A. Gofrank* (by *Thomas M. Douglas*) for MFO Management.

**Judges:** Before: OWENS, P.J., and SAWYER and WHITE, JJ.

**Opinion by:** [*299] Donald S. Owens

# Opinion

[**758] PER CURIAM.

Plaintiff Dayle Trentadue, as personal representative of the estate of Margarette F. Eby, deceased, appeals by leave granted the order granting defendants Carl L. Bekofske, as personal representative of the estate of Ruth R. Mott, deceased (Mott), [1] and MFO Management Company (MFO) summary disposition on plaintiff's claim pertaining to their breach of duty to provide adequate security to Margarette F. Eby (Eby), on the ground that it was barred by the applicable statute of limitations in this wrongful death action. Defendant Buckler Automatic Lawn Sprinkler Company (Buckler) and defendants Shirley Gorton and Laurence W. Gorton (the Gortons) appeal by leave granted the order denying their motion for summary disposition based on the applicable statutes of limitations on all plaintiff's claims. MFO appeals by leave granted the order denying its motion for summary disposition [***2] on plaintiff's breach of duty claim under a theory of respondeat superior. We affirm in part, reverse in part, and remand.

[*300] Defendants assert that plaintiff's claims are barred by _MCL 600.5805(10)_. Buckler and the Gortons assert that all plaintiff's claims should be precluded because _MCL 600.5827_ states that a claim accrues "at the time the wrong upon which the claim is based was

---

[1] Plaintiff's claims against Mott were voluntarily settled during the pendency of this appeal. Unpublished order of the Court of Appeals, entered May 11, 2004 (Docket No. 252155).

266 Mich. App. 297, *300; 701 N.W.2d 756, **758; 2005 Mich. App. LEXIS 1070, ***2

done regardless of the time when damage results." They contend that the time of the wrong that initiated the running of the limitations period was the date plaintiff's injury resulted from a breach of duty. _Lemmerman v Fealk, 449 Mich. 56, 64; 534 N.W.2d 695 (1995),_ citing **[\*\*\*3]** _Larson v Johns-Manville Sales Corp, 427 Mich. 301, 309; 399 N.W.2d 1 (1986)._ Defendants contend the discovery rule is not available to plaintiff because the **[\*\*759]** date of accrual is not delayed until discovery of the identity of the perpetrator or determination of all possible causes of action. Plaintiff argues that the discovery rule should apply because until Jeffrey Gorton's culpability for Eby's murder was discovered, there was no basis to assert breach of duty claims against Mott and MFO. Plaintiff asserts that, without the identity of Eby's murderer, there was no basis to assert any type of claim against the remaining defendants, Buckler, the Gortons, Nyberg, and Bakos, because their culpability was solely based on their specific job responsibilities or employment relationship to the murderer, Jeffrey Gorton.

_HN1_[↑] A trial court's ruling on motions for summary disposition is reviewed de novo. _Hazle v Ford Motor Co, 464 Mich. 456, 461; 628 N.W.2d 515 (2001)._ _HN2_[↑] When there is no disputed issue of fact, the question whether a statute of limitations bars a cause of action is also reviewed de novo. _Van Reken v Darden, Neef & Heitsch, 259 Mich. App. 454, 456; 674 N.W.2d 731 (2003)._ **[\*\*\*4]**

_HN3_[↑] Our Supreme Court has recognized the dichotomy that exists between the need to protect defendants from **[\*301]** stale claims and the injustice that could result from precluding certain claims by requiring application of a discovery rule to toll limitations periods in certain situations. A discovery rule has been applied to avoid unjust results that could occur when a reasonable and diligent plaintiff would be denied the opportunity to bring a claim because of either the latent nature of the injury or the inability of the plaintiff to learn of or identify the causal connection between the injury and the breach of a duty owed by a defendant. Specifically:

Where the discovery rule is found to be appropriate, a "plaintiff's claim accrues when the plaintiff discovers, or through the exercise of reasonable diligence, should have discovered . . . (1) an injury, and (2) the causal connection between plaintiff's injury and the defendant's breach [of duty to the plaintiff]." [_Lemmerman, supra, p 66,_ quoting _Moll v Abbott Laboratories, 444 Mich. 1, 16; 506 N.W.2d 816 (1993)._]

_HN4_[↑] The discovery rule has been deemed applicable

"[b]ecause statutes **[\*\*\*5]** of limitation do not evidence a legislative intent to extinguish a cause of action before the plaintiff is aware of the possible cause of action before the plaintiff is aware of the possible cause of action. . . ." [_Lemmerman, supra, p 66,_ quoting _Chase v Sabin, 445 Mich. 190, 196; 516 N.W.2d 60 (1994)._]

_HN5_[↑] When the discovery rule has been applied, it has involved a weighing of the need to protect defendants from the harms intended to be prevented by statutes of limitations against the benefit to a plaintiff afforded by application of the rule. _Goodridge v Ypsilanti Twp Bd, 451 Mich. 446, 454-455; 547 N.W.2d 668 (1996)._ The balancing of these competing interests

is facilitated where there is objective evidence of injury and causal connection guarding against the danger of stale claims and a verifiable basis for the plaintiffs' inability to **[\*302]** bring their claims within the statutorily proscribed limitation period. [_Lemmerman, supra, pp 66-67._]

_HN6_[↑] When the discovery rule is applicable, a claim does not accrue until the plaintiff discovers, or with the exercise of reasonable diligence should have discovered, (1) an injury and (2) a causal connection **[\*\*\*6]** between the plaintiff's injury and the defendant's breach of duty. _Jackson Co Hog Producers v Consumers Power Co, 234 Mich. App. 72, 78; 592 N.W.2d 112 (1999)._ "The test applied [to **[\*\*760]** determine] when a cause of action accrued is an objective one, based on objective facts, and not on what a particular plaintiff subjectively believed." _Jackson Co Hog Producers, supra._ Pursuant to the discovery rule, a limitations period begins to run if a plaintiff is aware that there is a "possible cause of action" i.e., when a plaintiff "is aware of an injury and its possible cause." _Moll, supra, pp 23-24._ It is not necessary that a plaintiff be

266 Mich. App. 297, *302; 701 N.W.2d 756, **760; 2005 Mich. App. LEXIS 1070, ***6

capable of proving each element of a cause of action before the limitations period begins to run. _Jackson Co Hog Producers, supra, p 78_.

_HN7_[⬆] The discovery rule applies when an element of a cause of action has occurred but is undiscoverable using reasonable diligence for a time. _Doe v Roman Catholic Archbishop of the Archdiocese of Detroit, 264 Mich. App. 632, 640; 692 N.W.2d 398, 403 (2004)_, citing [***7] _Travelers Ins Co v Guardian Alarm Co of Michigan, 231 Mich. App. 473, 479-480; 586 N.W.2d 760 (1998)_. With respect to plaintiff's claims against Buckler, the Gortons, Nyberg, and Bakos, the relationship of Buckler, the Gortons, Nyberg, and Bakos with Eby's killer could not be discovered by plaintiff, under the circumstances of this case, until Jeffrey Gorton was determined to be the killer or the means of access of Eby's killer into her residence was determined. Thus, plaintiff was not aware of a possible cause of action until that time. We reject defendants' [*303] argument that the discovery rule is inapplicable because this is simply a case of unknown identity, and the courts have consistently held that the rule is inapplicable in such cases. This is not a case where plaintiff knew of an injury and its cause, but did not know the identity of the actor. Plaintiff knew that Eby was murdered, but did not know that anyone had caused Eby harm other than the killer. Plaintiff could not have known of a cause of action against anyone in Buckler's, the Gortons', Nyberg's, or Bako's positions until the facts of the murder were uncovered.

As noted by our Supreme Court in addressing cases involving repressed memory of assault:

_HN8_[⬆] In those instances [***8] in which we have applied the common-law discovery rule to extend the statute of limitations, the dispute between parties has been based on evaluation of a factual, tangible consequence of action by the defendant, measured against an objective external standard. The presence of this external standard addresses the concern for reliable fact finding that is the underlying rationale for precluding untimely claims. [_Lemmerman, supra, p 68_.]

Plaintiff's claims against Buckler, the Gortons, Nyberg, and Bakos are neither speculative nor incapable of proof. Records pertaining to Jeffrey Gorton's employment, his prior criminal history, fingerprint and DNA evidence placing him within Eby's residence, and records verifying ties involving Buckler with access to the gatehouse by Nyberg and Bakos within days of the murder all constitute objective and verifiable evidence to

support application of the discovery rule. Thus, the discovery rule applied to plaintiff's claims against Buckler, the Gortons, Nyberg, Bakos, and Jeffrey Gorton. [2]

[***9]  [**761]  [*304] With respect to plaintiff's negligence cause of action against Mott and MFO, _HN9_[⬆] negligence is composed of (a) a duty, (2) breach of the duty, (3) causation, and (4) damages. _Haliw v Sterling Heights, 464 Mich. 297, 304; 627 N.W.2d 581 (2001)_. Although, at the time of the murder, plaintiff was aware of a duty owed to Eby by either Mott or MFO and of damages, plaintiff was unaware of any causal connection. The police theorized that a personal relationship existed between Eby and her killer because there was no sign of forced entry. This was an objective theory grounded in objective facts; thus, plaintiff's inability to recognize a possible cause of action was not merely a result of plaintiff's subjective beliefs. _Jackson Co Hog Producers, supra, p 78_. Until Jeffrey Gorton was implicated in the murder, there was no indication that Eby's killer was a stranger and, even with the exercise of reasonable diligence on the part of the police department, there was no causal connection between Eby's murder and any breach of duty by Mott or MFO. _Lemmerman, supra, p 66_, quoting _Moll, supra, p 16_. Therefore, the court [***10] should have determined that the discovery rule applied instead of improperly granting [*305] summary disposition to Mott and MFO. _Doe, supra,p 640_, citing _Travelers Ins Co,_

---

[2] Citing _Stephens v Dixon, 449 Mich. 531; 536 N.W.2d 755 (1995)_, _McCluskey v Womack, 188 Mich. App. 465, 472-473; 470 N.W.2d 443 (1991)_, and _Eschenbacher v Hier, 363 Mich. 676, 682; 110 N.W.2d 731 (1961)_, the trial court rejected plaintiff's argument that the discovery rule applied. We note that _McCluskey, supra_ and _Eschenbacher, supra, pp 679-683_, dealt with whether statutes of limitations were tolled by fraudulent concealment, not whether the discovery rule prevented the periods of limitations from accruing. See _Moll v Abbott Laboratories, 444 Mich. 1, 16; 506 N.W.2d 816 (1993)_. And the holding in _Stephens, supra, p 537_, that "the discovery rule is not available in a case of ordinary negligence where a plaintiff merely misjudges the severity of a known injury," is not applicable to the facts of this case. Moreover, although the trial court "rejected" plaintiff's argument with respect to the discovery rule, citing _Connelly v Paul Ruddy's Equipment Repair & Service Co, 388 Mich. 146, 150; 200 N.W.2d 70 (1972)_, the court nevertheless applied the discovery rule to all plaintiff's claims to determine whether and when each claim accrued. See _Stephens, supra, p 538_, quoting _Connelly, supra, p 151_.

266 Mich. App. 297, *305; 701 N.W.2d 756, **761; 2005 Mich. App. LEXIS 1070, ***10

*supra, pp 479-480.* [3]

Finally, MFO contends the trial court erred in denying its motion for summary disposition pertaining to plaintiff's assertion of MFO's liability for the actions of [***11] Nyberg and Bakos under the doctrine of respondent superior. MFO notes that in seeking summary disposition, it provided the trial court with documentary evidence that neither Nyberg nor Bakos was an employee of MFO. MFO contends the court improperly denied it summary disposition when plaintiff failed to present any documentary evidence contradicting or disputing MFO's employment relationship with Nyberg and Bakos at the time of the motion.

It is well-recognized that *HN10*[⊞] a party opposing a summary disposition motion under *MCR 2.116(C)(10)* has the burden of demonstrating by evidentiary materials or documents that a genuine issue of disputed fact exists. *Smith v Globe Life Ins Co, 460 Mich. 446, 455; 597 N.W.2d 28 (1999).* The nonmoving party may not rest upon mere allegations or denials, but must come forward with documentary evidence demonstrating the existence of a genuine issue [**762] of material fact for trial. *Karbel v Comerica Bank, 247 Mich. App. 90, 97; 635 N.W.2d 69 (2001).* The mere promise to provide factual support at trial is not sufficient. *Maiden v Rozwood, 461 Mich. 109, 121; [*306] 597 N.W.2d 817 (1999).* [***12] However, courts are liberal in finding a genuine issue of material fact. *Lash v Allstate Ins Co, 210 Mich. App. 98, 101; 532 N.W.2d 869 (1995).*

Plaintiff contends that the trial court's ruling was correct as discovery had not been completed. Plaintiff asserts that even if MFO were correct that Nyberg and Bakos were not its direct employees, plaintiff was still entitled to a denial of the motion for summary disposition as further factual development, through discovery, could demonstrate that MFO asserted some means of control or direction over the manner or completion of the job

responsibilities of Nyberg and Bakos such that MFO should be held liable. *HN11*[⊞] "'Generally, a motion for summary disposition is premature if granted before discovery on a disputed issue is complete.'" *Stringwell v Ann Arbor Pub School Dist, 262 Mich. App. 709, 714; 686 N.W.2d 825 (2004),* quoting *Peterson Novelties, Inc v City of Berkley, 259 Mich. App. 1, 24-25; 672 N.W.2d 351 (2003).* Summary disposition may ultimately be appropriate if further discovery does not stand a reasonable chance of uncovering factual support for the opposing party's [***13] position. *Peterson Novelties, Inc, supra, p 25.* However, under the circumstances of this case, continuing discovery could provide a reasonable opportunity to find or uncover factual support for plaintiff's assertions. Therefore, the trial court's ruling denying summary disposition to MFO was not in error.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Donald S. Owens

/s/ David H. Sawyer

/s/ Helene N. White

---

**End of Document**

---

[3] Buckler and the Gortons also contend that accrual of the claims and the running of the period of limitations with regard to Mott and MFO requires accrual of all claims at the same time. Our determination with respect to plaintiff's claim against Mott and MFO renders this issue moot. Moreover, the cases cited in support their argument are distinguishable because they involve accrual of the same "claim," such as medical malpractice, to multiple defendants. In this instance, the claims that accrued against Buckler and the Gortons, while arising from the same incident, involved duties and legal obligations owed to Eby different from those owed by MFO and Mott.

2024 U.S. Dist. LEXIS 176146, *136

Plaintiffs assert.[69] However, the Court finds that application of the _First Amendment's_ prohibition against compelled speech requires that the Court apply strict scrutiny.

As discussed above, the _First Amendment_ protects "both the right to speak freely and the right to refrain from speaking at all." _Wooley, 430 U.S. at 714_ . "[O]utside [of the commercial] context [the government] may not compel affirmance [*137] of a belief with which the speaker disagrees . . . . this general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." _Hurley, 515 U.S. at 573_ (punctuation modified). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." _Reed, 576 U.S. at 163_.

Here, SORA 2021 is a content-based regulation of speech because it requires registrants to state that they understand their registration obligations regardless of whether that is true. See _Riley, 487 U.S. at 795_ (explaining that "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech" and therefore, such regulations are "content-based regulation of speech"). Because the required statement of understanding alters the content of speech for Plaintiffs who do not understand their registration duties, the statement of understanding is a content-based regulation subject to strict scrutiny.

---

[69] Plaintiffs cite _Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 557, 125 S. Ct. 2055, 161 L. Ed. 2d 896 (2005)_ and _Jackler v. Byrne, 658 F.3d 225, 241 (2d Cir. 2011)_ for the proposition that the _First Amendment_ prohibits the government from forcing an individual to express a message with which he or she disagrees. Pls. Br. Supp. Mot. for Summ. J. at 61. But neither case involves the sort of facts at issue here. _Johanns_ held that a federal program financing advertising to promote beef products did not violate the _First Amendment_ because the advertising at issue was the Government's speech. _Johanns, 544 U.S. at 566-567_. In _Jackler_, the Second Circuit held that a probation officer stated a _First Amendment_ claim based on retaliation he faced after he retracted a false statement regarding a fellow officer's use of force. _Jackler, 658 F.3d at 241-242_. These cases provide the Court with little guidance in assessing Plaintiffs' claim centered on the attestation of understanding. In any event, the Court agrees with Plaintiffs that strict scrutiny applies.

## 2. Analysis of the Statement of Understanding Under Strict Scrutiny

Defendants [*138] argue that the statement of understanding is narrowly tailored to serve the state's goal of "ensur[ing] that registrants make efforts to understand and take seriously their ongoing requirements under the law" as part of its efforts to "monitor[] offenders by ensuring compliance." Defs. Br. Supp. Mot. for Summ. J. at 51. Plaintiffs protest that the purpose of the regulation is to "make it easier for prosecutors to establish willfulness" when bringing charges against registrants for failure to register, and, therefore, the government lacks a compelling interest. Pls. Br. Supp. Mot. for Summ. J. at 62.

Assuming the state has a compelling interest in ensuring compliance with SORA 2021's registration requirements,[70] Defendants fail to establish that the same goal could not be achieved without burdening Plaintiffs' speech. Defendants do not, for example, argue that they were unable to effectively monitor registrants' compliance before the form included the statement of understanding. As Plaintiffs note, registrants were not required to sign an Explanation of Duties form that attested to understanding the registration requirements until after SORA 2021's passage. Pls. SOMF ¶ 508 (citing Pre-2021 [*139] Explanation of Duties Form (Dkt. 126-19)); Defs. Resp. to Pls. SOMF ¶ 508. Defendants offer no explanation as to why a less burdensome regime, such as providing registrants with FAQs, training sessions, or similar informational aides, would not accomplish the goal of ensuring that registrants understand their reporting requirements.

In attempting to defend the attestation requirement, Defendants point out that the federal SORNA statute similarly requires that a state's registering agency employee must require the sex offender to read and sign a form stating that the duty to register has been explained and that the sex offender understands the registration requirement. See Defs. Br. Supp. Mot for Summ. J. at 50-51 (citing _34 U.S.C.A. 20919(a)(2)_). Unlike SORA 2021, however, federal SORNA does not penalize a registrant's failure to attest to understanding

---

[70] The parties do not point to case law specifically addressing whether the government has a compelling interest ensuring that registrants understand their registration obligations for purposes of monitoring their compliance.

2024 U.S. Dist. LEXIS 176146, *139

their registration requirements.[71] Thus, where SORA 2021 compels registrants by penalizing them for failing to sign the statement of understanding, federal SORNA does not. See *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ., No. 23-3630, 109 F.4th 453, 2024 WL 3565635, at \*7 (6th Cir. July 29, 2024)* ("A general principle of compelled speech jurisprudence is that a violation of the *First Amendment* right against compelled speech occurs only in the context of actual compulsion.") (punctuation modified). SORA 2021 compels [\*140] registrants to state that they understand their registration requirements and penalizes them if they fail to do so. Federal SORNA carries no such penalties and, therefore, lacks compulsion.

Requiring registrants to attest to understanding their registration requirements—even if they do not—constitutes compelled speech under the *First Amendment* and is subject to strict scrutiny. Because Defendants fail to establish that the regulation is narrowly tailored to further the state's compelling interest of monitoring registrants by ensuring that registrants understand their registration obligations, the requirement does not survive scrutiny. Plaintiffs are entitled to summary judgment on their forced understanding claim.

## I. Reporting of Internet Identifiers

SORA 2021 requires individuals required to be registered after July 1, 2011 to report "all electronic mail addresses and internet identifiers registered to or used by the individual." *Mich. Comp. L. § 28.727(1)(i)*. Registrants subject to this regulation must continue to report any change to their registered email addresses or internet identifiers within three business days of that change. Id. *§ 28.725(2)(a)*. SORA 2021 defines the term "internet identifier" to mean "all designations used for self-identification [\*141] or routing in internet communications or posting." Id. *§ 28.722(g)*.

"An author's decision to remain anonymous is an aspect of the freedom of speech protected by the *First Amendment*." *Signature Mgmt. Team, LLC v. Doe, 876 F.3d 831, 835 (6th Cir. 2017)* (punctuation modified). "Internet speech receives the same *First Amendment* protection as other speech." Id. Courts analyzing the validity of similar internet-identifier reporting requirements of other sex offender registration statutes have explained that such regulations are content-neutral and subject to intermediate scrutiny.[72] *Doe v. Shurtleff, 628 F.3d 1217, 1223 (10th Cir. 2010)*; *Doe v. Harris, 772 F.3d 563, 574-575 (9th Cir. 2014)*. "Under this test, the government may impose reasonable content-neutral restrictions on the time, place, or manner of protected speech, provided the restrictions: (1) serve a significant governmental interest; (2) are narrowly tailored; and (3) leave open ample alternative channels for communication of the information." *Phelps-Roper v. Strickland, 539 F.3d 356, 362 (6th Cir. 2008)* (punctuation modified).

Plaintiffs contend that having to report their "internet identifiers" chills internet use and anonymous speech. Pls. Br. Supp. Mot for Summ. J. at 63. Plaintiffs further submit that, because SORA 2021 contains no provision restricting law enforcement from publicizing such identifiers, registrants' speech is chilled for fear that the reported identifiers will be made public. [\*142] Id. at 64. As Plaintiffs point out, prior iterations of the statute prohibited the government from publicizing registrants' internet identifiers on the sex offender registry website. Pls. SOMF ¶ 516 (citing *Mich. Comp. L. § 28.728(3)(e)* (2020). SORA 2021 no longer contains an express restriction against sharing publicly the internet identifiers reported by registrants. Id. Defendants counter that the internet-reporting requirement does not limit Plaintiffs' online speech or registrants' anonymity. Defs. Br. Supp. Mot. for Summ. J. at 52. While Defendants acknowledge that SORA 2021 does not prohibit publication of internet identifiers, they submit that federal regulations prohibit such public posting. Id. at 52-53.

Although the Sixth Circuit has not squarely addressed whether the sort of internet-reporting requirements like those contained in SORA 2021 impermissibly chill speech, the weight of authorities that have addressed this issue supports Plaintiffs' view.

---

[71] And as Plaintiffs point out, SORNA does not implement its own registration scheme: "There is no way to register directly with the federal government. Nor does the federal government provide any notice about any federal obligations. State registration schemes are the only way for registrants to report and to be notified about registration requirements. There is also no way for registrants to report information not required by the state." Pls. Resp. to Defs. SOMF ¶ 35.

[72] Although Plaintiffs assert that Defendants' motion to dismiss "conceded that strict scrutiny applies" to the internet-identifier requirements, Plaintiffs do not cite any cases applying strict scrutiny to internet identifiers. Pls. Br. Supp. Mot. for Summ. J. at 66. The case law appears to be uniform in applying intermediate scrutiny to such provisions.

In Harris, the Ninth Circuit Court examined a provision requiring sex offenders to report "a list of any and all internet identifiers established or used by the person" and "a list of any and all internet service providers used by the person," as well as requiring registrants [*143] to send written notice to law enforcement within 24 hours of any additions or changes to this information.[73] Harris, 772 F.3d at 567-568 (punctuation modified). Applying intermediate scrutiny, the Ninth Circuit concluded that the Act "unnecessarily chills protected speech in at least three ways: [i] the Act does not make clear what sex offenders are required to report, [ii] there are insufficient safeguards preventing the public release of the information sex offenders do report, and [iii] the 24-hour reporting requirement is onerous and overbroad." Id. at 578. With respect to the law's treatment of publicly reporting internet identifiers, the court noted that this provision "contains no standards for judging what is necessary to ensure the public safety," and that, "[w]ithout such standards, the Act impermissibly places unbridled discretion in the hands of a government official or agency." Id. at 580 (punctuation modified). Thus, "registered sex offenders are unnecessarily deterred from engaging in anonymous online speech." Id. at 581.

Similarly, in Cornelio v. Connecticut, 691 F. Supp. 3d 529 (D. Conn. 2023)[74], the court held that a plaintiff challenging a statute requiring offenders to disclose email addresses and other internet identifiers was entitled to summary judgment on a First Amendment claim alleging [*144] chilled speech. In that case, the applicable statute required sex offenders to disclose their "electronic mail address, instant message address or other similar Internet communication identifier" on "such forms and in such locations as the commissioner shall direct." Id. at 535. The court held that the statute failed to survive intermediate scrutiny because (i) the state failed to produce evidence showing that the disclosure requirement "deterred a sex offender or helped solve a crime" and (ii) the statute was overbroad

because it required registrants to disclose any internet identifier regardless of whether the identifier was associated with a platform that could be used to perpetrate sex crimes. Id. at 543-544.[75]

In Doe v. Marshall, the court held that an Alabama law requiring registrants to report email addresses and other "designations or monikers used for self-identification in Internet communications or postings, and any and all [i]nternet service providers used by the sex offender" did not survive intermediate scrutiny. Marshall, 367 F. Supp. 3d at 1320, 1329. Like the court in Cornelio, the Marshall court found that the regulation lacked tailoring because it included reporting related to registrants' use of internet platforms that do not raise [*145] safety concerns. As posited by the court: "if a sex offender establishes a username on a news outlet's website for purposes of posting comments to news articles, it is hard to imagine how speedily reporting that identifier will serve the government's interests." Id. at 1329 (punctuation modified). Because the reporting requirements "chill[ed] a wide swath of protected speech," the Court concluded that they were overbroad in violation of the First Amendment. Id. at 1331.

Here, SORA 2021 shares the same lack of tailoring that doomed similar provisions in Harris, Cornelio, and Marshall. It applies too broadly, requiring registrants to report their email addresses, usernames, or other identifiers, regardless of whether a particular identifier is associated with a platform that could be used to commit a sex crime. In addition, the statute lacks tailoring in that it does not limit the disclosure of registrants' internet identifiers to law enforcement. Nor do Defendants offer any explanation as to how the reporting of internet identifiers would promote public safety.

SORA 2021 does not limit law enforcement's ability to publicly disclose the registrants' internet identifiers. Although Defendants assert that the federal SORNA statute prohibits [*146] such disclosure, see Defs. SOMF ¶ 148 (citing 34 U.S.C. § 20961(c); 34 U.S.C. § 20920(b)(4); 76 Fed. Reg. 1630, 1637; 86 Fed. Reg. 69856, 69858), that statute does not prevent the State of Michigan from publicly disclosing registrants' internet

---

[73] Harris was in the context of a motion for preliminary injunction.

[74] Plaintiffs' brief cites the Second Circuit's opinion in Cornelio v. Connecticut, 32 F.4th 160, 171 (2d Cir. 2022), which reversed the district court's prior grant of the state's motion to dismiss. See Pls. Br. Supp. Mot. for Summ. J. at 76. Because the district court's summary judgment opinion following remand from the Second Circuit is helpful in evaluating the parties' summary judgment briefing, the Court discusses the district court opinion.

---

[75] The court further observed that the registrants would be required to disclose internet identifiers "on a myriad of [i]nternet platforms," such as Amazon.com, the Washington Post, and WebMD—none of which is likely to be used as a platform to perpetrate sex crimes. Cornelio, 691 F. Supp. 3d at 544.

identifiers.[76] The absence of a limitation on law

---

[76] 34 U.S.C. § 20961(c) provides that "[t]he Attorney General . . . shall exempt from disclosure" the internet identifiers that offenders are required to report under § 20961(a). Section 20902(b)(4) mandates that "[a] jurisdiction shall exempt from disclosure . . . (4) any other information exempted from disclosure by the Attorney General." As Plaintiffs point out, states are not required to comply with every provision of SORNA. See Pls. Resp. to Defs. SOMF ¶ 35 (citing United States v. Felts, 674 F.3d 599, 604 (6th Cir. 2012) (explaining that a state has a "sovereign prerogative" to choose to comply with SORNA, but rejecting defendant's argument that SORNA requires persons to register only when states "fully implement[]" SORNA)). SORA 2021 does not contain any such exemption related to its internet-identifier disclosure requirements. That does not mean that the state is in violation of SORNA. Rather, to receive federal funding, states must achieve substantial compliance, which Michigan has done. See 3/16/22 Letter to Gov. Gretchen Whitmer at PageID.8281 ("Based on the response provided on July 21, 2021, the additional information provided on March 10, 2022, and information and analysis currently available, the SMART Office has determined that Michigan continues to substantially implement SORNA as of the [March 16, 2022] date of this letter.") (Dkt. 131-9); Morris Dep. Tr. at 129-130 (Dkt. 126-8) (explaining that SMART has not declined funding to the state based on changes made to the statute following the Does I and Does II decisions). Thus, while one requirement of SORNA is that states exempt internet identifiers from disclosure, Michigan has apparently chosen not to comply with this requirement and has nonetheless retained its status as a state that substantially implements SORNA.

Defendants' citation to 76 Fed. Reg. 1630-1631 actually undercuts its contention that federal regulations prohibit the state from posting internet identifiers. As the guidelines explain, "jurisdictions cannot, consistent with SORNA, include sex offenders' Internet identifiers (such as e-mail addresses) in the sex offenders' public Web site postings or otherwise list or post sex offenders' Internet identifiers on the public sex offender Web sites." 76 Fed. Reg. 1630, 1637. Importantly, however, the guidance further provides that SORNA's mandatory exemption of internet identifiers "does not limit the discretion of jurisdictions to include on their public Web sites functions by which members of the public can ascertain whether a specified e-mail address or other Internet identifier is reported as that of a registered sex offender . . . or to disclose Internet identifier information to any one by means other than public Web site posting." Id. (punctuation modified). Thus, even assuming SORNA did require that Michigan refrain from publicly disclosing internet identifiers on the registry website, it does not prohibit other means by which the public may obtain registrants' internet identifiers.

Finally, Plaintiffs' citation to 86 Fed. Reg. 69856-69858 is not

enforcement's ability to publicly disclose internet identifiers counsels further in favor of finding the statute overbroad. See Harris, 772 F.3d at 580-581 (finding that a similar internet-reporting statute chilled speech, despite including a provision that allowed law enforcement to disclose internet identifiers "when necessary to ensure public safety" because the statute contained "no standards" for judging what is necessary to ensure public safety).

Tellingly, Defendants do not dispute that SORA 2021 has a chilling effect on Plaintiffs' speech. Rather, Defendants argue that Plaintiffs' claim fails because any burden on Plaintiffs' internet usage is the result of their "own subjective chill." Defs. Br. Supp. Mot. for Summ. J. at 53-54 (citing ACLU v. Nat'l Sec. Agency, 493 F.3d 644, 654, 661 (6th Cir. 2007) (holding that plaintiffs who alleged a "well founded belief" that the National Security Agency was surveilling their communications did not state a First Amendment claim because they failed to allege an injury other than a chilling effect on speech caused by "their subjective [*147] belief that the NSA might be intercepting their communications")).

This argument misses the mark. In ACLU, the plaintiffs lacked standing because they alleged only a speculative, subjective fear of surveillance that could lead to future government action. But the court pointed out that if there was something "more" to a plaintiff's claim of injury beyond subjective "chill," then standing could be established. Id. at 663. That something "more" included "the exercise of governmental power that is regulatory, proscriptive, or compulsory in nature, and that directly regulates, proscribes, or compels the plaintiffs." Id. That exactly describes the circumstances of Plaintiffs here, given the myriad ways in which the sex registration system "regulates, proscribes, or compels" them. Indeed, SORA 2021 compels Plaintiffs by requiring them to report their internet identifiers to the state. Further, unlike in ACLU, there is no speculation regarding the state's receipt of information regarding Plaintiffs. The issue is whether that receipt—coupled with no limitation on the state's ability to disclose that Plaintiffs' information publicly—would likely engender a "chilling effect." Defendants do not dispute that it is [*148] reasonable to infer a chilling effect.

---

helpful, as that guidance provides: "Disclosure of sex offender information is separately addressed in statutory provisions that are not implicated by this rulemaking and in the SORNA Guidelines and SORNA Supplemental Guidelines." 86 Fed. Reg. 69856.

Defendants also attempt to rely on *Doe v. Shurtleff, 628 F.3d 1217, 1222 (10th Cir. 2010)* and *Does I, 101 F. Supp. 3d 672, 701 (E.D. Mich. 2015)* to argue that SORA 2021's internet-reporting requirements withstand scrutiny. Defs. Br. Supp. Mot. for Summ. J. at 52. Neither case supports Defendants' position.

In *Shurtleff*, the Tenth Circuit considered whether a Utah law requiring registrants to report their internet identifiers violated the *First Amendment. Shurtleff, 628 F.3d 1217*. The plaintiff in that case principally argued that the law chilled their speech by permitting state officials to make required disclosures public. *Id. at 1224*. Rejecting this argument, the Tenth Circuit read the applicable law narrowly, interpreting it to allow "sharing only among law-enforcement agencies, not the public at large, and only for recited law-enforcement purposes." *Id. at 1225*. Given this narrow interpretation of the statute, the court concluded that it survived intermediate scrutiny.

*Does I* analyzed a *First Amendment* challenge to a prior version of SORA, which required registrants (i) to report "all electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging [*149] system" and (ii) to report in person and notify the registering authority within three business days after the individual establishes any electronic mail or instant message address, or any other designations used in internet communications or postings." *Does I, 101 F. Supp. 3d at 699* (punctuation modified). Importantly, the 2011 version of SORA at issue in *Does I* expressly provided that the internet identifiers "shall not be made available on the public website." *Id. at 703*. Noting the differing outcomes in *Harris* and *Shurtleff*, the court concluded that SORA 2011 was "more akin to the Utah legislation [in *Shurtleff*] than the enjoined California statutes [in *Harris*]" because neither SORA 2011 nor the Utah statute in *Shurtleff* permitted registrants' identifiers to be made available to the public. *Id. at 703*. The court further reasoned that while SORA "unveil[ed] registrants' anonymity to law enforcement" that "does not, by itself, infringe upon [the plaintiffs'] *First Amendment* rights." *Id.* Ultimately, however, the court concluded that the internet-reporting requirements were not narrowly tailored because the statute (i) was ambiguous with respect to its use of the term "routinely used" and (ii) required registrants to report in person.

Neither *Shurtleff* nor [*150] *Does I* provides strong support for Defendants' position. The crux of *Shurtleff* was that the Utah statute did not impermissibly chill plaintiffs' speech because it did not permit public disclosure of internet identifiers. *Shurtleff, 628 F.3d at 1225*. *Snyder* is similarly unhelpful to Defendants. The version of SORA in that case prohibited the public disclosure of registrants' internet identifiers. No similar limitation on the disclosure of Plaintiffs' internet identifiers exists here.[77]

All told, SORA 2021's internet-identifier reporting requirements do not withstand intermediate scrutiny. The statute chills a wide swath of speech activity—regardless of whether such activity could further the commission of a sex crime. Moreover, Defendants have made no showing of whether or how law enforcement uses internet identifiers to protect the public against the commission of sex crimes. Nor have they made any showing that the public could effectively use such information to protect themselves. On this record, Defendants cannot show that the internet reporting requirements serve any government interest, much less a significant interest. The Court concludes that Plaintiffs are entitled to summary judgment on this [*151] claim. The precise contours of the relief that follows will be addressed at a later phase in this case.

## J. Vagueness

Plaintiffs argue that SORA 2021 is unconstitutionally vague. Pls. Br. Supp. Mot. for Summ. J. at 57. Under the void-for-vagueness doctrine, courts assess whether (i) "ordinary people, exercising ordinary common sense, can understand [the statute] and avoid conduct which is prohibited" and (ii) the statute "establishes minimal guidelines to govern enforcement." *United States v. Salisbury, 983 F.2d 1369, 1378 (6th Cir.1993)*. The doctrine is intended to "ensure fair notice to the citizenry" and "provide standards for enforcement by the police, judges, and juries." *Columbia Nat. Res., Inc. v. Tatum, 58 F.3d 1101, 1104 (6th Cir.1995)*. "The second prong—providing minimal guidelines to govern the conduct of law enforcement—constitutes the more important aspect of the vagueness doctrine." *Belle Maer Harbor v. Charter Twp. of Harrison, 170 F.3d 553, 556-*

---

[77] The Court recognizes that, like the plaintiffs in *Does I*, here, Plaintiffs also argue that SORA 2021's internet-reporting requirement is vague and ambiguous. Pls. Br. Supp. Mot. for Summ. J. at 65. The Court addresses Plaintiffs' void-for-vagueness claims below.

2024 U.S. Dist. LEXIS 176146, *151

_557 (6th Cir. 1999)_. "[A] failure to define a term within a statute or ordinance does not render the statute unconstitutionally vague, where the common meaning of the word provides both adequate notice of the conduct prohibited and the standards for enforcement." _Id. at 558_.

Plaintiffs' brief provides a list containing eight categories of provisions under SORA 2021 that they assert are vague: "Employment, changes to employment, employment locations, and volunteer [*152] work; phone numbers; vehicles; residential addresses; travel; email and internet usage; nicknames and physical descriptions; higher education and other classes." Pls. Br. Supp. Mot. for Summ. J. at 60 (capitalization and punctuation modified) (citing _Mich. Comp. L. §§ 28.722, 28.724a, 28.725, 28.727_). Plaintiffs submit that they "are unsure both about what they must do and what they cannot do" under SORA 2021. _Id._ at 59. And according to Plaintiffs, "[l]aw enforcement officials fare no better, offering widely divergent interpretations of [the above cited] provisions." _Id._ at 60 (citing MSP Response Chart (Dkt. 123-5); Law Enforcement Survey (Dkt. 123-23)).

Defendants disagree. They argue that SORA 2021 provides fair notice of the conduct it punishes and does not invite arbitrary enforcement of its terms. Defs. Br. Supp. Mot. for Summ. J. at 37, 41. Defendants briefly discuss each category of SORA 2021 challenged by Plaintiffs, arguing that the provisions are not lacking in clarity. _Id._ at 37-40.

Neither party provides a record from which the Court can render a determination regarding Plaintiffs' vagueness claims. Aside from the allegations summarized above, Plaintiffs' brief does not explain with any specificity how each of the challenged provisions [*153] is vague. Instead, Plaintiffs direct the Court to their Statement of Material Facts, which provides examples of provisions that Plaintiffs contend are vague. This is not a proper way of presenting its argument to the Court. See _McPherson v. Kelsey, 125 F.3d 989, 996 (6th Cir. 1997)_ ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (punctuation modified).

Defendants' presentation fares no better. In addressing each category challenged by Plaintiffs, Defendants direct the Court to review Defendants' initial motion to dismiss, arguments which it claims are incorporated by

reference. See Defs. Br. Supp. Mot. for Summ. J. at 37-40 (citing _Fed. R. Civ. P. 10(c)_). But Defendants' reliance on _Rule 10(c)_ is misguided. _Rule 10(c)_ allows parties to adopt by reference statements made in pleadings, a term that does not encompass a motion to dismiss. See _Fed. R. Civ. Pro. 7(a)_ (listing seven specific documents that are the "only" pleadings "allowed," none of which is a motion). Defendants, therefore, cannot rely on the arguments they made in their earlier motion. See, e.g., _Ortiz v. New Mexico, 550 F. Supp. 3d 1020, 1078-1079 (D.N.M. 2021); Marco Int'l, LLC v. Como-Coffee, LLC, No. 17-cv-10502, 2018 U.S. Dist. LEXIS 63249, 2018 WL 1790171, at *1 n.1 (E.D. Mich. Apr. 16, 2018)_.

Given the inadequacy of the record [*154] before it, the Court will require the parties to confer to reach agreement on the meaning of the terms challenged by Plaintiffs. If agreement can be reached on the meaning of terms, those definitions could then be the subject of a court order. If no agreement is reached, the Court will require further briefing from the parties.

## K. Statute of Limitations and Mootness Due to Federal SORNA

Defendants make two final arguments in an attempt to dispose of the case: (i) that the statute of limitations has lapsed on many of Plaintiffs' claims, and (ii) that Plaintiffs' claims are moot because even if SORA is struck down, federal SORNA is still in effect and would require registration. Defs. Mot. for Summ. J. at 73-74. Both arguments fail.

As an initial matter, Defendants do not develop either argument. Their brief in support of their motion for summary judgment simply "adopt[s] by reference the arguments previously made" in their earlier motion to dismiss, which they again contend is "consistent with _Fed. R. Civ. Pro. 10(c)_." _Id. at 73_. But as already discussed, Defendants reliance on _Rule 10(c)_ is misguided, and they cannot rely on the arguments they made in their earlier motion.

Without their motion to dismiss, Defendants' arguments [*155] regarding statute of limitations and mootness are, as Plaintiffs describe them, "perfunctory." Pls. Reply at 27. As discussed above, arguments adverted to in this matter are deemed waived. _McPherson, 125 F.3d at 996_.

But even if the Court were to consider Defendants'

earlier arguments, they are without merit. With respect to statute of limitations, Defendants contend that "many of the provisions being challenged in this lawsuit have remained unchanged for over a decade" because they were initially introduced in the 2011 amendments to SORA. Defs. Br. Supp. Mot. to Dismiss at 49. Defendants correctly note that Michigan's three-year statute of limitations period for personal injury claims is applied to Plaintiffs' claims brought under *42 U.S.C. § 1983*. *Id. at 47-48* (citing *Wolfe v. Perry, 412 F.3d 707, 713-714 (6th Cir. 2005)*; *Garza v. Lansing Sch. Dist., 972 F.3d 853, 867 n.8 (6th Cir. 2020)*). According to Defendants, the statute of limitations for many of Plaintiffs' claims began to run in 2011, when the Plaintiffs "[knew] or [had] reason to know that the act providing the basis of his or her injury has occurred." *Id.* (citing *Garza, 972 F.3d at 867 n.8*).

The Court disagrees. As Plaintiffs note in their response to Defendants' motion to dismiss, the Sixth Circuit views a constitutional challenge to a statute that is alleged to continue to violate a plaintiff's rights on an on-going [*156] basis as timely so long as the violation continues. Pls. Resp. to Defs. Mot. to Dismiss (Dkt. 44) at 65-66 (citing *Kuhnle Bros., Inc. v. Cnty. of Geauga, 103 F.3d 516 (6th Cir. 1997)*). In Kuhnle, the court considered a challenge under *§ 1983* based on a county resolution that interfered with the plaintiff's trucking operations. *Id. at 518*. The court distinguished between the plaintiff's (i) "takings" claim and substantive due process claim for deprivation of property, and (ii) substantive due process claim for interference with interstate travel. *Id. at 520-523*. The former claims were found to be time-barred. *Id. at 521*. The takings claim was time-barred because the "taking"—or the diminution in value of the plaintiff's property interest—occurred when the resolution was enacted. *Id.* The substantive due process claim for deprivation of property was time-barred for the same reason. *Id.*

The court found that the interference with travel claim, however, was a continuing violation so that plaintiff's claim was timely. *Id. at 521-523*. As the court explained, "each day that the invalid resolution remained in effect, it inflicted continuing and accumulating harm on [the plaintiff]." *Id. at 522* (punctuation modified). "A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge [*157] for all time merely because no one challenges it within [the first few] years of its enactment." *Id.*

The same principle has been recognized outside the Sixth Circuit. See *Flynt v. Shimazu, 940 F.3d 457, 462*

*(9th Cir. 2019)* (deeming timely a *§ 1983* challenge by gambling licensees to state statute limiting their ownership of out-of-state casinos because "[w]hen the continued enforcement of a statute inflicts a continuing or repeated harm, a new claim arises (and a new limitations period commences) with each new injury"); *Leal v. Azarii, No. 2:20-cv-185-Z, 2020 U.S. Dist. LEXIS 241947, 2020 WL 7672177, at *7 (N.D. Tex. Dec. 23, 2020)* (deeming timely a challenge to a federal agency rule because "these types of suits are seeking prospective relief for ongoing injuries" and "[s]tatutes of limitations are simply inapplicable to such injuries") (emphasis in original), *vacated and remanded on other grounds, Leal v. Becerra, No. 21-10302, 2022 U.S. App. LEXIS 20803, 2022 WL 2981427 (5th Cir. July 27, 2022)*.

Here, Plaintiffs claim ongoing injuries, as they allege that ongoing enforcement of SORA 2021 is unconstitutional. The remedy they seek—declaratory and injunctive relief—is prospective only. Their claims are not barred by any statute of limitations.

In their motion to dismiss, Defendants cited *Doe v. Rausch, No. 3:20-cv-00728, 2022 U.S. Dist. LEXIS 27853, 2022 WL 481240, at *1 (M.D. Tenn. Feb. 16, 2022)*, which the Court finds persuasive only in part. In Rausch, the plaintiff pled guilty to two counts of aggravated sexual battery in 1999. *2022 U.S. Dist. LEXIS 27853, [WL] at *1*. At that time, the plaintiff was required [*158] to register as a "sex offender" in Tennessee but was allowed under the statute to seek removal from the registry ten years after completing his sentence. *Id.* Plaintiff completed his sentence in 2006. *Id.* In 2004, the Tennessee General Assembly passed a new version of its SORA, under which the plaintiff was reclassified as a "violent sexual offender" and subject to lifetime registration. *Id.* The plaintiff waited until 2020 to file a lawsuit challenging the amendment as applied to him as unconstitutional, bringing ex post facto, due process, vagueness, and *First Amendment* claims. *Id.*

The defendant in Rausch argued that the plaintiff's claims were untimely because he filed his action more than one year after he knew or should have known that he was subject to lifetime registration, which was the relevant statute of limitations under Tennessee law. *2022 U.S. Dist. LEXIS 27853, [WL] at *2*. In response, the plaintiff argued that the continuing violation doctrine applied to his causes of action. *Id.* The court held that the plaintiff's ex post facto, vagueness, and *First Amendment* claims were timely, but that plaintiff's due process claim was not because it was "directed at the

original imposition of SORA's requirements on [p]laintiff rather than at the ongoing [*159] effects of the statutory scheme." *2022 U.S. Dist. LEXIS 27853, [WL] at *3*.

This Court agrees with *Rausch*, except as to it ruling regarding the due process claim. It would seem that any deprivation of due process was not confined to the date of the statute's enactment, but continued as long as it remained in effect. Unless that court's opinion obscured the peculiarities of the statute's enactment as it might bear on a due process claim, it would seem that the claim should have been treated as timely, like the other claims whose timeliness was sustained. Except for its inexplicable treatment of the due process claim, *Rausch* confirms this Court's conclusion that challenges seeking prospective relief for ongoing harms from unconstitutional statutes are timely so long as the allegedly unconstitutional conduct continues.

Defendants' mootness claim is also without merit. Because Defendants characterize this issue as touching on the question of jurisdiction, Defs. Br. Supp. Mot. to Dismiss at 51, the Court proceeds to address it.

According to Defendants, Plaintiffs' claims are moot because even if the Court grants relief from SORA, Plaintiffs will have a "continuing duty to comply with federal SORNA registration requirements, which [*160] are practically identical to the requirements of [SORA 2021]." *Id. at 53*. But Defendants provide no case that says the existence of SORNA makes a challenge to a state sex offender registry moot. As already discussed, SORNA does not establish its own sex offender registry; individuals are only required to register with states. Further, Plaintiffs' obligations under a state registration system are distinct from any obligations under SORNA. *Willman v. Att'y Gen. of U.S., 972 F.3d 819 (6th Cir. 2020)*. Regardless of Plaintiffs' federal obligations under SORNA, they have distinct state-law obligations, which they are entitled to challenge. Plaintiffs' claims regarding SORA are not mooted by the existence of federal SORNA.

**L. Whether the Governor is a Proper Defendant**

In their supplemental brief regarding *Doe v. Lee, 102 F.4th 330 (6th Cir. 2024)*, Defendants argue for the first time that the Court should dismiss the Governor as a party because Plaintiffs do not have standing to bring this challenge against her. Defs. Lee Br. at 5. In their supplemental brief, Plaintiffs submit that the Court "need not address Defendants' late request before deciding

the merits." Pls. Lee Br. at 4. The Court agrees with Plaintiffs. Defendants raised this argument too late for it to be ruled on presently, and whether the Governor [*161] remains a Defendant in this matter does not affect the Court's other rulings. The Court will direct counsel for the parties to confer on whether additional briefing on this issue is required.

**IV. CONCLUSION**

For the reasons explained above, the Court grants summary judgment to Plaintiffs as to their (i) ex post facto claims, (ii) non-sex offense claim, (iii) non-Michigan offense claim, and (iv) *First Amendment* claims alleging forced admission of understanding of chilled speech rights stemming from SORA 2021's internet-identifier reporting requirements. The Court grants summary judgment to Defendants as to Plaintiffs' claims regarding (i) lack of individualized review, (ii) unequal opportunity to petition, and (iii) compelled speech. Plaintiffs' claim regarding plea agreements is moot.

The Court orders counsel for the parties to meet and confer regarding the issues set forth below and then file a joint statement on or before October 18, 2024 setting forth their points of agreement and disagreement regarding each one.

1. What further proceedings are required.
2. The statutory terms that the parties agree can be narrowed to avoid vagueness and the terms upon which they cannot agree.

3. Whether additional [*162] briefing is required to address the issue of the propriety of the Governor of Michigan being a defendant in this action.
4. The terms of a proposed judgment upon which the parties can agree and the terms upon which they cannot agree.

SO ORDERED

Dated: September 27, 2024

Detroit, Michigan

/s/ Mark A. Goldsmith

MARK A. GOLDSMITH

United         States         District         Judge

2024 U.S. Dist. LEXIS 176146, *162

Table1 (*Return to related document text*)

I. INTRODUCTION

II. BACKGROUND

A. History of SORA

B. Related Litigation

C. The Present Case

III. ANALYSIS

A. Retroactive Application of SORA 2021

1. Controlling Precedent

2. SORA 2021 Constitutes Punishment

a. Legislative Intent

b. SORA 2021's Actual Effects

i. History and Tradition

ii. Affirmative Disability or Restraint

iii. Traditional Aims of Punishment

iv. Rational Connection to a Non-Punitive Purpose

v. Excessive with Respect to Purpose

B. Lack of Individualized Review

1. Due Process

a. Procedural Due Process

b. Substantive Due Process

i. Fundamental Rights

ii. Animus

iii. Rational Basis Review

2. Equal Protection

C. Unequal Opportunity to Petition for Removal

D. Plea Agreements

E. Non-Sex Offenses

1. Mootness

2. Class-Wide Relief

3. Merits of Plaintiffs' Non-Sex Claim

F. Non-Michigan Convictions

G. Compelled Speech

1. Compelled Speech Under the *First Amendment*

2. SORA 2021 Reporting Requirements and Strict Scrutiny

H. Forced Admission of Understanding

1. Applicable Scrutiny

2. Analysis of the Statement of Understanding Under Strict Scrutiny

I. Reporting of Internet Identifiers

J. Vagueness

K. Statute of Limitations and Mootness Due to Federal SORNA

L. Whether the Governor is a Proper Defendant

IV. CONCLUSION

2024 U.S. Dist. LEXIS 176146, *162

**Table1** (*Return to related document text*)

**Table2** (*Return to related document text*)

|  | Percent of Registrants[4] | Registration Length[5] | Reporting Interval[6] | Public or Non-Public Registry[7] | Ability for Adults to Petition for Removal[8] |
|---|---|---|---|---|---|
| Tier I | 7% | 15 years | Once a year | Non-public | Yes, after 10 years |
| Tier II | 20% | 25 years | Twice a year | Public | No |
| Tier III | 73% | Lifetime | Four times a year | Public | No |

**Table2** (*Return to related document text*)

**End of Document**

---

[4] Pls. SOMF ¶ 76 (citing Class Data Report ¶¶ 5, 42 (Dkt. 123-6)). The Class Data Report notes that "130 people (0.3%) are not classified in one of the tiers, which appears to reflect that they have a special status due to court decisions, special conditions related to an out-of-state offense, or some other exception." Class Data Report ¶ 42 n.11.

[5] *Mich. Comp. L § 28.725(11)-(13)*.

[6] *Mich. Comp. L § 28.725a(3)(a)-(c)*.

[7] *Mich. Comp. L § 28.728(4)(c)*.

[8] *Mich. Comp. L § 28.728c(1)*, *(12)*. As discussed in more detail later in this opinion, certain Tier III juvenile offenders can also petition for removal after 25 years. *Id. § (2)*, *(13)*.

**Ⓐ** Neutral
As of: November 16, 2024 4:58 PM Z

# *Trentadue v. Buckler Automatic Lawn Sprinkler Co.*

Court of Appeals of Michigan

March 24, 2005, Decided

No. 252155, No. 252207, No. 252209

**Reporter**
2005 Mich. App. LEXIS 835 *

DAYLE TRENTADUE, as Personal Representative of the Estate of MARGARETTE F. EBY, Deceased, Plaintiff-Appellant, v BUCKLER AUTOMATIC LAWN SPRINKLER COMPANY, SHIRLEY GORTON, LAURENCE W. GORTON, JEFFREY GORTON, and CARL L. BEKOFSKE, as Personal Representative of the Estate of RUTH R. MOTT, Deceased, Defendants, and VICTOR NYBERG, TODD MICHAEL BAKOS and MFO MANAGEMENT COMPANY, Defendants-Appellees. DAYLE TRENTADUE, as Personal Representative of the Estate of MARGARETTE F. EBY, Deceased, Plaintiff-Appellee, v BUCKLER AUTOMATIC LAWN SPRINKLER COMPANY, SHIRLEY GORTON and LAURENCE W. GORTON, Defendants-Appellants, and JEFFREY GORTON, VICTOR NYBERG, TODD MICHAEL BAKOS, MFO MANAGEMENT COMPANY, and CARL F. BEKOFSKE, as Personal Representative of the Estate of RUTH R. MOTT, Deceased, Defendants. DAYLE TRENTADUE, as Personal Representative of the Estate of MARGARETTE F. EBY, Deceased, Plaintiff-Appellee, v BUCKLER AUTOMATIC LAWN SPRINKLER COMPANY, SHIRLEY GORTON, LAURENCE W. GORTON, JEFFREY GORTON, VICTOR NYBERG, TODD MICHAEL BAKOS and CARL L. BEKOFSKE, as Personal Representative of the Estate of RUTH R. MOTT, Deceased, Defendants, and MFO MANAGEMENT COMPANY, Defendant-Appellant.

**Notice:** [*1] THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** The Publication Status of this Document has been Changed by the Court from Unpublished to Published. The Opinion is now Reported at: *2005 Mich. App. Lexis 1070*.

Ordered published by *Trentadue v. Buckler Automatic*

*Lawn Sprinkler Co., 266 Mich. App. 297, 701 N.W.2d 756, 2005 Mich. App. LEXIS 1070 (2005)*

**Prior History:** Genesee Circuit Court. LC No. 02-074145-NZ.

**Disposition:** Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

## Core Terms

discovery rule, summary disposition, breach of duty, murder, plaintiff's claim, statute of limitations, causal connection, cause of action, possible cause, discovery, killer, limitations period, diligence

**Judges:** Before: Owens, P.J., and Sawyer and White, JJ.

## Opinion

PER CURIAM.

Plaintiff Estate of Margarette F. Eby appeals by leave granted the order granting defendants Estate of Ruth R. Mott ("Mott") [1] and MFO Management Company ("MFO") summary disposition on plaintiff's claim pertaining to their breach of duty to provide adequate security to Margarette F. Eby ("Eby"), on the ground that it was barred by the applicable statute of limitations in this wrongful death action. Defendants, Buckler Automatic Lawn Sprinkler Company ("Buckler"), Shirley Gorton and Laurence W. Gorton ("the Gortons"), appeal

---

[1] Plaintiff's claims against Mott were voluntarily settled during the pendency of this appeal. *Est of Margarette F Eby v Buckler Automatic Lawn Sprinkler Co*, unpublished order of the Court of Appeals, entered May 11, 2004 (Docket No. 252115).

by leave granted the order denying their motion for summary disposition based on the applicable statutes of limitation on all plaintiff's claims. MFO appeals by leave granted the order denying its motion for summary disposition on plaintiff's breach [*2] of duty claim under a theory of respondeat superior. We affirm in part, reverse in part, and remand.

Defendants assert that plaintiff's claims are barred by MCL 600.5805(10). Buckler and the Gortons assert that all plaintiff's claims should be precluded because MCL 600.5827 states that a claim accrues "at the time the wrong upon which the claim is based was done regardless of the time when damages results." They contend that the time of the wrong that initiated the running of the limitations period was the date plaintiff's injury resulted from a breach of duty. Fealk, 449 Mich. 56, 64; 534 N.W.2d 695 (1995), citing Larson v Johns-Manville Sales Corp, 427 Mich. 301, 309; [*3] 399 N.W.2d 1 (1986). Defendants contend the discovery rule is not available to plaintiff because the date of accrual is not delayed until discovery of the identity of the perpetrator or determination of all possible causes of action. Plaintiff argues that the discovery rule should apply because until Jeffrey Gorton's culpability for Eby's murder was discovered, there was no basis to assert breach of duty claims against Mott and MFO. Plaintiff asserts that without the identity of Eby's murderer, there was no basis to assert any type of claim against the remaining defendants, Buckler, the Gortons, Nyberg and Bakos because their culpability was solely based on their specific job responsibilities or employment relationship to the murderer Jeffrey Gorton.

A trial court's ruling on motions for summary disposition is reviewed de novo. Hazle v Ford Motor Co, 464 Mich. 456, 461; 628 N.W.2d 515 (2001). When there is no disputed issue of fact, the question whether a statute of limitation bars a cause of action is also reviewed de novo. Van Reken v Darden, Neef & Heitsch, 259 Mich. App. 454, 456; 674 N.W.2d 731 (2003). [*4]

Our Supreme Court has recognized the dichotomy that exists between the need to protect defendants from stale claims and the injustice which could result from precluding certain claims as requiring application of a discovery rule to toll limitations periods in certain situations. A discovery rule has been applied to avoid unjust results which could occur when a reasonable and diligent plaintiff would be denied the opportunity to bring a claim due either to the latent nature of the injury or the inability of the plaintiff to learn of or identify the causal connection between the injury and the breach of a duty

owed by a defendant. Specifically:

Where the discovery rule is found to be appropriate, a 'plaintiff's claim accrues when the plaintiff discovers, or through the exercise of reasonable diligence, should have discovered . . . (1) an injury, and (2) the causal connection between plaintiff's injury and the defendant's breach [of duty to the plaintiff].' [Lemmerman, supra, p 66, quoting Moll v Abbott Laboratories, 444 Mich. 1, 16; 506 N.W.2d 816 (1993).]

The discovery rule has been deemed applicable:

because statutes [*5] of limitation do not evidence a legislative intent to extinguish a cause of action before the plaintiff is aware of the possible cause of action . . . . [Lemmerman, supra, p 66, quoting Chase v Sabin, 445 Mich. 190, 196; 516 N.W.2d 60 (1994).]

When the discovery rule has been applied, it has involved a weighing of the need to protect defendants from the harms intended to be prevented by statutes of limitation against the benefit to a plaintiff afforded by application of the rule. Goodridge v Ypsilanti Twp Bd, 451 Mich. 446, 454-455; 547 N.W.2d 668 (1996). The balancing of these competing interests:

Is facilitated where there is objective evidence of injury and causal connection guarding against the danger of stale claims and a verifiable basis for the plaintiffs' inability to bring their claims within the statutorily prescribed limitation period. [Lemmerman, supra, pp 66-67.]

When the discovery rule is applicable, a claim does not accrue until the plaintiff discovers, or with the exercise of reasonable diligence should have discovered, (1) an injury and (2) a causal [*6] connection between the plaintiff's injury and the defendant's breach of duty. Jackson Co Hog Producers v Consumers Power Co, 234 Mich. App. 72, 78; 592 N.W.2d 112 (1999). The test applied to determine when a cause of action accrues "is an objective one, based on objective facts, and not on what a particular plaintiff subjectively believed." Id. Pursuant to the discovery rule, a limitations period begins to run if a plaintiff is aware that there is a "possible cause of action" against a defendant, i.e., when a plaintiff "is aware of an injury and its possible cause." Moll, supra, pp 23-24. It is not necessary that a plaintiff be capable of proving each element of a cause of action before the limitations period begins to run. Jackson Co Hog Producers, supra, p 78.

2005 Mich. App. LEXIS 835, *6

The discovery rule applies when an element of a cause of action has occurred but is undiscoverable using reasonable diligence for a period of time. _Doe v Roman Catholic Archbishop of the Archdiocese of Detroit, 264 Mich. App. 632,   ;   N.W.2d_   (Docket No. 249394, issued December 21, 2004), **[\*7]** slip op, p 5, citing _Travelers Ins Co v Guardian Alarm Co of Michigan, 231 Mich. App. 473, 479-480; 586 N.W.2d 760 (1998)_. With respect to plaintiff's claims against Buckler, the Gortons, Nyberg and Bakos, the relationship between Buckler, the Gortons, Nyberg and Bakos to Eby's killer could not be discovered by plaintiff, under the circumstances of this case, until Jeffrey Gorton was determined to be the killer, or the means of access of Eby's killer into her residence was determined. Thus, plaintiff was not aware of a possible cause of action until that time. We reject defendants' argument that the discovery rule is inapplicable because this is simply a case of unknown identity, and the courts have consistently held that the rule is inapplicable in such cases. This is not a case where plaintiff knew of an injury and its cause, but did not know the identity of the actor. Plaintiff knew that Eby was murdered, but did not know that anyone had caused Eby harm other than the killer. Plaintiff could not have known of a cause of action against anyone in Buckler's, the Gortons', Nyberg's or Bako's positions until the facts of the murder were uncovered.

Further, **[\*8]** as noted by our Supreme Court in addressing cases involving repressed memory of assault:

> In those instances in which we have applied the common-law discovery rule to extend the statute of limitations, the dispute between parties has been based on evaluation of a factual, tangible consequence of action by the defendant, measured against an objective external standard. The presence of this external standard addressed the concern for reliable fact finding that is the underlying rationale for precluding untimely claims. [_Lemmerman, supra, p 68_.]

Plaintiff's claims against Buckler, the Gortons, Nyberg and Bakos are neither speculative nor incapable of proof. Records pertaining to Jeffrey Gorton's employment, his prior criminal history, fingerprint and DNA evidence placing him within Eby's residence and records verifying ties involving Buckler with access to the gatehouse by Nyberg and Bakos within days of the murder all constitute objective and verifiable evidence to support application of the discovery rule. Thus, the discovery rule applied to plaintiff's claims against Buckler, the Gortons, Nyberg, Bakos, and Jeffrey

Gorton. [2]

**[\*9]** With respect to plaintiff's negligence cause of action against Mott and MFO, negligence is comprised of (a) a duty, (2) breach of the duty, (3) causation, and (4) damages. _Haliw v Sterling Heights, 464 Mich. 297, 304; 627 N.W.2d 581 (2001)_. Although at the time of the murder plaintiff was aware of a duty owed to Eby by either Mott or MFO and of damages, plaintiff was unaware of any causal connection. The police theorized that a personal relationship existed between Eby and her killer because there was no sign of forced entry. This was an objective theory grounded in objective facts; thus, plaintiff's inability to recognize a possible cause of action was not merely a result of plaintiff's subjective beliefs. _Jackson Co Hog Producers, supra, p 78_. Until Jeffrey Gorton was implicated in the murder, there was no indication that Eby's killer was a stranger and, thus, even with the exercise of reasonable diligence on the part of the police department, there was no causal connection between Eby's murder and any breach of duty by Mott or MFO. _Lemmerman, supra, p 66_, quoting _Moll, supra, p 16_. Therefore, the **[\*10]** court should have determined that the discovery rule applied instead of improperly granting summary disposition to Mott and MFO. _Doe, supra_, slip op, p 5, citing _Travelers Ins Co, supra, pp 479-480_. [3]

---

[2] Citing _Stephens v Dixon, 449 Mich. 531; 536 N.W.2d 755 (1995)_, _McCluskey v Womack, 188 Mich. App. 465, 472-473; 470 N.W.2d 443 (1991)_, and _Eschenbacher v Hier, 363 Mich. 676, 682; 110 N.W.2d 731 (1961)_, the trial court rejected plaintiff's argument that the discovery rule applied. We note that _McCluskey, supra_ and _Eschenbacher, supra, pp 679-683_, dealt with whether statutes of limitation were tolled by fraudulent concealment, not whether the discovery rule prevented the periods of limitation from accruing. See _Moll v Abbott Laboratories, 444 Mich. 1, 16; 506 N.W.2d 816 (1993)_. And the holding in _Stephens, supra, p 537_, that "the discovery rule is not available in a case of ordinary negligence where a plaintiff merely misjudges the severity of a known injury," is not applicable to the facts of the instant case. Moreover, although the trial court "rejected" plaintiff's argument with respect to the discovery rule, citing _Connelly v Paul Ruddy's Equipment Repair & Service Co, 388 Mich. 146, 150; 200 N.W.2d 70 (1972)_, the court nevertheless applied the discovery rule to all plaintiff's claims to determine whether and when each claim accrued. See _Stephens, supra, p 538_, quoting _Connelly, supra, p 151_.

[3] Buckler and Gortons also contend that accrual of the period of limitation with regard to Mott and MFO requires accrual of all claims at the same time. Our determination with respect to plaintiff's claim against Mott and MFO renders this issue moot.

2005 Mich. App. LEXIS 835, *10

Finally, MFO contends the trial court erred in denying its motion for summary disposition pertaining to plaintiff's assertion of MFO's liability for the actions [*11] of Nyberg and Bakos under the doctrine of respondent superior. MFO notes that in seeking summary disposition, it provided the trial court with documentary evidence that neither Nyberg nor Bakos was an employee of MFO. MFO contends the court improperly denied it summary disposition when plaintiff failed to present any documentary evidence contradicting or disputing MFO's employment relationship with Nyberg and Bakos at the time of the motion.

It is well-recognized that a party opposing a summary disposition motion, pursuant to *MCR 2.116(C)(10)*, has the burden of demonstrating by evidentiary materials or documents that a genuine issue of disputed fact exists. *Smith v Globe Life Ins Co, 460 Mich. 446, 455; 597 N.W.2d 28 (1999)*. The nonmoving party may not rest upon mere allegations or denials but must come forward with documentary evidence demonstrating the existence of a genuine issue for trial. *Karbel v Comerica Bank, 247 Mich. App. 90, 97; 635 N.W.2d 69 (2001)*. The mere promise to provide factual support at trial is not sufficient. *Maiden v Rozwood, 461 Mich. 109, 121; 597 N.W.2d 817 (1999)*. [*12] However, courts are liberal in finding a genuine issue of material fact. *Lash v Allstate Ins Co, 210 Mich. App. 98, 101; 532 N.W.2d 869 (1995)*.

Plaintiff contends that the trial court's ruling was correct as discovery had not been completed. Plaintiff asserts that even if MFO is correct that Nyberg and Bakos were not its direct employees, plaintiff was still entitled to a denial of the motion for summary disposition as further factual development, through discovery, could demonstrate that MFO asserted some means of control or direction over the manner or completion of the job responsibilities of Nyberg and Bakos resulting in liability. "'Generally, a motion for summary disposition is premature if granted before discovery on a disputed issue is complete.'" *Stringwell v Ann Arbor Pub School Dist, 262 Mich. App. 709, 714; 686 N.W.2d 825 (2004)*, quoting *Peterson Novelties, Inc v City of Berkley, 259 Mich. App. 1, 24-25; 672 N.W.2d 351 (2003)*. Summary disposition may ultimately be appropriate if further

discovery does not stand a reasonable chance of uncovering factual support for the opposing party's [*13] position. *Peterson Novelties, Inc, supra, p 25*. However, under the circumstances of this case, continuing discovery could provide a reasonable opportunity to find or uncover factual support for plaintiff's assertions. Therefore, the trial court's ruling denying summary disposition to MFO was not in error.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Donald S. Owens
/s/ David H. Sawyer
/s/ Helene N. White

---

End of Document

---

Moreover, the cases cited to support their argument are distinguishable because they involve accrual of the same "claim," such as medical malpractice, to multiple defendants. In this instance, the claims that accrued against Buckler and Gortons, while arising from the same incident, involved different duties and legal obligations owed to Eby from those owed by MFO and Mott.

Signed in as State Of Michigan Michigan DOC - Staff.

🐢 State of Michigan DOC    Q

Client:-None-⌄    History    Help    Sign Out    More

Document:    Iden v. Warden, Se. Corr. Inst., 2024 U.S. Dist. LEXIS 162002    Actions⌄

✉  ⤓  ⛶  Go to ⌄  Page  Page #  ∧ ∨  Search Document Q    ⟨ 1 of 1 | Results list ⟩

## Iden v. Warden, Se. Corr. Inst., 2024 U.S. Dist. LEXIS 162002

Copy Citation

United States District Court for the Southern District of Ohio, Eastern Division

September 9, 2024, Filed

Case No. 2:23-cv-2525

**Reporter**
2024 U.S. Dist. LEXIS 162002 * | 2024 WL 4117202

JOHN J. IDEN, Petitioner, v. WARDEN, SOUTHEASTERN CORRECTIONAL INSTITUTION, Respondent.

## Core Terms

statute of limitations, woman, equitable tolling, memorandum, tolled, motion to dismiss, direct appeal, postconviction, deadline, sexual, application to reopen, direct review, filings, non-party, spoke, writ petition, one-year, arrived, felony, scene, ride, supplemental, collateral, sur-reply, expired, morning, Reply, truck, rape, habeas corpus

**Counsel:** [*1] John J Iden, Petitioner, Pro se, Lancaster, OH.

**Judges:** SARAH D. MORRISON ⌄, CHIEF UNITED STATES DISTRICT JUDGE. Magistrate Judge Chelsey M. Vascura ⌄.

**Opinion by:** SARAH D. MORRISON ⌄

## Opinion

### ORDER

John J. Iden, a state prisoner who is proceeding without the assistance of counsel, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (Petition, ECF No. 1.) This matter is currently before the Court on Respondent's Motion to Dismiss the Petition as time-barred. (Mot., ECF No. 8.) Petitioner responded (Resp., ECF No. 10), Respondent filed a Reply (Reply, ECF No. 11), and Petitioner filed a sur-reply (ECF No. 12). Petitioner also requested that the Court disregard an anticipated filing by a non-party who was hired to provide legal services on Petitioner's behalf. (ECF No. 13.) The anticipated non-party submission was filed shortly thereafter. (Clark's Memo, ECF No. 14.) Finally, Petitioner filed "Supplemental Evidence" in support of his arguments on equitable tolling. (ECF No. 15.) Respondent has not addressed the four latest filings (ECF Nos. 12-15).

For the reasons set forth below, the Court **STRIKES** Petitioner's sur-reply and supplemental evidence (ECF Nos. 12, 15) and the non-party's submission (ECF No. 14) because they were [*2] filed in violation of the Court's Rules. Petitioner's motion to disregard the non-party's submission (ECF No. 13) is **DENIED** as moot.

With respect to the Motion to Dismiss (ECF No. 8), the Court **CONCLUDES** that the Petition was not filed within the one-year statute of limitations for habeas corpus actions but **RESERVES** a conclusion on whether equitable tolling applies. Respondent is **ORDERED** to file an Answer and any necessary additional state-court record materials, and Petitioner may file a Reply, consistent with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules"). The parties may further address equitable tolling in their Answer and Reply but should not address the statute of limitations issue resolved herein. Respondent's Motion to Dismiss will be **HELD IN ABEYANCE** until these filings are made and considered.

### I. BACKGROUND

Petitioner was indicted in 2017 for crimes committed in 1998. (Record, ECF No. 7, PAGEID # 54-57.) A jury empaneled in the Court of Common Pleas of Muskingum County, Ohio, convicted him of six counts: kidnapping, rape, attempted murder, felonious assault, kidnapping in order to terrorize or to inflict serious physical harm, and kidnapping with sexual motivation.[1] (Id., PAGEID # 88-89.) The trial court [*3] also found

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DERRICK LEE CARDELLO-SMITH,#267009,
   Plaintiff,

                                  Case No 2:24-12647

Vs                              Hon. Judith Levy

SEAN COMBS,
   Defendant,
_____/

PLAINTIFFS CORRECTED, UPDATED AND TIMELY COPY
OF THE PLAINTIFFS ANSWERS TO DEFENDANTS
MOTION TO DISMISS WITH BRIEF IN SUPPORT
230 PAGES OF SUPPORTING CASES LAW, AND DOCUMENTS
PROOF OF SERVICE

   i swear and declare that on 11-27, 2024 I mailed one copy o
of the enclosed pleadings to the Defendants Attorney of
Record, Mr. David Fink-38500 Woodward Avenue, Bloomfield
Hills,MI 48304 by First Class Mail and this being done in
Muskegon, MI 49444


Thank you.

Mr. Derrick Lee Cardello-Smith
#267009
E.C. Brooks Correctional Facility
2500 S. Sheridan Drive
Muskegon, MI 49444

Derrick Lee Cardello-Smith
#267009
E.C. Brooks Correctional Facility
2500 S. Sheridan Drive
Muskegon, MI 49444

12-2-24

Office of the Clerk
United States District Court
Room 564
231 W. Lafayette Blvd
Detroit, MI 48226

    Re: Derrick Lee Cardello-Smith vs Sean Combs
    Case No 2:24-cv-12647

    Dear Clerk:

    Enclosed for filing in the above cause are documents I wish
to have placed on the docket for the case at bar.
    I have served proof of service upon the Defendants Lawyer of
Record on the same date of this filing by US Mail.

Thank you.

Mr. Derrick Lee Cardello-Smith

Mr. Derrick Lee Cardello-Smith
#267009
E.C. Brooks Correctional Facility
2500 S. Sheridan Drive
Muskegon, MI 49444

Mailed on 12-2-24

Case No 2:24-cv-12647

Office of the Clerk
United States District Court
Theodore Levin US Courthouse
231 W. Lafayette Blvd-Room 564
Detroit, MI 48226



US POSTAGE
$ 013.90°